*In The*
# United States Court of Appeals
## For The Fourth Circuit

### KIERAN RAVI BHATTACHARYA,

*Plaintiff – Appellant*,

**v.**

**JAMES B. MURRAY, JR., in his official capacity as Rector of the Board of Visitors of the University of Virginia; WHITTINGTON W. CLEMENT, in his official capacity as Vice Rector of the Board of Visitors of the University of Virginia; ROBERT M. BLUE; MARK T. BOWLES; L. D. BRITT, M.D., M.P.H.; FRANK M. CONNER, III; ELIZABETH M. CRANWELL; THOMAS A. DEPASQUALE; BARBARA J. FRIED; JOHN A. GRIFFIN; LOUIS S. HADDAD; ROBERT D. HARDIE; MAURICE A. JONES; BABUR B. LATEEF, M.D.; ANGELA HUCLES MANGANO; C. EVANS POSTON, JR.; JAMES V. REYES, in his official capacity as Member of the Board of Visitors of the University of Virginia; PETER C. BRUNJES, in his official capacity as Member of the Board of Visitors of the University of Virginia; MELISSA FIELDING, in her official capacity as Deputy Chief of Police of the University of Virginia; JOHN J. DENSMORE, M.D., Ph.D., in his official capacity as Associate Dean for Admissions and Student Affairs of the University of Virginia School of Medicine; JIM B. TUCKER, M.D., in his official capacity as Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine; CHRISTINE PETERSON, M.D., Assistant Dean for Medical Education of the University of Virginia School of Medicine; EVELYN R. FLEMING; CARLOS M. BROWN; LEWIS FRANKLIN (L. F.) PAYNE, JR.,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT CHARLOTTESVILLE**

---

**JOINT APPENDIX**
**VOLUME II OF VII**
**(Pages 377 – 836)**

---

| | |
|---|---|
| Michael J. Lockerby | Lucas W.E. Croslow |
| FOLEY & LARDNER LLP | Andrew N. Ferguson |
| 3000 K Street, NW, Suite 600 | Erika L. Maley |
| Washington, DC 20007 | OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA |
| (202) 945-6079 | 202 North 9th Street |
| | Richmond, Virginia 23219 |
| | (804) 786-7704 |
| *Counsel for Appellant* | *Counsel for Appellees* |

# TABLE OF CONTENTS

**VOLUME ONE**

District Court Docket Sheet ..................................................................JA1

Plaintiff's Complaint,
With Exhibits,
    Filed September 16, 2019 .......................................................JA85

Exhibits:

1.    Social Issues in Medicine Agency Evaluation of Student
        Undated ......................................................................JA134

2.    Student Performance Evaluation
        Dated September 12, 2016..................................................JA135

3.    Student Performance Evaluation
        Dated August 1, 2016 through December 18, 2016 ..........JA140

4.    University of Virginia Official Withdrawal Form
        Dated February 7, 2017......................................................JA143

5.    Student Performance Evaluation
        Dated March 26, 2018 through May 26, 2018...................JA145

6.    Student Performance Evaluation
        Dated January 1, 2018 through May 25, 2018...................JA150

7.    Policy on Academic and Professional Advancement
        Revised July 2018 ..............................................................JA153

8.    Concern Card
        Dated May 4, 2018.............................................................JA163

9.    1 Hour Audio Recording of Social Issues in Medicine
        Undated ..............................................................................JA164

<u>Exhibits</u>, continued:

10. Email Correspondence
      Various Dates ....................................................................JA165

11. Concern Card
      Dated October 25, 2018 ....................................................JA167

12. Email Correspondence
      Various Dates ....................................................................JA168

13. University of Virginia School of Medicine Minutes
      Dated November 14, 2018 ................................................JA170

14. Academic Standards and Achievement
    Commitment Operating Procedures
      Undated ............................................................................JA171

15. Redacted Jim Tucker's Bio
      Undated ............................................................................JA176

16. Redacted ASAC Committee Members
      Undated ............................................................................JA179

17. Information about Brian W. Behm, MD
      Undated ............................................................................JA181

18. Information about Donna T. Chem, M.D., MPH
      Undated ............................................................................JA183

19. Information about Stephen H. Culp, MD PhD
      Undated ............................................................................JA185

20. Information about Pamila Herrington, M.D.
      Undated ............................................................................JA186

21. Information about Nicolas Intagliata, MD
      Undated ............................................................................JA188

Exhibits, continued:

22.     Information about Dr. Nora Kern
         Undated .......................................................................... JA190

23.     Information about Wilson Miller, PhD
         Undated .......................................................................... JA191

24.     Information about Barnett R. Nathan, MD
         Undated .......................................................................... JA192

25.     Information about Catherine C. Shaffrey, MD
         Undated .......................................................................... JA194

Pretrial Order of
The Honorable Norman K. Moon
         Filed October 1, 2019 ..................................................... JA196

First Amended Complaint,
With Exhibits,
         Filed February 19, 2020 .................................................. JA203

Exhibits:

2.     Audio Recording of AMWA Microaggression Panel Discussion
         Dated October 25, 2018 ................................................... JA259

9.     Policy on Academic and Professional Advancement
         Revised July 2018 ............................................................ JA261

65.     Appeal to Trespass Warning
         Dated July 21, 2019 ........................................................ JA272

66.     Email Correspondence between
         Kieran Bhattacharya and Gloria Graham
         Re: Attached Trespass Appeal Decision
         Dated August 7, 2019 ...................................................... JA275

Memorandum Opinion of The Honorable Norman K. Moon
         Filed March 31, 2021 ....................................................... JA278

Order of
The Honorable Norman K. Moon
Re: Granting in Part and Denying in Part
Defendants' Motion to Dismiss
     Filed March 31, 2021.................................................................JA317

Report and Recommendations of
Magistrate Judge Joel C. Hoppe
     Filed November 12, 2021 ......................................................JA318

Plaintiff's Objections to Magistrate's Report and Recommendations
     Filed November 26, 2021 ......................................................JA339

Plaintiff's Reply Memorandum in Support of
Plaintiff's Objections to Magistrate's Report and Recommendations
     Filed December 17, 2021.......................................................JA352

Memorandum Opinion and Order of
The Honorable Norman K. Moon
Re: Granting in Part and Denying in Part Plaintiff's Motion for
Leave to File Second Amended Complaint and Adopting in
Part Magistrate Judge's Report and Recommendations
     Filed March 16, 2022............................................................JA366

**VOLUME TWO**

Second Amended Complaint,
With Exhibits,
     Filed March 24, 2022............................................................JA377

     Exhibits:

    1.    A Printout of the Website Posting under the Heading
        "New AMWA Chapter at the University of Virginia —
        First Event a Success!"
            Dated January 7, 2019......................................JA450

    2.    Audio Recording
            Dated October 25, 2018 ....................................JA456

Second Amended Complaint,
With Exhibits,
    Filed March 24, 2022, continued:

13.   Second Professionalism Concern Card
        Dated October 25, 2018 ....................................................JA458

28.   UVA Medical School's Webpage on "Medical Student Advocacy"
        Undated ............................................................................JA460

36.   Email to Kieran Bhattacharya from Jim Tucker
      Re:  Attached ASAC Letter
        dated November 15, 2018 ................................................JA463

37.   Email Correspondence between
      Kieran Bhattacharya and John Densmore
        dated November 26-27, 2019............................................JA466

38.   FIRE's Mission Statement
        Undated ............................................................................JA468

40.   Email to Kieran Bhattacharya from R. J. Canterbury
        Dated November 27, 2018 ................................................JA471

41.   Redacted Information about Randolph Canterbury
        Undated ............................................................................JA473

42.   Email to Kieran Bhattacharya from Katherine Yates
        Dated November 28, 2018 ................................................JA480

45.   Academic Standards and Achievement
      Committee Operating Procedures
        Undated ............................................................................JA482

46.   Verizon Telephone Call Log
        Dated November 28, 2018 ................................................JA488

53.   Email to Kieran Bhattacharya from Jim Tucker
      Re:  Attached ASAC Letter
        Dated November 29, 2018 ................................................JA490

Second Amended Complaint,
With Exhibits,
    Filed March 24, 2022, continued:

58.    Letter to Kieran Bhattacharya from Melissa Fielding
            Dated January 2, 2019........................................................JA494

59.    Email Correspondence between
       John Densmore and Kieran Bhattacharya
            Dated December 27, 2018 to January 3, 2019...................JA498

63.    Email to Kieran Bhattacharya from Melissa Fielding
            Dated July 18, 2019 ...........................................................JA501

Exhibit to Appeal of Magistrate Judge's Decision
    Filed April 6, 2022:

A.    Contact Notes of Call from Nicole Ruzek to Poplar Springs
            Dated November 20, 2018 ..................................................JA504

Exhibit to Plaintiff's Response to Dr. Hsu's Motion to Quash Verizon Subpoena
    Filed May 27, 2022:

C.    Excerpts of Deposition of Christine Peterson
            Heard on May 4, 2022 .......................................................JA505

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022:

DX1.  Redacted Videoconference Videotaped Deposition of
      Melissa Fielding
            Heard on April 27, 2022 ....................................................JA517

            Examination by Mr. Lockhart............................................JA528
            Examination by Ms. Thompson.........................................JA571

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

DX2.  Excerpts of Deposition of Kieran Ravi Bhattacharya
          Heard on May 23, 2022 ....................................................JA586

          Examination .......................................................................JA588

DX4.  Functions and Structure of a Medical School
        Standards for Accreditation of Medical Education
        Programs Leading to the MD Degree
          Dated July 1, 2018 ............................................................JA593

DX5.  University of Virginia Graduate Record of 2018-2019
          Dated June 30, 2021............................................................JA634

DX6.  Tech Standard Acknowledgements
          Undated ...............................................................................JA652

DX9.  Excerpts of Virtual Video Deposition of
        Pamila A. Herrington, M.D.
          Heard on May 12, 2022 ....................................................JA661

          Examination .......................................................................JA664

DX10.        Redacted Videotaped Deposition of John Densmore
          Heard on May 9, 2022 .......................................................JA669

          Examination by Mr. Lockerby................................JA676

DX11.        University of Virginia Official Withdrawal Form
          Dated February 7, 2017 and February 21, 2017......JA695

DX12.        Email Correspondence
          Various Dates............................................................JA697

DX13.        Redacted Virtual Video-recorded
        Deposition of Roxanne Bhattacharya
          Heard on April 23, 2022 .........................................JA700

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

DX15.        Email Correspondence
                Various Dates...........................................................JA730

DX16.        Redacted Declaration of Christine Peterson, M.D.,
             With Exhibits,
                Dated June 11, 2022 ................................................JA732

DX17,        Email to
             Victor Soukoulis from
             Christine M. Peterdon
             Re:  Student
                Dated September 2, 2015........................................JA738

DX18.        Audio File
                Undated...................................................................JA740

DX19.        Redacted Email Correspondence
                Various Dates...........................................................JA741

DX20.        Declaration of Nora G. Kern, M.D.
                Dated June 10, 2022 ...............................................JA745

DX20-A.      Concern Card
                Dated October 25, 2018...........................................JA751

DX21.        Email Correspondence
                Dated October 25, 2018...........................................JA755

DX22.        Email Correspondence
                Various Dates...........................................................JA758

DX23.        Redacted University of Virginia School of Medicine Minutes
                Dated November 14, 2018......................................JA761

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
Filed June 22, 2022, continued:

DX24.       University of Virginia Academic Standards and
            Achievement Committee Letter
                Dated November 15, 2018......................................JA763

DX25.       Email Correspondence
            Re:  HEME Final Update
                Dated November 12 2018.......................................JA766

DX26.       Email Correspondence
                Various Dates...........................................................JA769

DX27.       Redacted Letter to
            Justice Clark from
            Kieran Bhattacharya
            Re:  Introduction
                Dated November 25, 2018......................................JA771

DX29.       Redacted Petition for Involuntary Admission for Treatment
                Dated November 14, 2018......................................JA774

DX30.       Emergency Custody Order
                Dated November 14, 2021......................................JA777

DX31.       University of Virginia Police Department Field Case Report
                Dated November 14, 2018......................................JA779

DX32.       Incident Report
                Dated July 16, 2021 ...............................................JA781

DX33.       Redacted Petition for Involuntary Admission for Treatment
                Dated November 19, 2018......................................JA784

DX35.       Video
                Undated....................................................................JA791

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
Filed June 22, 2022, continued:

DX36.    Redacted Email to
         Internal Notification List, Gloria Graham and
         Patricia M. Lampkin
         Re:  Internal Notification – Assist Citizen CEO
              Dated November 19, 2019 ......................................JA792

DX37.    Excerpts of Videotape Zoom Deposition of
         Patrick L. Stafford, M.D.
              Heard on April 6, 2022 ...........................................JA794

DX38.    Redacted Temporary Detention Order – Magistrate
              Dated July 19, 2018 ...............................................JA798

DX39.    Report Information
              Undated ...................................................................JA800

DX40.    Order for Treatment
              Dated January 13, 2022 .........................................JA803

DX41.    Discharge Summary
              Dated November 26, 2018 .....................................JA807

DX42.    Student Participation in Curricular Events
              Dated June, 2019 ....................................................JA811

DX44.    Email Correspondence
              Various Dates ...........................................................JA815

DX45.    Email to
         Kieran Bhattacharya from
         R.J. Canterbury
         Re:  Required Process to Attend Class
              Dated November 27, 2011 ......................................JA817

DX46.    Email to
         R.J. Canterbury from

John J. Densmore
Re:  Update
Dated November 20, 2018........................................JA819

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
Filed June 22, 2022, continued:

DX47.          Email Correspondence
               Dated November 27, 2018........................................JA821

DX48.          Declaration of Randolph J. Canterbury, M.D.
               Dated June 9, 2022 ...................................................JA823

DX49.          Email to
               Jim Tucker from
               R.J. Canterbury
               Re:  Subject Emergency ASAC Meeting
               Dated November 27, 2011........................................JA827

DX50.          Email Correspondence
               Dated November 27, 2018........................................JA829

DX51.          Email to
               Kieran Bhattacharya from
               Katherine Yates
               Re:  ASAC Meeting Invite
               Dated November 18, 2018........................................JA832

DX52.          Video
               Undated...................................................................JA834

DX54.          Redacted University of Virginia School of Medicine Minutes
               Dated November 28, 2018........................................JA835

**VOLUME THREE**

DX55.          Redacted Deposition of Christine Peterson
               Heard on May 4, 2022 .............................................JA837

               Examination by Mr. Lockerby.................................JA849

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

DX56.        Letter to
             Kieran Bhattacharya from
             Jim B. Tucker
             Re:  School of Medicine's Technical Standards
                    Dated November 29, 2018 ....................................... JA870

DX58.        Redacted Declaration,
             With Exhibits,
                    Dated June 10, 2022 ................................................ JA873

DX59.        Redacted Email Correspondence
                    Dated December 30, 2018 ..................................... JA888

DX61.        Declaration of Jim B. Tucker, M.D.,
             With Exhibits,
                    Dated June 10, 2022 ................................................ JA891

DX63.        Trespass Warning
                    Dated January 2, 2019 ............................................ JA901

DX64.        Email Correspondence
                    Various Dates........................................................... JA905

DX65.        Email to
             Virginia Police from
             Kieran Bhattacharya
                    Dated January 8, 2019 ............................................ JA908

DX66.        Email to
             Kieran Bhattacharya from
             Gloria Graham
             Re:  Trespass Warning Correspondence
                    Dated January 11, 2019 ........................................... JA910

DX67.        Email Correspondence
                    Dated July 7, 2019 .................................................. JA912

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

DX68.       Email Correspondence
                Various Dates........................................................JA914

DX69.       Email Correspondence
                Various Dates........................................................JA916

DX70.       Email Correspondence
                Various Dates........................................................JA919

DX71.       Email Correspondence
                Various Dates........................................................JA923

DX72.       Email Correspondence
                Various Dates........................................................JA928

DX73.       Letter to
            Kieran Bhattacharya from
            Gloria Graham
            Re: Trespass Warning
                Dated August 7, 2019 ............................................JA931

DX75.       Declaration of Brian W. Behm
                Dated June 9, 2022 ................................................JA934

DX76.       Declaration of Robert A. Bloodgood
                Dated June 9, 2022 ................................................JA940

DX77.       Declaration of Sharon Diamond-Myrsten, M.D.
                Dated June 10, 2022 ..............................................JA945

DX78.       Declaration of Nicolas Intagliata
                Dated June 13, 2022 ..............................................JA951

DX79.       Declaration of G. Wilson Miller, Ph.D.
                Dated June 11, 2022 ..............................................JA957

Defendants' Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

DX80.    Declaration of Barnett R. Nathan
             Dated June 12, 2022 ................................................JA963

DX90.    Declaration of Dr. Roger Abounader
             Dated June 13, 2022 ................................................JA969

DX91.    Redacted Preadmission Face Sheet
             Dated November 19, 2018......................................JA975

DX93.    Redacted Emergency Custody Order
             Filed November 19, 2018 .......................................JA985

Memorandum in Support of Plaintiff's Motion to Compel Production of
Documents Withheld by UVA's "Hybrid" Non-Reporting Expert Witnesses,
With Exhibit,
    Filed July 2, 2022 .................................................................JA987

    Exhibit:

2.    Email Correspondence
          Dated November 29, 2018 ..............................................JA1015

Exhibits to Plaintiff's Opposition to
UVA's Motion for Summary Judgment
    Filed July 13, 2022:

PX2.  Email Correspondence
          Re:  Listening Post – General Evaluation
              Dated October 26, 2015 .................................JA1018

PX3.  Email Correspondence
          Re:  Listening Post – General Evaluation
              Dated October 28, 2016 .................................JA1020

Exhibits to Plaintiff's Opposition to
UVA's Motion for Summary Judgment
  Filed July 13, 2022, continued:

PX4.  Excerpts of Transcript of Videotaped Deposition of
      Christine Peterson
            Heard on May 4, 2022 ....................................JA1022

            Examination by Mr. Lockerby.........................JA1027

PX5.  Handwritten Notes
            Dated October 31, 2018 ................................JA1059

PX6.  Notes from Telephone Meeting with John Densmore
            Dated November 20, 2018 ..............................JA1062

PX7.  Email Correspondence
      Re:  Listening Post – General Evaluation
            Dated October 25-29, 2018..............................JA1065

PX8.  Randolph Canterbury Tweet
            Dated September 22, 2018..............................JA1068

PX9.  Excerpts of Transcript of Videotaped Deposition of
      John Densmore
            Heard on May 9, 2022 ....................................JA1070

            Examination by Mr. Lockerby ........................JA1075

PX11. Email Correspondence
      Re:  Listening Post – General Evaluation
            Dated October 26, 2016 ................................JA1083

PX12. Email Correspondence between
      Christine Peterson and Nicole Ruzek
            Dated November 19-20, 2018.........................JA1086

Exhibits to Plaintiff's Opposition to
UVA's Motion for Summary Judgment
Filed July 13, 2022, continued:

PX14.Excerpts of Transcript of Videotaped Deposition of
     Edward Markowski
          Heard on April 27, 2022 ..................................................JA1090

          Examination by Mr. Slovak ...........................................JA1095

PX15.Excerpts of Transcript of Videotaped Deposition of
     Nicole Ruzek, Ph. D.
          Heard on May 11, 2022 ..................................................JA1107

          Examination ..................................................................JA1112

PX19.Email to Meg Keeley, John Densmore, and Sean Reed from
     Christine Peterson
          Dated January 2, 2009....................................................JA1152

PX23.Email Exchange between Christine Peterson,
      Kieran Bhattacharya, and John Densmore
          Dated October 25-26, 2018.............................................JA1154

PX27.Excerpts of Transcript of Virtual Video Deposition of
     Pamila A. Herrington, M.D.
          Heard on May 12, 2022 ..................................................JA1156

          Examination ..................................................................JA1158

PX34.Email to Nicole Ruzek from Christine Peterson
          Dated November 28, 2014 ...............................................JA1170

PX39.University of Virginia Police Department Detail
          Dated December 10, 2021................................................JA1172

PX40.Email Correspondence between
     R. J. Canterbury and Jim Tucker
          Dated December 29-30, 2018 ..........................................JA1225

Exhibits to Plaintiff's Opposition to
UVA's Motion for Summary Judgment
     Filed July 13, 2022, continued:

     PX41. Email from J. R. Canterbury
          Dated November 3, 2020 .................................................JA1229

     PX42. Excerpts of Transcript of Videotaped Deposition of
          Randolph Canterbury, M.D.
          Heard on May 24, 2022 ...................................................JA1231

          Examination by Mr. Munisteri.........................................JA1236

     PX43. Email to Kieran R. Bhattacharya from R. J. Canterbury
          Dated November 27, 2018 ...............................................JA1252

Memorandum Opinion of
The Honorable Norman K. Moon
Re: Denying Plaintiff's Appeals of Judge Hoppe's Discovery Orders, Granting
Defendant Rasmussen's Motion to Dismiss, and Granting in Full the UVA
Defendants' Motion for Judgment on the Pleadings
     Filed July 21, 2022 ...............................................................JA1254

Corrected Exhibit 13 to Opposition to UVA's
Motion for Summary Judgment,
With Exhibit,
     Filed July 27, 2022 ...............................................................JA1266

Transcript of Motion for Summary Judgment before
The Honorable Norman K. Moon
     Heard on August 15, 2022 ...................................................JA1269

Memorandum Opinion of
The Honorable Norman K. Moon
     Filed August 19, 2022.........................................................JA1312

Order of
The Honorable Norman K. Moon
Re: Granting UVA's Motion for Summary Judgment
     Filed August 19, 2022.........................................................JA1332

Administrative Order of
The Honorable Norman K. Moon
Re: Closing Case
     Filed September 30, 2022 ....................................................................JA1333

Plaintiff's Notice of Appeal
     Filed October 3, 2022 .........................................................................JA1334

**VOLUME FOUR (SEALED)**

Exhibit to Plaintiff's Motion for Leave to File Second Amended Complaint
     Filed June 10, 2021:

     A.     Proposed Second Amended Complaint
             Dated June 10, 2021.........................................................JA1336
Exhibit to Plaintiff's Opposition to Defendants' Joint Motion to Compel
     Filed November 17, 2021:

     10.    Email Correspondence
             Dated November 20, 2018 ...............................................JA1423

Exhibits to Defendants' Joint Reply to Plaintiff's Opposition to
Defendants' Joint Motion to Compel
     Filed November 19, 2021:

     A.     Petition for Involuntary Admission for Treatment
             Undated ............................................................................JA1425

     B.     Emergency Custody Order
             Dated November 14, 2018 ...............................................JA1426

Exhibit to Plaintiff's Objections to Magistrate's Report and Recommendations
     Filed November 26, 2021:

     A.     Letter from
           Christine M. Peterson, MD
           Re: Angel Hsu's Request for Legal Protection from the
           Aggressive Behavior
             Dated November 23, 2018 ...............................................JA1427

Exhibits to Plaintiff's Objections to Magistrate's Reports and Recommendations
        Filed November 29, 2021:

    B.    Fed. R. Evid. 1006 Summary of Angel Hsu's Involvement in
          Alleged Triggering Event Number One
                Undated ........................................................................JA1429

    C.    Fed. R. Evid. 1006 Summary of Angel Hsu's Involvement in
          Alleged Triggering Event Number Two
                Undated ........................................................................JA1459

    D.    Fed. R. Evid. 1006 Summary of Angel Hsu's Involvement in
          Alleged Triggering Event Number Three
                Undated ........................................................................JA1464

    E.    Fed. R. Evid. 1006 Summary of Angel Hsu's Involvement in
          Alleged Triggering Event Number Four
                Undated ........................................................................JA1467

    F.    Fed. R. Evid. 1006 Summary of Angel Hsu's Involvement in
          Alleged Triggering Event Number Five
                Undated ........................................................................JA1468

Exhibit to Plaintiff's Memorandum in Support of Motion to Remediate
Defendants' Spoilation of Evidence and Amend Scheduling Order
        Filed February 7, 2022:

    D.    Email Correspondence
                dated November 27, 2018 ................................................JA1470


    F.    Email Correspondence
                Various Dates................................................................JA1472

Exhibit to Plaintiff's Reply to UVA Defendants' Opposition to Plaintiff's
Spoilation Remediation Motion
        Filed February 25, 2022(301):

    9.    Email Correspondence

Various Dates ................................................................JA1487

Exhibits to Plaintiff's Opposition to the UVA Defendants'
Motion for Protective Order
    Filed April 20, 2022(368):

    D.    Text Messages
            Dated October 28, 2018 ....................................JA1494

    N.    Email Correspondence
            Various Dates ....................................................JA1496

Defendants' Sealed Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022:

    DX8. ED in UVA Emergency Department
            Dated November 19, 2018 ................................JA1500

## VOLUME FIVE (SEALED)

Defendants' Sealed Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

    DX8. ED in UVA Emergency Department
            Dated November 19, 2018, continued ..............JA1837

## VOLUME SIX (SEALED)

Defendants' Sealed Exhibits to Memorandum in
Support of Defendants' Motion for Summary Judgment
    Filed June 22, 2022, continued:

    DX8. ED in UVA Emergency Department
            Dated November 19, 2018, continued ..............JA2338

    DX14.    Medical School Record
            Dated October 11, 2019 ....................................JA2617

DX28.        Summary of Note for Kieran R. Bhattacharya
             Dated November 14, 2018....................................JA2619

DX34.        Declaration of Angel Hsu, M.D.
             Dated June 9, 2022 ................................................JA2690

DX34-B.      Photograph/Screen Capture
             undated................................................................JA2694

DX34-C.      Text Messages
             Various Dates.........................................................JA2697

DX34-D.      Preliminary Protective Orders – Family Abuse
             Dated November 26, 2018....................................JA2701

DX34-E.      LinkedIn Messages
             Dated July 5, 2019 ................................................JA2712

DX34-F.      Protective Order – Family Abuse
             Dated September 20, 2019....................................JA2717

DX57.        Meeting Notes
             Dated April 2, 2019 ..............................................JA2722

Plaintiff's Opposition to UVA's Motion for Summary Judgment
     Filed July 13, 2022 ...............................................................JA2739

Exhibits to Plaintiff's Amended Opposition to
UVA's Motion for Summary Judgment
     Filed July 13, 2022:

     PX10.Handwritten Notes
           Dated January 10, 2017....................................JA2797

     PX17.Email Correspondence between
          Christine Peterson and Tabitha Enoch
           Dated November 30, 2018 ................................JA2800

     PX21.University of Virginia Progress Notes
           Dated January 8-21, 2017 ................................JA2806

Exhibits to Plaintiff's Amended Opposition to
UVA's Motion for Summary Judgment
Filed July 13, 2022, continued:

PX22. Declaration of Kieran Ravi Bhattacharya
      Dated July 12, 2022 ........................................................JA2808

PX24. Communications to and from John Densmore
      Various Dates.................................................................JA2815

PX25. Text Messages
      Undated .........................................................................JA2817

PX33. Email Correspondence
      Dated November 20-26, 2018.........................................JA2819

PX46.    Email Correspondence between
         Tabitha Enoch and Christine Peterson
         Dated November 29, 2018...................................JA2832

**VOLUME SEVEN (MEDIA)**

Exhibit to First Amended Complaint
Filed February 19, 2020:

2.       Audio Recording of AMWA Microaggression Panel Discussion
         Dated October 25, 2018 ...................................................JA2836

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **KIERAN RAVI BHATTACHARYA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **WHITTINGTON W. CLEMENT, Rector,** | ) |
| **ROBERT D. HARDIE, Vice Rector, and** | ) |
| **ROBERT M. BLUE, MARK T. BOWLES, L.D.** | ) |
| **BRITT, M.D., M.P.H., CARLOS M. BROWN,** | ) |
| **FRANK M. CONNER III, ELIZABETH M.** | ) |
| **CRANWELL, THOMAS A. DEPASQUALE,** | ) |
| **BARBARA J. FRIED, LOUIS S. HADDAD,** | ) |
| **BABUR B. LATEEF, M.D., ANGELA HUCLES** | ) |
| **MANGANO, JAMES B. MURRAY JR., LEWIS** | ) |
| **FRANKLIN (L.F.) PAYNE JR., C. EVANS** | ) **Civil Action No.** |
| **POSTON JR., and JAMES V. REYES, Members** | ) **3:19-CV-00054-NRM-JCH** |
| **of the Board of Visitors, University of Virginia, in** | ) |
| **their respective official capacities; TIMOTHY** | ) **JURY TRIAL DEMANDED** |
| **LONGO SR., Chief of Police and Associate Vice** | ) |
| **President for Safety, and MELISSA FIELDING,** | ) |
| **Deputy Chief of Police, University of Virginia, in** | ) |
| **their respective official capacities; JIM B.** | ) |
| **TUCKER, M.D., Chair of the Academic** | ) |
| **Standards and Achievement Committee of the** | ) |
| **University of Virginia School of Medicine, in his** | ) |
| **official capacity; and JOHN J. DENSMORE,** | ) |
| **M.D., Ph.D., Associate Dean for Admissions and** | ) |
| **Student Affairs, CHRISTINE PETERSON, M.D.,** | ) |
| **Former Assistant Dean for Medical Education,** | ) |
| **NORA KERN, M.D., and SARA K.** | ) |
| **RASMUSSEN, M.D., Ph.D. of the University of** | ) |
| **Virginia School of Medicine, each in his or her** | ) |
| **official and individual capacity,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**SECOND AMENDED COMPLAINT**

4865-8896-4888.3

JA377

Plaintiff Kieran Ravi Bhattacharya ("Mr. Bhattacharya"), by counsel, respectfully states as for his Second Amended Complaint against the following Defendants: (1) the Rector, Vice Rector, and Members of the Board of Visitors of the University of Virginia, all of whom are named in their respective official capacities (collectively, the "Board of Visitors Defendants"), along with Timothy Longo, Sr., Chief of Police and Associate Vice President for Safety of the University of Virginia, who is named in his official capacity ("Mr. Longo"), and Melissa Fielding, Deputy Chief of Police of the University of Virginia, who is named in her official capacity ("Ms. Fielding") (collectively, the "University Defendants"); (2) Jim B. Tucker, M.D., Chair of the Academic Standards and Achievement Committee, University of Virginia School of Medicine ("Dr. Tucker"), who is named in his official capacity; and (3) John J. Densmore, M.D., Ph.D., Associate Dean for Admissions and Student Affairs, University of Virginia School of Medicine ("Dean Densmore"), Christine Peterson, M.D., Former Assistant Dean for Medical Education, University of Virginia School of Medicine ("Dean Peterson"), Nora Kern, M.D., Associate Professor of Urology, University of Virginia School of Medicine ("Professor Kern"), and Sara K. Rasmussen, M.D., Ph.D., former Associate Professor, University of Virginia School of Medicine ("Professor Rasmussen"), each of whom is named in his or her official capacity and in in his or her individual capacity (collectively, the "UVA Med School Individual Defendants") (together with Dr. Tucker, the "UVA Med School Defendants").

## NATURE OF THE ACTION

1.      This Complaint seeks redress for the violation of Plaintiff's constitutional rights by the University of Virginia, which was founded more than 200 years ago by Thomas Jefferson. Before founding the University of Virginia—during the time that ratification of the Constitution was being debated—Mr. Jefferson wrote a December 20, 1787 letter to James Madison expressing the view that "a bill of rights is what the people are entitled to against every government on earth, general

1

or particular, and what no just government should refuse." Of the various provisions of the Bill of Rights that later became part of the Constitution of the United States, the First Amendment's guarantee of free speech is of paramount importance to the mission of any public university, including the University of Virginia. Ever since enactment of the Fourteenth Amendment in 1868, the guarantee of free speech has applied with equal force to the several States—including the Commonwealth of Virginia and state agencies such as the University of Virginia.

2.    If its treatment of Mr. Bhattacharya is any indication, however, the University that Mr. Jefferson founded now seems to think that it is above the law of the land, including the Bill of Rights. The UVA Med School Defendants—at the behest of the Non-Party Speech Suppressors and others—have acted to deprive and have in fact deprived Mr. Bhattacharya of his right to free speech protected by the First Amendment.

3.    Before the UVA Med School Defendants violated his civil rights, Mr. Bhattacharya was a student enrolled in the University of Virginia School of Medicine ("UVA Med School"). All that changed, however, as a result of Mr. Bhattacharya's questions and comments during an October 25, 2018 panel discussion on "microaggression" (the "AWMA Microaggression Panel Discussion") sponsored by the newly formed UVA Med School chapter of the American Medical Women's Association ("AMWA").[1] At the time of the October 25, 2018 AWMA Microaggression Panel Discussion, Mr. Bhattacharya was a second-year medical student in good standing at UVA Med School. Nevertheless—in retaliation for his questions and comments at the AWMA Microaggression Panel Discussion to which the UVA Med School Individual Defendants and the

---

[1]On January 7, 2019, the AMWA posted on its website a description of the AMWA Microaggression Panel Discussion proclaiming it to have been a "success." A printout of the website posting under the heading "New AMWA Chapter at the University of Virginia — First Event a Success!" (https://www.amwa-doc.org/news/new-amwa-chapter-at-the-university-of-virginia) (New AMWA Chapter at the University of Virginia — First Event a Success! - American Medical Women's Association (archive.ph)) is attached as **Exhibit 1**.

2

Non-Party Speech Suppressors objected—Mr. Bhattacharya was disciplined, suspended, and ultimately banished altogether from UVA Med School.  As a result, Mr. Bhattacharya is now unable to pursue his chosen career in medicine.

4.      The organizers of the AWMA Microaggression Panel Discussion included two of the UVA Med School Individual Defendants, Professors Kern and Rasmussen, both of whom were also panelists at the October 25, 2018 event.  Following a presentation by Associate Professor of Psychology at the University of Virginia—Beverly Colwell Adams, Ph.D. ("Professor Adams")—Mr. Bhattacharya asked questions and made comments that organizers of the AWMA Microaggression Panel Discussion later characterized as "antagonistic."  The audio recording of the AMWA Microaggression Panel Discussion (attached as **Exhibit 2**) demonstrates that this characterization is neither fair nor accurate.  The audio recording establishes that Mr. Bhattacharya and the speaker, Professor Adams, had a rational and calm discussion about the theory of microaggression.  The only person whose behavior was questionable was one of the two AMWA members on the panel, UVA Med School Individual Defendant Professor Rasmussen.  Professor Rasmussen interrupted the dialogue between Mr. Bhattacharya and Professor Adams, launched into a diatribe about microaggressions that she personally had experienced as a native of West Virginia, and raised her voice in anger at Mr. Bhattacharya before cutting him off altogether.  Ultimately, however, it is immaterial whether UVA Med School's characterization of Mr. Bhattacharya's questions and comments as "antagonistic" is a fair one.  The First Amendment does not permit the government to censor speech that it considers to be antagonistic.

5.      Unfortunately for Mr. Bhattacharya, Professor Rasmussen's angry outburst at the AMWA Microaggression Panel Discussion was just the beginning rather than the end of UVA Med School's efforts—so far successful—to silence and punish anyone who dared to even question the

4865-8896-4888.3

JA380

theories being espoused that day.  Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion were not the first time that exercising his free speech rights had attracted the attention and ire of certain UVA Med School students, faculty, and administrators, many of whom disagreed with the political views that Mr. Bhattacharya had expressed during two UVA Med School "town hall" meetings around the time of the November 2016 election.  At one of these meetings, Mr. Bhattacharya disagreed with a comment made by Randolph J. Canterbury, M.D., former Professor of Psychiatric Medicine and Internal Medicine and Senior Associate Dean for Education of the University of Virginia School of Medicine ("Dean Canterbury").  This time, the UVA Med School "thought police" were determined not to let Mr. Bhattacharya's free speech go unpunished.

6.     Less than two hours after the AMWA Microaggression Panel Discussion, UVA Med School began to receive complaints about Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion from the individuals identified herein as the Non-Party Speech Suppressors.  The first such documented complaint, from someone who "was not in attendance," was an email to Dean Densmore stating that the Non-Party Speech Suppressor had "received several notes and direct conversations from students who are expressly concerned regarding one of our classmates and the way he interacted during the Q&A portion of the panel at lunch today" and that "it has been noted that Kieran Bhattacharya was extremely aggressive and confrontational in the manner he questioned the panelist, to the point of being quite disrespectful." Another complaint from a student at UVA Med School, which was forwarded to Dean Densmore by a UVA Med School faculty member, stated:

> During the micro-aggression talk hosted by AMWA yesterday, Kieran engaged in a line of questioning that was viewed by many to be combative and aggressive against the panelists.  This incident made many in the class feel rather uncomfortable.

4

7.     Other complaints came in through the UVA Med School Office of Medical Student Advocacy, which provides various ways for students to submit "anonymous, in-person, or phone reports of mistreatment or unprofessional behavior."   One way is to contact Lesley Thomas, Assistant Dean for Medical Education of the University of Virginia School of Medicine ("Dean Thomas").   According to UVA Med School's webpage on "Medical Student Advocacy" (attached as **Exhibit 28**), Dean Thomas is "available to hear reports of mistreatment," including "reports involv[ing] sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior directed at students."   Another way is through an on-line "Listening Post," which allows students to submit anonymous "reports of mistreatment," including "sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior."  Upon receipt of such an anonymous report, the "Listening Post" immediately forwarded it to two individuals: Elizabeth B. Bradley, Ph.D., Associate Professor and Director of Evaluation at UVA Med School, and Dean Thomas.   In October 2018, Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion were the subject of at least two anonymous complaints to the "Listening Post," as follows:

a.     The first anonymous complaint, on the subject "unprofessional behavior," stated that Mr. Bhattacharya "was very disrespectful to the panelists in his tone and matter of questioning."   This complaint stated that Mr. Bhattacharya "repeatedly interrupted the speakers."    As the audio recording shows, this statement was inaccurate.   Rather, Mr. Bhattacharya waited until the presentation was over to ask questions during a time expressly reserved for that purpose.  As the audio recording also shows, UVA Med School Individual Defendant Professor Rasmussen was the one who interrupted Mr. Bhattacharya—not the

5

other way around.  This anonymous report also complained that Mr. Bhattacharya had "called the legitimacy of one panelist's research into question."

      b.     The second anonymous complaint, which Dean Thomas forwarded to Dean Canterbury and Dean Densmore, stated that Mr. Bhattacharya "was extremely disrespectful, unprofessional, and condescending to the speaker."  This complaint reported that Mr. Bhattacharya "interrupted [the speaker] on multiple occasions."   Again, this statement was incorrect, as the audio recording shows.  The second anonymous complaint also reported that Mr. Bhattacharya had "questioned the validity of the information that [the speaker] had presented, all over the microphone for the entire audience to hear."

In response to one of the anonymous complaints, Dean Canterbury wrote to Dean Densmore—with a copy to Dean Thomas—"I think this is the equivalent of a concern card."  The "concern card" to which Dean Canterbury was referring was a "Professionalism Concern Card" or "PCC" used to document various forms of misconduct, including unexcused absences and violations of professionalism, in student files at UVA Med School.  As it turns out, the UVA Med School Individual Defendants had already seen to it that Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion were the subject of an *actual* Professionalism Concern Card.

      8.     On October 25, 2018, two minutes after complaining to Dean Densmore about Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion, Non-Party Speech Suppressor No. 1 sent Mr. Bhattacharya a text message stating that he "heard there was a pretty passionate debate this afternoon and was a little concerned."  While thanking Non-Party Speech Suppressor No. 1 for his concern, Mr. Bhattacharya declined this individual's invitation to "chat" about it.  The same day as the AMWA Microaggression Panel Discussion, one of the UVA

6

JA383

Med School faculty members who was also a member of the AMWA Microaggression Panel Discussion—UVA Med School Individual Defendant Professor Kern—surreptitiously lodged a Professionalism Concern Card against Mr. Bhattacharya, citing him for asking a "series of questions that were quite antagonistic toward the panel." The fact that Mr. Bhattacharya's Student File now included a Professionalism Concern Card was never disclosed to Mr. Bhattacharya as required by UVA Med School's own policies and procedures.

9.      On October 25, 2018, within approximately 30 minutes of Non-Party Speech Suppressor No. 1's communications with Dean Densmore and Mr. Bhattacharya, UVA Med School Individual Defendant Dean Peterson "invited" Mr. Bhattacharya to a meeting for the stated purpose of "help[ing] you understand and be able to cope with unintended consequences of conversations." Although Dean Peterson never disclosed this during their subsequent meeting on October 31, 2018, one of the "unintended consequences" to which she was referring included the formal discipline that Mr. Bhattacharya was soon to receive. This discipline was the result of two later meetings of UVA Med School's Academic Standards and Achievement Committee ("ASAC" or the "Committee") in which Dean Peterson participated even though she is not now and was not at the time a member of the Committee.

10.      The first such Committee meeting, which took place on November 14, 2018, was a secret meeting to consider the Professionalism Concern Card lodged by UVA Med School Individual Defendant Professor Kern. Professor Kern also happened to be a member of the Committee and—along with UVA Med School Individual Defendant Dean Peterson—was present for its deliberations. During this November 14, 2018 meeting, of which Mr. Bhattacharya had no notice, the Committee did not bother to listen to the actual audio recording of the AMWA Microaggression Panel Discussion. Instead, the Committee relied upon Professor Kern's characterization of Mr.

4865-8896-4888.3

Bhattacharya's questions and comments as the basis for its decision to reprimand Mr. Bhattacharya and place the imprimatur of ASAC on Professor Kern's Professionalism Concern Card.

11.     The reprimand from ASAC took the form of a letter the following day signed by Committee Chair Dr. Tucker.  By correspondence dated November 15, 2018, UVA Med School admonished Mr. Bhattacharya to "show mutual respect to all" and "express [his opinions] in appropriate ways" and advised him to "consider getting counseling" to improve his communication skills.  By the end of Thanksgiving break, however, UVA Med School's advice to "consider getting counseling" had become a prerequisite for Mr. Bhattacharya to continue his medical school education.  On November 26, 2018, Mr. Bhattacharya was notified by email that he needed to be evaluated by a counselor or psychiatrist before he could return to his classes at UVA Med School. The following day, November 27, 2018, Mr. Bhattacharya was notified that he could not resume his studies until he had undergone psychological evaluation and received "medical clearance."

12.     Two days later—following a hastily convened "emergency" meeting of the Academic Standards and Achievement Committee on November 28, 2018—Mr. Bhattacharya received correspondence dated November 29, 2018 notifying him that he had been suspended from UVA Med School until August 2019 because "your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards."  Thereafter, Mr. Bhattacharya was denied the opportunity to appeal the one-year suspension or apply for readmission because the University of Virginia Police Department issued a No Trespass Order to Mr. Bhattacharya for a four-year period.  In short, Mr. Bhattacharya's comments and questions during the AMWA Microaggression Panel Discussion—"antagonistic" or not—resulted in his permanent exile to the UVA Med School equivalent of Siberia.

4865-8896-4888.3

JA385

13.     The foregoing events—which became a matter of public record when Mr. Bhattacharya filed his original *pro se* Complaint in September 2019—are just the tip of the proverbial iceberg.  Other, previously undisclosed events show that UVA Med School responded to Mr. Bhattacharya's dissident speech in a manner reminiscent of the infamous "treatment" of dissidents in psychiatric hospitals in the former Soviet Union.  For example:

a.      On November 14, 2018, the morning of the ASAC meeting that resulted in the issuance of the written directive to "consider getting counseling," Dean Densmore coerced Mr. Bhattacharya to undergo a psychiatric "evaluation" by CAPS (an acronym for "Counseling and Psychological Services" at the Elson Student Health Center of the University of Virginia).  The Licensed Professional Counselor responsible for the evaluation, Catherine L. Richard ("Ms. Richard"), is now in private practice, according to the website www.therapyden.com/therapist/katie-richard-charlottesville-va (Katie Richard, Charlottesville Therapist - TherapyDen (archive.ph)) (a printout of which is attached as **Exhibit 67**).  The website describes Ms. Richard's "background and approach" and "personal beliefs and interests" and states that "I strive to bring a feminist, social justice, and antiracist lens to my work."  The topics of discussion during Ms. Richard's November 14, 2018 interrogation of Mr. Bhattacharya's included and focused primarily on his questions and comments during the AMWA Microaggression Panel Discussion along with Mr. Bhattacharya's political views generally.

b.      After three hours of interrogation, Ms. Richard reported that Mr. Bhattacharya made "sexist, demeaning remarks" and signed an Emergency Custody Order ("ECO").  Thereafter, Mr. Bhattacharya was handcuffed and transported in the back of a police car to the Emergency Department at UVA Medical Center to meet with a graduate student in the

9

University of Virginia School of Social Work who would decide whether to issue a Temporary Detention Order ("TDO"). A TDO requires immediate hospitalization of an individual for further evaluation and stabilization, on an involuntary basis, until a commitment hearing can be arranged to determine the patient's future treatment needs.

c.   Shortly before the scheduled TDO meeting on November 14, 2018, Mr. Bhattacharya was involuntarily and forcibly given an intramuscular injection of 5 mg of Haldol (haloperidol) and 2 mg of Ativan (lorazepam). The pretext for the injection, which violated Virginia Code §§ 37.2-1104 and 37.2-809, was that Mr. Bhattacharya had refused bloodwork—which he had the legal right to do before issuance of the TDO. As a result of this forcible and involuntary rapid tranquilization, Mr. Bhattacharya collapsed in the middle of his meeting with the graduate student. The graduate student submitted written reports recommending issuance of the TDO, and Mr. Bhattacharya later awoke to find himself in the psychiatric ward of UVA Medical Center. At that point, a hearing was scheduled to take place on November 16, 2018 before Special Justice Robert Clarke—who was responsible for the psychiatric ward—to determine whether Mr. Bhattacharya should be involuntarily committed for an indefinite period of time.

d.   During this hospitalization, Mr. Bhattacharya was under the care of Pamila Herrington, M.D. ("Dr. Herrington"), a member of ASAC who participated in the November 14, 2018 ASAC meeting that resulted in the November 15, 2018 reprimand. After meeting with Mr. Bhattacharya on November 15, 2018, Dr. Herrington wrote in his medical records that Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion were "manic" to provide evidence for the necessity of Mr. Bhattacharya's involuntary hospitalization at the upcoming involuntary commitment hearing.

4865-8896-4888.3

e.      On November 15, 2018, a nurse at UVA Medical Center transcribed Mr. Bhattacharya's side of the story and submitted it in writing to the Special Justice.

f.      On November 16, 2018, Mr. Bhattacharya was notified that he would be released immediately and that there would be no involuntary commitment hearing.

g.      Following Mr. Bhattacharya's release on November 16, 2018, Dean Densmore and Dean Peterson—acting in conjunction with others—redoubled their efforts to punish Mr. Bhattacharya for his questions and comments during the AMWA Microaggression Panel Discussion.   They made demonstrably false claims that Mr. Bhattacharya was a threat to himself and others and enlisted unwitting third parties (including members of Mr. Bhattacharya's family) in the process.  As a result, on November 19, 2018 at 12:50 p.m., Mr. Bhattacharya was picked up from the Claude Moore Health Sciences Library by the City of Charlottesville Police, University of Virginia Police, and University of Virginia Health System security officers and forcibly transported to the Emergency Department at UVA Medical Center, where he arrived at 1:01 p.m.  Thereafter he was once again tranquilized for refusing bloodwork under the Emergency Custody Order that had been issued on November 19, 2018 at 11:41 a.m.  This time, however, Defendants arranged for Mr. Bhattacharya's immediate transfer to a private psychiatric hospital nearly 100 miles away in Petersburg, Virginia, where someone other than Special Justice Robert Clarke at UVA Medical Center would decide whether Mr. Bhattacharya should be involuntarily committed.

h.      Following the November 19, 2018 TDO deliberations—during which Mr. Bhattacharya was unconscious, having been rapidly tranquilized once again—Mr.

11

4865-8896-4888.3

Bhattacharya awoke in the back of a police car that was transporting him to a private psychiatric hospital in Petersburg.

  i.  On November 21, 2018, a Special Justice in Petersburg—citing the fact that Mr. Bhattacharya had been the subject of two TDOs in less than a week—ordered that Mr. Bhattacharya be involuntarily committed.

  j.  After several days of evaluation, Mr. Bhattacharya was released on November 26, 2018 with no restrictions and no orders for further treatment.

  k.  Both times that Mr. Bhattacharya was hospitalized (collectively, "the November 14, 2018 and November 19, 2018 Forced Psychiatric Evaluations"), those who evaluated him found that he was no threat to himself and others.  Nor did they find any evidence that he exhibited homicidal ideations or suicidal ideations or that he had any history of or propensity for violence.  The November 14, 2018 and November 19, 2018 Forced Psychiatric Evaluations were not sufficient for the UVA Med School Defendants, however. Upon learning of Mr. Bhattacharya's release and impending return to UVA Med School after the Thanksgiving break, on November 26 and 27, 2018, the UVA Med School Defendants insisted that he undergo psychiatric evaluation a third time and then convened the "emergency" ASAC meeting on November 28, 2018 that resulted in his indefinite suspension (which later became permanent) on November 29, 2018, as described in ¶¶ 11 and 12.

  14.  Defendants' subsequent retaliation for Mr. Bhattacharya's questions and comments during the AMWA Microaggression Panel Discussion was not limited to the subsequent four-year No Trespass Order issued by the University of Virginia Police whereby Mr. Bhattacharya was denied the opportunity to appeal his suspension from UVA Med School or apply for readmission.  For example:

4865-8896-4888.3

a.      On December 30, 2018, someone claiming to be from the University of

Virginia Police called Mr. Bhattacharya's father from 434-924-6303, a telephone number

listed as being assigned to the University of Virginia.  The caller demanded to know Mr.

Bhattacharya's whereabouts, suggested that Mr. Bhattacharya may need further mental

health evaluation, and claimed that Mr. Bhattacharya may be criminally involved with some

type of "alt-right, storm front" extremist group.

b.      On January 15, 2019, Mr. Bhattacharya's father received an anonymous call

from 434-243-3609.   The caller demanded information regarding Mr. Bhattacharya's

whereabouts and/or his plans to be in or near the City of Charlottesville.  Mr. Bhattacharya's

father received another anonymous call on February 1, 2019, from 434-243-3610.

15.     Since his suspension from UVA Med School and the filing of this litigation, Mr.

Bhattacharya has sought to pursue his interest in medicine by, for example, obtaining the national

certifications and completing the academic requirements to work as an Emergency Medical

Technician ("EMT").   Applying for state certification, however, would require disclosure of his

suspension and expulsion from UVA Med School.  The same would be true if he applied to any

educational institution, including medical school.  Without the relief sought in this Complaint, Mr.

Bhattacharya cannot complete his medical education—much less become a licensed physician.

13

JA390

**PARTIES**

(**Plaintiff**)

16.     Kieran Ravi Bhattacharya ("Mr. Bhattacharya") is a resident of Hawai'i who was a student at the University of Virginia School of Medicine before his suspension.

(**The University Defendants**)

17.     The University of Virginia is a public university owned and operated by the government of the Commonwealth of Virginia.

18.     The Rector, Vice Rector, and Members of the Board of Visitors of the University of Virginia (collectively, the "Board of Visitors Defendants") are, and were at all times relevant to this Complaint, officials of the University of Virginia responsible for the adoption and enforcement of policies applicable to students attending the University of Virginia—including policies to ensure that students' rights of free speech are protected.

19.     Timothy Longo, Sr., Chief of Police and Assistant Vice President for Safety and Security of the University of Virginia ("Mr. Longo"), is responsible for overseeing safety and security functions of the University of Virginia and enforcing no trespass orders.

20.     Melissa Fielding, Deputy Chief of Police of the University of Virginia ("Ms. Fielding"), was at all times relevant to this Complaint a member of the police force at the University of Virginia with responsibility for overseeing safety and security functions of the University of Virginia.

21.     Each of the Board of Visitors Defendants, Mr. Longo, and Ms. Fielding (collectively, the "University Defendants") is sued in his or her official capacity for injunctive and declaratory relief and for damages resulting from the acts and omissions alleged in this Complaint.

4865-8896-4888.3

JA391

**(<u>The UVA Med School Defendants</u>)**

**(Dr. Tucker)**

22.     Jim B. Tucker, M.D. ("Dr. Tucker") is Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine and Director of the "Division of Perceptual Studies" in the University of Virginia Health System's Department of Psychiatry & Neurobehavioral Sciences.  The "Division of Perceptual Studies" is, according its website, "a highly productive university-based research group devoted to the investigation of phenomena that challenge mainstream scientific paradigms regarding the nature of the mind/brain relationship."

23.     The University of Virginia School of Medicine ("UVA Med School") is a public medical college that is part of the University of Virginia.

24.     Dr. Tucker is a member of the faculty and administration of UVA Med School responsible for the adoption and enforcement of policies applicable to students attending UVA Med School—specifically including UVA Med School's Policy on Academic and Professional Enhancement and, more generally, policies to ensure that medical students' rights of free speech.

25.     Dr. Tucker is sued in his official capacity for injunctive and declaratory relief and for damages resulting from the acts and omissions alleged in this Complaint.

**(The UVA Med School Individual Defendants)**

26.     John J. Densmore, M.D., Ph.D. ("Dean Densmore") is Associate Dean for Admissions and Student Affairs, University of Virginia School of Medicine, according to his publicly available biography attached as **Exhibit 68**.

27.     Christine Peterson, M.D. is former Assistant Dean for Medical Education, University of Virginia School of Medicine ("Dean Peterson"), according to her publicly available biography attached as **Exhibit 33**.

15

JA392

28.     Nora Kern, M.D. ("Professor Kern") is an Associate Professor of Urology at the University of Virginia School of Medicine, according to her publicly available biography attached as **Exhibit 18**.  Professor Kern was formerly a member of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine.

29.     Sara K. Rasmussen, M.D., Ph.D. ("Professor Rasmussen") was an Associate Professor at the University of Virginia School of Medicine at the time of the AMWA Microaggression Panel Discussion.

30.     Professor Kern and Professor Rasmussen are both members of AMWA who helped organize and participated in the AMWA Microaggression Panel Discussion.

31.     As members of the faculty of UVA Med School, the UVA Med School Individual Defendants are required to comply with policies applicable to students attending UVA Med School. These include UVA Med School's Policy on Academic and Professional Enhancement, policies related to Title IX prohibited conduct, and policies to ensure that medical students' rights of free speech are protected.

32.     With respect to Mr. Bhattacharya, however, Dean Peterson, Professor Kern, and Professor Rasmussen subordinated their responsibilities to UVA Med School—including students and faculty alike—to their personal ideologies and prejudices and their loyalty to AMWA.

33.     Dean Densmore, Dean Peterson, Professor Kern, and Professor Rasmussen acted in concert with third parties—including the Non-Party Speech Suppressors and others—to deprive Mr. Bhattacharya of his constitutional right of free speech.

34.     Dean Densmore and Dean Peterson also acted in concert with others to subvert and corrupt the activities of the Academic Standards and Achievement Committee, to abuse its processes for improper purposes, and to otherwise cause injury to Mr. Bhattacharya.

4865-8896-4888.3

JA393

35.     Dean Densmore, Dean Peterson, Professor Kern, and Professor Rasmussen each had an independent personal stake in the conduct alleged herein.

36.     Each of the UVA Med School Individual Defendants is sued in his or her official capacity for injunctive and declaratory relief and for damages resulting from the acts and omissions alleged in this Complaint.

37.     Each of the UVA Med School Individual Defendants is also sued in his or her individual capacity for damages resulting from the acts and omissions alleged in this Complaint.

### (The Non-Party Speech Suppressors)

38.     "Non-Party Speech Suppressor No. 1" is a 2021 graduate of the University of Virginia School of Medicine who—shortly after the AMWA Microaggression Panel Discussion, on October 25, 2018 at 2:24 p.m.—sent an email to Dean Densmore complaining about Mr. Bhattacharya's questions and comments during the AMWA Microaggression Panel Discussion.

39.     "Non-Party Speech Suppressor No. 2" is a 2021 graduate of the University of Virginia School of Medicine who—on October 26, 2018 at 11:45 a.m.—sent an email to Joanne C. Mendoza, M.D., Associate Professor of Medicine, University of Virginia School of Medicine ("Professor Mendoza") with a copy to one of the student organizers of the AMWA Microaggression Panel Discussion.  The email from Non-Party Speech Suppressor No. 2 complained about Mr. Bhattacharya's questions and comments during the AMWA Microaggression Panel Discussion.

40.     "Non-Party Speech Suppressor No. 3" is the individual who posted an anonymous complaint about Mr. Bhattacharya's questions and comments during the AMWA Microaggression Panel Discussion on the UVA Med School "Listening Post" on October 26, 2018 at 3:11 p.m.

17

JA394

41.     "Non-Party Speech Suppressor No. 4" is the individual who posted an anonymous complaint about Mr. Bhattacharya's questions and comments during the AMWA Microaggression Panel Discussion on the UVA Med School "Listening Post" on October 28, 2018 at 4:59 p.m.

## JURISDICTION AND VENUE

42.     This civil rights action raises federal questions under the United States Constitution, particularly the First Amendment, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

43.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

44.     This Court has authority to award the requested damages pursuant to 28 U.S.C. §§ 1343 and 42 U.S.C. § 1983; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 28 U.S.C. § 1343, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

45.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the acts conduct described in this Complaint occurred in this district.

## FACTUAL BASIS FOR FIRST AMENDMENT RETALIATION CLAIM

**(Before His Attendance at the AMWA Microaggression Panel Discussion,
Mr. Bhattacharya Was a Medical Student in Good Standing at UVA Med School)**

46.     Mr. Bhattacharya enrolled in UVA Med School and began the fall 2016 semester as a member of the Class of 2020 on August 4, 2016.  At the time he began his medical school education, Mr. Bhattacharya was 20 years old.  Mr. Bhattacharya had skipped kindergarten and graduated from high school in May 2013 at age 16 as valedictorian at HP Baldwin High School.  He received a full tuition merit scholarship, with an additional merit stipend, from the University of Alabama in Tuscaloosa.  In May 2016, at age 19, Mr. Bhattacharya graduated *summa cum laude* with a degree in chemistry.

18

JA395

47.     During the fall 2016 semester, Mr. Bhattacharya participated in UVA Med School's mandatory Social Issues in Medicine ("SIM") course through shadowing and direct client contact at the Albemarle County Department of Social Services, Foster Care Unit.  In the Agency Evaluation of Student attached as **Exhibit 3**, Supervisor Beckie Aderholz reported that Mr. Bhattacharya attended all scheduled sessions, conformed to expectations with respect to different metrics, and received no negative responses.

48.     During the fall 2016 semester, Mr. Bhattacharya participated in Team-Based Learning ("TBL") exercises and received five Student Performance Evaluations (hereinafter "SPE") from five medical students in Mr. Bhattacharya's six-person TBL team for that semester.  Three of the five medical students rated Mr. Bhattacharya's TBL performance as "Frequently exceeds expectations;" one medical student rated Mr. Bhattacharya's TBL performance as "Meets and sometimes exceeds expectations;" and one medical student rated Mr. Bhattacharya's TBL performance as "Meets expectations."  All five of Mr. Bhattacharya's SPEs from TBLs in the fall 2016 Semester are attached as **Exhibit 4**, which has been redacted to remove personal identifiers of each of the other five medical students in Mr. Bhattacharya's TBL group.

49.     During the fall 2016 semester, Mr. Bhattacharya participated in Clinical Performance Development ("CPD") 1A and received one SPE from his CPD mentor, Andrew Wolf, MD ("Dr. Wolf").  In this SPE, attached as **Exhibit 5**, Dr. Wolf marked "Strongly Agree" with respect to the following assertions:

> a.     "The student participates in and contributes to small group discussion"
>
> b.     "The student is willing to help others in the group"
>
> c.     "The student exhibits humanism, compassion, and empathy during small group"

4865-8896-4888.3

JA396

      d.     "The student demonstrates engagement in the SIM community service experience"

      e.     "The student demonstrates awareness of the political and economic forces that impact the delivery of health care"

      f.     "The student demonstrates awareness of the socio-cultural forces that impact the delivery of health care."

50.    On December 18, 2016, Mr. Bhattacharya completed the fall 2016 semester at UVA Med School in good academic standing as a member of the Class of 2020.

51.    Mr. Bhattacharya began the spring 2017 semester at UVA Med School on January 2, 2017 as a member of the Class of 2020.

52.    On February 7, 2017, Mr. Bhattacharya took a one-year leave of absence (the "LOA") from UVA Med School.  On the University of Virginia Official Withdrawal Form, attached as **Exhibit 6**, Plaintiff cited his reason for withdrawal as "Personal."

53.    During Mr. Bhattacharya's LOA from UVA Med School in 2017, he engaged in a number of activities related to his career objective of becoming a medical doctor.  These include the following:

      a.     On September 30, 2017, Mr. Bhattacharya presented—in conjunction with a former UVA Med School classmate—an abstract that the two of them had co-authored at the Fourth Annual Symposium on Academic Interventional Radiology in Washington, D.C.

      b.     On November 7, 2017, Mr. Bhattacharya presented—in conjunction with a former UVA Med School classmate—a poster that the two of them had co-authored entitled "Characterization of trends in medical student indebtedness with current and potentially new

20

repayment options for young physicians" at the Sixteenth Annual Medical Student Research Symposium at UVA Med School.

      c.     Throughout 2017, Mr. Bhattacharya authored—in conjunction with a former UVA Med School classmate—a paper entitled "Endovascular Management of Acute Mesenteric Ischemia," the findings of which the two of them presented orally at the 43rd Annual Scientific Meeting of Society of Interventional Radiology on March 19, 2018 in Los Angeles.

      d.     Throughout 2017, Mr. Bhattacharya authored a textbook chapter entitled "Special Considerations:  Revision Anterior Cruciate Ligament" that was published in 2018 in the first edition of the textbook entitled *ACL Injuries in Female Athletes*.

      e.     Throughout 2017, Mr. Bhattacharya authored a textbook chapter entitled "Head and Spine Diagnosis and Decision Making" that was published in the fifth edition of *Delee, Drez, and Miller's Orthopaedic Sports Medicine* in 2019.

      f.     Throughout 2017, Mr. Bhattacharya edited and contributed to a manuscript entitled "Endovascular Management of Acute Mesenteric Ischemia" that was accepted for publication in the *Annals of Gastroenterology* on August 13, 2019 and published online on September 26, 2019 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6826075).

54.     On January 3, 2018, Mr. Bhattacharya returned to UVA Med School to begin the spring 2018 semester as a member of the Class of 2021.

55.     During the spring 2018 semester, Mr. Bhattacharya participated in TBL exercises and received five SPEs from five medical students in Mr. Bhattacharya's six-person TBL.  Three of the five medical students rated Mr. Bhattacharya's TBL performance as "Frequently exceeds expectations;" and two medical students rated Mr. Bhattacharya's TBL performance as "Meets and

21

sometimes exceeds expectations."  All five complete SPEs from the spring 2018 Semester are attached as **Exhibit 7**, which has been redacted to remove personal identifiers of each of the other five medical students in the TBL group.

56.     During the spring 2018 semester, Mr. Bhattacharya participated in CPD 1B and received one SPE (attached as **Exhibit 8**) from his CPD mentor, James Moak, MD (hereinafter "Dr. Moak").

57.     A "Professionalism Concern Card" ("PCC") at UVA Med School is an administrative action taken against medical students for a variety of forms of misconduct, including unexcused absences and violations of professionalism.  According to UVA Med School's Policy on Academic and Professional Enhancement (**Exhibit 9**), "Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by their college dean and documentation of the discussion must be recorded."

58.     During the spring 2018 semester, at 10:52 a.m. on May 4, 2018, an attendance monitor submitted the Professionalism Concern Card attached as **Exhibit 10** (the "First Professionalism Concern Card") to Mr. Bhattacharya's medical student file.   The First Professionalism Concern Card stated as follows with respect to Mr. Bhattacharya: "Student did not attend the required Patient Presentation on May 2, 2018."  In the First Professionalism Concern Card, the attendance monitor reported that he or she did not notify Mr. Bhattacharya of this concern card; that he or she did not feel uncomfortable in reporting this concern card to Mr. Bhattacharya; and that he or she did not request to be contacted about the action taken.

59.     Mr. Bhattacharya did not become aware of the First Professionalism Concern Card until after receiving his medical student file more than seven and a half months later on December 20, 2018.

4865-8896-4888.3

60.     Contrary to the report contained in the First Professionalism Concern Card, Mr. Bhattacharya in fact attended the May 2, 2018 patient presentation but was not recorded as present due to a lapse in Mr. Bhattacharya's subscription to UVA Med School's attendance technology.

61.     By way of background, attendance at UVA Med School is monitored using technology known as "Turning Point Login."  As of the May 2, 2018 patient presentation, Mr. Bhattacharya's subscription to Turning Point Login had expired during his LOA in calendar year 2017.  At that time, Mr. Bhattacharya was notified of the lapse in his subscription by Dr. Mary Kate Warden ("Dr. Warden")—a "system leader" for the area of study for which the May 2, 2018 patient presentation was focused—and Mr. Bhattacharya promptly resolved the issue with UVA Med School's technical support.

62.     Notwithstanding Mr. Bhattacharya's resolution of the subscription issue and communication of the resolution to Dr. Warden, the attendance monitor did not rescind the First Professionalism Concern Card.  Again, Mr. Bhattacharya had no knowledge at the time that the First Professionalism Concern Card had even been recorded in his medical student file.

63.     Mr. Bhattacharya was unaware of the existence of the First Professionalism Concern Card because neither Dean Densmore nor any other faculty or staff member of UVA Med School ever notified him of its existence or discussed it with him as required by UVA Med School's Policy on Academic and Professional Enhancement.

64.     On May 27, 2018, Mr. Bhattacharya completed the spring 2018 semester at UVA Med School in good academic standing as a member of the Class of 2021.

65.     On July 30, 2018, Mr. Bhattacharya began the fall 2018 semester at UVA Med School as a member of the Class of 2021.

4865-8896-4888.3

JA400

66.    Mr. Bhattacharya was in good standing at UVA Med School as of October 25, 2018,

when he attended the AMWA Microaggression Panel Discussion.

**(During the Q&A Period Following the AMWA Microaggression Panel Discussion,
Mr. Bhattacharya Politely Challenged Certain Statements by a Professor of Psychology
Before Professor Rasmussen Interrupted the Exchange in Anger)**

67.    The official title of the AMWA Microaggression Panel Discussion was

"Microaggressions: Why are 'They' So Sensitive?"  The AMWA website description of the event

([https://www.amwa-doc.org/news/new-amwa-chapter-at-the-university-of-virginia](https://www.amwa-doc.org/news/new-amwa-chapter-at-the-university-of-virginia)), entitled "New

AMWA Chapter at the University of Virginia — First Event a Success!" (**Exhibit 1**), conflates

"microaggression" with "gender harassment" and "gender inequity," describing it as follows:

> One of the goals for University of Virginia AMWA Chapter's first
> semester as a chapter was to highlight the micro-aggressions female
> medical students and providers can face in the workplace, and
> subsequently equip our classmates with tools to both handle these
> issues in the moment as well as report them. We approached this in
> two ways. First, we collected anonymous stories of micro-
> aggressions/gender harassment from medical students at UVA, and
> got an amazing, yet terribly sad, volume of responses. We collected
> all the stories and put up a display in our student lounge so that our
> classmates could read the responses and reflect on them. Second, we
> arranged a panel of three incredible female faculty to speak on micro-
> aggressions and how they handle them in the workplace. Dr. Beverly
> Adams, a psychology professor from the College of Arts and Sciences
> opened up our lecture by discussing the history, definitions, and her
> personal research on micro-aggressions. This was followed by Dr.
> Nora Kern and Dr. Sara Rasmussen, two powerhouse female surgeons
> at UVA discussing their personal experiences with gender inequity as
> healthcare providers. Our event was attended by members of all
> classes, and caught the attention of our college deans and directors of
> education, prompting discussion within our administration about
> harassment and how we can handle it better as an institution. The
> UVA chapter hopes that publicizing this event will help other chapters
> hold similar events and prompt discussion nation-wide!

68.    If the reaction of Professors Kern and Rasmussen and Non-Party Speech Suppressor

Nos. 1, 2, 3, and 4 is any indication, however, the "discussion nation-wide" that AMWA's UVA

Med School chapter hoped to prompt was not intended to include any questions or comments

24

perceived as critical of the theory of microaggression—even though it is in fact controversial.[2]

Following Professor Adams' remarks, UVA Med School Individual Defendant Professor Kern

opened the floor to questions and called upon Mr. Bhattacharya.  His questions and comments had

nothing to do with "gender harassment" or "gender inequity."  Nor were the content and tone of Mr.

Bhattacharya's questions and comments inappropriate as later claimed by Professor Kern and Non-

Party Speech Suppressor Nos. 1, 2, 3, and 4.  The audio link of the exchange establishes that Mr.

Bhattacharya's questions and comments were logical and not something that should have prompted

any concern—let alone retaliation or discipline—from either UVA Med School as an institution or

the UVA Med School Individual Defendants.

69.     Mr. Bhattacharya asked four questions, as follows:

a.     Question #1:  "Hello, thank you for your presentation.  I had a few questions

just to clarify your definition of microaggressions.  Is it a requirement to be a victim of

microaggression that you are a member of a marginalized group?  In the definition it just said

you had to be a member of a marginalized group—in the definition you just provided it in

the last slide.  So that's contradictory."

b.     Question #2:  "Follow up question.  Exactly how do you define marginalized

and who is a marginalized group.  Where does that go?  I mean it seems extremely non-

specific."

c.     Question #3:  "Third component about your definition of microaggression

and how you said 'oh ha' it is distinguished from rude statements you clarified that is because

the person who is receiving the microaggressions somehow knows the intention of the person

---

[2] *See, e.g.,* Althea Nagai, "The Pseudo-Science of Microaggressions," Academic Questions (Spring 2017) (www.nas.org/academic-questions/30/1/the_pseudo_science_of_microaggressions) (The Pseudo-Science of Microaggressions by Althea Nagai | NAS (archive.ph)), attached as **Exhibit 11**.

4865-8896-4888.3

who made it.  Somehow knows whether or not the person is educated, whether that person actually is intentionally harming them or whether or not they are unintentionally harming them (1), (2) the distinguishing factor that we should also make between what a rude statement is and what you are now defining as a microaggression is that a microaggression is entirely dependent on how the person who is receiving it is reacting.  It could be dependent upon a previous relationship and it is not exactly what the person is saying.  So the evidence that you provided, and you said you studied this for years, which is just one anecdotal case, I mean do you have—have you studied anything else about microaggression that you know in the last few years."

        d.       Question #4**:  "**Yeah but isn't it really out of my control what hurts somebody?  I can't control what offends. I can punch the air, and if that makes someone mad, that's really not my problem or fault.  If I punch someone in the face, and it directly hurts them, I incited at them, that is completely different.  So, again, what is the basis for what you are going to tell someone that they have committed a microaggression?  You hear a story from someone but how do you know that their interpretation is not subject to bias, that they do not have a prejudice towards the person that they're saying made it.  I mean, where are you getting this basis from?  How are you studying this? And collecting evidence on this and making presentations from it?"

70.     In response to Mr. Bhattacharya's first three questions, Professor Adams took them in stride, providing answers that were logical and complete regardless of whether the entire audience found them to be persuasive.  UVA Med School Individual Defendant Professor Rasmussen would not allow Professor Adams to answer Question #4.  Instead, Professor Rasmussen interrupted the exchange and proceeded to provide lengthy anecdotes about microaggressions that she had allegedly

suffered as a native of West Virginia.  When Mr. Bhattacharya attempted to respond, Professor

Rasmussen raised her voice in anger and cut him off.

> 71.     Rather than answer Question #4 or permit Professor Adams to do so, Professor

Rasmussen provided the following anecdote(s) based on her personal experience:

> I am from West Virginia and on my father's side was sort of
> transplanted to West Virginia but my mother's side has been from
> West Virginia since the 1700s.  And growing up, I was privileged
> enough to be able to go out of state to attend summer camps, and a
> rejoining refrain I heard all the time was oh you don't sound like
> you're from West Virginia.  Or immediately lots of harmless jokes
> like oh but you are wearing shoes, oh but you are here at this math
> camp, oh but you're a girl, why are you bothering to get a …. These
> were all. You could argue it was said in good fun by people who don't
> know what they are saying.  I grew up innocent to that and never
> pushed back on it but I tell you when I got to residency and I saw how
> people started thinking less of me because I was from a rural state.  I
> began to understand the impact of these microaggressions.  It doesn't
> matter.  You have to learn to uncouple the intent of what you are
> saying and the impact it has on the audience.  And you have to have a
> responsibility on the impact of your actions.  And if you make a
> statement that someone considers insensitive, the first thing you can
> say is oh my gosh that it wasn't my intent.  But don't get frustrated
> with that person for bringing it to your attention.

> 72.     In response to Professor Rasmussen, Mr. Bhattacharya stated: "I have to respond to

that because I never talked about getting frustrated at a person for making the statement. I never

would condone any statements that you are making like that.  What I'm saying is that what you are

providing is anecdotal evidence. That's what you provided.  That's what she provided."

> 73.     At that point, Professor Rasmussen raised her voice in anger, stated as follows: "No,

I think she provided a lot of citations and the literature and I'm sorry…I was just reading your body

language," and then cut off Mr. Bhattacharya altogether, asking another student "Would you like to

ask a question?"

4865-8896-4888.3

**(After the AMWA Microaggression Panel Discussion, the Non-Party Speech Suppressors Complained to UVA Med School About Mr. Bhattacharya's Questions and Comments)**

74.     After the AMWA Microaggression Panel Discussion, UVA Med School received at the following four complaints about Mr. Bhattacharya's questions and comments, at least two of which were from students:

    a.     an October 25, 2018 2:24 p.m. email from Non-Party Speech Suppressor No. 1 addressed to Dean Densmore;

    b.     an October 26, 2018 11:45 a.m. email from Non-Party Speech Suppressor No. 2 addressed to Professor Mendoza with a copy to one of the student organizers of the AMWA Microaggression Panel Discussion;

    c.     an October 26, 2018 3:11 p.m. anonymous complaint from Non-Party Speech Suppressor No. 3 submitted to the "Listening Post" maintained by UVA Med School for the purpose receiving of "reports of mistreatment," including "sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior;" and

    d.     an October 28, 2018 4:59 p.m. anonymous complaint from Non-Party Speech Suppressor No. 4 submitted to the "Listening Post."

75.     The October 25, 2018 2:24 p.m. email to Dr. Densmore from Non-Party Speech Suppressor No. 1 stated that he "was not in attendance" at the AMWA Microaggression Panel Discussion but had "received several notes and direct conversations from students who are expressly concerned regarding one of our classmates and the way he interacted during the Q&A portion of the panel at lunch today," elaborating that "it has been noted that Kieran Bhattacharya was extremely aggressive and confrontational in the manner he questioned the panelist, to the point of being quite disrespectful."

4865-8896-4888.3

76.     The October 26, 2018 11:45 a.m. email from Non-Party Speech Suppressor No. 2 was addressed to Professor Mendoza with a copy to one of the student organizers of the AMWA Microaggression Panel Discussion.  The email from Non-Party Speech Suppressor No. 2, which Professor Mendoza forwarded to Dean Densmore for the purpose of seeking "guidance about how to proceed," stated:

> During the micro-aggression talk hosted by AMWA yesterday, Kieran engaged in a line of questioning that was viewed by many to be combative and aggressive against the panelists.  This incident made many in the class feel rather uncomfortable.

77.     The October 26, 2018 3:11 p.m. anonymous complaint from Non-Party Speech Suppressor No. 3, on the subject "unprofessional behavior," stated that Mr. Bhattacharya "was very disrespectful to the panelists in his tone and matter of questioning."  This complaint stated that Mr. Bhattacharya "repeatedly interrupted the speakers."   As the audio recording shows, this statement was inaccurate.  In fact, Mr. Bhattacharya waited until the presentation was over to ask questions during a time expressly reserved for that purpose.  As the audio recording also shows, UVA Med School Individual Defendant Professor Rasmussen was the one who interrupted Mr. Bhattacharya— not the other way around.  This anonymous report also complained that Mr. Bhattacharya had "called the legitimacy of one panelist's research into question."

78.     The October 28, 2018 4:59 p.m. anonymous complaint from Non-Party Speech Suppressor No. 4 stated that Mr. Bhattacharya "was extremely disrespectful, unprofessional, and condescending to the speaker."  This complaint reported that Mr. Bhattacharya "interrupted [the speaker] on multiple occasions."  Again, this statement was incorrect, as the audio recording shows. The second anonymous complaint also reported that Mr. Bhattacharya had "questioned the validity of the information that [the speaker] had presented, all over the microphone for the entire audience to hear."

4865-8896-4888.3

79.     On October 27, 2018 at 4:34 a.m., after reviewing the anonymous complaint from Non-Party Speech Suppressor No. 4, Dean Canterbury wrote to Dean Densmore—with a copy to Dean Thomas—"I think this is the equivalent of a concern card."  At that point, Dean Canterbury was apparently unaware that UVA Med School Professor Kern had already submitted a Professional Concern Card about Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion and that she had already enlisted the UVA Med School Individual Defendants, Dean Canterbury, Dean Thomas, and others to see to it that Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion did not go unpunished.

**(After the AMWA Microaggression Panel Discussion, the UVA Med School Individual Defendants Collaborated With One Another to Retaliate Against Mr. Bhattacharya)**

80.     Beginning shortly after the October 25, 2018 Microaggression Panel Discussion— and continuing through the November 14, 2018 and November 28, 2018 ASAC meetings that resulted in official communications from UVA Med School censuring and later suspending Mr. Bhattacharya—the UVA Med School Individual Defendants collaborated with one another and with other UVA Med School faculty members and students who shared their personal ideologies.  The objective of the foregoing conduct was to punish Mr. Bhattacharya for his questions and comments during the AMWA Microaggression Panel Discussion and to deter him and others from questioning or challenging the ideologies of the organizers, speakers, and those in attendance who agreed with these ideologies.  Dean Peterson also injected herself into the functions of ASAC for the improper purpose of abusing its disciplinary powers.

81.     The conduct in furtherance of this retaliation for Mr. Bhattacharya's protected speech included:

a.      emails from Dean Peterson to Mr. Bhattacharya that resulted in an October 31, 2018 meeting between her and Mr. Bhattacharya;

30

4865-8896-4888.3

b.      inappropriate and unprofessional communications among Dean Densmore, Dean Peterson, Professor Kern, and Professor Rasmussen with one another, with others at UVA Med School, with the University of Virginia Medical Center, and with third parties before and after the October 31, 2018 meeting between Mr. Bhattacharya and Dean Peterson, and before and after the November 14, 2018 and November 28, 2018 ASAC meetings in which Professor Kern participated and which Dean Peterson attended as a "guest" even though she was not a member of the Committee;

c.      the surreptitious submission by Professor Kern of a "Professionalism Concern Card" to Mr. Bhattacharya's UVA Med School student file and the wrongful concealment of that submission by Dean Densmore, Dean Peterson, Professor Kern, and other UVA Med School Defendants who had a duty to disclose it to Mr. Bhattacharya;

d.      orchestrating the November 14, 2018 and November 28, 2018 ASAC meetings described herein and the discipline against Mr. Bhattacharya that resulted from these meetings; and

e.      the involvement of Dean Densmore and Dean Peterson in the November 14, 2018 and November 19, 2018 Forced Psychiatric Evaluations.

The evidence of this retaliatory conduct includes email and text message traffic to and from Professor Rasmussen, Professor Kern, Dean Peterson, the UVA Med School Defendants, and others within UVA Med School—some of which Mr. Bhattacharya has in his possession, has seen, or knows about.  There is other email and text message traffic, however, to which Mr. Bhattacharya does not have access.  The UVA Med School Defendants and UVA Med School had a duty to preserve and hopefully have preserved such evidence.  To the extent that the UVA Med School Defendants and

31

UVA Med School destroyed rather than preserved such evidence, Mr. Bhattacharya is entitled to adverse inferences with respect to the retaliatory conduct.

82.     In furtherance of the retaliatory conduct described herein, at 2:59 p.m. on October 25, 2018, Dean Peterson sent Mr. Bhattacharya the email attached as **Exhibit 12** stating:

> Kieran, I was at the noontime "Microaggressions" panel today and observed your discomfort with the speaker's perspective on the topic.  Would you like to come share your thoughts with me? I think I can provide some perspective that will reassure you about what you are and are not responsible for in interactions that could be uncomfortable even when that's not intended.  If you'd prefer to talk with your own college dean, that's fine too.  I simply want to help you understand and be able to cope with unintended consequences of conversations.  Dr. Peterson

83.     Before receiving Dean Peterson's October 25, 2018 email, Mr. Bhattacharya had only two brief encounters with Dean Peterson.  The reference to "your own college dean" was to Dean Densmore.  Pursuant to UVA Med School's Policy on Academic and Professional Advancement, Dean Densmore—not Dean Peterson—was responsible for addressing Professor Kern's Professionalism Concern Card with Mr. Bhattacharya and documenting that discussion. Unbeknownst to Mr. Bhattacharya at the time, however, Dean Peterson had been in contact with Professors Kern and Rasmussen and others about Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion.

84.     By email that same day, October 25, 2018 at 4:30 p.m. (**Exhibit 12**), Mr. Bhattacharya responded to Dean Peterson's October 25, 2018 email as follows:

> Your observed discomfort of me from wherever you sat was not at all how I felt.  I was quite happy that the panel gave me so much time to engage with them about the semantics regarding the comparison of microaggressions and barbs.  I have no problems with anyone on the panel; I simply wanted to give them some basic challenges regarding the topic.  And I understand that there is a wide range of acceptable interpretations on this.  I would be happy to meet with you at your convenience to discuss this further.

Dean Peterson's response later that day stated in pertinent part: "Kieran, I understand. I don't know you at all so I may have misinterpreted your challenges to the speaker." The exchange closed with an agreement for the two of them to meet in Dean Peterson's Student Health office at 4 p.m. on October 31, 2018.

85.     On October 25, 2018, Professor Kern issued the Professionalism Concern Card against Mr. Bhattacharya attached as **Exhibit 13** (the "Second Professionalism Concern Card"). Professor Kern was a speaker at the AMWA Microaggression Panel Discussion who called on Mr. Bhattacharya to ask questions after the presentation but did not respond to any of his questions or comments—at least not to his face.

86.     The Second Professionalism Concern Card against Mr. Bhattacharya identified relevant areas of concern as "Respect for Others" and "Respect for Differences," referred to Mr. Bhattacharya as "this student" and "med student," and described the basis for it as follows:

> For a AMWA session, we held a panel on microaggression. Myself [sic] and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards.

87.     The supporting commentary from Professor Kern in the Second Professionalism Concern Card against Mr. Bhattacharya does not directly quote Mr. Bhattacharya, Professor Rasmussen, or Professor Adams from the 5 minutes and 20 seconds of available audio discussion among these three individuals.

88.     The Second Professionalism Concern Card stated that Professor Kern had not discussed her concerns with Mr. Bhattacharya and that she did not feel uncomfortable discussing

33

her concerns with Mr. Bhattacharya.  When she issued the Professional Concern Card on October 25, 2018, Professor Kern did not disclose that she had reported its issuance to anyone other than the registrar at UVA Medical School who was the standard recipient of such concern card notifications at the email address som-studentaffairs@virgina.edu.  In fact, however, Professor Kern disclosed her submission of the Second Professionalism Concern Card to others—including at least two of the other UVA Med School Individual Defendants, Dean Densmore and Dean Peterson.  The UVA Med School Individual Defendants used this information to punish Mr. Bhattacharya for his questions and comments at the AMWA Microaggression Panel Discussion with which they and other UVA Med School students, faculty, and administrators (including Non-Party Speech Suppressors Nos. 1, 2, 3, and 4) took issue.  This Professionalism Concern Card was not made available to Mr. Bhattacharya until 56 days after its issuance as part of his medical student file that he received on December 20, 2018 following his suspension from UVA Med School on November 29, 2018.

89.     Professor Kern never notified Mr. Bhattacharya of the issuance of the Second Professionalism Concern Card and never spoke with him about it.  Nor did Professor Kern ever contact Mr. Bhattacharya or been contacted by Mr. Bhattacharya for any reason during his enrollment at UVA Medical School.

90.     The day after Professor Kern submitted the Professionalism Concern Card to Mr. Bhattacharya's medical student file, Mr. Bhattacharya received an email from Dean Densmore—the member of the UVA Med School faculty and administration who, under UVA Med School's policies and procedures, was required to discuss the Professionalism Concern Card with Mr. Bhattacharya and document the discussion.  In fact, he never did so that day or at any other time.  On October 26, 2018 at 1:12 p.m., Dean Densmore sent Mr. Bhattacharya the e-mail attached as **Exhibit 14** stating:

4865-8896-4888.3

"Hi Kieran, I just wanted to check in and see how you are doing.  I hope the semester is going well.  I'd like to meet next week if you have some time.  JJD."

91.     In response, Mr. Bhattacharya agreed to meet with Dean Densmore at noon on November 1, 2018.

92.     The day before his scheduled meeting with Dean Densmore, Mr. Bhattacharya met with Dean Peterson as previously agreed.  The meeting between Mr. Bhattacharya and Dean Peterson took place on October 31, 2018 beginning at 4 p.m. and lasted for approximately one hour.  Besides prying into Mr. Bhattacharya's personal life, Dean Peterson spent much of their time together trying to ascertain Mr. Bhattacharya's views on various social and political issues— including sexual assault, affirmative action, and the election of Donald Trump.  Dean Peterson also mentioned that, before the AMWA Microaggression Panel Discussion, she had heard about an unspecified statement that Mr. Bhattacharya had made at an unspecified time regarding an unspecified political issue.  Dean Peterson barely mentioned the ostensible purpose of the meeting, *i.e.,* to discuss Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion.  At no time during Mr. Bhattacharya's hour-long meeting with Dean Peterson on October 31, 2018 did she tell him about the Professionalism Concern Card against him that had been issued by Professor Kern.

93.     The following day, November 1, 2018, Mr. Bhattacharya met with Dean Densmore as previously agreed.  The meeting took place in Dean Densmore's personal office starting at noon on November 1, 2018 and lasted approximately ten minutes.  The discussion focused primarily on study strategies for UVA Med School's "summative exams" and the United States Medical Licensing Exam ("USMLE") Step 1, which Mr. Bhattacharya was scheduled to take on February 1, 2019.

4865-8896-4888.3

JA412

94.     At no time during this November 1, 2018 meeting—or at any other time—did Dean Densmore inform Mr. Bhattacharya that Professor Kern had issued a Professionalism Concern Card against him.  In fact, Dean Densmore did not even raise the issue of Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion during the November 1, 2018 meeting.  Toward the end of the meeting, Mr. Bhattacharya himself brought up the fact that he had been called to meet with Dean Peterson the preceding day.  At that point, Dean Densmore informed Mr. Bhattacharya that he was aware of the discussions with Dean Peterson.  Dean Densmore did not inform Mr. Bhattacharya that he had anything to be concerned about.  Again, he did not let Mr. Bhattacharya know about Professor Kern's Professionalism Concern Card.

95.     After meeting with Dean Densmore on November 1, 2018, Mr. Bhattacharya had no reason to know, believe, or even suspect that there were any Professionalism Concern Cards in his medical student file.  In fact, however, two Professionalism Concern Cards had been placed in Mr. Bhattacharya's medical student file at the time of the November 1, 2018 meeting with Dean Densmore.  Dean Densmore knew of the two Professionalism Concern Cards but affirmatively concealed their existence from Mr. Bhattacharya.  By doing so, Dean Densmore violated UVA Med School's Policy on Academic and Professional Advancement.  No member of the faculty or administration of UVA Medical School ever informed Mr. Bhattacharya of and/or discussed with Mr. Bhattacharya these two serious, punitive administrative decisions.  In both the First Professionalism Concern Card (**Exhibit 10**) issued by an attendance monitor and the Second Professionalism Concern Card issued by Professor Kern (**Exhibit 13**), the attendance monitor and Professor Kern did not report feeling uncomfortable discussing their concerns with Mr. Bhattacharya.  Nevertheless, neither the attendance monitor nor Professor Kern ever reported these punitive administrative actions to Mr. Bhattacharya.  Nor did they arrange to have anyone else report

36

either or both of these Professionalism Concern Cards to Mr. Bhattacharya at any time during Mr. Bhattacharya's enrollment at UVA Med School.

**(Based Upon the "Professionalism Concerns" Raised by Professor Kern,
UVA Med School's Academic Standards and Achievement Committee
Cited and Ultimately Suspended Mr. Bhattacharya for Being "Antagonistic")**

96.     Unbeknownst to Mr. Bhattacharya at the time, UVA Med School's Academic Standards and Achievement Committee ("ASAC" or the "Committee") met on November 14, 2018 from 4:03 p.m. until 5:18 p.m. to discuss the Second Professionalism Concern Card that had been issued by Professor Kern, according to the meeting minutes attached as **Exhibit 15**.

97.     The November 14, 2018 Committee was presided over by UVA Med School Defendant Dr. Tucker, whose publicly available biography is attached as **Exhibit 16**.  Dr. Tucker serves as the Chair of the Committee according to the UVA Med School Office of Student Affairs publication attached as **Exhibit 17.**

98.     UVA Med School Individual Defendant Professor Kern, whose publicly available biography is attached as **Exhibit 18**, was also present at the November 14, 2018 Committee meeting. The November 14, 2018 meeting minutes listed Professor Kern as a voting member of the Committee even though the Committee was voting upon Professor Kern's Professionalism Concern Card that day.

99.     In addition to Dr. Tucker and Professor Kern, the voting members of the Committee present for the November 14, 2018 meeting, according to the minutes, were as follows:

      a.     Brian Behm, M.D., whose publicly available biography is attached as **Exhibit 19**;

      b.     Donna Chen, M.D., M.P.H., whose publicly available biography is attached as **Exhibit 20**;

37

      c.      Stephen Culp, M.D., Ph.D., whose publicly available biography is attached as **Exhibit 21**;

      d.      Dr. Herrington, whose publicly available biography is attached as **Exhibit 22**;

      e.      Nicolas Intagliata, M.D. whose publicly available biography is attached as **Exhibit 23**;

      f.      Wilson Miller, Ph.D., whose publicly available biography is attached as **Exhibit 24**;

      g.      Barnett R Nathan, M.D., whose publicly available biography is attached as **Exhibit 25**;

      h.      Catherine Shaffrey, M.D., whose publicly available biography is attached as **Exhibit 26**; and

      i.      two students at UVA Medical School.

100.    Of the twelve voting members present for the November 14, 2018 ASAC meeting, Mr. Bhattacharya had previously had no contact with ten of them—including Dr. Tucker, who presided over the November 14, 2018 Committee meeting, and Professor Kern, whose "Professionalism Concern Card" was the subject of the meeting.  Both before and after the November 14, 2018 ASAC meeting, Dr. Herrington had a "physician-patient relationship" with Mr. Bhattacharya.  She nevertheless did not recuse or absent herself from the November 14, 2018 ASAC meeting as required by Section III.A of the ASAC Operating Procedures.

101.    In addition to the voting members present for the November 14, 2018 ASAC meeting, the minutes reflect that the following four "non-voting members" were also present:

4865-8896-4888.3

JA415

a.      Megan Bray, M.D. ("Dr. Bray"), whose publicly available biography is attached as **<u>Exhibit 27</u>**;

b.      Dean Thomas, who—according to publicly available information from UVA Med School's webpage on "Medical Student Advocacy" attached as **<u>Exhibit 28</u>**—is "available to hear reports of mistreatment," including "reports involv[ing] sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior directed at students;"

c.      Selina Noramly, Ph.D., Director of Academic Enhancement at UVA Med School ("Dr. Noramly"), whose publicly available biography is attached as **<u>Exhibit 29</u>**; and

d.      Katherine Yates ("Ms. Yates"), who—according to the UVA Med School Office of Student Affairs contact list attached as **<u>Exhibit 30</u>**—is the registrar and should be contacted for "Clerkship Scheduling, Enrollment, Leaving and Returning from the University."

102.    Of the four non-voting members present for the November 14, 2018 ASAC meeting, Mr. Bhattacharya had previously had contact with only two of them—one of whom was the registrar, Ms. Yates, who kept the meeting minutes.

103.    In addition to the voting and non-voting members present for the November 14, 2018 ASAC meeting, the minutes reflect that the following four "guests" were also present:

a.      David Charles Lewis, who is identified as "Business Intelligence Lead" on the excerpt from UVA Med School's website attached as **<u>Exhibit 31</u>**;

b.      Lynne Fleming, Esq., whose available publicly available biography as of February 2020 (**<u>Exhibit 32</u>**) identified her as Associate University Counsel at the Office of

the University Counsel at the University of Virginia (although Mr. Bhattacharya is

informed that she no longer works there);

      c.     UVA Med School Individual Defendant Dean Peterson, and

      d.     Sean Reed, M.D. ("Dr. Reed"), whose publicly available biography is

attached as **Exhibit 34.**

104.    At no time on or before November 14, 2018 UVA Med School ASAC meeting did

Mr. Bhattacharya have any direct contact or communication with any of the "guests" who were

present except for Dean Peterson.  Mr. Bhattacharya's prior communications with Dean Peterson

were largely limited to the October 31, 2018 meeting described herein and the email exchanges

preceding that meeting.

105.    The minutes of the November 14, 2018 UVA Med School ASAC meeting (**Exhibit**

**35**), under the heading "Professionalism Issue," state as follows:

> Kieran Bhattacharya (Densmore) concern card for professionalism
>
> – From the reporter: "For a AMWA session, we held a panel on micro
> aggression. I and 2 other faculty members were invited guests. This
> student asked a series of questions that were quite antagonistic toward
> the panel. He pressed on and stated one faculty member was being
> contradictory. His level of frustration/anger seemed to escalate until
> another faculty member defused the situation by calling on another
> student for questions. I am shocked that a med student would show so
> little respect toward faculty members. It worries me how he will do on
> wards."
>
> – One prior concern card (attendance of a mandatory activity).

106.    Except for the reference to the prior concern card, the November 14, 2018 meeting

minutes track—verbatim—the language of the October 25, 2018 Professional Concern Card

submitted by Professor Kern.

107.    According to the minutes of the November 14, 2018 UVA Med School ASAC

meeting: "The committee voted unanimously to send Kieran Bhattacharya (Densmore) a letter

4865-8896-4888.3

JA417

reminding him of the importance in medicine to show respect to all: colleagues, other staff, and patients and families." The minutes do not reflect that Professor Kern abstained from voting as she was required to do.

108.    At no time during the November 14, 2018 meeting of the UVA Med School ASAC meeting did those present listen to any portion of the audio of the October 25, 2018 AMWA Microaggression Panel Discussion.

109.    At no time before or immediately after the November 14, 2018 ASAC meeting did anyone present inform Mr. Bhattacharya that Dr. Kern had issued a Professionalism Concern Card against him on October 25, 2018.

110.    On November 15, 2018, Dr. Tucker sent Mr. Bhattacharya correspondence by email (**Exhibit 36**) stating as follows:

> Dear Mr. Bhattacharya:
>
> The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.
>
> It is always important in medicine to show respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.
>
> Sincerely,
>
> Jim B. Tucker, M.D.

111.    Dr. Tucker's recommendation that Mr. Bhattacharya "consider getting counseling" set forth in the November 15, 2018 letter on behalf on UVA Med School ASAC was not included in the reminder that was unanimously voted upon by the Committee members on November 14, 2018 according to the minutes taken by Ms. Yates.

4865-8896-4888.3

112.    Dr. Tucker's November 15, 2018 correspondence failed to disclose to Mr. Bhattacharya that it was Professor Kern who viewed Mr. Bhattacharya's conduct as "antagonistic."

113.    Dr. Tucker's November 15, 2018 correspondence failed to disclose to Mr. Bhattacharya that Professor Kern had issued a Professionalism Concern Card against him on October 25, 2018.

114.    Professor Kern was the only individual who was witness to the AMWA Microaggression Panel Discussion on October 25, 2018 and also present and voting at the UVA Med School ASAC meeting on November 14, 2018.

115.    At 5:45 p.m. on November 26, 2018, Dean Densmore sent Mr. Bhattacharya an email (**Exhibit 37**) stating:  "Hi Kieran, I hope you're doing well.  We were notified by the Dean of Students Office that you were heading back to Charlottesville.  You will need to be seen by CAPS before you can return to classes.  Let me know if you have questions.  Best regards, JJD."

116.    "CAPS" is an acronym for "Counseling and Psychological Services" at the Elson Student Health Center of the University of Virginia.  To receive treatment from CAPS, Mr. Bhattacharya would have to provide express written consent.

117.    In response to Dean Densmore's email, Mr. Bhattacharya sent Dean Densmore an email (**Exhibit 37)** at 5:00 a.m. on November 27, 2018 stating as follows:

> How can it be legal to mandate psychiatric evaluations to continue my education?   "Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience." – Kelly Sarabyn, FIRE (Foundation for Individual Rights in Education).

The Foundation for Individual Rights in Education ("FIRE") was founded in 1999 and describes its mission (**Exhibit 38**) as being to "defend and sustain individual rights of students and faculty members at America's colleges and universities.  These rights include freedom of speech, freedom

42

4865-8896-4888.3

JA419

of association, due process, legal equality, religious liberty, and sanctity of conscience."   The

quotation in Mr. Bhattacharya's November 27, 2018 email came from a December 31, 2007 article

(**Exhibit 39**) by Kelly Sarabyn, an author for and contributor to FIRE, which stated in part:

> Public colleges responding to clearly protected expressions by
> prescribing mandatory counseling or psychological evaluation
> violates both students' rights to free speech and private conscience.
> Unlike a suspension from school, which offends a student's right to
> free speech, ordering psychological counseling for protected speech
> compounds the offense to the Constitution by violating both a
> student's right to free speech and his right to private conscience.

118.    At the time, UVA Med School apparently was not persuaded by the foregoing

constitutional arguments from FIRE.[3]  Instead, at 11:48 a.m. on November 27, 2018, Randolph J.

Canterbury, M.D. ("Dr. Canterbury") sent Mr. Bhattacharya an email (**Exhibit 40**) stating:

> Dear Kieran, I have heard from Dr. Densmore that you have been
> calling him about your desire to return to classes today.  You are not
> cleared to return to class until you have been evaluated by CAPS at
> the Student Health Service.  Do not attend your CPD group today.
> Make an appointment with CAPS to initiate the medical clearance
> process.  Best regards, R.J. Canterbury, M.D.

According to his publicly available biography (**Exhibit 41**), Dr. Canterbury is Professor of

Psychiatric Medicine and Internal Medicine as well as Senior Associate Dean for Education at UVA

Med School.

119.    At the time of Dr. Canterbury's November 27, 2018 email and even to this day, Mr.

Bhattacharya did not and still does not have any understanding or awareness as to the "medical

clearance process" to which Dr. Canterbury's email referred.

---

[3] In December 2018, however, the University of Virginia published FIRE's "green-light" assessment of the
University's free speech policies on its own website.  *See* December 14, 2018 archive of freespeech.virginia.edu
(https://web.archive.org/web/20181214144051/https://freespeech.virginia.edu/).

4865-8896-4888.3

JA420

120.    The following day, November 28, 2018, at 1:00 p.m., UVA Med School Registrar

Ms. Yates sent Mr. Bhattacharya an email (**Exhibit 42**) stating as follows:

> Hello Kieran, The Academic Standards and Achievement Committee
> will be meeting today to discuss your current enrollment status. You
> are invited to attend to share your insights with the committee. The
> meeting will take place at 5:00 in the Claude Moore Medical
> Education Building, in room G 165. Please arrive at 5:00. The
> meeting has some business to attend to before they have questions for
> you, so we will have someone waiting to let you know when they are
> ready for you. Please reply and let us know if you will be in
> attendance. Thank you, Katherine M. Yates.

121.    Within less than half an hour, at 1:28 p.m. on November 28, 2018, Mr. Bhattacharya

responded to Ms. Yates with an email (**Exhibit 43**) stating: "Who exactly will be present? Do you

normally just give students 3 hours to prepare after indirectly threatening to kick them from medical

school? Why exactly is my enrollment status up for discussion?" Mr. Bhattacharya also asked

whether he could have a lawyer present. Thereafter, Mr. Bhattacharya attempted to retain counsel

but did not have sufficient time to obtain legal advice before the disciplinary hearing that afternoon

or have a lawyer present.

122.    The only written response from Ms. Yates or anyone else at UVA Med School in

advance of the ASAC meeting scheduled for 5:00 p.m. that day took the form of an email from Ms.

Yates sent at 1:37 p.m. on November 28, 2018 (**Exhibit 44**) stating as follows:

> Hello, Here is the information about the committee's make up
> policies, and procedures:
>
> https://med.virginia.edu/student-affairs/policies/academic-standards-
> and-achievement-committee-operating-procedures/
>
> https://med.virginia.edu/student-affairs/policies/academic-standards-
> achievement-policy/
>
> https://med.virginia.edu/school-administration/standing-
> committees/academic-standards-and-achievement-committee/
>
> Regards,

44

JA421

Katherine

123.    The materials linked to Ms. Yates' email sent at 1:37 p.m. on November 28, 2018 included the following provisions of the Academic Standards and Achievement Committee Operating Procedures (**Exhibit 45**) (the "Operating Procedures") that the Committee violated that day:

a.    The introductory paragraph of the Operating Procedures concludes with the following statement:

> Comprised of faculty in the school of medicine who do not assign final grades to students as well as student representatives, the role of ASAC is to promote students who meet these required standards, to recommend remedial action for those who do not meet the standards, and to suspend or recommend dismissal of those students who are incapable or who choose not to meet the required standards of achievement within the time frame allotted for completion of the M.D. degree.

It also declares:

> It is the policy of the School of Medicine to give every qualified and committed student the opportunity to graduate; however, the School reserves the right, in its sole and absolute discretion, to make judgments about who has or has not demonstrated the necessary qualification to earn a degree and to practice medicine competently.

b.    Section III.A. of the Operating Procedures states as follows:

> Official votes may be taken when a quorum (greater than 50% of the voting members) is present. All motions, except for a motion of dismissal, shall pass by a majority of voting members present. A motion for dismissal requires a two-thirds majority of voting members. Voting members will be recused from participating and shall not be counted in the quorum if they have (or have had) a personal, mentoring, or advising relationship with the student beyond that of usual student-faculty contact in class or clinical environment. This restriction includes faculty mentors on research projects, family members, anyone with a physician-patient relationship with the student or other personal relationship.

45

c. Section III.D. of the Operating Procedures states as follows:

> When there are severe professional transgressions or the Committee is to consider serious actions such as suspension or dismissal of a student, a final vote should be taken by the Committee only after the student has been offered an opportunity to address the Committee in person, and to respond to questions from members of the Committee. Also, the student should be notified by the Committee in writing as to what the major concerns of the Committee are likely to be during the coming meeting. Assistant Deans for Student Affairs (College Deans) as well as relevant teaching faculty may also be invited to attend committee meetings to provide information.

d. The beginning portion of Section III.H. of the Operating Procedures states as follows: "When a student addresses the Committee, the student will act as his or her own advocate."

e. Section III.J. of the Operating Procedures states as follows:

> Guidelines and policies written in advance cannot cover all possible scenarios. When in doubt, the Committee should be guided by several important general principles, including: fairness to students; following due process; promptness of action and notification; maintaining confidentiality when possible; and, balancing the best interests of each student with its obligations to the Faculty, patients and to society to train graduates who demonstrate the highest standards or academic performance and conduct.

124. At no time before its November 28, 2018 meeting did the Committee comply with Paragraph 3 of the "Professionalism" subsection of UVA Med School's Policy on Academic and Professional Advancement (**Exhibit 9**).   Paragraph 3 states as follows: "Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by their [sic] college dean and documentation of the discussion must be recorded."   At the time that Mr. Bhattacharya received an email from Ms. Yates at 1:00 p.m. on November 28, 2018 notifying him of the ASAC disciplinary hearing that

4865-8896-4888.3

afternoon, Mr. Bhattacharya had received no specific written notice or documentation from his college dean or anyone else at UVA Med School regarding either or both of the Professionalism Concern Cards that were in his student file at the time.

125.    Although Section III.D. of the Operating Procedures states that in instances in which the Committee is to consider serious actions such as suspension or dismissal of the student, "the student should be notified by the Committee in writing as to what the major concerns of the Committee are likely to be during the coming meeting," Mr. Bhattacharya received no written notification of specific allegations in which he was expected to explain and/or defend against in advocating for his continued enrollment status at UVA Med School.  As a result, Mr. Bhattacharya was effectively denied the opportunity to advocate for himself at the November 28, 2018 disciplinary hearing as contemplated by Section III.H. of the Operating Procedures.  Moreover, the Committee cited Mr. Bhattacharya's effort to advocate for himself as a basis for his suspension from UVA Med School.

126.    Although Mr. Bhattacharya responded to Ms. Yates within 28 minutes of receiving notice of the ASAC disciplinary hearing scheduled for later that day (November 28, 2018) and asked specifically what its rationale was, neither Ms. Yates nor any other member of the faculty or administration at UVA Med School provided Mr. Bhattacharya with any written statement of the allegations against him during the remaining 3 hours and 32 minutes that he had to prepare to advocate for his continued enrollment status at UVA Med School.

127.    In addition to his efforts to obtain additional information from Ms. Yates about the ASAC disciplinary hearing scheduled for the afternoon of November 28, 2018, Mr. Bhattacharya made nine telephone phone calls between 1:23 p.m. and 2:06 p.m. that day (**Exhibit 46**) to various members of the UVA Med School faculty and administration attempting to obtain more information

47

about what to expect and the potential consequences of the upcoming ASAC disciplinary hearing. During this time, Mr. Bhattacharya also attempted to contact an attorney in Charlottesville with whom he had previously spoken but was unable to obtain any advice before the ASAC disciplinary hearing or arrange for her presence on such short notice.

128.    In response to one of these calls, Mr. Bhattacharya received a telephone call at 2:12 p.m. on November 28, 2018 (**Exhibit 46**) from Sean Reed, M.D. ("Dr. Reed").  During the call, Dr. Reed informed Mr. Bhattacharya of a Professionalism Concern Card resulting from Mr. Bhattacharya's participation in the AMWA Microaggression Panel Discussion.  In response to Mr. Bhattacharya's statement that he was unaware of having received any Professionalism Concern Cards, Dr. Reed expressed doubt that Mr. Bhattacharya had not received such notice.  In fact, at no time before or at the November 28, 2018 ASAC disciplinary hearing did Dr. Reed or any other member of the faculty or administration of UVA Med School provide Mr. Bhattacharya with a copy of the Professionalism Concern Card that had been issued against him or a description of its contents. During his November 28, 2018 telephone call with Dr. Reed, Mr. Bhattacharya informed Dr. Reed that he intended to record the meeting.  Dr. Reed thanked Mr. Bhattacharya for providing this information.  Mr. Bhattacharya asked Dr. Reed how to prepare for the meeting and what to bring up. Dr. Reed advised him to just "speak from the heart"—a response that Mr. Bhattacharya found baffling and unhelpful.

129.    At 5:00 p.m. on November 28, 2018, Mr. Bhattacharya attended the ASAC disciplinary hearing to discuss his enrollment status.  Mr. Bhattacharya documented the hearing via a photograph of the attendees (**Exhibit 47**) and an audio recording of the entire disciplinary hearing (**Exhibit 48**).  The hearing lasted approximately 28 minutes.

48

JA425

130.    When Mr. Bhattacharya showed up at the November 28, 2018 hearing, he saw a uniformed member of the University of Virginia Police department.  The police officer told Mr. Bhattacharya that his presence had been requested by Dean Thomas—whom Mr. Bhattacharya had never met.  The police officer also collected audio and video footage of the November 28, 2018 ASAC meeting with his bodycam.

131.    During the November 28, 2018 ASAC disciplinary hearing against Mr. Bhattacharya, Dr. Tucker referred—erroneously—to the statement in Dean Densmore's November 26, 2018 email (**Exhibit 37**) that "[y]ou will need to be seen by CAPS" as merely a "recommendation" to be evaluated by CAPS.  Dr. Tucker refused to acknowledge his error even after Mr. Bhattacharya read the contents of the email out loud during the ASAC disciplinary hearing.

132.    According to the minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**), twelve voting members of the Committee were present. Nine of the twelve ASAC members present at the November 28, 2018 ASAC disciplinary hearing had also been present at the November 14, 2018 ASAC meeting.  According to the minutes, these nine members were—in addition to UVA Med School Defendant Dr. Tucker and UVA Med School Individual Defendant Professor Kern—Dr. Behm, Dr. Chen, Dr. Intagliata, Dr. Miller, Dr. Nathan, Dr. Shaffrey, and one fourth year medical student.

133.    The other three voting members of the Committee present at the November 28, 2018 ASAC disciplinary hearing were:

        a.    Roger Abounader, MD, PhD ("Dr. Abounader"), whose publicly available biography is attached as **Exhibit 50**;

        b.    Robert Bloodgood, PhD ("Dr. Bloodgood"), whose publicly available biography is attached as **Exhibit 51**; and

49

      c.     Sharon Diamond-Myrsten, M.D. ("Dr. Diamond-Myrsten"), whose publicly available biography is attached as **Exhibit 52**.

Before the November 28, 2018 ASAC disciplinary hearing, Mr. Bhattacharya had no prior direct contact with Dr. Abounader or Dr. Diamond-Myrsten.

134.    According to the minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**), four non-voting members of the Committee members who had been present for the November 15, 2018 ASAC meeting were also present during the November 28, 2018 disciplinary hearing, along with three "guests," as follows:  Plaintiff Mr. Bhattacharya, UVA Med School Individual Defendant Dean Densmore, UVA Med School Individual Defendant Dean Peterson, and University Counsel Ms. Fleming.

135.    The minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**) contain five paragraphs under the heading "Professionalism Issues," as follows.

      a.     The first paragraph states:

> The committee convened to discuss concerning behaviors exhibited by Kieran Bhattacharya (Densmore) over the past weeks after members of the Technical Standards Committee determined that the concerns were best addressed by the ASAC. The ASAC convened an emergency meeting on Wednesday November 28. Kieran Bhattacharya was invited to attend the meeting to discuss his enrollment status and did attend the meeting.

      b.     The second paragraph states: "The student was given the opportunity to address concerns about his behavior. He asked questions of members of the Committee and responded to questions asked by the Committee."

      c.     The third paragraph states: "The Committee reviewed the list of technical standards that are acknowledged annually by the students especially the Emotional, Attitudinal and Behavioral Skills."

4865-8896-4888.3

JA427

    d.      The fourth paragraph states:

> Because the student's behavior demonstrated his inability to meet several of those standards. Dr. Nathan made a motion to suspend Kieran Bhattacharya (Densmore) from the School of Medicine, effective immediately, with the option to petition to return in August of 2019. Dr. Behm seconded this motion. The committee voted unanimously to accept the motion. Nora Kern did not vote on the matter, as personal business required her to leave before the vote was executed.

    e.      The fifth paragraph states: "A letter will be sent to Kieran Bhattacharya's email, informing him of the decision and explaining the appeals process."

136.    On November 29, 2018 at 5:30 p.m., Dr. Tucker sent Mr. Bhattacharya an email (**Exhibit 53**) stating as follows:

> Dear Mr. Bhattacharya, See the attached letter from the Academic Standards and Achievement Committee. Please know that Drs. Densmore, Reed, and Keeley are available for support. Also, in response to your question about ID access, suspension involves a deactivation of your ID per standard university procedure, but you can make an appointment should you need to meet with your college dean.

The attachment to the November 29, 2018 email was correspondence notifying Mr. Bhattacharya that he was being suspended from UVA Med School for a period of one year (the "November 29, 2018 Suspension Letter").

137.    The November 29, 2018 Suspension Letter consisted of four paragraphs.

    a.      The first paragraph stated:

> The Academic Standards and Achievement Committee ("ASAC") convened on November 28, 2018 to review concerns that your recent behavior in various settings demonstrated a failure to comply with the School of Medicine's Technical Standards. Members of the Technical Standards Committee determined that the concerns about your recent behavior should be addressed by the Academic Standards and Achievement Committee. The ASAC decided that the nature of the concerns necessitated the calling of an emergency meeting. You were notified of that meeting on November 28, 2018 and provided an opportunity to be heard

51

and to respond to the concerns about your recent behavior. You attended the meeting, asked and answered questions and presented information.

b.  The second paragraph stated:

The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards that are found at: https://med.virginia.edu/student-affairs/policies/technical-standards/

c.  The third paragraph stated:

Those Standards, in relevant and as part of professionalism, state that each student is responsible for: Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own.

d.  The fourth paragraph stated:

The committee has voted to suspend you from school, effective immediately. You may apply for readmission to return to class no earlier than August, 2019. A student suspended for academic, professionalism, or administrative reasons or a student who has academic or Technical Standards/professionalism deficiencies at the time of suspension must be reviewed and approved to return by ASAC. The committee would only approve your return if you are able to provide evidence that further violations of the Technical Standards are unlikely to occur. You may appeal your suspension, in accordance with the SOM's appeal procedures.

138.  Other than the November 29, 2018 Suspension Letter, the only documentation that Mr. Bhattacharya ever received from UVA Med School about "aggressive and inappropriate interactions" that allegedly occurred in "public settings" was the November 15, 2018

52

correspondence attached as **Exhibit 36** regarding his questions and comments during the October 25, 2018 AWMA Microaggression Panel Discussion.  The November 29, 2018 Suspension Letter provided no details as to the nature, timing, location, severity, and/or identity of individuals reporting the "multiple aggressive and inappropriate interactions" that Mr. Bhattacharya had allegedly exhibited in "public settings."

139.   During the November 28, 2018 ASAC disciplinary hearing, no member of the Committee made any specific reference to or allegation of Mr. Bhattacharya's alleged "multiple aggressive and inappropriate interactions" in multiple "public settings."  Nor did the Committee listen to the audio recording of what had transpired at the October 25, 2018 AMWA Microaggression Panel Discussion.  Instead, the Committee relied upon the inaccurate and ideologically motivated characterization of Mr. Bhattacharya's October 25, 2018 questions and comments by UVA Med School Individual Defendant Professor Kern—who also happened to be a member of the Committee. Professor Kern was, along with UVA Med School Individual Defendant Dean Peterson, present for the Committee meetings on November 14, 2018 and November 28, 2018.  During the November 28, 2018 ASAC disciplinary hearing, Mr. Bhattacharya was referred to the November 15, 2018 correspondence attached as **Exhibit 36** regarding his questions and comments during the October 25, 2018 AWMA Microaggression Panel Discussion.  Mr. Bhattacharya did not recall having received this letter, which he had previously overlooked because it had come in while he was hospitalized as a result of the November 14, 2018 Forced Psychiatric Evaluation at the behest of Defendants.  At first, Mr. Bhattacharya thought that the reference was to the November 14, 2018 correspondence from ASAC attached as **Exhibit 69** regarding his performance on the Hematology System summative exam—which was the subject matter of his discussion that day when Dean Densmore demanded that he be evaluated by CAPS.  During the November 28, 2018 ASAC

53

JA430

disciplinary hearing, Mr. Bhattacharya was unable to find the November 15, 2018 correspondence on his laptop.

140.    Before the November 28, 2018 ASAC disciplinary hearing, Mr. Bhattacharya was not provided with written documentation from UVA Med School of the "aggressive and inappropriate interactions" that Mr. Bhattacharya allegedly had "with [his] dean" (or the identity of the dean with whom he allegedly had such interaction).

141.    The November 29, 2018 Suspension Letter asserted that Mr. Bhattacharya's conduct at the November 28, 2018 ASAC disciplinary hearing itself qualified as "aggressive and inappropriate" but provided no details to support this allegation.  The minutes of the November 28, 2018 ASAC disciplinary hearing provide no support for the characterization in the November 29, 2018 Suspension Letter that Mr. Bhattacharya's efforts to defend his continuing enrollment in UVA Med School had violated the Technical Standards by being "aggressive and inappropriate."

142.    Although not reflected in the minutes of the November 28, 2018 ASAC disciplinary hearing, the November 29, 2018 Suspension Letter followed more than two weeks of efforts by the UVA Med School Individual Defendants and others to discredit Mr. Bhattacharya and punish him for his questions and comments at the AMWA Microaggression Panel Discussion.  These efforts resulted in the previously undisclosed November 14, 2018 Forced Psychiatric Evaluation of Mr. Bhattacharya and the previously undisclosed November 19, 2018 Forced Psychiatric Evaluation of Mr. Bhattacharya, as described in the paragraphs that follow.

**(The Forced Psychiatric Evaluations Were Used to Penalize Mr. Bhattacharya for Exercising His First Amendment Rights at the AMWA Microaggression Panel Discussion)**

143.    Before October 24, 2018, Mr. Bhattacharya had never failed any summative exam or system and therefore had never been required to retake any assessment while at UVA Med School, although he had received scores of less than 70% on minor quizzes.  According to its academic

4865-8896-4888.3

policies in effect at the time, UVA Med School recorded and reported academic transcripts during the "pre-clinical phase" of its curriculum to residency programs on a pass/fail basis. As a result, UVA Med School would report the same "pass" to residency programs had he scored significantly higher on the Renal System Summative Exam or entire Renal System. The primary cause of Mr. Bhattacharya's lower score on an October 2018 renal summative exam was that he was focused on studying for the United States Medical Licensing Exam ("USMLE Step 1"), which he was scheduled to take on February 1, 2019. Since early 2017, Mr. Bhattacharya had worked with and published several book chapters and other scientific articles in surgical journals and orthopaedic surgery textbooks, and was therefore particularly interested in orthopaedic surgery residency programs. Mr. Bhattacharya based his emphasis on preparing for the 2019 USMLE Step 1 Examination at the expense of a few lower scores in the pre-clinical medical system on a June 2018 publication of survey results from program directors of the National Residency Match Program ("NRMP") demonstrating what program directors of medical residency programs value in applicants to their specialties. Because Mr. Bhattacharya was interested in being an orthopaedic surgeon, he was focused on the six pages of the report showing survey results from 49 orthopaedic surgeon program director respondents. According to the report, the most important factor used by orthopaedic surgery program directors to select applicants to interview is the "USMLE Step 1/COMPLEX Level 1 score." It was even cited more often (91%) as a factor used by orthopaedic surgery program directors to give interview invites than "letters of recommendations in the specialty" of orthopaedic surgery (89%). The survey report also stated that programs directors' most important factor in ranking applicants after the interview—other than the interview process itself—was the "USMLE Step 1/COMPLEX Level 1 score" (71%).

4865-8896-4888.3

JA432

144.    At the time, the USMLE Step 1 ("Step 1") score was not graded in the same manner as a pass/fail summative exam at UVA Med School because the Step 1 exam grade was a three-digit number with a maximum (and virtually impossible to obtain) score of 300.  In 2018, the mean score for first time American and Canadian test takers of the Step 1 was 230.  Meanwhile, a July 2018 Charting Outcomes publication from the NRMP demonstrated that for U.S. allopathic (M.D.) seniors who were applying to orthopaedic surgery residencies and had matched had an average Step 1 score of 248; and those U.S. allopathic seniors who did not match had an average Step 1 score of 240.  Because orthopaedic surgery residency programs expect a significantly higher score than do most other residency programs, Mr. Bhattacharya found it prudent and logical to focus on the Step 1 score rather than regular UVA Med school classwork, for which there were diminishing returns after attaining a passing grade.  Using a commonly used flashcard software called "Anki," Mr. Bhattacharya had—by October and November 2018—been through more than 215,000 such flashcards in preparation for the USMLE Step 1 Exam.  This preparation came to a halt as a result of his November 14, 2018 Forced Psychiatric Evaluation, his November 19, 2018 Forced Psychiatric Evaluation, and his November 29, 2018 suspension from UVA Med School.  Otherwise Mr. Bhattacharya was planning to review hundreds of thousands of additional flashcards in the time remaining before the Step 1 Exam.

145.    The morning of November 14, 2018, Mr. Bhattacharya received an email from Dean Densmore requesting that the two of them meet, and stating that "it looks like the Hematology Summative didn't go so well."  In a later memo to Mr. Bhattacharya's student file, Dean Densmore wrote that he "asked Kieran to meet after hearing of concerns that his girlfriend had about his condition worsening."

146.    Unbeknownst to Mr. Bhattacharya, at the time that he was meeting with Dean Densmore on November 14, 2018, Dr. Tucker on behalf of ASAC sent Mr. Bhattacharya an email on November 14, 2018 with the heading "ASAC letter" forwarding the November 14, 2018 correspondence attached as **Exhibit 69**.  The correspondence stated that "[t]he Academic Standards and Achievement Committee has received notice of your failing score on the Hematology System summative exam" and that, "[i]f you have not already done so, please contact your college dean to discuss your progress to date."  At that point, however, Mr. Bhattacharya was already meeting with his "college dean," Dean Densmore.

147.    The stated purpose of the November 14, 2018 meeting was to discuss Mr. Bhattacharya's score on the Hematology Summative Exam.  Mr. Bhattacharya assured Dean Densmore that he had passed the course and was confident that would score well when he re-took the exam.  Thereafter, without explanation or justification, Dean Densmore began insisting that Mr. Bhattacharya undergo evaluation from CAPS.  When Mr. Bhattacharya resisted, Dean Densmore demanded that Mr. Bhattacharya provide him with access to his medical records from a treating psychiatrist or further proof that he was receiving treatment from a psychiatrist at the time.  When Mr. Bhattacharya refused to do so, Dean Densmore again demanded that Mr. Bhattacharya be evaluated by CAPS.  At that point, Mr. Bhattacharya was under the impression that he would be suspended from UVA Med School if he did not immediately comply—just as Mr. Bhattacharya was later summarily suspended from UVA Med School for not complying with a similar order contained in the November 26, 2018 e-mail from Dean Densmore attached as **Exhibit 37** stating: "You will need to be seen by CAPS before you can return to classes."  Ultimately, out of fear of retaliation if he did not comply, Mr. Bhattacharya complied with Dean Densmore's order.  Dean Densmore

57

JA434

escorted Mr. Bhattacharya to CAPS and sat near Mr. Bhattacharya so that he could see Mr. Bhattacharya sign the "consent" form to be evaluated.

148.    Although Mr. Bhattacharya was surprised that a meeting to discuss an exam grade would result in a coerced evaluation by CAPS, CAPS seemed to be expecting him and to have received some "information" about Mr. Bhattacharya in advance.  According to the CAPS report of Mr. Bhattacharya's November 14, 2018 visit prepared by Ms. Richard, the CAPS counselor who reported that Mr. Bhattacharya made "sexist, demeaning" comments:

> Dr. Densmore walked him in today because there has been concern expressed about a number of recent events: Kieran failed 2 of his last 3 exams; Kieran attended a panel regarding microaggressions and many concerns were raised by the panelists and others in attendance that Kieran was confrontational; his girlfriend recently broke up with him because of his behavior, describing him as paranoid (she was adamant that there were no safety concerns); he has not been sleeping; and he is smoking an increased amount of marijuana.

Ms. Richard would not allow Mr. Bhattacharya to leave their "counseling" session and threatened to report him to Dean Densmore if he voluntarily exited the session.  Ms. Richard kept Mr. Bhattacharya for more than three hours and also had him evaluated by Michael Gerard Mason, Associate Dean in the University of Virginia Office of African American Affairs and Director of the Luther Porter Jackson Black Cultural Center, who expressed concern that they could not be sure that Mr. Bhattacharya would not suffer a recurrence of the issues that had prompted his January 2017 involuntary hospitalization.  Thereafter Ms. Richard issued an Emergency Custody Order on the false pretense that Mr. Bhattacharya was a threat to himself and others and was unable to care for himself.  Mr. Bhattacharya was then handcuffed and taken by two police officers to the Emergency Department at UVA Medical Center for Temporary Detention Order hearing before a graduate student in the University of Virginia School of Social Work.  Mr. Bhattacharya could not participate

4865-8896-4888.3

JA435

in the TDO meeting because—shortly before it began—he was given an intramuscular injection of 5 mg of Haldol (haloperidol) and 2 mg of Ativan (lorazepam). The pretext for the injection, which violated Virginia Code §§ 37.2-1104 and 37.2-809, was that Mr. Bhattacharya had refused bloodwork—which he had the legal right to do before issuance of the TDO. Pursuant to the TDO, Mr. Bhattacharya was hospitalized in the psychiatric ward of UVA Medical Center on November 14, 2018 but was released on November 16, 2018 based on findings that he was no threat to himself or others and was able to care for himself.

149.   On November 15, 2018 at 11:52 a.m., Dean Densmore—knowing that Mr. Bhattacharya was hospitalized—sent an email to Mr. Bhattacharya that read: "Hi Kieran, how did things go yesterday?" Suffice it to say that things did not go as well as Dean Densmore, Dean Peterson, and others had hoped. The November 16, 2018 findings that Mr. Bhattacharya was no threat to himself or others and was able to care for himself were not the answers they were looking for because they did not satisfy the criteria for involuntary commitment. Dean Densmore and Dean Peterson needed more "evidence" that Mr. Bhattacharya should be involuntarily hospitalized again. Thereafter they acted in concert with others to manufacture such "evidence."

150.   By November 16, 2018, Mr. Bhattacharya's mother had flown to Charlottesville out of concern based on reports that she had received from the University of Virginia and others as part of the retaliatory conduct described herein. Many of these reports were the subject of telephone calls placed between November 14 and November 28, 2018, as set forth in the Fed. R. Evid. 1006 Summary of Telephone Calls on the Cell Phone of Mr. Bhattacharya's Mother from November 14-28, 2018 attached as **Exhibit 70.** Ultimately, Mr. Bhattacharya's mother was persuaded that it was in Mr. Bhattacharya's best interests to go along with a plan—developed in conjunction with Dean

59

Densmore and Dean Peterson—to once again obtain an Emergency Custody Order and Temporary Detention Order against Mr. Bhattacharya.

151.    According to an email sent on November 19, 2018 at 10:19 a.m., Dean Peterson was scheduled to meet with Mr. Bhattacharya at 3 p.m. that day.  The plan was that, "in case [Mr. Bhattacharya] is presenting the same as he did last week," Dean Peterson would escort him to CAPS for another "evaluation."  That became unnecessary, however, according to a November 19, 2018 2:05 p.m. "update from Chris Peterson that this student met with Dean Densmore today and was behaving in the same way as when he was TDO'd and the police were called and he was TDO'd again, so he will not be meeting with her this afternoon."  In reality, there was nothing about Mr. Bhattacharya's meeting with Dean Densmore that warranted calling the police—as documented by recordings of Mr. Bhattacharya's November 19, 2018 meeting with Dean Densmore and his subsequent police "escort."  The meeting between Dean Densmore and Mr. Bhattacharya began on November 19, 2018 at 11:53:57 a.m. according to data obtained from Mr. Bhattacharya's video recording.    Thirteen minutes earlier, at 11:41 a.m. on November 19, 2018, the signature of Mr. Bhattacharya's mother was procured on an Emergency Custody Order before Mr. Bhattacharya began meeting with Dean Densmore.  The video footage of Mr. Bhattacharya's November 19, 2018 meeting with Dean Densmore shows that there was nothing that warranted calling the police.  The video footage of Mr. Bhattacharya's November 19, 2018 "police escort" to UVA Medical Center also shows no conduct that would have warranted once again having him handcuffed, tranquilized, and hauled off to a hearing.

152.    The November 19, 2018 Forced Psychiatric Evaluation was by no means the end of the efforts by Dean Densmore, Dean Peterson, and others to punish Mr. Bhattacharya for his

4865-8896-4888.3

JA437

questions and comments at the AMWA.  On November 20, 2018, at 8:57 a.m., Dean Peterson an email to the Director of CAPS,[4] with a copy to Dean Densmore, that:

        a.      contained a link to a podcast of the October 25, 2018 AMWA Microaggression Panel Discussion, which Dean Peterson said had been "sent by a concerned student," and identified the portion of the recording where Mr. Bhattacharya's questions began;

        b.      contained a link to ASAC's Technical Standards—the Technical Standards that, according to the November 29, 2018 Suspension Letter from ASAC, Mr. Bhattacharya had violated;

        c.      thanked the Director of CAPS "for taking this to the TAT"—a reference to the University of Virginia Threat Assessment Team; and

        d.      attached an email that she had sent the previous day, November 19, 2018 at 8:06 p.m. to a Licensed Clinical Social Worker at CAPS.

153.    The Director of CAPS responded by requesting a meeting the following day with Dean Densmore and Dean Peterson to obtain additional information.

154.    On November 26, 2018, Mr. Bhattacharya was released without any court order to undergo outpatient psychiatric treatment.  Thereafter, he received the previously discussed November 26 and 27, 2018 communications from the UVA Med School Defendants insisting that he undergo psychiatric evaluation a third time by CAPS before convening the "emergency" ASAC meeting on November 28, 2018 that resulted in his indefinite suspension on November 29, 2018.

---

[4] According to her professional biography on the University of Virginia website, the Director of CAPS "has extensive experience working with students from diverse cultural and socioeconomic backgrounds and particularly enjoys helping individuals with romantic relationships, spiritual questions, trauma, mood and anxiety concerns."

155.    The evening of November 28, 2018—after ASAC had voted to suspend Mr. Bhattacharya, but before Mr. Bhattacharya himself received notice of the suspension—Dean Peterson sent text messages to a third party the evening of November 28, 2018 suggesting that Mr. Bhattacharya would receive only a suspension rather than an expulsion from UVA Med School.  By sending this text message, Dean Peterson—one day before Mr. Bhattacharya himself received the November 29, 2018 Suspension Letter, in violation of Mr. Bhattacharya's privacy rights, General Policies III.E. of ASAC's Operating Procedures, and the Family Educational Rights and Privacy Act of 1974.  After ASAC sent the November 29, 2018 Suspension Letter, Dean Densmore, Dean Peterson, and others worked to ensure that Mr. Bhattacharya's one-year suspension from UVA Med School became—as a practical matter—a permanent expulsion.

### (Mr. Bhattacharya Was Prevented From Appealing His Suspension and Applying for Readmission to UVA Med School Because the University Issued a Four-Year "No Trespass" Order Against Him)

156.    The November 29, 2018 Suspension Letter advised Mr. Bhattacharya that he had the option of appealing the suspension if he filed his appeal within 14 days.  As a practical matter, however, UVA Med School denied Mr. Bhattacharya the right to appeal his suspension and to apply for readmission based on a series of subterfuges, as described in the paragraphs that follow.

157.    On December 4, 2018, Mr. Bhattacharya timely filed an appeal of his suspension by sending an email to Dr. Densmore (**Exhibit 54**) to initiate the appeals process.  Dr. Densmore responded by email later that day (**Exhibit 55**) acknowledging that the appeal process had been initiated and that additional information would be provided to Mr. Bhattacharya relating to the appeal.

158.    University Counsel, Ms. Fleming, did not acknowledge Mr. Bhattacharya's interest in completing the appeals process until after he sent information about what had happened to him to

62

a website known as SecureDrop.  The SecureDrop website (https://securedrop.org) describes itself as "an open source whistleblower submission system that media organizations and NGOs can install to securely accept documents from anonymous sources. It was originally created by the late Aaron Swartz and is now managed by Freedom of the Press Foundation."  The website goes on to state that SecureDrop "is used at over 50 news organizations worldwide, including The New York Times, The Washington Post, ProPublica, The New Yorker, and The Intercept."

159.    Had UVA Med School complied with its own appeal procedures (**Exhibit 56**), UVA Med School have conducted a hearing "as soon as possible (ordinarily within 14 days)" to review the suspension decision that ASAC made on November 28, 2018.  In this case, however, Mr. Bhattacharya did not receive his medical student file to prosecute his appeal until December 20, 2018—16 days after he initiated the appeals process.  It was at this time, more than three weeks after his one-year suspension, that Mr. Bhattacharya was able to review for the very first time the Professional Concerns Card(s) in his medical student file.  Mr. Bhattacharya did not receive his medical student file until several days after sending information about his situation to SecureDrop.

160.    Meanwhile, on December 7, 2018—three days after Mr. Bhattacharya had initiated an appeal of his suspension—he received notice (**Exhibit 57**) from the National Board of Medical Examiners ("NBME") that his registration for the United States Medical Licensing Exam Step 1 ("USMLE Step 1") had been cancelled because he was no longer enrolled at UVA Med School. Previously, Mr. Bhattacharya had been scheduled to take the USMLE Step 1 on February 1, 2019.

161.    On December 30, 2018, someone claiming to be from the University of Virginia Police Department (the "UVA Police Department") called Mr. Bhattacharya's father from 434-924-6303, a telephone number listed as being assigned to the University of Virginia.  The caller demanded to know Mr. Bhattacharya's whereabouts, suggested that Mr. Bhattacharya may need

63

JA440

further mental health evaluation, and claimed that Mr. Bhattacharya may be criminally involved with some type of "alt-right, storm front" extremist group.

162.    That same day, December 30, 2018, University Defendant Ms. Fielding—who was at the time a Police Captain with the UVA Police Department—called Mr. Bhattacharya and advised him that the UVA Police Department was issuing him a "no trespass" warning.  Mr. Bhattacharya requested additional information regarding the reason that he would no longer be welcome on the grounds of the University of Virginia, including UVA Med School.  Ms. Fielding was unable or unwilling to provide any additional information regarding the reason for the "no trespass" warning.

163.    On January 2, 2019, Ms. Fielding sent a letter to Mr. Bhattacharya attaching a "No Trespass Order" issued by the UVA Police Department (**Exhibit 58**).  The No Trespass Order did not state the basis for its directive that "You are not to come on **any** property or facility on the Grounds of the University of Virginia **except** as a patient at the University of Virginia Medical Center."  (*Id.*) (emphasis in original).

164.    On January 3, 2019, Dr. Densmore sent Mr. Bhattacharya an email (**Exhibit 59**) stating that UVA Med School would "not be able to proceed with an appeal to your suspension at this time" because of the No Trespass Order.

165.    Thereafter, Mr. Bhattacharya contacted Ms. Fielding and requested that the No Trespass Order be rescinded.  Ms. Fielding was unable or unwilling to do so and—once again— provided no information about the basis for the No Trespass Order.  Ms. Fielding asserted that there was no possibility of appeal at that time. At that point Mr. Bhattacharya said "thank you very much." Ms. Fielding said "what?"  In response, Mr. Bhattacharya again said "thank you very much" and ended the phone call.

4865-8896-4888.3

JA441

166.    On January 15, 2019 at 5:00 p.m., after the telephone call described in the foregoing

paragraph, Ms. Fielding sent Mr. Bhattacharya an email (**Exhibit 60**) stating in part as follows:

> I am writing as a follow up to my call to you at 4:10 p.m. (EST), today.
> You hung up on me before I could relay all of the information that I
> was calling to discuss with you.  As I stated on the phone, **the trespass
> notice issued to you is active and will remain active for the period
> of time indicated on the form.**  If you violate it, you will be arrested.

(emphasis in original).

167.    That same day, January 15, 2019, Mr. Bhattacharya's father received a call from 434-

243-3609.  The caller demanded information regarding Mr. Bhattacharya's whereabouts and/or his

plans to be in or near the City of Charlottesville.  This call was followed up with another call to Mr.

Bhattacharya's father on February 1, 2019, this time from 434-243-3610.

168.    On July 7, 2019, Mr. Bhattacharya sent an email to UVA Med School Defendants

Dr. Tucker and Dean Densmore inquiring about the possibility of readmission to the UVA Med

School 2019.  By email dated July 12, 2019 (**Exhibit 61**), Dean Densmore responded as follows:

> Dear Kieran, Thank you for your email. The School of Medicine is
> aware that a no trespass order was issued by the University Police
> Department (UPD) on January 2, 2019 prohibiting you from
> University Grounds for four years. We cannot address your request
> for readmission while a no trespass order is in effect. Should you have
> questions about that order, you will need to contact UPD directly. Best
> regards, John Densmore.

169.    Therefore, Mr. Bhattacharya sought to have the UVA Police Department rescind the

No Trespass Order and sought additional information from the UVA Police Department about the

rationale for it.

170.    Following a telephone conversation with Ms. Fielding, Mr. Bhattacharya sent Ms.

Fielding an email on July 13, 2019 at 6:16 a.m. (**Exhibit 62**).  The email, on which Dean Densmore

was shown as a cc: recipient, stated as follows:

65

JA442

During your time as Support Services Captain between December 2018-January 2019, you issued an NTO in my name (Kieran Ravi Bhattacharya) and failed to provide me with any specific reasons for this order in your initial phone call before issuing it; failed to provide me with any specific reason in the PDF that was forwarded to me by John Densmore; failed to provide me with any specific reasons in the physical document sent to the Haiku Post post office addressed 70 Hale Pili Way, failed to me [sic] with provide me with any specific reasons during the attached e-mail follow up phone call that is mentioned below, failed to provide any specific reasons during the phone call mentioned in this e-mail, and finally: you failed to mention in this e-mail that I ended this phone call after twice providing you a curt parting gesture of "Thank you very much" after you in a rather emotionally charged tone announced to me that there was no possibility for appeal…and unsurprisingly failed again to provide me with specific details as to what exactly I was appealing in this NTO. I had already for this more than than [sic] 6 months ago. I again ask that you provide me with specific reasons in painstaking detail, dissolve the order immediately, or do both to avoid the costly risk of taking this matter, should it be found to be applicable under Diversity Jurisdiction (28 U.S.C. ss 1332) to the United States District Court for the Western District of Virginia at the earliest convenience of any and all parties involved.

Sincerely,
Kieran Ravi Bhattacharya

171.    On July 18, 2019, Mr. Bhattacharya received an email from Ms. Fielding, who had subsequently been promoted to Deputy Chief of the UVA Police Department. The July 18, 2019 email from Ms. Fielding (**Exhibit 63**) stated that the No Trespass Order was issued "after concerns were raised about comments on a chat room that were perceived as threats." The UVA Police Department did not identify who made the "comments," the identity of the "chat room" on which the comments had been posted, the substance of the comments, and why they were "perceived as threats." Mr. Bhattacharya was provided this scanty information seven months after receiving the No Trespass Order.

172.    By email that same day (**Exhibit 64**), Mr. Bhattacharya asked Ms. Fielding the following questions, to which she never responded:

-What comments specifically?
-Who threatened who exactly?
-What chat room are you referring to and how does this at all relate to my or anyone else's safety at UVA?
-What community are you referring to?
-Who exactly, if not you, told you to issue this NTO?
-Why was none of this mentioned on the NTO issued more than 6 months ago?
-Was UPD able to make any arrests towards any of these perceived threats?
-What exactly do you mean when you affirm that the NTO was not a result of the suspension?

173.    On July 21, 2019, Mr. Bhattacharya submitted an appeal of the No Trespass Order to the UVA Police Department (**Exhibit 65**).  By way of a letter from the UVA Police Department dated August 7, 2019 (**Exhibit 66**), the University upheld the No Trespass Order, stating:

> The conduct you directed at members of the university community compromised safety and security and caused fear.  You are not permitted to be on University property throughout the duration of this trespass warning, which is currently effective until January 2, 2023.  This decision is final.

To this day, Mr. Bhattacharya has not been told what conduct on his part supposedly "compromised safety and security and caused fear."  Absent this information, no neutral third party—such as this Court—can decide whether the University had any objectively reasonable basis for the No Trespass Order or whether it was part of the continuing effort by UVA Med School—at the behest of the UVA Med School Individual Defendants, the Non-Party Speech Suppressors, and others—to punish Mr. Bhattacharya for questions and comments during the October 25, 2018 AMWA Microaggression Panel Discussion with which certain individuals took issue.

174.    The No Trespass Order from the UVA Police Department does not expire until January 3, 2023.  By the time that the No Trespass Order is scheduled to expire, Mr. Bhattacharya would be unable to complete his medical education even if his appeal were granted.  UVA Med School's Policy on Academic and Professional Advancement states: "All requirements for

67

JA444

graduation, including passing Step 1, Step 2 CK and Step 2 CS of the USMLE, must be completed within six years from the date the student matriculated in the School of Medicine."

## COUNT I

### DEPRIVATION OF FIRST AMENDENT RIGHT OF FREE SPEECH
### IN VIOLATION OF 42 U.S.C. § 1983

**(Against the University Defendants, the UVA Med School Defendants,
and the UVA Med School Individual Defendants)**

175.    Mr. Bhattacharya hereby incorporates by reference the allegations of Paragraphs 1 through 174 of this Complaint.

176.    By asking questions and making comments at the October 25, 2018 AMWA Microaggression Panel Discussion, attempting to defend himself at the November 28, 2018 ASAC disciplinary hearing, and seeking to obtain press coverage of his wrongful suspension as described in the foregoing Paragraph 175, Mr. Bhattacharya engaged in speech that is protected by the First Amendment to the U.S. Constitution (the "Protected Free Speech").

177.    By virtue of the Fourteenth Amendment to the U.S. Constitution, the University of Virginia—including UVA Med School—is subject to the First Amendment because it is an agency of the Commonwealth of Virginia.

178.    The conduct described in the foregoing Paragraph 175 on the part of the University of Virginia (including University Defendant Ms. Fielding), UVA Med School (including the UVA Med School Defendants), and the UVA Med School Individual Defendants infringed upon, chilled, and otherwise adversely affected Mr. Bhattacharya's Protected Free Speech.

179.    The conduct described in the foregoing Paragraph 175 included, *inter alia*, the following acts of retaliation against Mr. Bhattacharya for his Protected Free Speech (collectively, the "Retaliatory Conduct"):

4865-8896-4888.3

     a.       issuing the Second Professionalism Concern Card;

     b.       disciplining Mr. Bhattacharya for his Protected Free Speech;

     c.       requiring Mr. Bhattacharya to undergo the November 14, 2018 and November 19, 2018 Forced Psychiatric Evaluations;

     d.       requiring Mr. Bhattacharya to undergo counseling and obtain "medical clearance" as a prerequisite for remaining enrolled at UVA Med School;

     e.       suspending Mr. Bhattacharya from UVA Med School; and

     f.       preventing Mr. Bhattacharya from appealing his suspension or applying for readmission to UVA Med School by issuing and refusing to remove the No Trespass Order

180.     The Retaliatory Conduct would deter a person of normal resolve from speaking freely at the University of Virginia, including UVA Med School.

181.     The Retaliatory Conduct is causally related to Mr. Bhattacharya's Protected Free Speech.  The UVA Med School Defendants have admitted this causal relationship in writing, *e.g.*, in the following documents:

     a.       Professor Kern's Professionalism Concern Card (**Exhibit 13**);

     b.       the minutes of the November 14, 2018 ASAC meeting (**Exhibit 15**);

     c.       the November 15, 2018 ASAC correspondence (**Exhibit 36**);

     d.       the minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**); and

     e.       the November 29, 2018 Suspension Letter (**Exhibit 53**).

182.     But for Mr. Bhattacharya's Protected Free Speech, the University of Virginia (including University Defendant Ms. Fielding), UVA Med School (including the UVA Med School

69

Defendants), and the UVA Med School Individual Defendants would not have engaged in the Retaliatory Conduct.

183.    By engaging in the Retaliatory Conduct, the University of Virginia (including University Defendant Ms. Fielding) and UVA Med School (including the UVA Med School Defendants) violated 42 U.S.C. § 1983—making the University Defendants and the UVA Med School Defendants liable for injunctive relief, damages, and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kieran Bhattacharya prays that the Court:

(A)    Order the University Defendants to dissolve the existing No Trespass Order issued by the UVA Police Department;

(B)    Order the UVA Med School Defendants to remove all references to the Professionalism Concern Cards, the AMWA Microaggression Panel Discussion, and his suspension from Mr. Bhattacharya's medical student file;

(C)    Order the UVA Med School Defendants to allow Mr. Bhattacharya to re-enroll in UVA Med School as soon as possible and to deem his matriculation date, for purposes of fulfilling UVA Med School's graduation requirements, to be the date of reenrollment;

(D)    Order the UVA Med School Defendants to allow Mr. Bhattacharya to register for the USMLE Step 1 as soon as possible by immediately notifying the NBME of Mr. Bhattacharya's enrollment status at UVA Med School;

(E)    Award compensatory damages in favor of Mr. Bhattacharya for lost potential future income, harm to professional reputation, and out-of-pocket expenses against the University Defendants and the UVA Med School Defendants;

4865-8896-4888.3

JA447

(F)     Award Mr. Bhattacharya costs and attorneys' fees against the University Defendants

and the UVA Med School Defendants; and

(G)     Award Mr. Bhattacharya such other and further relief as this Court deems just and

proper under the circumstances.

## **JURY TRIAL DEMANDED**

Mr. Bhattacharya hereby demands trial by jury of all issues so triable.

71

4865-8896-4888.3

Dated:  March 24, 2022                    Respectfully submitted,

                                          KIERAN RAVI BHATTACHARYA

                                          By: /s/ *Michael J. Lockerby*
                                                 Counsel

                                          Michael J. Lockerby (VSB No. 24003)
                                          FOLEY & LARDNER LLP
                                          Washington Harbour
                                          3000 K Street, N.W., Suite 600
                                          Washington, D.C. 20007-5109
                                          Telephone:  (202) 672-5300
                                          Facsimile:  (202) 672-5399
                                          Email:  mlockerby@foley.com

                                          Steven C. Lockhart (admitted *pro hac vice*)
                                          Robert T. Slovak (admitted *pro hac vice*)
                                          Brandon C. Marx (admitted *pro hac vice*)
                                          FOLEY & LARDNER LLP
                                          2021 McKinney Avenue, Suite 1600
                                          Dallas, Texas 75201
                                          Telephone: (214) 999-3000
                                          Facsimile: (214) 999-4667
                                          E-mail:  slockhart@foley.com
                                          E-mail:  rslovak@foley.com
                                          E-mail:  bmarx@foley.com

                                          John P. Melko (admitted *pro hac vice*)
                                          James G. Munisteri (admitted *pro hac vice*)
                                          FOLEY & LARDNER LLP
                                          1000 Louisiana Street, Suite 2000
                                          Houston, Texas 77002
                                          Telephone: (713) 276-5500
                                          Facsimile: (713) 276-5555
                                          Email:  jmelko@foley.com
                                          E-mail:  jmunisteri@foley.com

                                          *Counsel for Plaintiff, Kieran Ravi Bhattacharya*

4865-8896-4888.3

# EXHIBIT 1

JA450

Case 3:19-cv-00054-NKM-JCH Document 335-1 Filed 03/24/22 Page 2 of 6 Pageid#: 4068



Join | Login | Contact | Donate | Shop | Help

The Vision and Voice of Women in Medicine since 1915

American Medical Women's Association

About ⌄   Our Work ⌄   Members ⌄   News & Events ⌄   Exhibitions ⌄

# New AMWA Chapter at the University of Virginia — First Event a Success!

| January 07, 2019



One of the goals for University of Virginia AMWA Chapter's first semester as a chapter was to highlight the micro-aggressions female medical students and providers can face in the workplace, and subsequently equip our classmates with tools to both handle these issues in the moment as well as report them. We approached this in two ways. First, we collected anonymous stories of micro-aggressions/gender harassment from medical students at UVA, and got an amazing, yet terribly sad, volume of responses. We collected all the stories and put up a display in our student lounge so that our classmates could read the responses and reflect on them. Second, we arranged a panel of three incredible female faculty to speak on micro-aggressions and how they handle them in the workplace. Dr. Beverly Adams, a psychology professor from the College of Arts and Sciences opened up our lecture by discussing the history, definitions, and her personal research on micro-aggressions. This was followed by Dr. Nora Kern and Dr. Sara Rasmussen, two powerhouse female surgeons at UVA discussing their personal experiences with gender inequity as healthcare providers. Our event was attended by members of all classes, and caught the attention of our college deans and directors of education, prompting discussion within our administration about harassment and how we can handle it better as an institution. The UVA chapter hopes that publicizing this event will help other chapters hold similar events and prompt discussion nation-wide!

JA451

1/30/2020                      New AMWA Chapter at the University of Virginia – First Event a Success! American Medical Women's Association



The Vision and Voice of
Women in Medicine
since 1915

American Medical **Women's** Association

About ⌄    Our Work ⌄    Members ⌄    News & Events ⌄    Exhibitions ⌄      🔍











JA452

Case 3:19-cv-00054-NKM-JCH Document 335-1 Filed 03/24/22 Page 4 of 6 Pageid#: 4070

1/30/2020 New AMWA Chapter at the University of Virginia – First Event a Success! American Medical Women's Association



Join | Login | Contact | Donate | Shop | Help

The Vision and Voice of
Women in Medicine
since 1915

American Medical Women's Association

About ⌄   Our Work ⌄   Members ⌄   News & Events ⌄   Exhibitions ⌄          🔍




# Health Care Needs Women Physician Leaders

Carnegie Mellon University

Master of Medical Management (MMM) for Physicians

**Scholarships for AMWA Members**

105th AMWA Annual Meeting — March 26 – 29, 2020, Indianapolis, IN

**LEARN MORE!**

Find Medical Jobs On

Learn of the past and continuing legacy of AMWA leaders

JA453

Case 3:19-cv-00054-NKM-JCH Document 335-1 Filed 03/24/22 Page 5 of 6 Pageid#: 4071



Join | Login | Contact | Donate | Shop | Help

About ⌄   Our Work ⌄   Members ⌄   News & Events ⌄   Exhibitions ⌄

**CONTACT US**

AMWA
1100 E. Woodfield Rd.
Suite 350
Schaumburg, IL 60173

Ph: (847) 517-2801
Email Us



**INFORMATION ABOUT**

 Advocacy

 Initiatives

 American Women's Hospitals Services

 Partnering with AMWA

**AMWA DIVISIONS**

INFO FOR PREMEDICAL STUDENTS

JA454

Case 3:19-cv-00054-NKM-JCH Document 335-1 Filed 03/24/22 Page 6 of 6 Pageid#: 4072

Join    Login    Contact    Donate    Shop    Help

**AMWA**
The Vision and Voice of
Women in Medicine
since 1915
American Medical Women's Association

About ⌄    Our Work ⌄    Members ⌄    News & Events ⌄    Exhibitions ⌄

**AMWA BLOG**



### Finding Clinical Experience
January 27, 2020



### Having a Productive Winter Break
January 13, 2020



### Developing Resilience as a Premedical Student
January 10, 2020

© 2020 American Medical Women's Association.

JA455

# EXHIBIT 2

JA456

Audio recording of AMWA Microaggression Panel Discussion on 25 October, 2018.

# EXHIBIT 13

JA458

**From:** ███████████████████████████████
**Sent:** Thursday, October 25, 2018 9:04 PM
**To:**
**Subject:** ████████████████████████

# Concern Card

**Faculty Information:**

**From:** ██████████████████
Name: Nora Kern
Department: Urology
Phone Number:
E-mail: █████████████████

**Student Information:**

Student Name: Kieran Bhattacharya
Class Year: 2
Date: 10/25/18

**Concerns Based On:**

**Areas:**

Respect for Others
Respect for Differences

**Comments:**

For a AMWA session, we held a panel on micro aggression. Myself and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards.

**Contact Issues:**

I have discussed my concerns with the student: no

I feel uncomfortable discussing my concerns with the student: no

1

JA459

# EXHIBIT 28

JA460

## The Listening Post

Click below to leave an anonymous report to the Office of Educational Affairs.

Leave a Report

**Medical Student Advocacy** seeks to promote and support a welcoming and professional environment for students in the School of Medicine and associated educational and clinical settings.

We are available to hear reports of mistreatment.  These reports may involve sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior directed at students.

Medical students can make reports about mistreatment or unprofessional behavior in person, by phone or email.  Medical students can also make reports about mistreatment or unacceptable behaviors in person or by phone or email to the Office of Educational Affairs, through the Assistant Dean for Medical Education, Lesley Thomas, available at (434) 924-1864 or llt6p@virginia.edu.  Anonymous reports to the Office of Educational Affairs can be made using the Listening Post.

The University also has a web site for all students for reporting bias complaints: http://www.virginia.edu/justreportit/

JA461

tionally, the University Ombuds, Brad ███████████ly office hours within the Health System.  The services of the Ombuds are independent of the University administration and confidential to the extent permitted by law.  Note that the Ombuds must report sexual misconduct disclosures (Title IX).  For more information, visit http://eocr.virginia.edu/ombuds.

# EXHIBIT 36

JA463

**Yates, Katherine M *HS**

| | |
|---|---|
| **From:** | Tucker, Jim *HS |
| **Sent:** | Thursday, November 15, 2018 10:36 AM |
| **To:** | Bhattacharya, Kieran R *HS |
| **Cc:** | Densmore, John J *HS (MD-Internal Medicine); Yates, Katherine M *HS |
| **Subject:** | ASAC Letter |
| **Attachments:** | ASAC Letter.pdf |

Dear Mr. Bhattacharya,

Please see the attached letter from the Academic Standards and Achievement Committee.

With best regards,

Jim B. Tucker, M.D.
Chair, Academic Standards and Achievement Committee

1

JA464



SCHOOL OF MEDICINE
*Academic Standards and Achievement Committee*

November 15, 2018

Kieran Bhattacharya
SMD 2021

Dear Mr. Bhattacharya:

The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.

It is always important in medicine to show mutual respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.

Sincerely,

Jim B. Tucker, M.D.
Chair, Academic Standards and Achievement Committee

CC:   John Densmore, M.D., College Dean
      Katherine Yates, Registrar

JA465

# EXHIBIT 37

JA466

# Gmail

From: Bhattacharya, Kieran R *HS
Sent: Tuesday, November 27, 2018 5:00 AM
To: Densmore, John J *HS (MD-Internal Medicine)
Subject: Re:

How can it be legal to mandate psychiatric evaluations to continue my education?

"Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience." - Kelly Sarabyn, FIRE (Foundation for Individual Rights in Education)

From: Densmore, John J *HS (MD-Internal Medicine)
Sent: Monday, November 26, 2018 5:45 PM
To: Bhattacharya, Kieran R *HS
Subject:

Hi Kieran,
I hope you're doing well.  We were notified by the Dean of Students Office that you were heading back to Charlottesville. You will need to be seen by CAPS before you can return to classes.
Let me know if you have questions.

Best regards,
JJD

# EXHIBIT 38

JA468

FIRE's mission is to defend and sustain the individual rights of students and faculty members at America's colleges and universities. These rights include freedom of speech, freedom of association, due process, legal equality, religious liberty, and sanctity of conscience—the essential qualities of liberty. FIRE educates students, faculty, alumni, trustees, and the public about the threats to these rights on our campuses, and provides the means to preserve them.

FIRE was founded in 1999 by University of Pennsylvania professor Alan Charles Kors and Boston civil liberties attorney Harvey Silverglate after the overwhelming response to their 1998 book *The Shadow University: The Betrayal Of Liberty On America's Campuses.*

# FIRE Issues

## Why is free speech important on campus?

Freedom of speech is a fundamental American freedom and a human right, and there's no place that this right should be more valued and protected than America's colleges and universities. A university exists to educate students and advance the frontiers of human knowledge, and does so by acting as a "marketplace of ideas" where ideas compete. The intellectual vitality of a university depends on this competition—something that cannot happen properly when students or faculty members fear punishment for expressing views that might be unpopular with the public at large or disfavored by university administrators.

Nevertheless, freedom of speech is under continuous threat at many of America's campuses, pushed aside in favor of politics, comfort, or simply a desire to avoid controversy. As a result, speech codes dictating what may or may not be said, "free speech zones" confining free speech to tiny areas of campus, and administrative attempts to punish or repress speech on a case-by-case basis are common today in academia.

## What is the First Amendment?

The First Amendment to the United States Constitution is the part of the Bill of Rights that expressly prohibits the United States Congress from making laws "respecting an establishment of religion," prohibiting the free exercise of religion, infringing freedom of speech, infringing freedom of the press, limiting the right to peaceably assemble, or limiting the right to petition the government for a redress of grievances. The protections of the First Amendment are extended to state governments and public university campuses by the Fourteenth Amendment.

## What does FIRE do?

FIRE effectively and decisively defends the fundamental rights of tens of thousands of students and faculty members on our nation's campuses while simultaneously reaching millions on and off campus through education and outreach. In case after case, FIRE brings about favorable resolutions not only for those individuals facing rights violations, but also for the millions of other students affected by the culture of censorship within our institutions of higher education. In addition to our defense of specific individuals and groups, FIRE works across the nation and in all forms of media to empower campus activists, reform restrictive policies, and inform the public about the state of rights on our campuses.

## What is religious liberty?

Religious liberty is the right to follow the faith of your choice—or to follow no faith at all. Religious liberty is a cornerstone of our nation and is the very first freedom guaranteed to Americans by the Bill of Rights. Yet on many college and university campuses, the right to associate on the basis of religious belief and even the right to express those beliefs is under attack. Under the guise of "nondiscrimination" policies, religious groups are often told that they may not choose the membership or leadership of their groups using religious criteria. Other students who merely express religious beliefs in public are condemned and even punished for "hate speech" or "intolerance." FIRE's cases dealing with religious liberty display our commitment to defending America's religious pluralism by protecting students' rights to express their views and to associate around shared beliefs.

JA469

## What is due process?

The right to due process refers to the idea that governmental authorities must provide fair, unbiased, and equitable procedures when determining a person's guilt or innocence. The same principle applies to judicial hearings on college campuses; if those campuses care about the justice and accuracy of their findings, they must provide fair and consistent procedures for the accuser and the accused.

History has taught that the rights of all Americans can be secured only through the establishment of fair procedures and with a consciousness that all are equal in the eyes of the law. Yet on many campuses, the accused face "kangaroo courts" that lack fair procedures, in which the political viewpoint or institutional interests of the "judges" greatly affect the outcomes of trials. The accused are often charged with no specific offense, given no right to face their accusers, and sentenced with no regard for fairness or consistency. As a result, a generation of students is being taught the wrong lessons about justice—and facing the ruinous consequences for their personal, academic, and professional lives. Students must come to know that justice means more than merely the enforcement of the will of the powerful and the suppression of the views of the powerless.

## What is freedom of conscience?

Freedom of conscience means the right to be free to think and believe as you will without the imposition of official coercive power over those beliefs.

Liberty cannot exist when people are forced to conform their thoughts and expression to an official viewpoint. Differences of opinion are the natural byproducts of a vibrant, free society. At many of our nation's colleges and universities, however, students are expected to share a single viewpoint on hotly debated matters like the meaning and significance of diversity, the definition of social justice, and the impermissibility of "hate speech." Mandatory "diversity training," in which students are instructed in an officially-approved ideology, is common. Some institutions have enacted policies that require students to speak and even share approved attitudes on these matters or face disciplinary charges.

## More Information

For more information, please see FIRE's Frequently Asked Questions.

JA470

# EXHIBIT 40

JA471



From: Canterbury, R. J. *HS
Sent: Tuesday, November 27, 2018 11:48 AM
To: Bhattacharya, Kieran R *HS
Subject: Required process to attend class

Dear Kieran,

I have heard from Dr. Densmore that you have been calling him about your desire to return to class today. You are not cleared to return to class until you have been evaluated by CAPS at the Student Health Service. Do not attend your CPD group today. Make an appointment with CAPS to initiate the medical clearance process.

Best regards,
R. J. Canterbury, M.D., M.S., DLFAPA
Senior Associate Dean for Education
Wilford W. Spradlin Professor
UVA School of Medicine
Box 800005
Charlottesville, VA 22908-0005
Phone: (434) 243-2522
Fax: (434) 924-5986
http://www.medicine.virginia.edu
Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Any use, reuse, copying or distribution of the content of this email is strictly prohibited.



JA472

# EXHIBIT 41

JA473



Randolph Canterbury



# Randolph Canterbury

Senior Associate Dean for Education at University of Virginia School of Medicine

Charlottesville, Virginia Area · 343 connections

University of Virginia Health System



Randolph Canterbury

# Experience

### Senior Associate Dean for Education

University of Virginia Health System

2008 – Present · 11 years





# Randolph Canterbury, MD

< return to list



**Randolph J. Canterbury, M.D.**

Professor of Psychiatric Medicine and Internal Medicine

**Department of Psychiatry and Neurobehavioral Sciences**
Division of Outpatient Psychiatry

## Contact

**Phone:** (434) 243-5719

**Fax:** (434) 982-1853

**Email:** rjc9s@virginia.edu

**Department Web Site:** http://www.healthsystem.virginia.edu/internet/psychiatric/

## Education

**M.D. Degree:**

JA476

St Virginia University, I

**Residency:**

Psychiatry, University of Virginia

Internal Medicine, University of Virginia

**Certification:**

American Board of Internal Medicine, 1983

American Board of Psychiatry and Neurology, 1985

Addiction Medicine, 1991

# Interests

**Clinical Interests:**

Substance abuse treatment and psychopharmacology, panic disorder, medical interviewing

**Research Interests:**

Substance abuse, epidemiology of substance abuse and AIDS, health services research

**Patients Most Frequently Seen:** Panic disorder, depression

200 Jeanette Lancaster Way

Charlottesville, VA 22903

Map and directions

## SCHOOL OF MEDICINE

About the School

Alumni Association

School Administration

Faculty



# Randolph J Canterbury, MD

**Division:** Outpatient Psychiatry

**Department:** Psychiatry and Neurobehavioral Sciences

Call 434.924.2241

**Primary Location:**
PO Box 800623
Charlottesville, VA 22908-0623

⊙ Directions

**Fax:** 434.982.1853

## Expertise

**ABMS Certification:** American Board of Internal Medicine, 1983; American Board of Psychiatry and Neurology, 1985; Addiction Medicine, 1991

**Research Interests:** Substance abuse, epidemiology of substance abuse and AIDS, health services research

**Clinical Practice:** Panic Disorder, Depression, Drug Abuse and Drug Addiction, Psychiatry Services - Adult

## About

**Title:** Professor

**Awards**

- 2015 Bedside Manner Award, Our Health Magazine; Second place

## Education

**Primary:** West Virginia University, 1979

**Residency:** Psychiatry, University of Virginia; Internal Medicine, University of Virginia

1215 Lee Street
Charlottesville, VA 22903

⊚ Map & Directions

**UVA HEALTH**

About Us

Contact Us

Clinical Trials & Research

News

Services

Quality & Safety

**COMMUNITY**

JA479

# EXHIBIT 42

JA480

**To:** Yates, Katherine M *HS <KAM5VD@hscmail.mcc.virginia.edu>
**Subject:** Re: ASAC meeting invite

████████████████████████████████████████████████████

**From:** Yates, Katherine M *HS
**Sent:** Wednesday, November 28, 2018 1:00 PM
**To:** Bhattacharya, Kieran R *HS
**Cc:** Tucker, Jim *HS; Densmore, John J *HS (MD-Internal Medicine)
**Subject:** ASAC meeting invite

Hello Kieran,

The Academic Standards and Achievement Committee will be meeting today to discuss your current enrollment status.  You are invited to attend to share your insights with the committee. The meeting will take place at 5:00 in the Claude Moore Medical Education Building, in room G 165.  Please arrive at 5:00.  The meeting has some business to attend to before they have questions for you, so we will have someone waiting to let you know when they are ready for ɔu.

Please reply and let us know if you will be in attendance.

Thank you,

Katherine M. Yates, M.Ed.
Registrar
School of Medicine
University of Virginia
PO Box 800739
Charlottesville, VA 22908
434-924-5200

2

JA481

# EXHIBIT 45

JA482

# Academic Standards and Achievement Committee Operating Procedures

The Academic Standards and Achievement Committee (ASAC) of the University of Virginia School of Medicine (UVA SOM) is charged with the responsibility of ensuring that each student in the School of Medicine masters the education program objectives. These objectives include assuring that each student demonstrate the required level of academic accomplishment and the required level of professionalism as set forth in the Twelve Competencies Required of the Contemporary Physician (http://www.medicine.virginia.edu/education/medical-students/UMEd/curriculum/competencies-page) in order to be promoted and to graduate with the degree of Doctor of Medicine. As part of these Competencies, students must develop the ability to understand the nature of and demonstrate professional and ethical behavior in the act of medical care. Among the attributes that go into making up these Competencies are respect, responsibility and accountability, excellence and scholarship, honor and integrity, altruism, leadership, cultural competency, caring and compassion, and confidentiality. The UVA SOM Curriculum Committee establishes these educational and professionalism standards. The ASAC oversees, monitors and enforces these standards. Comprised of faculty in the school of medicine who do not assign final grades to students as well as student representatives, the role of the ASAC is to promote students who meet these required standards, to recommend remedial action for those who do not meet the standards, and to suspend or to recommend dismissal of those students who are incapable or who choose not to meet the required standards of achievement within the time frame allotted for completion of the M.D. degree.

It is the policy of the School of Medicine to give every qualified and committed student the opportunity to graduate; however, the School reserves the right, in its sole and absolute discretion, to make judgments about who has or has not demonstrated the necessary qualifications to earn a degree and to practice medicine competently.

## I. Name and Mission

This committee of the Faculty and students shall be called the Academic Standards and Achievement Committee (ASAC). The mission of the ASAC is twofold. The first is to review the UVA SOM transcripts of students who have failed one or more required activities. Depending on the circumstance, the committee can recommend review, remediation or repeating the activity. The second is to review evidence of unprofessional, unethical or illegal activities or behaviors by the students. Recommendations, based on the severity and persistence of these activities or behaviors, can result in a broad range of actions from remediation to dismissal from the university. The committee shall follow the guidance of the Policy on Academic and Professional Advancement and the Policy on Technical Standards Required for Matriculation, Progression and Graduation.

The ASAC will meet monthly and as often as necessary to carry out these missions assuming an agenda to be discussed.

## II. Composition

The Committee shall consist of several groups of voting members and non-voting members.

**Voting members:**

The Senior Associate Dean for Education solicits nominations from department chairs and the faculty at large and recommends potential members to the UVA SOM Dean for appointment. A minimum of 15 voting members are appointed with a maximum of 21 voting members. Two fourth-year medical students shall serve as ex officio voting members of the ASAC. These shall be the President of the Mulholland Society and the fourth-year class President. Generally, the term will be three years with the possibility of one consecutive reappointment; former members may return for a new appointment after a two-year hiatus. Student members will serve for one year. The Chair is appointed by the Dean of the School of Medicine. A vice-chair is elected by a majority vote of the ASAC. The vice chair may call and chair an ASAC meeting in the event that the chair is unavailable.
Members who fail to attend the majority of meetings during a given calendar year without cause shall be excused from the Committee. Members who cannot attend the majority of the meetings due to illness or sabbatical, etc. may request that the ASAC Chair, in consultation with the Senior Associate Dean and subject to the approval of the Dean, appoint a substitute for them for the duration of their absence.

**Non-voting members:**

The Associate Dean for Admissions and Student Affairs, Associate Dean for Diversity and Inclusion, the Director of Academic Enhancement, and the Assistant Dean for Medical Education shall be non-voting ex officio members of the ASAC. The Registrar shall staff the committee and keep minutes as described below.

### III. General policies

A. Official votes may be taken when a quorum (greater than 50% of voting members) is present. All motions, except for a motion for dismissal, shall pass by majority of voting members present. A motion for dismissal requires a two-thirds majority of voting members. Voting members will be recused from participating and shall not be counted in the quorum if they have (or have had) a personal, mentoring or advising relationship with the student beyond that of usual student-faculty contact in class or clinical environment. This restriction includes faculty mentors on research projects, family members, anyone with a physician-patient relationship with the student or other personal relationship.

B. All members are required to sign a confidentiality agreement at the beginning of each academic year.

C. The Registrar shall take minutes of each meeting with special emphasis being applied to recording every official motion, and the numerical vote taken on that motion. Official letters sent to students also will constitute part of the minutes of each meeting, as they summarize the decisions of the Committee. Minutes of all meetings will be kept in the Office of Student Affairs and will be made available to the Dean. Letters from the chair to individual students shall be kept in the students' academic file in the Office of Student Affairs. A notice is sent to the Dean after

each meeting indicating that a meeting was held and that the confidential minutes are available for review in the Office of Student Affairs.

D. When there are severe professional transgressions or the Committee is to consider serious actions such as suspension or dismissal of a student, a final vote should be taken by the Committee only after the student has been offered an opportunity to address the Committee in person, and to respond to questions from members of the Committee. Also, the student should be notified by the Committee in writing before the meeting as to what the major concerns of the Committee are likely to be during the coming meeting. Assistant Deans for Student Affairs (College Deans) as well as relevant teaching faculty may also be invited to attend committee meetings to provide information.

E. Consistent with the requirements of law, decisions made by the Committee may be revealed to authorized university personnel, to the student, and in appropriate circumstances, to the student's parents or guardians (especially when the personal safety of the student is a concern). Other individuals may be notified as appropriate.

F. Official notification of Committee actions shall be made by the Registrar as soon as possible after the action is taken by the ASAC (and after the student has been notified of the action, as in III.C above, III.I below). All individuals and departments with a need to know will be so notified.

G. The official medical school transcript shall accurately reflect the actual academic record of the student, and important decisions reached by the Committee about each student's academic performance or misconduct (for example, reflecting change in student status, systems failed, grades changed through re-examination, suspensions, etc.).

H. When a student addresses the Committee, the student will act as his or her own advocate. In some sensitive situations, the student may be accompanied by a current member of the medical school community (e.g. classmate, faculty member, etc.) for support or advice. Such a guest must be approved by the committee chair prior to the meeting. Since these are not formal legal proceedings, but internal meetings of an official school committee, no counsel representing a student shall be allowed.

I. The formal decisions of the ASAC shall be communicated by the Chair to the student in a timely fashion, usually on the night of the meeting or the next day. Copies of this communication will be placed in the student's academic record, and into the minutes of the ASAC. In some situations, such as when news of a decision is given verbally to the student, the Chair may invite one of the college deans to be present.

J. Guidelines and policies written in advance cannot cover all possible scenarios. When in doubt, the Committee should be guided by several important general principles, including: fairness to students; following due process; promptness of action and notification; maintaining confidentiality when possible; and, balancing the best interests of each student with its obligations to the Faculty, patients and to society to train graduates who demonstrate the highest standards of academic performance and conduct.

K. Administrative support to the Committee will be provided by the Registrar who will work with the Chair to set the agenda; inform members of meeting dates and times; take and maintain the minutes; maintain official student folders; maintain copies of all letters sent by the Chair; invite guests, e.g. system or clerkship directors when necessary, etc.

L. These policies concerning the ASAC, and various types of student status changes, must be updated as needed. The updated version must be posted in the online Student Handbook. The incoming first year class must receive a URL link to the latest version at the time of matriculation.

M. No student will be formally dismissed or suspended prior to an appropriate hearing by the ASAC, as outlined in other sections. However, on rare occasions an emergency may arise in which the health of a student, faculty member, patient, or other member of the community is placed at risk by the presence of a student. In such an unusual situation, the Chair of the ASAC may recommend to the Dean or Senior Associate Dean for Education that a student be suspended provisionally, pending formal consideration of the relevant issues by the full Committee at the earliest possible opportunity. It is anticipated that this action will be required only under very rare circumstances.

N. When a student wishes to contest a decision of the ASAC, the student must follow the process as outlined in the Policy on Academic and Professional Advancement.

- If the ASAC requires a student to be dismissed from the School of Medicine or to repeat an academic period, the notification to the student will provide the option of an appeal and a description of the appeals process. This option will not be granted to those students failing to pass Steps 1 or 2CK of the USMLE within three attempts. The student may formally request that the Associate Dean for Admissions and Student Affairs appoint an ad hoc Appeals Committee to review the decision of the ASAC. The student must file his or her appeal no later than 14 days from receipt of notification or lose the right to appeal.
- The three-person ad hoc Appeals Committee is drawn from a pool of 10 faculty members named by the Associate Dean for Admissions and Student Affairs, none of whom is a current member of the ASAC. The student selects one member, the Senior Associate Dean for Education selects one member, nd the Dean selects the third member (who chairs the ad hoc Appeals Committee). The Associate Dean for Admissions and Student Affairs serves as staff liaison, ex officio, without vote.
- The student is permitted to inspect his/her entire medical school file including any material upon which the decision of the ASAC was based.
- The student is permitted to have counsel, to submit affidavits and exhibits, and to summon witnesses at the Appeals Committee hearing. Legal counsel may be present to provide advice but legal counsel will not be permitted to participate actively in presentation of testimony, examination/cross examination of witnesses or oral arguments.
- The Appeals Committee is to conduct a hearing as soon as possible (ordinarily within 14 days) and will uphold, modify or reverse the decision(s) of the ASAC.
- The Appeals Committee will provide the student with all the evidence against him/her, including the academic grades and written evaluations, and will base its recommendations upon the evidence presented at the hearing.

- The Appeals Committee will send its decision, along with a written record of its proceedings, to the Dean of the School of Medicine.
- The decision of the Appeals Committee will be final.

JA487

# EXHIBIT 46

JA488

# verizon√

# Kieran Bhattacharya

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| Nov 28 | 1:23 PM | 434.328.8798 | Charlottes, VA | Charlotsvl, VA | 1 | -- | -- | -- |
| Nov 28 | 1:32 PM | 434.243.2522 | Charlottes, VA | Charlotsvl, VA | 1 | -- | -- | -- |
| Nov 28 | 1:35 PM | 434.962.0349 | Charlottes, VA | Charlotsvl, VA | 1 | -- | -- | -- |
| Nov 28 | 1:36 PM | 434.981.6424 | Charlottes, VA | Charlotsvl, VA | 13 | -- | -- | -- |
| Nov 28 | 2:03 PM | 434.962.5785 | Charlottes, VA | Charlotsvl, VA | 1 | -- | -- | -- |
| Nov 28 | 2:04 PM | 434.996.8406 | Charlottes, VA | Charlotsvl, VA | 1 | -- | -- | -- |
| Nov 28 | 2:04 PM | 434.962.0349 | Charlottes, VA | Charlotsvl, VA | 1 | -- | -- | -- |
| Nov 28 | 2:06 PM | 908.361.5712 | Charlottes, VA | Plainfield, NJ | 1 | -- | -- | -- |
| Nov 28 | 2:06 PM | 540.365.6484 | Charlottes, VA | Ferrum, VA | 2 | -- | -- | -- |
| Nov 28 | 2:12 PM | 434.981.6424 | Charlottes, VA | Incoming, CL | 11 | -- | -- | -- |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ██████ | ████████ | ████████ | █ | █ | █ | █ |

JA489

# EXHIBIT 53

JA490

 Gmail

From: Tucker, Jim *HS
Sent: Thursday, November 29, 2018 5:30 PM
To: Bhattacharya, Kieran R *HS
Cc: Densmore, John J *HS (MD-Internal Medicine); Yates, Katherine M *HS
Subject: ASAC Letter

Dear Mr. Bhattacharya,

See the attached letter from the Academic Standards and Achievement Committee.

Please know that Drs. Densmore, Reed, and Keeley are available for support. Also, in response to your question about ID access, suspension involves a deactivation of your ID per standard university procedure, but you can make an appointment should you need to meet with your college dean.

[Quoted text hidden]

📄 **ASAC Letter.pdf**
153K

 

**UNIVERSITY *of* VIRGINIA**

SCHOOL OF MEDICINE
*Academic Standards and Achievement Committee*

November 29, 2018

Kieran Bhattacharya
SMD 2021

Dear Mr. Bhattacharya:

The Academic Standards and Achievement Committee ("ASAC") convened on November 28, 2018 to review concerns that your recent behavior in various settings demonstrated a failure to comply with the School of Medicine's Technical Standards. Members of the Technical Standards Committee determined that the concerns about your recent behavior should be addressed by the Academic Standards and Achievement Committee. The ASAC decided that the nature of the concerns necessitated the calling of an emergency meeting. You were notified of that meeting on November 28, 2018 and provided an opportunity to be heard and to respond to the concerns about your recent behaviors. You attended the meeting, asked and answered questions and presented information.

The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards that are found at: https://med.virginia.edu/student-affairs/policies/technical-standards/

Those Standards, in relevant part and as related to professionalism, state that each student is responsible for: Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own.

The committee has voted to suspend you from school, effective immediately. You may apply for readmission to return to class no earlier than August, 2019. A student suspended for academic, professionalism, or administrative reasons or a student who has academic or Technical Standards/professionalism deficiencies at the time of suspension must be reviewed and approved to return by ASAC. The committee would only approve your return if you are able to provide evidence that further violations of the Technical Standards are unlikely to occur.

JA492

You may appeal your suspension, in accordance with the SOM's appeal procedures:

**Academic Appeals Process:**
• If ASAC requires a dismissal from the School of Medicine or repetition of an academic period, the notification to the student will provide the option of an appeal and a description of the appeals process. This option will not be granted to those students failing to pass Steps 1, 2 CK or 2 CS of the USMLE within three attempts. The student may formally request that the Associate Dean for Student Affairs appoint an ad hoc Appeals Committee to review the decision of ASAC. The student must file his/her appeal no later than 14 days from receipt of notification or lose the right to appeal.
• The three-person ad hoc Appeals Committee is drawn from a pool of 10 faculty members named by the Associate Dean for Student Affairs, none of whom are current members of ASAC. The student selects one member, the Senior Associate Dean for Education selects one member, and the Dean selects the third member (who chairs the ad hoc Appeals Committee). The Associate Dean for Student Affairs serves as staff liaison, ex officio, without vote.
• The student is permitted to inspect their entire medical school file, including any material upon which the decision of ASAC was based.
• The student is permitted to have counsel, to submit affidavits and exhibits and to summon witnesses at the Appeals Committee hearing. Legal counsel may be present to provide advice, but legal counsel will not be permitted to participate actively in presentation of testimony, examination/cross examination of witnesses or oral arguments.
• The Appeals Committee is to conduct a hearing as soon as possible (ordinarily within 14 days) and will uphold, modify or reverse the decision(s) of ASAC.
• The Appeals Committee will provide the student with all the evidence against him or her, including the academic grades and written evaluations, and will base its recommendations upon the evidence presented at the hearing.
• The Appeals Committee will send its decision, along with a written record of its proceedings, to the Dean of the School of Medicine.
• The decision of the Appeals Committee will be final.

Sincerely,

Jim B. Tucker, M.D.
Chair, Academic Standards and Achievement Committee


CC:    John Densmore, M.D., College Dean
       Katherine Yates, Registrar

# EXHIBIT 58

JA494



# UNIVERSITY POLICE

January 2, 2019

Kieran Bhattacharya

████████████

Dear Mr. Bhattacharya:

As a follow up to my phone conversation with you on Sunday, December 30, 2018, please find attached to this letter a no trespass warning which has been issued to you by the University of Virginia Police Department at the University of Virginia.

Regards,

Melissa Fielding
Police Captain

Enclosure (1)



2304 Ivy Road • Charlottesville, VA 22903-4970
434-924-7166 • Fax: 434-982-2817
www.virginia.edu/uvapolice

JA495



# UNIVERSITY OF VIRGINIA POLICE DEPARTMENT

## TRESPASS WARNING

OPS-006
10/2018

| IBR Number | 2018-33244 | Officer | Melissa Fielding | Badge Number | 3 | Effective Date | 01/02/2019 |

Location of Warning  Verbal by phone followed by this written notice by certified mail.

**Recipient of Trespass Warning**

Last Name  Bhattacharya        First Name  Kieran        Middle Name

DOB  6/20/1996    SSN                    Sex  M    Race

Address  ██████████    City  ██████    State  ████  Zip  ██████

☐ Student      ☐ Faculty      ☐ Staff      ☒ No Affiliation

**This written form serves as notice to you that you are being warned for trespassing on the Grounds of the University of Virginia.**

☐    You are not to enter the following University of Virginia facility/building:

_____

**OR**  _____

☒    You are not to come on **any** property or facility on the Grounds of the University of Virginia **except** as a patient at the University of Virginia Medical Center.

**YOU MAY VISIT THE EMERGENCY DEPARTMENT OF THE UNIVERSITY OF VIRGINIA MEDICAL CENTER FOR A MEDICAL SCREENING EXAMINATION OF AN EMERGENCY MEDICAL CONDITION.**

**IF YOU ARE FOUND IN ANY AREA FROM WHICH YOU HAVE BEEN WARNED ABOVE, YOU WILL BE ARRESTED AND CHARGED WITH TRESPASSING AFTER HAVING BEEN WARNED AGAINST IT.  VIRGINIA CODE § 18.2-119.**

This Trespass Warning  ☒ expires 4 years after the Effective Date; or ☐ is effective until rescinded in writing.

The Grounds of the University of Virginia include all property owned and leased by the University of Virginia. If you have a question as to the status of a particular place, you may call the University Police Department at (434) 924-7166 for clarification and should do so BEFORE coming onto an area which may be owned or leased by the University of Virginia.

Signing this form does not constitute an admission of guilt to any offense nor does it give a promise to appear in a court of law or participate in any legal proceeding. It simply verifies that the signer understands the instructions in reference to trespassing on the Grounds of the University of Virginia.

Recipient Signature  Sent by certified mail                    Date  01/02/2019

JA496

## Procedures to Appeal a Trespass Warning:

The Trespass Warning must be appealed in writing to the Associate Vice President for Safety and Security within five (5) calendar days after the date the Trespass Warning is served.

Written appeals should be hand-delivered or mailed to:

> Associate Vice President for Safety and Security
> PO Box 400214
> 2304 Ivy Road
> Second Floor
> Charlottesville, VA 22903-44790

Written appeals also may be submitted by electronic mail to: **police@virginia.edu**

If the appeal is not delivered or postmarked within five (5) calendar days after the date the Trespass Warning is served, then the recipient of the Trespass Warning waives the opportunity to appeal.

Written appeals shall include:

1. Appellant's contact information, including address, telephone number, and e-mail address,
2. Date of the issuance of the Trespass Warning and the IBR Number located in the upper left-hand corner of the Trespass Warning,
3. The reason for the review request,
4. A complete and candid explanation for the conduct that precipitated the Trespass Warning,
5. The basis for the desire to be on University or Medical Center property, and
6. Any other information the appellant wished to be considered.

The Trespass Warning remains in effect while the appeal is being considered, unless the University of Virginia Police modifies or withdraws the Trespass Warning.

If the basis of the appeal is a need to be on Medical Center property for a scheduled medical procedure or appointment or to visit a registered patient at the Medical Center, the Associate Vice President shall consult with the Medical Center's Office of Patient Safety and Risk Management prior to finalizing a decision regarding upholding, modifying, or withdrawing the Trespass Warning.

The Associate Vice President shall issue the decision within twenty-one (21) calendar days of receipt of the written appeal. The Associate Vice President may uphold, modify, or withdraw the Trespass Warning. The decision of the Associate Vice President is final.

Trespass Warnings will automatically expire within four (4) years after the date the Trespass Warning was served, unless otherwise noted in the Trespass Warning.

JA497

# EXHIBIT 59

JA498

---------- Forwarded message ----------
From: **Densmore, John J *HS (MD-Internal Medicine)**
<JJD2Q@hscmail.mcc.virginia.edu>
Date: Thursday, January 3, 2019
Subject: Appeal (Day 23, Updated)
To: Kieran Bhattacharya <kieran0696@gmail.com>

Dear Kieran,

I received from the University Police Department a copy of a "no trespass warning" issued to you (attached).  We will not be able to proceed with an appeal of your suspension at this time.

Best regards,

John Densmore

**From:** Kieran Bhattacharya [mailto:kieran0696@gmail.com]
**Sent:** Thursday, December 27, 2018 2:48 PM
**To:** Densmore, John J *HS (MD-Internal Medicine) <JJD2Q@hscmail.mcc.virginia.edu>; Fleming, Lynne *HS <ERF3DF@hscmail.mcc.virginia.edu>; Canterbury, R. J. *HS <RJC9S@hscmail.mcc.virginia.edu>
**Subject:** Appeal (Day 23, Updated)

Hello Dr. Densmore,

Do not include Debasis Bhattacharya in any future correspondence on this matter.

I would like to interview (

JA499

I understand that witnesses who I want to summon have the option of not attending the hearing as there is no mechanism of issuing subpoenas in this setting. I believe that 7 witnesses are of extremely high importance in helping the committee reach a decision. Here is a list of these 7 witnesses in my perceived order of importance with respect to assisting the appeals committee in reaching a decision:

1. Randolph Canterbury
2. John J Densmore
3. Jim Tucker
4. Sean Reed
5. Christine Peterson
6. Nora Kern
7. David S Wilkes

This witness list was refined after I was given access to my medical school file which, from my understanding, includes any all decisions in which ASAC decided to suspend me.

It is very important to me that I am aware of who (if any) of these 7 witnesses are able to attend the hearing well before the hearing is scheduled. Because I only have 90 minutes, I need to properly prepare my line of questioning for whatever (if any) combination of these 7 witnesses decide to answer questions in the hearing. I would also like to call witnesses in a particular order after knowing what combination (if any) of these 7 witnesses are able to attend.

As mentioned earlier, I want to submit an affidavit to the committee. I only feel comfortable completing this affidavit after I am aware of which witnesses (if any) will be present as well as knowing which 3 members are on the ad hoc committee.

Thank you for your cooperation, and I look forward to returning to UVA after the holiday season to complete this appeal.

Sincerely,
Kieran Bhattacharya

JA500

# EXHIBIT 63

JA501



Kieran Ravi <kieran0696@gmail.com>

---

## Follow-up to phone call

**Fielding, Melissa Annette (mab3q)** <mab3q@virginia.edu>                         Thu, Jul 18, 2019 at 9:49 AM
To: Kieran Ravi <kieran0696@gmail.com>

Dear Kieran,


The NTO was issued by the University of Virginia Police Department after concerns were raised about comments on a chat room that were perceived as threats.  These comments raised safety concerns for the community and UPD issued the NTO.  The NTO was not a result of your suspension.  The NTO remains in effect.  The appeal process is printed on the back page of the NTO.  As previously communicated, you did not appeal the NTO as specified in the appeal process instructions.


Sincerely,

Melissa




**Melissa Fielding**
*Deputy Chief of Police*
*University of Virginia Police Department*

**E** fielding@virginia.edu
**P** 434.924.8835
**F** 434.982.2817

**University of Virginia**
2304 Ivy Road
Charlottesville, VA 22903

**uvapolice.virginia.edu/**






**From:** Kieran Ravi <kieran0696@gmail.com>
**Sent:** Wednesday, July 17, 2019 3:10 AM
**To:** Fielding, Melissa Annette (mab3q) <mab3q@virginia.edu>; police@virginia.edu
**Subject:** Fwd: Follow-up to phone call

JA502

[Quoted text hidden]

[Quoted text hidden]

JA503

Exhibit A

 POPLAR SPRINGS Hospital

*Behavioral Healthcare Specialists*

BHATTACHARYA, KIERAN
M# 000049290
06/20/1996 022  M
2064194-0018 11/19/2018
J. WOOLDRIDGE MD

## CONTACT NOTE

O·434·243·5150  C·909·706·0682

Date: 11/20/18      Time: 1510      F:F _____      Telephone ✓
Name: Dr. Ruzck                        Agency Relationship: UVA Counseling Center

- ☐ Left VM for return call        ☐ Left clinical update on confidential VM    ☐ Reviewed treatment plan
- ☐ Phone disconnected             ☐ Provided discharge information             ☐ No voicemail available
- ☐ Scheduled family therapy for:

"A student of intense concern for us". Is not functioning as he should be. Dr. Ruzck states he has been TDO'ed twice. Concern for himself and "university". Has not made physical threats but threatens litigation against his Dean. States he has been combative with other students. Also hospitalized in 2017 with similar symptoms of pressured speech, paranoia, thoughts of grandiosity. Has made threats / gestures of aggression to mother and ex-girlfriend. Ex-girlfriend is actively seeking a protective order. Discussing with counseling center and UVA local police. Dr. Ruzck is concerned with Kieran "talking himself out of a hospitalization". States he

Signature: _____
↳ continued below ↴

Date: 11/20/18      Time: 1510      F:F _____      Telephone ✓
Name: Dr. Ruzck                        Agency Relationship: UVA Counseling Center

- ☐ Left VM for return call        ☐ Left clinical update on confidential VM    ☐ Reviewed treatment plan
- ☐ Phone disconnected             ☐ Provided discharge information             ☐ No voicemail available
- ☐ Scheduled family therapy for:

has extensive medical knowledge and is very intelligent. Last hospitalization at UVA was for 3 days. Kieran is a second year medical student. He DOES NOT know this, but UVA is discussing possibly suspending him and presenting him with the discharge paperwork while he is in the hospital.

Signature: _____, M.A.

VM = voicemail      F:F = face to face

Non-Confidential                                                        PSH00003661

JA504

# Exhibit C

To

**PLAINTIFF'S RESPONSE TO**
**DR. HSU'S MOTION TO QUASH VERIZON SUBPOENA**

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

KIERAN RAVI BHATTACHARYA,      )
                             )
        Plaintiff,       )   Civil Action No.
                             )   3:19-CV-00054
v.                          )
                             )
JAMES B. MURRAY, JR., et al.,   )
                             )
        Defendants.      )
_____)

Deposition of CHRISTINE PETERSON

May 4, 2022

Karen Kidwell, RMR, CRR, Registration #7625774
482980



SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles   (415) 433-5777 San Francisco   (949) 955-0400 Irvine   (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose   (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento   (800) 222-1231 Martinez   (702) 366-0500 Las Vegas   (800) 222-1231 Monterey
(951) 686-0606 Riverside   (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson   (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn   (518) 490-1910 Albany   (914) 510-9110 White Plains
(312) 379-5566 Chicago   00+1+800 222 1231 Paris   00+1+800 222 1231 Dubai   001+1+800 222 1231 Hong Kong

JA506

```
1              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
2                 CHARLOTTESVILLE DIVISION

3
   KIERAN RAVI BHATTACHARYA,          )
4                                     )
           Plaintiff,                 )  Civil Action No.
5                                     )  3:19-CV-00054
   v.                                 )
6                                     )
   JAMES B. MURRAY, JR., et al.,      )
7                                     )
           Defendants.                )
8  _____)

9

10

11

12      Videotaped Deposition of CHRISTINE PETERSON

13                  (Given Remotely)

14              Wednesday, May 4, 2022

15          9:37 a.m. Eastern Standard Time

16

17

18

19

20  Reported by:  Karen Kidwell, RMR, CRR

21

22

23

24

25
```

1

CHRISTINE PETERSON

JA507

1    believe that the chair of the meeting asked me to

2    recount what I observed of Mr. Bhattacharya's

3    behavior.

4         Q.   That was at the November 14 meeting?

5         A.   Yes.

6         Q.   And what do you recall having said at that

7    meeting?

8         A.   I don't have specific recollections, but I

9    would have reported that I observed him behaving in a

10   rude manner towards an invited guest speaker.

11        Q.   And no one listened to the audio or viewed

12   a video of what actually happened that day, correct?

13             MS. THOMPSON:  Objection.  Asked and

14        answered.  Form.

15             You may respond.

16             THE WITNESS:  I certainly didn't.  I don't

17        recall that it was shown or -- or listened to at

18        the meeting.

19   BY MR. LOCKERBY:

20        Q.   And did you speak at the November 28,

21   2018, ASAC meeting as well?

22        A.   I did.

23        Q.   What did you say at that meeting?

24        A.   The chair asked me to read a copy of the

25   letter that I had sent to the magistrate in support

                         67

CHRISTINE PETERSON

BARKLEY
Court Reporters

JA508

1    of Angel Hsu's petition for a protective order.

2           Q.    And did you read it out loud?

3           A.    I did.

4           Q.    Did you say anything else at that meeting?

5           A.    Not that I recall.

6           Q.    Getting back to the list of individuals in

7    the hybrid expert disclosures, on page 9, seventh

8    person listed is Randolph J. Canterbury, M.D.  You

9    did in fact have communications with Dr. Canterbury

10   regarding Mr. Bhattacharya, correct?

11          A.    Yes.  E-mail communication.

12          Q.    Did you ever speak with him in person

13   about Mr. Bhattacharya?

14          A.    Not that I recall, no.

15          Q.    Did you ever speak with him by telephone?

16          A.    No.

17          Q.    The eighth person listed is Jim B.

18   Tucker, M.D.  Dr. Tucker was chair of ASAC, correct?

19          A.    Yes.

20          Q.    And you had communications with Dr. Tucker

21   regarding Mr. Bhattacharya in 2018, correct?

22          A.    Yes.

23          Q.    What form did those communications take

24   place?

25          A.    Certainly during the meetings, right?  And

68

CHRISTINE PETERSON

BARKLEY
Court Reporters

JA509

1    that based on your observations at the time?

2         A.   Yes, it was.

3         Q.   All right.  And when you went on to write,

4    "It's hard to imagine that he'll be able to thrive

5    given his complete lack of social insight," what did

6    you mean by that?

7         A.   I was reflecting on the fact that he had a

8    really hard time acknowledging that his pressure on

9    the speaker to refine her definitions or, you know,

10   acknowledge that -- that he had a point that he was

11   trying to make, that that affected her adversely,

12   that it felt rude and disrespectful to her, he just

13   could not acknowledge that.

14            And people who can't acknowledge the

15   impact that their behavior has on other people have a

16   really hard time working in teams, and even in --

17   even in pairs, right?  Doctor-physician dyads.

18        Q.   The next e-mail -- or text message,

19   rather -- on November 1st, you write, "Just letting

20   you know that according to a reliable direct

21   observer, our student of concern has escalated use of

22   pot."

23            Did that reflect information that you had

24   obtained from Angel Hsu on November 1st, 2018?

25        A.    It does, yes.

154

CHRISTINE PETERSON

BARKLEY
Court Reporters

JA510

1      Q.   And on November 1st, 2018, did Angel Hsu

2    tell you that she and Mr. Bhattacharya had broken up?

3      A.   I don't remember when she told me.  But

4    Angel did tell me that they had broken up.

5      Q.   But you're not sure if it was then, or

6    later, that she told you that?

7      A.   Yes.  You're correct.

8      Q.   And you had another meeting with Angel Hsu

9    on November 13, 2018, correct?

10     A.   I believe that's correct, yes.

11     Q.   And that meeting was what prompted you to

12   send the text message to John Densmore, on

13   Exhibit 24, on November 13, 2018, at 15:45:56,

14   correct?

15     A.   I believe that that's the case, yes.

16     Q.   And did you in fact talk to Mr. -- to Dean

17   Densmore that day, in response to this text message?

18     A.   I believe I did, yes.

19     Q.   And what did you tell Dean Densmore?

20     A.   I don't remember specifically, but I would

21   have wanted to convey my concern that the student was

22   having psychological difficulties, according to this

23   text message.  That's what I wanted to do.

24     Q.   And the information that you had, that

25   Mr. Bhattacharya was supposedly having psychological

155

CHRISTINE PETERSON



JA511

 1  difficulties, came from Angel Hsu, correct?

 2      A.   Yes.  Yes.

 3      Q.   Did Angel Hsu tell you that

 4  Mr. Bhattacharya was paranoid?

 5      A.   I don't remember her using that term, but

 6  she might have.

 7      Q.   What did Angel Hsu tell you that you

 8  relayed to Dean Densmore?

 9      A.   I don't have specific memories of that.

10      Q.   What do you recall generally?

11      A.   Exactly what I just said, that the -- that

12  Kieran was -- Mr. Bhattacharya was decompensating,

13  was acting strangely, was reacting badly to news of

14  their breakup, and that she was concerned for her

15  safety.

16      Q.   Well, in fact, as of that date, she hadn't

17  yet claimed to have concerns for her safety, did she?

18  She didn't raise --

19          MS. THOMPSON:  Objection.

20  BY MR. LOCKERBY:

21      Q.   She didn't raise those until after

22  Mr. Bhattacharya was released, on November 16, 2018;

23  isn't that true?

24      A.   I don't remember the exact sequence.  But

25  she was concerned about him and his behavior not

156

CHRISTINE PETERSON



JA512

1   being normal.  And whether safety came up that day or

2   a couple days later, I honestly don't recall.

3       Q.   And in fact, if you look at the text

4   messages that have previously been marked as

5   Exhibit 23, the first mention of safety is on

6   November 19, 2018.  Correct?

7           MS. THOMPSON:  Objection to form.  And

8       objection, assumes facts not in evidence.

9           You may respond.

10          THE WITNESS:  That seems to be the first

11      mention of safety that's in these documents,

12      right.  I don't recall the exact sequence of

13      what came up when.

14  BY MR. LOCKERBY:

15      Q.   And you were aware that on November 14,

16  2018, John Densmore walked Mr. Bhattacharya to CAPS,

17  and that Mr. Bhattacharya was evaluated by CAPS and

18  later hospitalized.  You were aware of that, correct?

19          MS. THOMPSON:  Objection.  Assumes facts

20      not in evidence.  And objection to form.

21          You may respond.

22          THE WITNESS:  I don't recall when I became

23      aware of that.  It might have been, for example,

24      the next day, that Dr. Densmore would have

25      reported to us.  But eventually I was aware,

157

CHRISTINE PETERSON



JA513

1        yes.

2    BY MR. LOCKERBY:

3        Q.   And that's something that Dr. Densmore

4    told you, correct?

5             MS. THOMPSON:  Objection to form.  Assumes

6        facts not in evidence.

7             VIDEOGRAPHER:  I don't remember how I

8        became aware of it, whether Dr. Densmore told me

9        or whether Angel Hsu told me.

10            MR. LOCKERBY:  I would like to have marked

11       as Exhibit 25 a document that's in the folder

12       as 001.

13       (Exhibit 25 was marked for identification.)

14            VIDEOGRAPHER:  Document in OneDrive.

15   BY MR. LOCKERBY:

16       Q.   Have you ever seen these messages before?

17       A.   No, I have not.

18       Q.   And do you see, down the page, it says,

19   "Yeah I feel guilty since I told Dean Peterson that

20   he was having paranoia again and that I'm worried for

21   him.

22            "And the deans decided to intervene and

23   get him to the ED."

24            Do you recall having had any discussions

25   with Angel Hsu about Mr. Bhattacharya supposedly

                            158

BARKLEY
Court Reporters

JA514

1   being paranoid?

2         A.   I -- I don't recall.  I believe that she

3   may have said to me, "I think he's being paranoid,"

4   but I don't recall the specifics.

5         Q.   As of November 14, 2018, when ASAC met,

6   the fact that Mr. Bhattacharya was being hospitalized

7   was something that was discussed at ASAC; isn't that

8   right?

9         A.   I do not recall that.

10        Q.   Well, you knew about Mr. Bhattacharya's

11  visit to CAPS as of November 14, 2018, when ASAC met;

12  isn't that true?

13        A.   I don't recall whether I knew at the time

14  ASAC met that he had gone to CAPS already.  I don't

15  recall that.

16        Q.   Have you ever seen the letter that ASAC

17  sent to Mr. Bhattacharya, dated November 15, 2018?

18             MS. THOMPSON:  Objection to form.  Assumes

19        facts not in evidence.

20             THE WITNESS:  I think I've seen that

21        letter, yeah.

22             MR. LOCKERBY:  Okay.  I would like to have

23        marked as Exhibit 26, please, document that's in

24        the folder as Number 40.

25             VIDEOGRAPHER:  Document in OneDrive.

159

CHRISTINE PETERSON



JA515

```
 1                C E R T I F I C A T E

 2

 3        I, KAREN K. KIDWELL, RMR, CRR, Notary Public

 4    for the Commonwealth of Virginia, do hereby certify

 5    that the witness whose deposition is hereinbefore set

 6    forth, was virtually sworn by me and that such

 7    deposition is a true record of the testimony given by

 8    such witness.

 9

10        I further certify that I am not related to any

11    of the parties to this action by blood or marriage;

12    and that I am in no way interested in the outcome of

13    this matter.

14

15

16    _____
                                      KAREN K. KIDWELL, RMR, CRR
17                                    Registered Merit Reporter
                                      Certified Realtime Reporter
18                                    Registration #7625774
                                      My Commission expires:
19                                    September 30, 2023

20

21

22

23

24

25

                        227
```

CHRISTINE PETERSON



JA516

TO BE FILED UNDER SEAL

# EXHIBIT DX1

JA517

**TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION

Civil Action No. 3:19:CV-00054

- - - - - - - - - - - - - - - - - - - - - - - -

KIERAN RAVI BHATTACHARYA,   **CERTIFIED COPY**

Plaintiff,

v.

JAMES B. MURRAY, JR., et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

MELISSA FIELDING

Wednesday, April 27, 2022

Reported by:

SUSAN ASHE, CSR, RMR, CRR

Job No.:  482977

1

JA518

**TO BE FILED UNDER SEAL**



1

2

3

4

5

6

7               Videoconference videotaped deposition of

8    MELISSA FIELDING, taken remotely on behalf of the

9    Plaintiff, beginning at 9:38 a.m. Eastern Daylight

10   Time, on Wednesday, April 27, 2022, via Zoom,

11   before Susan Ashe, CSR, RMR, CRR.

12

13

14

15

16

17

18

19

20

21

22

                                                              2

JA519

TO BE FILED UNDER SEAL

```
 1   APPEARANCE OF COUNSEL:

 2        On behalf of the Plaintiff:

 3             FOLEY & LARDNER LLP

 4             BY:  STEVEN C. LOCKHART, ESQ.

 5             (Admitted Pro Hac Vice)

 6             2021 McKinney Avenue, Suite 1600

 7             Dallas, Texas  75201

 8             (214) 999-3000

 9             slockhart@foley.com

10                  -  and  -

11             BY:  DAVID R. LEVINTOW, ESQ.

12             BY:  WHITNEY M. SWART, ESQ.

13             3000 K Street, Northwest, Suite 600

14             Washington, D.C.  20007-5109

15             (202) 672-5300

16             dlevintow@foley.com

17             wswart@foley.com

18             (Via Videoconference)

19

20

21

22
                                                        3
```

JA520

TO BE FILED UNDER SEAL

```
 1   APPEARANCE OF COUNSEL (Continued):

 2        On behalf of the Defendants, except for

 3        Dr. Sara Rasmussen, and the Witness:

 4             McGUIREWOODS LLP

 5             BY:  FARNAZ FARKISH THOMPSON, ESQ.

 6             888 16th Street, Northwest, Suite 500

 7             Black Lives Matter Plaza

 8             Washington, D.C.  20006

 9             (202) 857-1700

10             fthompson@mcguirewoods.com

11             (Via Videoconference)

12

13

14

15

16

17

18

19

20

21

22
                                                    4
```

JA521

**TO BE FILED UNDER SEAL**

```
 1   APPEARANCE OF COUNSEL (Continued):

 2        On behalf of the Defendant

 3        Dr. Sara Rasmussen:

 4             O'HAGAN MEYER, PLLC

 5             BY:  ROBERT YATES, ESQ.

 6             BY:  C. QUINN ADAMS, ESQ.

 7             411 East Franklin Street, Suite 500

 8             Richmond, Virginia  23219

 9             (804) 403-7100

10             ryates@ohaganmeyer.com

11             cadams@ohaganmeyer.com

12             (Via Videoconference)

13

14

15

16

17

18

19

20

21

22
                                                      5
```

JA522

**TO BE FILED UNDER SEAL**

```
1   ALSO PRESENT:

2            Melissa Riley, Esq.

3            The Office of the University Counsel

4            University of Virginia

5

6            Mary Dugan, Paralegal

7            McGuireWoods LLP

8

9            Ravi Bhattacharya, Plaintiff

10

11           Rob Chang, Videographer

12

13

14

15

16

17

18

19

20

21

22
```

6

JA523

**TO BE FILED UNDER SEAL**

```
 1                    CONTENTS

 2   THE WITNESS

 3   Melissa Fielding

 4

 5   EXAMINATION

 6     BY MR. LOCKHART                    14, 267

 7     BY MS. THOMPSON                 255, 275

 8

 9                    EXHIBITS

10   FIELDING

11   Exhibit No.                        Marked

12   Exhibit 1   Email Correspondence

13               UVA00006569 through -571       175

14   Exhibit 2   Email Correspondence

15               UVA00002761 through -763       175

16   Exhibit 3   Email Correspondence

17               UVA00002768 through -770       175

18   Exhibit 4   Email Correspondence

19               UVA00006250 and -251            84

20   Exhibit 5   Email Correspondence

21               UVA00003271 through -273       181

22
                                                   7
```

**TO BE FILED UNDER SEAL**

```
 1                    EXHIBITS (Continued)

 2    FIELDING

 3    Exhibit No.                              Marked

 4    Exhibit 6    Email Correspondence

 5                 UVA00003285 and -286          181

 6    Exhibit 7    Email Correspondence

 7                 UVA00006273 and -274          195

 8    Exhibit 9    January 2, 2019 Correspondence

 9                 KB-005317 through -319         25

10    Exhibit 10   Conference Call Agenda

11                 UVA00006280                    35

12    Exhibit 11   Email Correspondence

13                 UVA00006285                    41

14    Exhibit 12   Email Correspondence

15                 UVA00005641                    75

16    Exhibit 13   Email Correspondence

17                 UVA00005645 and -646           46

18    Exhibit 14   Email Correspondence

19                 UVA00006703 through -705      208

20    Exhibit 21   February 3, 2019 Correspondence

21                 KB-002824                      98

22
                                                      8
```

JA525

**TO BE FILED UNDER SEAL**

```
1              EXHIBITS (Continued)

2   FIELDING

3   Exhibit No.                      Marked

4   Exhibit 22  Email Correspondence

5               UVA00006399 and -400         41

6   Exhibit 24  Email Correspondence

7               UVA00001723 through -726     101

8   Exhibit 25  Email Correspondence

9               UVA00001743 through -746     101

10  Exhibit 26  Email Correspondence

11              UVA00001738 through -741     101

12  Exhibit 27  Email Correspondence

13              UVA00001753 through -756     101

14  Exhibit 30  Defendants' Responses and

15              Objections to Plaintiff's

16              Fourth Discovery Requests    131

17  Exhibit 32  University of Virginia Police

18              Department Detail

19              UVA00008079 through -130     195

20  Exhibit 33  Action - Meeting Notes

21              April 2, 2019

22              UVA00000435 through -450     163
```

9

Sound Deposition Service
(888) 297-6863

JA526

**TO BE FILED UNDER SEAL**

```
1                    EXHIBITS (Continued)

2    FIELDING

3    Exhibit No.                              Marked

4    Exhibit 34   Policy Directory               267

5    Exhibit 36   Email Correspondence

6                 UVA00005684 through -688        36

7    Exhibit 37   Email Correspondence

8                 UVA00006299                     36

9    Exhibit 38   Email Correspondence

10                UVA00011561 through -563       140

11

12

13

14

15

16

17

18

19

20

21

22
                                                  10
```

JA527

10:34  1        Ms. Thompson?

10:34  2              MS. THOMPSON:  Well, actually, though,

10:34  3        your notice of deposition stated that this

10:34  4        is for trial, this video deposition.

10:34  5              And so if it's for trial testimony,

10:34  6        this would be a direct, wouldn't it?

10:35  7              MR. LOCKHART:  You can lead opposing

10:35  8        witnesses.

10:35  9   BY MR. LOCKHART:

10:35 10        Q     Can you answer the question,

10:35 11   Officer Fielding?

10:35 12        A     Would you mind repeating the question

10:35 13   again?  I'm sorry.

10:35 14        Q     Sure.  You're identified on the

10:35 15   trespass warning at the top.  Correct?

10:35 16        A     I am.

10:35 17        Q     Does the officer that's reflected at

10:35 18   the top of a trespass warning indicate who issued

10:35 19   the -- what officer issued the trespass warning?

10:35 20        A     Yes.

10:35 21        Q     So in this case, you were the one who

10:35 22   issued the trespass warning?

                                                      27

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 10:35 | 1 | A     Yes. |
| 10:35 | 2 | Q     And isn't it true that it was |
| 10:35 | 3 | ultimately you that made the decision to issue the |
| 10:35 | 4 | trespass warning? |
| 10:35 | 5 | A     Yes. |
| 10:35 | 6 | Q     Prior to you ultimately making the |
| 10:35 | 7 | decision to issue the trespass warning to Kieran, |
| 10:35 | 8 | was anyone else involved in discussions about |
| 10:35 | 9 | whether or not to issue a trespass order? |
| 10:36 | 10 | MS. THOMPSON:  Objection to form. |
| 10:36 | 11 | You can answer. |
| 10:36 | 12 | A     Yes.  There were communications with |
| 10:36 | 13 | Ed Markowski, I believe, if memory is serving me |
| 10:36 | 14 | correctly, as this was a while ago, Susan Davis, |
| 10:36 | 15 | Laurie Casteen, and.... |
| 10:36 | 16 | I'm not sure who else was on that, but |
| 10:36 | 17 | those are the ones that I recall. |
| 10:36 | 18 | Q     Barry Meek? |
| 10:36 | 19 | A     I'm not sure that Barry was on the |
| 10:36 | 20 | call.  He typically advises the TAT team. |
| 10:36 | 21 | Q     Tommye Sutton? |
| 10:36 | 22 | A     I'm not sure if he would have been. |

28

JA529

TO BE FILED UNDER SEAL

| | | |
|---|---|---|
| 10:36 | 1 | This would have been December 30, |
| 10:36 | 2 | 2018, which was a holiday break.  So I don't |
| 10:36 | 3 | recall if he was, but I know he was copied on |
| 10:37 | 4 | communications. |
| 10:37 | 5 | Q    Gloria Graham? |
| 10:37 | 6 | A    The same.  I'm not sure that she was |
| 10:37 | 7 | on anything other than the email strings. |
| 10:37 | 8 | Q    Donald Mcgee? |
| 10:37 | 9 | A    I don't know if he was involved in |
| 10:37 | 10 | anything other than the email strings. |
| 10:37 | 11 | Q    Allen Groves? |
| 10:37 | 12 | A    I don't recall. |
| 10:37 | 13 | Q    Nicole Ruzek? |
| 10:37 | 14 | A    I don't know -- I don't know if she |
| 10:37 | 15 | was on anything other than the email string. |
| 10:37 | 16 | Q    Gabriel Gates? |
| 10:37 | 17 | A    It's unlikely that he was. |
| 10:37 | 18 | But I know that he was -- I think he |
| 10:37 | 19 | was part of -- he's definitely was part of the TAT |
| 10:37 | 20 | team and would have received email communication. |
| 10:38 | 21 | Q    Emily Babb? |
| 10:38 | 22 | A    Yes. |

29

JA530

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 10:38 | 1 | Q    So if I understand your testimony |
| 10:38 | 2 | correctly, you mentioned email string and a call. |
| 10:38 | 3 | Correct? |
| 10:38 | 4 | A    Yeah.  Again, I'm -- I -- as memory |
| 10:38 | 5 | serves me today, I'm recalling a communication |
| 10:38 | 6 | either with Ed and a small group by telephone or |
| 10:38 | 7 | perhaps by text message. |
| 10:38 | 8 | I just -- I don't recall whether -- |
| 10:38 | 9 | I'm recalling a telephone call at that particular |
| 10:38 | 10 | point. |
| 10:38 | 11 | Q    On which day? |
| 10:38 | 12 | A    December 30th. |
| 10:38 | 13 | Q    December 30th? |
| 10:38 | 14 | A    That's correct. |
| 10:39 | 15 | Q    So it was a group call with at least |
| 10:39 | 16 | some of the folks that we've mentioned here. |
| 10:39 | 17 | Is that correct? |
| 10:39 | 18 | MS. THOMPSON:  Objection; asked and |
| 10:39 | 19 | answered. |
| 10:39 | 20 | You can answer. |
| 10:39 | 21 | A    That is how I remember it, yes. |
| 10:39 | 22 | Q    What was discussed? |

30

JA531

| | | |
|---|---|---|
| 10:39 | 1 | A     What was discussed was some concerns |
| 10:39 | 2 | that had been brought forward, and specifically |
| 10:39 | 3 | Kieran and whether, you know, there were steps |
| 10:39 | 4 | that we needed to take to mitigate any threats or |
| 10:39 | 5 | concerns. |
| 10:39 | 6 | Q     What were the concerns that were |
| 10:39 | 7 | brought forward? |
| 10:39 | 8 | A     Well, I recall concerns specifically |
| 10:40 | 9 | about ██████, his ex-girlfriend, the protective |
| 10:40 | 10 | order that she had previously obtained. |
| 10:40 | 11 | And then the -- within the chat room, |
| 10:40 | 12 | there were messages that were encouraging Kieran |
| 10:40 | 13 | to use violence towards the members of the School |
| 10:40 | 14 | of Medicine. |
| 10:40 | 15 | Q     Any other concerns brought forward, |
| 10:40 | 16 | you recall? |
| 10:40 | 17 | A     No -- his mental state, the concerns |
| 10:40 | 18 | about the protective order and protecting ██████ |
| 10:40 | 19 | and just, more broadly, you know, the fact that he |
| 10:40 | 20 | had demonstrated sort of a pattern of targeting |
| 10:41 | 21 | individuals who -- like ██████, who we thought |
| 10:41 | 22 | obtained the ECO in late November, that ultimately |

31

JA532

**TO BE FILED UNDER SEAL**

10:41  1    resulted in her obtaining a protective order.

10:41  2        Q    What were the concerns about the

10:41  3    protective order?

10:41  4             She already had it.  Correct?

10:41  5             MS. THOMPSON:  Objection; compound.

10:41  6             What's your question, Counselor?

10:41  7        Q    █████████████, already had a

10:41  8    protective order in place.  Correct?

10:41  9        A    She did.

10:41  10       Q    And that preliminary protective order

10:41  11   had been in place since November of 2018.

10:41  12   Correct?

10:42  13       A    Yes.

10:42  14       Q    So what were the concerns about the

10:42  15   protective order?

10:42  16       A    The protective order had an expiration

10:42  17   date of February.

10:42  18            But the concerns really were that he

10:42  19   would perhaps show up on grounds and targeting her

10:42  20   or other individuals within the School of

10:42  21   Medicine.

10:42  22       Q    You said he had a pattern of

                                                           32

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 10:42 | 1 | "targeting"? |
| 10:42 | 2 | A    Yeah, showing up, confronting -- yes. |
| 10:42 | 3 | Q    What was the pattern of targeting? |
| 10:42 | 4 | A    Well, when he felt like ████ |
| 10:42 | 5 | obtained -- or ████ obtained the ECO or was |
| 10:42 | 6 | responsible for him being ECO'd, there were |
| 10:42 | 7 | behaviors that she had concerns about that led her |
| 10:42 | 8 | to obtaining the protective order. |
| 10:42 | 9 | And there were others within the |
| 10:42 | 10 | School of Medicine who had been confronted, |
| 10:43 | 11 | unannounced, by Kieran and, as articulated, had |
| 10:43 | 12 | them concerned. |
| 10:43 | 13 | Q    Who? |
| 10:43 | 14 | A    Dr. Densmore, for one. |
| 10:43 | 15 | Q    Who else? |
| 10:43 | 16 | A    To my recollection, that's the one |
| 10:43 | 17 | that stands out at that particular point. |
| 10:43 | 18 | Q    When was that confrontation that |
| 10:43 | 19 | you're speaking of? |
| 10:43 | 20 | A    I would have -- I don't recall.  It |
| 10:43 | 21 | would have been in November or December. |
| 10:43 | 22 | Again, this was -- these were facts |

33

JA534

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 10:43 | 1 | that were relayed during a -- you know, a |
| 10:43 | 2 | communication with other members of the TAT team |
| 10:43 | 3 | or December 30th. |
| 10:43 | 4 | Q    So the confrontation that you believe |
| 10:43 | 5 | occurred with Dr. Densmore, it occurred more than |
| 10:43 | 6 | a month before you issued the NTO.  Correct? |
| 10:44 | 7 | A    That's correct. |
| 10:44 | 8 | Q    The conduct that you mentioned |
| 10:44 | 9 | regarding ████████ occurred more than a month |
| 10:44 | 10 | before you issued the NTO.  Correct? |
| 10:44 | 11 | A    That's correct. |
| 10:44 | 12 | Q    The chat rooms that you mentioned, |
| 10:44 | 13 | that was more recent activity as of December 30th, |
| 10:44 | 14 | correct? -- December 30th of 2018? |
| 10:44 | 15 | A    I don't recall the exact date that |
| 10:44 | 16 | that occurred, but it seems to me that it would |
| 10:44 | 17 | have been the more recent activity. |
| 10:45 | 18 | MR. LOCKHART:  Let's turn to |
| 10:45 | 19 | Exhibit 10. |
| 10:45 | 20 | THE WITNESS:  I have a question about |
| 10:45 | 21 | how to -- do I just "X-out" of that? |
| 10:45 | 22 | MS. THOMPSON:  Just go back -- that |

34

JA535

| | | |
|---|---|---|
| 11:08 | 1 | Q     And you understand that under those |
| 11:08 | 2 | policies there are limited circumstances for which |
| 11:08 | 3 | a trespass warning may be issued? |
| 11:09 | 4 | MS. THOMPSON:  Objection to form. |
| 11:09 | 5 | A     So the trespass issuance policy is a |
| 11:09 | 6 | relatively new policy, and there was little |
| 11:09 | 7 | guidance over issuance prior to the policy as it |
| 11:09 | 8 | exists now. |
| 11:09 | 9 | And in that particular time, there |
| 11:09 | 10 | was -- there were -- you know, if there were |
| 11:09 | 11 | safety concerns involved, we would issue a No |
| 11:09 | 12 | Trespass notice. |
| 11:09 | 13 | Q     Is it your testimony, |
| 11:09 | 14 | Officer Fielding, that there was No Trespass |
| 11:09 | 15 | policy in place in December 2018, January 2019? |
| 11:09 | 16 | A     I do not -- I don't recall when the |
| 11:09 | 17 | policy went into effect.  But there were -- the |
| 11:09 | 18 | policy was relatively new, if it was in effect at |
| 11:09 | 19 | all. |
| 11:09 | 20 | Q     So as a captain of the University |
| 11:09 | 21 | Police Department, you don't know that as of |
| 11:10 | 22 | April 25, 2018 there was PRM-18 issuance of |

52

JA536

**TO BE FILED UNDER SEAL**

```
11:10   1   trespass warnings policy?

11:10   2          A     Yes, I'm aware of that policy.

11:10   3                I was not aware of the effective date.

11:10   4   I knew it was a relatively new policy.

11:10   5          Q     So you understand that policy -- that

11:10   6   the trespass warning policy, there are limited

11:10   7   circumstances for which a trespass warning can be

11:10   8   issued.  Right?

11:10   9          A     Yes.

11:10  10          Q     Now, at the time you issued the

11:10  11   trespass warning to Kieran, to your knowledge

11:10  12   Kieran had not committed any criminal activity on

11:10  13   the University or Medical Center property.

11:10  14   Correct?

11:10  15          A     I was aware of a protective order.

11:10  16                MR. LOCKHART:  Objection;

11:10  17          nonresponsive.

11:11  18          Q     At the time -- do you know what the

11:11  19   basis for the protective order was?

11:11  20          A     I recall a conversation on the night

11:11  21   of the 30th that provided some basis for that

11:11  22   protective order.  And what I recall was that
```
                                                                53

JA537

**TO BE FILED UNDER SEAL**

```
11:11   1        ███████  obtained a protective order after she

11:11   2   became concerned for her personal safety.

11:11   3              I believe what was relayed was that

11:11   4   she was concerned that Kieran felt that she was

11:11   5   responsible for him being ECO'd, and that based on

11:11   6   some behavior after that, she obtained -- she

11:11   7   obtained a protective order.

11:12   8        Q    You're aware that you can obtain a

11:12   9   protective order without someone committing

11:12  10   criminal activity.  Correct?

11:12  11        A    I'm aware -- I'm aware that someone

11:12  12   can obtain a protective order if they have

11:12  13   concerns about their personal safety.

11:12  14        Q    And you don't know, specifically, what

11:12  15   conduct Ms. -- or, excuse me, ███████ was

11:12  16   concerned about, do you?

11:12  17              MS. THOMPSON:  Objection; asked and

11:12  18        answered.

11:12  19        A    I don't know the specifics.

11:12  20              But I know that certain elements have

11:12  21   to be met before a magistrate would issue them,

11:12  22   and a magistrate felt like they had enough to
```

                                                              54

JA538

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 11:12 | 1 | issue a protective order. |
| 11:12 | 2 | Q    To your knowledge, at the time you |
| 11:12 | 3 | issued the trespass warning, Kieran had not |
| 11:12 | 4 | committed any criminal activity on University or |
| 11:12 | 5 | Medical Center property.  True? |
| 11:13 | 6 | MS. THOMPSON:  Objection; asked and |
| 11:13 | 7 | answered.  The court reporter can read back |
| 11:13 | 8 | the transcript.  You've already asked that |
| 11:13 | 9 | question.  Move on. |
| 11:13 | 10 | Q    Please answer the question. |
| 11:13 | 11 | MS. THOMPSON:  She's already answered |
| 11:13 | 12 | it. |
| 11:13 | 13 | MR. LOCKHART:  Ms. Thompson, please |
| 11:13 | 14 | stop interrupting. |
| 11:13 | 15 | You can state your objection. |
| 11:13 | 16 | If you're going to instruct her not to |
| 11:13 | 17 | answer, we can take it up with the judge. |
| 11:13 | 18 | MS. THOMPSON:  This is the third time |
| 11:13 | 19 | you've asked her this question. |
| 11:13 | 20 | MR. LOCKHART:  I'm asking a very |
| 11:13 | 21 | simple true-or-false, yes-or-no question. |
| 11:13 | 22 | THE WITNESS:  So restate your |

55

JA539

```
11:29   1   front of you? -- because I'd like to see it.

11:29   2        Q     No, I don't.

11:29   3              You're not familiar with that policy?

11:29   4        A     I am -- I wouldn't -- I would like to

11:29   5   see it if I -- if possible, before I answer.

11:29   6        Q     Within 48 hours of issuing the NTO,

11:29   7   did you consult with anyone from Student Affairs

11:29   8   about consideration of the circumstances under

11:29   9   which the trespass warning was issued?

11:29  10        A     Within 48 hours, you're asking if I

11:29  11   consulted with anyone at Student Affairs?

11:29  12        Q     Yes.

11:29  13        A     The discussions I had were with

11:29  14   members of the TAT team:  Ed Markowski, perhaps

11:29  15   Susan Davis, Laurie Casteen.

11:29  16              But that's it, to my recollection.

11:30  17        Q     Do you know whether any of those

11:30  18   people that you were communicating with were with

11:30  19   the Student Affairs office?

11:30  20        A     Well, sure.  Laurie Casteen and Susan

11:30  21   Davis are both with Student Affairs.

11:30  22        Q     Did you communicate with anybody on
```

71

JA540

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 11:30 | 1 | the EOCR committee? |
| 11:30 | 2 | A    Perhaps Emily Babb. |
| 11:30 | 3 | But I don't recall -- oh, she's with |
| 11:30 | 4 | Title IX.  I don't recall any other communications |
| 11:30 | 5 | directly, and -- but she's part of the larger TAT |
| 11:30 | 6 | group as well. |
| 11:30 | 7 | Q    Prior to issuing the NTO, had you |
| 11:31 | 8 | spoken with Kieran? |
| 11:31 | 9 | A    Prior to issuing the NTO, had I spoken |
| 11:31 | 10 | with Kieran?  No, not to my knowledge. |
| 11:31 | 11 | Q    Well, let me understand:  Can an NTO |
| 11:31 | 12 | be verbal, or does -- is it actually issued when |
| 11:31 | 13 | you fill out a document like Exhibit 9 that we |
| 11:31 | 14 | looked at earlier? |
| 11:31 | 15 | A    It can be verbal, having warned. |
| 11:31 | 16 | But it's official -- that's what our |
| 11:31 | 17 | officers are going to look for when they respond |
| 11:31 | 18 | to a scene and find a violation, they're going to |
| 11:31 | 19 | look for that paper document. |
| 11:31 | 20 | Q    You spoke with Kieran on December 30, |
| 11:31 | 21 | 2018? |
| 11:31 | 22 | A    Yes. |

72

JA541

| | | |
|---|---|---|
| 11:31 | 1 | Q     How long was that call? |
| 11:32 | 2 | A     It was very brief. |
| 11:32 | 3 |       To my knowledge -- I don't know |
| 11:32 | 4 | exactly how long, but it was really brief. |
| 11:32 | 5 | Q     Two minutes? |
| 11:32 | 6 | A     If that. |
| 11:32 | 7 | Q     And you asked Kieran if he had been |
| 11:32 | 8 | trespassed by UVA during that call -- if he had |
| 11:32 | 9 | been trespassed by UVA before.  Right? |
| 11:32 | 10 |       MS. THOMPSON:  Objection to form, |
| 11:32 | 11 |     hearsay. |
| 11:32 | 12 |       You can answer. |
| 11:32 | 13 | A     I recall introducing myself, telling |
| 11:32 | 14 | him who I was, who I was calling with, instructing |
| 11:32 | 15 | him that I was calling to verbally issue him a No |
| 11:32 | 16 | Trespass notice and that I would follow up in a |
| 11:32 | 17 | couple of days with the -- a written one. |
| 11:32 | 18 |       I believe he asked what it was for, |
| 11:32 | 19 | and my comments were very broad and general.  It |
| 11:33 | 20 | was due to some safety concerns that others had, |
| 11:33 | 21 | individuals had for their safety. |
| 11:33 | 22 |       And that's the basic extent of it, as |

73

JA542

**TO BE FILED UNDER SEAL**

11:33  1  I recall.

11:33  2          Q     Do you recall specifically mentioning

11:33  3  chat rooms?

11:33  4          A     I don't recall, but I might have.

11:33  5          Q     You didn't mention ████████?

11:33  6          A     I didn't.

11:33  7          Q     You didn't mention the preliminary

11:33  8  protective order?

11:33  9          A     I did not.

11:33 10                I was concerned that he would, you

11:33 11  know, further his aggressions towards her if I did

11:33 12  single her out.

11:33 13                MR. LOCKHART:  Objection to everything

11:33 14          after the words "I did not" as

11:33 15          nonresponsive.

11:34 16          Q     Do you recall Kieran asking you to put

11:34 17  it in writing?

11:34 18          A     I don't know whether he said that or

11:34 19  not.

11:34 20                But it's a typical protocol.  It would

11:34 21  have been in writing anyway, the NTO.

11:34 22          Q     And you sent Kieran a letter,

                                                              74

JA543

TO BE FILED UNDER SEAL

| | | |
|---|---|---|
| 11:35 | 1 | enclosing the NTO, by mail on January 2, 2019? |
| 11:35 | 2 | A     I did. |
| 11:35 | 3 | Q     That was Exhibit 9 that we looked at |
| 11:35 | 4 | earlier? |
| 11:35 | 5 | A     Okay, yes. |
| 11:35 | 6 | MR. LOCKHART:  Could you put |
| 11:35 | 7 | Exhibit 12 in OneDrive, please. |
| 11:35 | 8 | VIDEOGRAPHER:   Exhibit 12 is now in |
| 11:35 | 9 | OneDrive. |
| 11:35 | 10 | (Whereupon, Fielding Exhibit 12 was |
| 11:35 | 11 | marked for identification.) |
| 11:35 | 12 | BY MR. LOCKHART: |
| 11:35 | 13 | Q     Do you have it open, Officer Fielding? |
| 11:35 | 14 | A     Yes. |
| 11:35 | 15 | Q     The day after you sent the letter |
| 11:35 | 16 | enclosing the NTO, you sent an email to Kieran. |
| 11:35 | 17 | Correct? |
| 11:35 | 18 | A     The day after? |
| 11:36 | 19 | You're asking me if I sent it? |
| 11:36 | 20 | I don't recall sending an email to him |
| 11:36 | 21 | the day after. |
| 11:36 | 22 | Q     Well, maybe when we look at some other |

75

JA544

11:40  1    the -- at the AVP level.

11:40  2         Q     And you can actually -- well, are you

11:40  3    saying the UPD can't grant an exception without

11:40  4    going to the AVP level?

11:40  5         A     Without an appeal.

11:40  6         Q     Exceptions can be made to the NTO,

11:40  7    including to allow someone to participate in a

11:40  8    hearing.  Right?

11:40  9         A     Yes.

11:40 10         Q     But even before Kieran had a chance --

11:40 11               You're aware that Kieran was suspended

11:41 12    in November of 2018.  Right?

11:41 13         A     I don't know if I was aware at that

11:41 14    particular time, but I did become aware that he

11:41 15    was suspended.

11:41 16         Q     You're aware that even before Kieran

11:41 17    had a chance to ask for permission to participate

11:41 18    in an appeal of his suspension that UVA had

11:41 19    decided that the trespass warning prevented his

11:41 20    appeal from going forward.  Right?

11:41 21               MS. THOMPSON:  Objection; assumes

11:41 22         facts not in evidence.

                                                              79

JA545

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 11:41 | 1 | You may answer. |
| 11:41 | 2 | A     Can you repeat that again, because I'm |
| 11:41 | 3 | not understanding your question. |
| 11:41 | 4 | Q     You're aware that even before Kieran |
| 11:41 | 5 | had a chance to ask for permission to participate |
| 11:41 | 6 | in an appeal of his suspension that UVA decided |
| 11:41 | 7 | that the trespass warning prevented his appeal |
| 11:41 | 8 | from going forward.  Right? |
| 11:41 | 9 | A     I'm not -- I wasn't aware of it, no. |
| 11:42 | 10 | Q     On December 28, 2018, how did you |
| 11:42 | 11 | first become aware that there was an issue |
| 11:42 | 12 | involving Kieran? |
| 11:42 | 13 | A     My first recollection of an issue with |
| 11:42 | 14 | Kieran was December 30, 2018. |
| 11:42 | 15 | Q     I'm sorry.  I misspoke.  You are |
| 11:42 | 16 | correct.  Let me restate. |
| 11:42 | 17 | On December 30, 2018, how did you |
| 11:42 | 18 | first become aware that there was an issue |
| 11:42 | 19 | involving Kieran? |
| 11:42 | 20 | A     I was copied on an email exchange |
| 11:42 | 21 | looping me into the thread by Gloria Graham. |
| 11:42 | 22 | Q     And who is Ms. Graham? |

80

JA546

11:43  1        A      She -- at the time she was the

11:43  2   associate vice president for Safety and Security.

11:43  3        Q      Were you aware that at the time you

11:43  4   issued the NTO that Kieran was already prohibited

11:43  5   from coming on University property without prior

11:43  6   permission as part of his suspension?

11:43  7        A      I was not.

11:43  8        Q      Nobody told you that?

11:43  9        A      No.

11:43  10             MS. THOMPSON:  I'd like to just say --

11:43  11        objection, you've assumed facts not in

11:43  12        evidence with both of those last two

11:43  13        questions.

11:43  14        Q      Have you since had any conversation

11:43  15   with anyone, where you were told that Kieran was

11:43  16   prohibited from coming onto University property

11:44  17   without prior permission as a part of his

11:44  18   suspension?

11:44  19        A      No.

11:44  20        Q      If that were true -- I understand you

11:44  21   don't -- I understand you haven't been told that

11:44  22   or haven't seen any documents about that -- but if

                                                          81

| | | |
|---|---|---|
| 11:44 | 1 | that were true, would that be something you'd want |
| 11:44 | 2 | to know at the time that you were deciding whether |
| 11:44 | 3 | to issue an NTO? |
| 11:44 | 4 | A    No.  We would issue our own NTO based |
| 11:44 | 5 | on our concerns. |
| 11:44 | 6 | And the information we have available |
| 11:44 | 7 | to us is that NTO provides our officers the |
| 11:44 | 8 | authority to act upon the violation of |
| 11:44 | 9 | trespassing. |
| 11:44 | 10 | (Pause.) |
| 11:45 | 11 | MR. LOCKHART:  Can you put Exhibit 4 |
| 11:45 | 12 | into OneDrive. |
| 11:45 | 13 | MR. YATES:  Steve, at some point can |
| 11:45 | 14 | we take a break? |
| 11:45 | 15 | It doesn't have to be now.  But.... |
| 11:45 | 16 | MS. THOMPSON:  Can we take a break in |
| 11:45 | 17 | about 15.... |
| 11:45 | 18 | MR. LOCKHART:  Now is a perfect time. |
| 11:45 | 19 | MR. YATES:  Okay. |
| 11:45 | 20 | MS. THOMPSON:  Now is a perfect time? |
| 11:45 | 21 | VIDEOGRAPHER:  We are going off the |
| 11:45 | 22 | record.  The time is -- |

82

JA548

12:36  1                    (Witness reading.)

12:36  2        A    I see that I was copied here, but I'm

12:36  3   not sure that I read it in November.

12:36  4        Q    Do you typically not read your emails

12:36  5   when you receive them?

12:36  6        A    I'm copied on some emails for an

12:36  7   informational purpose.

12:36  8             And this looked like an informational

12:36  9   purpose for me.  It was not my responsibility at

12:36 10   that point to be intricately familiar with the

12:36 11   details of this email.

12:36 12        Q    So for it to be informational, you

12:36 13   would have to read it.  Correct?

12:37 14             MS. THOMPSON:  Objection;

12:37 15        mischaracterizes the witness's testimony.

12:37 16        A    Again, I don't recall reading this

12:37 17   email.

12:37 18             It was -- started out by saying,

12:37 19   "Please place...in Services...."

12:37 20             That's the responsibility of Maryann

12:37 21   Gritmon.  That's not an action that I would need

12:37 22   to take.

                                                          85

JA549

| | | |
|---|---|---|
| 12:37 | 1 | Q    You don't deny receiving this email in |
| 12:37 | 2 | November of 2018? |
| 12:37 | 3 | A    I'm copied here.  So, no, I do not |
| 12:37 | 4 | deny it. |
| 12:37 | 5 | I don't recall it, though. |
| 12:37 | 6 | Q    As a captain at the time and deputy |
| 12:37 | 7 | chief now, you're aware that the UVA trespass |
| 12:37 | 8 | policy provides a procedure for appealing a No |
| 12:38 | 9 | Trespass warning.  Right? |
| 12:38 | 10 | A    Yes. |
| 12:38 | 11 | Q    And in Exhibit 9 -- if you want to |
| 12:38 | 12 | pull Exhibit 9 up and look at it while we go |
| 12:38 | 13 | through this, feel free. |
| 12:38 | 14 | A    Okay. |
| 12:38 | 15 | Q    Exhibit 9 also details the process. |
| 12:38 | 16 | Right? |
| 12:38 | 17 | A    It does. |
| 12:38 | 18 | Q    And the appeal has to be in writing. |
| 12:38 | 19 | Correct? |
| 12:38 | 20 | A    Yes.  The procedures to appeal the |
| 12:38 | 21 | trespass warning are written on that last page. |
| 12:38 | 22 | Q    So the appeal has to be in writing. |

86

JA550

TO BE FILED UNDER SEAL

| | | |
|---|---|---|
| 12:38 | 1 | Correct? |
| 12:38 | 2 | A    Yes. |
| 12:38 | 3 | Q    And it goes to the associate vice |
| 12:38 | 4 | president for Safety and Security.  Right? |
| 12:38 | 5 | A    Yes. |
| 12:38 | 6 | Q    And who did you say that was in the |
| 12:38 | 7 | December 2018, January 2019 period? |
| 12:39 | 8 | A    It would have been Gloria Graham. |
| 12:39 | 9 | Q    So the appeal goes to Ms. Graham, as I |
| 12:39 | 10 | understand it. |
| 12:39 | 11 | And the appeal must be submitted |
| 12:39 | 12 | within five calendar days of the date the trespass |
| 12:39 | 13 | warning is served.  Right? |
| 12:39 | 14 | You knew that. |
| 12:39 | 15 | A    Yeah. |
| 12:39 | 16 | MS. THOMPSON:  Objection to form. |
| 12:39 | 17 | Q    And you also knew that failure to meet |
| 12:39 | 18 | the five-day deadline means the trespass warning |
| 12:39 | 19 | recipient waives the opportunity to appeal. |
| 12:39 | 20 | Right? |
| 12:39 | 21 | A    Yes. |
| 12:39 | 22 | Q    Now, you understand that the written |

87

JA551

12:39   1    appeal must include the appellant's contact

12:39   2    information, including their address, telephone

12:39   3    number, email.  Right?

12:39   4          A     Yes.

12:39   5          Q     And you knew at the time you issued

12:39   6    the trespass warning that the date of issuance of

12:39   7    the trespass warning and the incident base report

12:39   8    number located on the upper left-hand corner of

12:39   9    the trespass warning had to be included on the

12:39   10   appeal.  Right?

12:40   11         A     Yes.

12:40   12         Q     And you knew at the time that the

12:40   13   appellant had to give the reason for the review

12:40   14   request.  Right?

12:40   15         A     Yes.

12:40   16         Q     At the time you issued the No Trespass

12:40   17   warning, you knew that the appellant had to give a

12:40   18   complete and candid explanation for the conduct

12:40   19   that precipitated the trespass warning.  Right?

12:40   20         A     Yes.

12:40   21         Q     And you knew that the appellant also

12:40   22   had to provide the basis for the desire to be on

88

JA552

**TO BE FILED UNDER SEAL**

12:53 1              Do you recall, in February of 2019,

12:53 2     being contacted by anyone with UVA requesting that

12:53 3     you pull any records that related to your decision

12:53 4     to issue the No Trespass Order?

12:54 5          A     I'm not aware -- I don't recall if

12:54 6     anyone did or not.

12:54 7          Q     Do you know if UVA responded to this

12:54 8     information request that Kieran sent?

12:54 9          A     I do not know.  I don't know.

12:54 10         Q     So if UVA did, you don't know how UVA

12:54 11    responded.  Correct?

12:54 12         A     I don't know if they did or not.

12:54 13         Q     Isn't it true that you did not provide

12:54 14    Kieran with any kind of detailed reason for

12:54 15    issuing the NTO until July 18, 2019?

12:54 16             MS. THOMPSON:  Objection; asked and

12:54 17         answered.

12:54 18         A     You have copies of the documents that

12:54 19    I provided to him.  And I've provided testimony

12:55 20    about my conversation with him by phone on

12:55 21    December 30, 2018.

12:55 22             That's the information I provided to

                                                          100

JA553

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 12:55 | 1 | him. |
| 12:55 | 2 | MR. LOCKHART:  Put Exhibit 24 in |
| 12:55 | 3 | OneDrive. |
| 12:55 | 4 | VIDEOGRAPHER:  Counselor, 24 is in |
| 12:55 | 5 | OneDrive. |
| 12:55 | 6 | (Whereupon, Fielding Exhibit 24 was |
| 12:55 | 7 | marked for identification.) |
| 12:55 | 8 | MR. LOCKHART:  You can also put in |
| 12:55 | 9 | Exhibits 25, 26, and 27. |
| 12:55 | 10 | (Whereupon, Fielding Exhibits 25, 26, |
| 12:55 | 11 | and 27 were marked for identification.) |
| 12:55 | 12 | BY MR. LOCKHART: |
| 12:55 | 13 | Q     Officer Fielding, if you'll open up |
| 12:55 | 14 | Exhibit 24. |
| 12:55 | 15 | A     Okay.  I have 24 open. |
| 12:55 | 16 | Q     Do you recognize Exhibit 24, which is |
| 12:56 | 17 | Bates-labeled UVA-0001723 through -1726? |
| 12:56 | 18 | A     Yes. |
| 12:56 | 19 | Q     If you'll turn to the page that's |
| 12:56 | 20 | Bates-stamped UVA-0001724. |
| 12:56 | 21 | A     Okay. |
| 12:56 | 22 | Q     On the second line, Kieran says -- or |

101

JA554

12:56  1    writes that you "failed to provide me with any

12:56  2    specific reasons for this order in your initial

12:56  3    phone call before issuing it."

12:57  4              Do you see that?

12:57  5      A    I see it.

12:57  6      Q    And you didn't respond to

12:57  7    Mr. Bhattacharya, or to Kieran, and say, That's

12:57  8    not true, here is the information I provided --

12:57  9    did you?

12:57 10      A    I did not respond to him, no.

12:57 11      Q    You didn't say, You're wrong, here's

12:57 12    what you forgot.  Right?

12:57 13              MS. THOMPSON:  Objection;

12:57 14         mischaracterizes the witness's prior

12:57 15         testimony.

12:57 16      A    I did not respond to his emails.

12:57 17              There were a barrage of emails and

12:57 18    text messages and phone calls at this time.

12:57 19              MR. LOCKHART:  Objection; unresponsive

12:57 20         to everything after, "I did not respond to

12:57 21         his emails."

12:58 22      Q    If you continue on, on the third line,

                                                          102

JA555

TO BE FILED UNDER SEAL

| | | |
|---|---|---|
| 12:58 | 1 | Kieran says that you "failed to provide me with |
| 12:58 | 2 | any specific reason in the PDF that was forwarded |
| 12:58 | 3 | to me by John Densmore." |
| 12:58 | 4 | You didn't take issue with that and |
| 12:58 | 5 | say "you're wrong" in a response.  Correct? |
| 12:58 | 6 | A    I just told you I did not respond to |
| 12:58 | 7 | this email. |
| 12:58 | 8 | Q    Well, you in fact did subsequently |
| 12:58 | 9 | respond to that email, did you not? |
| 12:58 | 10 | MS. THOMPSON:  Objection; lacks |
| 12:58 | 11 | foundation. |
| 12:58 | 12 | Q    If you turn to page UVA00001723, is |
| 12:58 | 13 | that not your response? |
| 12:58 | 14 | A    It is. |
| 12:58 | 15 | (Witness reading.) |
| 12:59 | 16 | A    It is my response. |
| 12:59 | 17 | I believe this email came after a |
| 12:59 | 18 | series of emails came in. |
| 12:59 | 19 | And I wasn't the only one receiving |
| 12:59 | 20 | them.  And so, I had a conversation with Barry |
| 12:59 | 21 | Meek and Ed.  And this is the response that I sent |
| 12:59 | 22 | after that. |

103

JA556

01:55  1    before or not.

01:55  2         Q     Will you flip to page 22 of

01:55  3    Exhibit 30, which is entitled "DEFENDANTS'

01:55  4    RESPONSES AND OBJECTIONS TO PLAINTIFF'S FOURTH

01:55  5    DISCOVERY REQUESTS."

01:55  6         A     Okay.

01:55  7         Q     And if you look at the -- do you see

01:55  8    where it says "ANSWER TO INTERROGATORY NO. 2"?

01:55  9         A     I do.

01:55 10         Q     And the third sentence down that

01:55 11    begins, "The primary reason" -- do you see that

01:56 12    sentence?

01:56 13              Would you read that aloud.

01:56 14         A     The third sentence down in answer to

01:56 15    No. 2....

01:56 16         Q     Yeah.  It begins, "The primary

01:56 17    reason...," that sentence.

01:56 18         A     (Reading:)

01:56 19              The primary reason that

01:56 20              Captain Fielding issued the

01:56 21              Trespass Warning was to

01:56 22              protect... ████████ who had

                                                    132

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 01:56 | 1 | obtained a Preliminary |
| 01:56 | 2 | Protective Order against "the" |
| 01:56 | 3 | Plaintiff that was in place at |
| 01:56 | 4 | the time.  She was.... |
| 01:56 | 5 | Okay. |
| 01:56 | 6 | Q    Is that a true statement? |
| 01:56 | 7 | A    Yes. |
| 01:56 | 8 | Q    Do you ever communicate that, those |
| 01:56 | 9 | words, to Kieran? |
| 01:56 | 10 | A    As I've answered already, no, I did |
| 01:57 | 11 | not.  And I have explained the reasons for that. |
| 01:57 | 12 | Q    Can you tell me where in Exhibit 24 |
| 01:57 | 13 | that there is any reference to concerns about ▇ |
| 01:57 | 14 | because of the preliminary protective order? |
| 01:57 | 15 | MS. THOMPSON:  Objection; asked and |
| 01:57 | 16 | answered. |
| 01:57 | 17 | A    Can you ask your question again. |
| 01:57 | 18 | Q    Can you tell me where in Exhibit 24 |
| 01:57 | 19 | that there is any reference to concerns about ▇ |
| 01:57 | 20 | because of the preliminary protective order? |
| 01:57 | 21 | MS. THOMPSON:  Objection; asked and |
| 01:57 | 22 | answered. |

133

**TO BE FILED UNDER SEAL**

01:57  1              She already testified numerous times

01:57  2         what she provided the plaintiff.

01:58  3              MR. LOCKHART:  Just stick with asked

01:58  4         and answered.  I got it.

01:58  5              She can answer the question.

01:58  6              MS. THOMPSON:  Is that a

01:58  7         microaggression, Steve?

01:58  8         A    I did not include that in the response

01:58  9    to Kieran because of my concern that he would

01:58  10   further target her.

01:58  11             But as I've testified, I did not

01:58  12   include that piece in the response to him.

01:58  13        Q    The next sentence, can you read that

01:58  14   aloud, please.

01:58  15        A    Yes.

01:58  16        Q    In Exhibit 30, page 22, fourth

01:58  17   sentence.

01:58  18        A    (Reading:)

01:58  19                 She was aware that the

01:58  20             University received several

01:58  21             concerns regarding Plaintiff's

01:58  22             social media posts as well as

                                                         134

JA559

TO BE FILED UNDER SEAL

01:58  1                    posts made in response to

01:58  2                    Plaintiff's posts.  She had not

01:59  3                    read Plaintiff's social media

01:59  4                    posts or the posts made in

01:59  5                    response to Plaintiff's posts

01:59  6                    when she decided to issue the

01:59  7                    Trespass "notice."

01:59  8          Q     That last sentence isn't exactly true,

01:59  9   is it?

01:59  10         A     I had not read all of his social

01:59  11  media -- I don't think I read any of his social

01:59  12  media posts.

01:59  13                But in regard to the chat forum posts,

01:59  14  I read the threads that were related to the

01:59  15  threats.

01:59  16         Q     So the answer to my question was yes?

02:00  17                    (No response.)

02:00  18         Q     Do you need me to restate my question,

02:00  19  Officer Fielding?

02:00  20         A     Sure.

02:00  21         Q     I just said the last sentence -- I'll

02:00  22  read back my question.

                                                              135

JA560

02:45  1            MS. THOMPSON:  To my knowledge,

02:45  2        sitting here right now, yes.

02:45  3  BY MR. LOCKHART:

02:45  4        Q    So Officer Fielding, can you go --

02:45  5  we're done with Exhibit 38.  Can you go back to

02:45  6  Exhibit 30 and open it up to page 22.

02:45  7        A    Okay.  I'm there.

02:45  8        Q    In response to Interrogatory No. 2,

02:45  9  the third sentence where -- that you've already

02:45 10  read into the record that begins, "The primary

02:45 11  reason" -- do you see that?

02:45 12        A    Yes.

02:46 13        Q    If the primary reason suggests to me

02:46 14  that there are other reasons that you issued the

02:46 15  trespass warning, is that a fair interpretation of

02:46 16  the interrogatory response?

02:46 17        A    Yes.

02:46 18        Q    Could you identify for me any other

02:46 19  reasons -- any other specific reasons that you

02:46 20  issued the protective order [sic]?

02:46 21        A    So the -- as I testified earlier, the

02:46 22  primary reason was related to ███████ and the

                                                    147

JA561

02:46  1    protective order.

02:46  2              There were other broader concerns

02:46  3    about, you know, Kieran's behavior and his -- the

02:46  4    fact that he had at least been confrontational one

02:47  5    other time and -- with Dr. Densmore.

02:47  6              And, you know, that's the --

02:47  7              Coupled with the concerns that others

02:47  8    were encouraging him to use violence, that's why I

02:47  9    issued the No Trespass notice.

02:47 10        Q    So you're talking about the others to

02:47 11    encourage -- so three reasons, as I understand it?

02:47 12        A    In summary, it's....

02:47 13        Q    ██, Densmore, and the Exhibit 38

02:47 14    postings that we saw --

02:47 15        A    Just his general confrontational

02:47 16    behavior at that point in time, yes.

02:47 17        Q    So what other "general confrontational

02:47 18    behavior" are you talking about besides Densmore

02:47 19    and ██?

02:48 20              That's what I'm trying to understand.

02:48 21        A    So the primary reason being the

02:48 22    protective order and his behavior; his conduct

                                                          148

02:48  1   with          ; and the confrontation, you know,

02:48  2   that he had with Dr. Densmore, who expressed

02:48  3   concern for his safety; also these, you know,

02:48  4   threads that encouraged him to act out violence

02:48  5   against members of the School of Medicine.

02:48  6           Those were -- those were the reasons

02:48  7   that I felt justified in issuing the trespass

02:48  8   notice.

02:48  9       Q    Okay.  So -- but you mentioned

02:48  10  "general confrontational behavior."

02:49  11          I'm trying to make sure that there's

02:49  12  nothing other than what -- the conduct that you're

02:49  13  saying occurred with respect to          and

02:49  14  Dr. Densmore.

02:49  15          Is there anything else that you fit

02:49  16  into this "general confrontational behavior" at

02:49  17  the time --

02:49  18      A    No.

02:49  19      Q    -- that you made the determination?

02:49  20      A    No.

02:49  21      Q    What specific conduct do you

02:49  22  characterize as "general confrontational behavior"

                                                          149

JA563

```
02:49  1    with respect to Dr. Densmore?

02:49  2          A     Well, at this point, you know, what I

02:49  3    was aware of was the -- showing up, you know --

02:49  4                 He had been ECO'd in November.  He --

02:50  5    at least according to the information I was

02:50  6    provided, ███ believed that he'd blamed her for

02:50  7    that.

02:50  8                 He acted in a way that had her

02:50  9    concerned for her safety.  She obtained a

02:50  10   protective order because she was concerned for her

02:50  11   life.

02:50  12                And he at one point did show up

02:50  13   unannounced to confront Dr. Densmore, who had

02:50  14   expressed concern for his safety.

02:50  15                This was all prior to the issuance of

02:50  16   the NTO, but in close proximity to the emergency

02:50  17   custody orders that had been issued.

02:50  18         Q     What specific behavior or conduct are

02:50  19   you referring to as "general confrontational

02:51  20   behavior" with respect to his interaction with

02:51  21   Dr. Densmore?

02:51  22                MS. THOMPSON:  Objection; asked and
```

150

JA564

02:51  1        answered.

02:51  2        Q     I want you to detail --

02:51  3        A     Yep, showing up in his space

02:51  4   unannounced, not -- you know, not listening to him

02:51  5   and --

02:51  6              You know, I wasn't there at that

02:51  7   particular time.  But it was relayed to me that

02:51  8   Dr. Densmore was concerned for his safety -- as a

02:51  9   result of that encounter with Kieran.

02:51 10        Q     That information was conveyed to you

02:51 11   by Mr. Markowski?

02:51 12        A     I believe so.

02:51 13        Q     Anyone else?

02:51 14        A     I'm not aware of anyone else, no.

02:52 15        Q     Are you aware of -- strike that.

02:52 16              If you'll turn to page 23 of

02:52 17   Exhibit 30.  The third sentence in the Answer to

02:52 18   Interrogatory No. 3., will you read that aloud,

02:52 19   please.

02:52 20        A     You said the third sentence?  It

02:52 21   starts with, "On or about..."?

02:53 22        Q     "In her July 18..." -- maybe I'm

                                                      151

Sound Deposition Service
(888) 297-6863

JA565

**TO BE FILED UNDER SEAL**

```
03:04  1            I think I probably was aware that

03:04  2   there was a TAT case regarding him because Ed

03:04  3   talked to me.  But what the nature of that was,

03:04  4   I'm -- on December 30th, I don't -- I don't know

03:05  5   beyond, you know, what he briefed me on in terms

03:05  6   of the protective order and the concerning posts.

03:05  7      Q     At the time that you issued the

03:05  8   trespass warning, you weren't aware of any

03:05  9   violation by Kieran of the conditions of his

03:05  10  suspension, were you?

03:05  11     A     I didn't know what the -- I don't know

03:05  12  what the conditions of his suspension are, no.

03:05  13            I don't --

03:05  14     Q     You didn't ask anyone?

03:05  15     A     No.

03:05  16            I didn't -- I don't even know that I

03:05  17  knew that he was suspended.

03:05  18            I don't think I knew that he was --

03:05  19     Q     You knew enough to mark him as

03:05  20  unaffiliated with the University, didn't you, in

03:05  21  Exhibit 9?

03:05  22     A     It was marked on the form, but I
```

161

JA566

| | | |
|---|---|---|
| 04:49 | 1 | protective order.  That would become part of the |
| 04:49 | 2 | material that is used to evaluate it. |
| 04:49 | 3 | Q    How does the AVP know what the |
| 04:49 | 4 | officer's basis for issuing the NTO is absent a |
| 04:49 | 5 | written record of it? |
| 04:49 | 6 | MS. THOMPSON:  Objection; calls for |
| 04:49 | 7 | speculation.  She's not the AVP. |
| 04:49 | 8 | Q    Have you been involved with NTO |
| 04:50 | 9 | appeals before? |
| 04:50 | 10 | A    I wasn't involved in this one. |
| 04:50 | 11 | The AVP and chief of police, Tim |
| 04:50 | 12 | Longo, does not -- he doesn't consult with me on |
| 04:50 | 13 | evaluations.  He runs the individuals through the |
| 04:50 | 14 | databases and systems and obtains all the |
| 04:50 | 15 | information available and then makes an |
| 04:50 | 16 | evaluation. |
| 04:50 | 17 | Q    So even if there's no -- take the case |
| 04:50 | 18 | of Kieran. |
| 04:50 | 19 | Even if there are no emails that talk |
| 04:50 | 20 | about ████████ being the primary reason for |
| 04:50 | 21 | issuance of the NTO, and let's assume that none of |
| 04:50 | 22 | the other written documents that the AVP's office |

227

JA567

TO BE FILED UNDER SEAL

04:50  1   get from either TAT or ASAC or anybody else on

04:51  2   campus that they ask -- that they request

04:51  3   documents from -- my understanding is you're

04:51  4   saying they would look at whether or not there had

04:51  5   been a protective order issued by a court

04:51  6   somewhere and consider that in conjunction with an

04:51  7   appeal?

04:51  8        A    They would look at all available

04:51  9   information -- mental health history.

04:51 10             They would look at protective order.

04:51 11   They would look at databases that would give them

04:51 12   information about incidents that have occurred

04:51 13   outside of our jurisdiction that would be relevant

04:51 14   to assess whether this person is a risk or a

04:51 15   concern to our community before they rescind an

04:51 16   NTO.

04:51 17        Q    So if I understand you correctly, they

04:51 18   can consider information and conduct that might

04:52 19   not have been the basis for the NTO in the first

04:52 20   place to deny an appeal of the NTO?

04:52 21             MS. THOMPSON:  Objection; calls for

04:52 22        speculation and mischaracterizes the

                                                        228

JA568

TO BE FILED UNDER SEAL

| | | |
|---|---|---|
| 04:52 | 1 | witness's testimony. |
| 04:52 | 2 | A    They might look at the totality of the |
| 04:52 | 3 | information available to help them make that |
| 04:52 | 4 | decision. |
| 04:52 | 5 | But again, I've not been involved in |
| 04:52 | 6 | rescinding or appealing any NTO.  That would be a |
| 04:52 | 7 | question for an AVP who does. |
| 04:52 | 8 | (Pause.) |
| 04:53 | 9 | MR. LOCKHART:  Could we take -- let's |
| 04:53 | 10 | go off the record for a minute. |
| 04:53 | 11 | VIDEOGRAPHER:  We are going off the |
| 04:53 | 12 | record.  The time is -- excuse me -- 4:53. |
| 05:12 | 13 | (Whereupon, a recess was taken.) |
| 05:15 | 14 | VIDEOGRAPHER:  We are now going back |
| 05:15 | 15 | on the record.  The time is 5:15. |
| 05:15 | 16 | Please proceed. |
| 05:15 | 17 | MR. LOCKHART:  So before we jump back |
| 05:15 | 18 | in, Officer Fielding, we were -- off the |
| 05:15 | 19 | record, Ms. Thompson and I discussed the |
| 05:15 | 20 | fact that Exhibit 38 has been Bates-labeled |
| 05:15 | 21 | and produced. |
| 05:15 | 22 | And we -- it's Bates-labeled |

229

```
05:15   1        UVA00011561 through -11563.

05:15   2              And the parties' -- all parties'

05:16   3        counsel have agreed to submit that to the

05:16   4        court reporter for inclusion in the

05:16   5        deposition record as Exhibit 38.

05:16   6              Is that correct, Ms. Thompson?

05:16   7              MS. THOMPSON:  That's correct.

05:16   8              MR. LOCKHART:  Mr. Yates?

05:16   9              MR. YATES:  That's correct.

05:16  10              MR. LOCKHART:  All right.

05:16  11   BY MR. LOCKHART:

05:16  12        Q    Officer Fielding, does the University

05:16  13   Police Department have its own email retention

05:16  14   policies?

05:16  15        A    It's not a separate one from the

05:16  16   University's, no, not to my knowledge.

05:16  17        Q    So when an NTO is put into place --

05:17  18   and there's a case open, I assume, when it's put

05:17  19   into place.

05:17  20              Is that correct?

05:17  21        A    Yes.  There's a case number assigned

05:17  22   to it.
```

                                                          230

JA570

06:14  1            MR. LOCKHART:  Objection; beyond the

06:14  2       scope -- beyond the scope of redirect.

06:14  3            MS. THOMPSON:  No.  I don't -- I

06:14  4       don't -- I disagree with that.

06:14  5            MR. LOCKHART:  Of course you do.

06:14  6            But it is beyond the scope of

06:14  7       redirect.

06:14  8            MS. THOMPSON:  Okay.  You've stated

06:14  9       your objection for the record.

06:14  10           That's great, good job.

06:15  11  BY MS. THOMPSON:

06:15  12       Q    Okay.  So this policy is specifically

06:15  13  with respect to the chief of police or their

06:15  14  designee and the authority issued by the Code of

06:15  15  Virginia, Sections 23.1-15 and 18.2-119, to issue

06:15  16  a trespass warning, but it excludes individuals

06:15  17  from all University or Medical Center property or

06:15  18  a specific building or area.

06:15  19           Is that a correct characterization of

06:15  20  this policy?

06:15  21           MR. LOCKHART:  Objection; leading.

06:15  22       Objection; foundation.

                                                          276

06:15  1          Q     She can still answer.

06:15  2                Go ahead.

06:15  3          A     Yes, I understand -- yes -- it to give

06:15  4     us authority to issue trespass notices for

06:15  5     University property or specific buildings, um-hum.

06:15  6          Q     Is there any -- at the time in 2018

06:15  7     and 2019, was there any other entity that could

06:16  8     issue -- at the University of Virginia that could

06:16  9     issue a university-wide trespass warning?

06:16 10          A     Not to my knowledge.

06:16 11                MR. LOCKHART:  Objection; foundation.

06:16 12          Q     What was the only entity, to your

06:16 13     knowledge, at the University of Virginia that

06:16 14     could issue a university-wide trespass warning?

06:16 15          A     The University Police Department.

06:16 16                MR. LOCKHART:  Objection; foundation.

06:16 17                MS. THOMPSON:  Ms. Ashe, did you get

06:16 18          that -- did you get her answer?

06:16 19             (Court reporter indicates yes.)

06:16 20                MS. THOMPSON:  Thank you.

06:16 21          Q     Okay.  And actually -- there's one

06:16 22     more thing that counsel asked about.  It was about

                                                              277

JA572

**TO BE FILED UNDER SEAL**

| | | |
|---|---|---|
| 06:16 | 1 | rescinding No Trespass Orders and when they're |
| 06:16 | 2 | typically rescinded. |
| 06:16 | 3 | So -- |
| 06:16 | 4 | MR. LOCKHART:  Objection; beyond the |
| 06:16 | 5 | scope -- objection beyond the scope of |
| 06:16 | 6 | recross. |
| 06:16 | 7 | Q    You mentioned that -- something along |
| 06:16 | 8 | the lines -- and the court reporter can read it |
| 06:16 | 9 | back -- about trespass warnings sometimes being |
| 06:16 | 10 | rescinded for students. |
| 06:16 | 11 | What was the -- what -- when you were |
| 06:16 | 12 | making that remark earlier today, what was the |
| 06:17 | 13 | context of these trespass warnings being |
| 06:17 | 14 | rescinded? |
| 06:17 | 15 | MR. LOCKHART:  Objection -- objection; |
| 06:17 | 16 | beyond the scope of recross.  Objection; |
| 06:17 | 17 | foundation.  Objection; vague, ambiguous as |
| 06:17 | 18 | to what the prior testimony was. |
| 06:17 | 19 | Q    Deputy Captain [sic] Fielding, do you |
| 06:17 | 20 | recall earlier today making a statement regarding |
| 06:17 | 21 | trespass warnings sometimes being rescinded for |
| 06:17 | 22 | students? |

278

JA573

```
06:17  1        A     Trespass notices issued --

06:17  2              MR. LOCKHART:  Objection;

06:17  3        misrepresents the record.

06:17  4              MS. THOMPSON:  You've already stated

06:17  5        your objections.  They can be standing

06:17  6        objections.  That's fine.

06:17  7        Q     Go ahead.

06:17  8        A     -- issued -- appeal processes for

06:17  9   trespass notices issued by University police.

06:17  10       Q     So what was the context of the

06:17  11  recision?

06:17  12             MR. LOCKHART:  Objection; beyond the

06:17  13       scope of recross.

06:17  14       A     The context of recision.

06:17  15       Q     And you mentioned appeal -- so, an

06:17  16  appeal of what?

06:17  17       A     Oh, yeah, an appeal of the No Trespass

06:18  18  notice issued by our department.

06:18  19       Q     So do you mean that a student would

06:18  20  have to appeal the trespass warning in order for

06:18  21  the trespass warning to be rescinded?

06:18  22       A     Yes.
```

                                                              279

JA574

TO BE FILED UNDER SEAL

```
06:18  1              MR. LOCKHART:  Objection; beyond the

06:18  2         scope of recross.  Objection; leading.

06:18  3              MS. THOMPSON:  No further questions.

06:18  4              MR. LOCKHART:  For the same reasons

06:18  5         earlier, I suspend until I have an

06:18  6         opportunity to review the supplemental

06:18  7         production.

06:18  8              MS. THOMPSON:  Well, as far as I'm

06:18  9         concerned, we're done today.

06:18 10              Could you tell me how long we've been

06:18 11         on record.

06:18 12              VIDEOGRAPHER:  Ma'am, one moment,

06:18 13          please.

06:18 14              Madam Court Reporter, do you have

06:18 15         anything to add for the record?

06:18 16    (Court reporter asks about rough draft orders.)

06:18 17              MR. YATES:  I do not.

06:18 18              MS. THOMPSON:  No; thank you.

06:18 19        (Court reporter asks about final orders.)

06:18 20              MS. THOMPSON:  Yes -- yes, we would

06:18 21          like an eTran.

06:18 22              MR. YATES:  I'll take an eTran as
```

                                                        280

JA575

TO BE FILED UNDER SEAL

```
 1                      CERTIFICATE

 2           I, SUSAN ASHE, a Registered Merit

 3   Reporter and Notary Public, hereby certify that

 4   the foregoing is a true and accurate transcript of

 5   the deposition of said witness, who was first duly

 6   sworn by me on the date and place hereinbefore set

 7   forth.  I FURTHER CERTIFY that I am neither

 8   attorney nor counsel, nor related to or employed

 9   by any of the parties to the action in which this

10   deposition was taken, and further that I am not a

11   relative or employee of any attorney or counsel

12   employed in this action, nor am I financially

13   interested in this case.  I FURTHER CERTIFY that I

14   was situated in Charlottesville, Virginia while

15   performing eNotary services remotely.

16           Dated this 10th day of May 2022.

17

18

     _____
19           Susan Ashe, Notary Public

20           for the Commonwealth of Virginia

21   My commission expires:  January 31, 2024.

22   Notary Registration Number:  100809.
```

                                                    282

JA576

# EXHIBIT DX1-A

JA577

| | |
|---|---|
| **From:** | Dwyer, James J. (RH) (FBI) |
| **Sent:** | Sunday, December 30, 2018 4:17 PM |
| **To:** | Fielding, Melissa Annette (mab3q) <mab3q@virginia.edu> |
| **Cc:** | Sutton, Tommye S. (ts2dr) <ts2dr@virginia.edu>; Mcgee, Donald Harold (dhm) <dhm@virginia.edu>; Alhusen, Philipp W. (RH) (FBI) <pwalhusen@fbi.gov>; Blake, Robinson N. (RH) (FBI) <rnblake@fbi.gov> |
| **Subject:** | Re: Concerning Posts |

Melissa,

I am currently traveling and am out of the area. Cc'ing Phil Alhusen and Robby Blake who are covering in my absence.

Regards,

Jim

-

On Dec 30, 2018 9:42 PM, "Fielding, Melissa Annette (mab3q)" <mab3q@virginia.edu> wrote:

Jim,
I hope you are having a good holiday break and hate to intrude but wanted to pass along a site and screenshots of posts that are encouraging a former medical school student to use violence after a disciplinary panel hearing. Below is the link to this larger anonymous site and screenshots of two concerning posts that have some medical students/faculty concerned.

We are attempting to determine the former students whereabouts.

Melissa

https://archive.4plebs.org/pol/thread/198117428/

CONFIDENTIAL



This website uses cookies to improve your experience. Learn More          Got It



>t. MD

Anonymous ID:bdtiALlt Sat 29 Dec 2018 16:01:39 No.198131564 🇺🇸 Report
>>198128378
Don't apologize to retards for not accepting their retardation

Anonymous ID:p0xf3Q6k Sat 29 Dec 2018 16:02:28 No.198131662 🇵🇹 Report
OP, march in there with a gun and shoot the biggest faggots in the room. make sure to shoot dead every single bastard that is out to ruin your life and save others from going through the same.

Anonymous ID:XvZsUvA9 Sat 29 Dec 2018 16:03:13 No.198131729 🇺🇸 Report
Quoted By: >>198132609
>>198131358
Everyone on that panel is trying to legal speak their way out of what they are doing to him because they know they are being recorded.

Anonymous ID:DbetHGJ5 Sat 29 Dec 2018 16:04:08 No.198131807 🏴 Report
Quoted By: >>198132015 >>198132480
>>198117428
Constitutions don't Grant Rights.
Rights are freedoms (like free speech) whose violation (like censorship) will result in violence.

Constitutions simply declare the
rights that citizens have always been willing to defend with violence.

"Let your neighbors know what kind of ammo (hollow-points) you use, so that they know what kind of neighbors (polite, respectful) to be."
-Jefferson

>Constitutions do grant rights
When's the last time paper dissuaded someone interested in oppressing you?

Anonymous ID:Kore69QC Sat 29 Dec 2018 16:05:35 No.198131952 🇺🇸 Report
>i speak from 28:45 to 34:00
These fucking people are crazy. They refuse to define anything, try that in a a legal sense. Is driving a truck microaggression?

This website uses cookies to improve your experience. Learn More    Got It

Sent from my iPad

CONFIDENTIAL                                                                                                    UVA00011563

JA580

Case 3:19-cv-00054-NKM-JCH Document 260-1 Filed 06/22/22 Page 65 of 69 Pageid#: 6621
TO BE FILED UNDER SEAL

# EXHIBIT DX1-B



archive.today
webpage capture

Saved from

All snapshots from host uvapolicy.virginia.edu

no other snapshots from this url

26 Apr 2018 16:26:16 UTC

| Webpage | Screenshot |

share    download .zip    report bug or abuse    donate



| Home | Policy Program | Process |
| Template | Policy Review Committee | |

Print this policy



# PRM-018: Issuance of Trespass Warnings

**Date:** 04/25/2018 **Status:** Final
**Policy Type:** University
**Contact Office:** University Police Department
**Oversight Executive:** Associate Vice President for Safety & Security, Executive Vice President and Chief Operating Officer
**Applies To:** Academic Division and Medical Center.
**Table of Contents:**
Policy Statement
Procedures Related to the:

1. Issuance of a Trespass Warning
2. Appeal of a Trespass Warning

**Reason for Policy:**
The University of Virginia Police Department is committed to providing a safe workplace and environment for its employees, students, patients, and visitors. The Chief of Police, or designee, is authorized by the Code of Virginia §§ 23.1-815 and 18.2-119 to issue a Trespass Warning that excludes individuals from all University or Medical Center property or a specific building or area. This policy governs the issuance of a Trespass Warning by the University of Virginia Police Department.

**Definition of Terms in Statement:**
  **Trespass Warning:** A written notice issued by the University of Virginia Police that warns a person that the person is not permitted to enter or remain upon the University or Medical Center property described in the Trespass Warning.

**Policy Statement:**
This policy governs the issuance of a Trespass Warning by the University of Virginia Police Department. The University and the Medical Center retain the authority to ban current employees, students, patients, and visitors using existing processes such as a disciplinary or administrative process. This Policy and its accompanying procedures do not apply to any Trespass Warning issued as a result of a disciplinary or administrative process. This Policy and its accompanying procedures also do not apply to any Trespass Warning issued by local law enforcement for trespass on University or Medical Center property.

JA582

The University of Virginia Police may issue a Trespass Warning to a person who has engaged in:

1. criminal activity on University or Medical Center property,
2. a violation of a University regulation,
3. a violation of a University, Health System, or Medical Center policy after having been notified of the specific policy or policies at issue, or
4. conduct that threatens the health, safety, or property of a member of the University or its Medical Center community, a patient or visitor at the Medical Center or other persons on University or Medical Center property.

Violations of the Trespass Warning constitute a Class 1 Misdemeanor and constitute grounds for arrest pursuant to Virginia Code § 18.2-119.

Trespass Warnings shall not prohibit any individual from accessing care at the Medical Center's Emergency Department, Labor and Delivery, or any other medical facility owned and operated by the Medical Center for an examination or treatment for an emergency medical condition in accordance with Medical Center Policy No. 0214, Medical Screening and Stabilizing Treatment for Emergency Medical Conditions.

Trespass Warnings will automatically expire within four (4) years after the date the Trespass Warning was served, unless otherwise noted in the Trespass Warning.

**Questions about this policy should be directed to the Office of the Associate Vice President for Safety and Security.**

**Procedures:**

1. **Procedures Related to the Issuance of a Trespass Warning:**

    1. *Consultation with the Medical Center:*
       Prior to the issuance of a Trespass Warning, the University of Virginia Police Department shall consult with the Medical Center's Office of Patient Safety and Risk Management during normal business hours (Monday-Friday, 8:00 a.m. - 5:00 p.m.) if:

       1. the incident occurred at the Medical Center[1] and
       2. the nature of the criminal activity, violation, or conduct presents a threat to public safety that may necessitate barring the individual from seeking or receiving non-emergent patient care at the Medical Center.

       After normal business hours or on weekends, the University of Virginia Police shall consult with the Administrator on Call.

       ---

       [1]In the context of the requisite consultation, the "Medical Center" means the University Hospital, connected buildings, connective elements between them, the Medical Research Buildings on the Medical Center Comples (MR-4, MR-5, & MR-6) and all parking lots or garages serving the University of VIrginia Medical Center. See Map.

       ---

    2. *Trespass Warning to include Copy of Appeal Procedures:*
       The University of Virginia Police shall include a copy of the Procedures to Appeal a Trespass Warning with a Trespass Warning when a Trespass Warning is served.

    3. *Notification Process:*
       The Associate Vice President for Safety and Security, or designee (hereinafter collectively referred to as "Associate Vice President"), shall develop procedures for notifying all University Departments, including its Medical Center, when a Trespass Warning has been issued.

2. **Procedures to Appeal a Trespass Warning:**
    The Trespass Warning must be appealed in writing to the Associate Vice President for Safety and Security within five (5) calendar days after the date the Trespass Warning is served.
    Written appeals should be hand-delivered or mailed to:
    Executive Vice President and Chief Operating Officer
    Office of the Executive Vice President and Chief Operating Officer
    University of Virginia
    P.O. BOX 400228
    Charlottesville, VA 22904-4228

    Written appeals also may be submitted by electronic mail to:

JA583

Executive Vice President and Chief Operating Officer, Hogan@virginia.edu.

If the appeal is not delivered or postmarked within five (5) calendar days after the date the Trespass Warning is served, then the recipient of the Trespass Warning waives the opportunity to appeal.

Written appeals shall include:

1. Appellant's contact information, including address, telephone number, and e-mail address,
2. Date of the issuance of the Trespass Warning and the IBR Number located in the upper left-hand corner of the Trespass Warning,
3. The reason for the review request,
4. A complete and candid explanation for the conduct that precipitated the Trespass Warning,
5. The basis for the desire to be on University or Medical Center property, and
6. Any other information the appellant wished to be considered.

The Trespass Warning remains in effect while the appeal is being considered, unless the University of Virginia Police modifies or withdraws the Trespass Warning.

If the basis of the appeal is a need to be on Medical Center property for a scheduled medical procedure or appointment or to visit a registered patient at the Medical Center, the Associate Vice President shall consult with the Medical Center's Office of Patient Safety and Risk Management prior to finalizing a decision regarding upholding, modifying, or withdrawing the Trespass Warning.

The Associate Vice President shall issue the decision within twenty-one (21) calendar days of receipt of the written appeal. The Associate Vice President may uphold, modify, or withdraw the Trespass Warning. The decision of the Associate Vice President is final.

Trespass Warnings will automatically expire within four (4) years after the date the Trespass Warning was served, unless otherwise noted in the Trespass Warning.

**Related Information:**
Virginia Code § 18.2-119. Trespass after having been forbidden to do so, penalties.
Virginia Code § 23.1-815. Campus police forces and auxiliary police forces; powers and duties; jurisdiction.
Virginia Administrative Code, Title 8, Agency 85
Virginia Administrative Code, Title 8, Agency 85, Chapter 20 Regulation of Weapons, Fireworks, and Explosives
Virginia Administrative Code, Title 8, Agency 85, Chapter 20 Open Burn and Open Flame Operations
**Policy Background:**
The Policy Statement is the codification of existing practice. This Policy and the accompanying Procedures apply to all trespass warnings issued on or after the effective date of this Policy, April 25, 2018.

**Major Category:** Physical Resource Management
**Category Cross Reference:** Safety, Security and Environmental Quality
**Next Scheduled Review:** 04/11/2021
**Approved by, Date:** Executive Vice President and Chief Operating Officer, 04/10/2018
**Revision History:** This is the first version of this policy.

Policy Manager
(434) 924-4037
(434) 982-2315

P.O. Box 400194
Charlottesville
VA 22904-4210

Maintained by: Policy Directory© Copyright 2018 by the Rector and Visitors of the University of Virginia

JA584

Case 3:19-cv-00054-NKM-JCH   Document 286-3   Filed 06/22/22   Page 69 of 69   Pageid#: 6625

TO BE FILED UNDER SEAL

JA585

# EXHIBIT DX2

TO BE FILED UNDER SEAL

```
1        VA: IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                 CHARLOTTESVILLE DIVISION
3
                              )
4                             )
     KIERAN RAVI BHATTACHARYA    )
5                             )        CASE NO.
                              )        3:19-CV-54-NKM-JCH
6              Plaintiff,     )
                              )
7     V.                      )
                              )
8                             )
                              )
9     JAMES B. MURRAY, JR., et  )
       al.,                   )
10                            )
               Defendants.
11
12
13   DEPONENT:        KIERAN RAVI BHATTACHARYA
14   DATE:            MAY 23RD, 2022
15   TIME:            9:30 A.M.
16   LOCATION:        OMNI CHARLOTTESVILLE HOTEL
                       212 RIDGE MCINTIRE ROAD
17                    CHARLOTTESVILLE, VIRGINIA 22093
18   REPORTED BY:     LAURA B. BALLENGEE, CER
19
20
21
22
23
24
25
```

JA587

1    Q.   But with the sentence that you read, ASAC will

2  assess the severity of the problem, the management and

3  the consequences, including possibly reporting the

4  behaviors in the student's medical student performance

5  evaluation. Possibly.  So the ASAC could consider a

6  concern card and decide to do nothing about it.  Is that

7  true?

8    A.   Yes.

9    Q.   Okay.  So let's talk a little bit about the

10  second concern card that was issued against you.  Let's

11  go to tab 2D.

12        MS. THOMPSON:  And Mary, can you please issue

13  that.

14        MR. FLEMMING:  Should be up now.

15        THE WITNESS:  All right. I got it.

16  BY MS. THOMPSON:

17    Q.   Is this a true and accurate copy of the second

18  professionalism concern card issued to you?

19    A.   May I please have a minute to read it?

20    Q.   Sure.

21    A.   Okay.  I read it.

22    Q.   And this is the second professionalism concern

23  card that you have attached to your complaint.  Is this

24  a true and accurate copy of the professionalism concern

25  card that was issued against you?

1  residency.  So I wouldn't -- I don't think I'd be able

2  to read it anyway. So I don't think there's any way

3  that I would ever know what would or wouldn't be the

4  MSPE 2020 or 2021.

5  BY MS. THOMPSON:

6      Q.   But had you applied to a residency?

7      A.   No.

8      Q.   Okay.  And you weren't -- the letter in

9  Exhibit 6 didn't require you to go to counseling, did

10 it?

11     A.   It does not describe ASAC's suggestion that I

12 consider getting counseling in order to work on my

13 skills and being able to express myself appropriately as

14 a necessary requirement, no.

15     Q.   Okay.  Let's pull up tab 4A.

16          MR. FLEMMING:  I'm told we're still on there.

17 She's pulling it up now.

18          THE VIDEOGRAPHER:  I apologize. I keep on

19 thinking I unmuted it.

20          THE WITNESS:  You said 4A.

21          MS. THOMPSON:  Yes.  Is exhibit 4A up yet?

22          MR. FLEMMING:  Not yet.

23          MS. THOMPSON:  I don't see it.

24          MR. YATES:  You might need to ask her again.

25          MS. THOMPSON:  I think -- yeah, Mary. Can

1      Q.   Would you agree you have a checkered mental

2   health history?

3      A.   I would say a checkered record. I wouldn't

4   say mental. I mean, I'm not sure what you mean by

5   medical history in that sense, but I'd say checkered

6   record.

7      Q.   A checkered record of mental health issues?

8   Is that what you mean?

9           MR. LOCKERBY:  Object to the form.

10          THE WITNESS:  A checkered record by virtue of

11   three involuntary hospitalizations.

12   BY MS. THOMPSON:

13      Q.   Do you admit that you have bipolar disorder?

14          MR. LOCKERBY:  Objection to the form.

15          THE WITNESS:  I don't know.

16   BY MS. THOMPSON:

17      Q.   Do you deny that you have bipolar disorder?

18          MR. LOCKERBY:  Same objection.

19          THE WITNESS:  I don't know.

20   BY MS. THOMPSON:

21      Q.   Have you ever taken any medications for

22   bipolar disorder?

23      A.   I've taken medications both voluntarily and

24   involuntarily that were prescribed for me, to me, on the

25   basis of a diagnosis of bipolar.

Page 162

1     Q.    When did you take those medications?

2     A.    From January 2017, beginning mid-January 2017

3   to around the end of January -- on the 21st of January

4   2017.  That was involuntarily. And then voluntarily

5   from, I think, early February 2017 until maybe around

6   June 2018.  I'm not exactly sure, but I think June 2018.

7     Q.    Why did you stop taking your medications

8   around June 2018?

9     A.    I felt that they were very damaging to me and

10   and hurt me in a variety of ways, and I felt that it

11   would be best for my health to discontinue it.

12     Q.    Did you feel as though you no longer had

13   bipolar disorder?

14        MR. LOCKERBY:  Object to the form.

15        THE WITNESS:  I don't know.

16   BY MS. THOMPSON:

17     Q.    What don't you know?  You don't know what you

18   thought about bipolar disorder in June of 2018?

19     A.    I always had doubts, not really about the

20   diagnosis, but about the helpfulness of the drugs.  And

21   I concluded around then that it would be best to stop

22   and see how I feel and I feel better. Don't buy or use

23   the drugs again.

24     Q.    Did you consult with any doctor before coming

25   to this conclusion that you just described?

1      A.   I didn't tell anyone about it, no.

2      Q.   I'd like to go to tab 7A.

3      A.   Okay.  All right. I got it.  I'm downloading

4  it now.

5           MS. THOMPSON:  And for the record, that's

6  Exhibit 13.

7                               (WHEREUPON, the document

8                               referred to as Exhibit No.

9                               13 was duly marked for

10                              identification purposes.)

11          THE WITNESS:  I have it open.

12  BY MS. THOMPSON:

13     Q.   I'd like to direct your attention to page

14  three of the records, which is Bates stamped KB477.

15     A.   I see it.  Okay.

16     Q.   In the first paragraph of his narrative notes,

17  these are emergency department notes by Doctor Nathan

18  Charlton.  Doctor Charlton writes that you presented at

19  the emergency department for a psychiatric evaluation

20  after reporting that you were, "feeling out of it in the

21  head".  Did I read that correctly?

22     A.   "Mr. Bhattacharya reports a history of feeling

23  out of it in the head".  That sentence you're referring

24  to?

25     Q.   Yes.

TO BE FILED UNDER SEAL

# EXHIBIT DX4

TO BE FILED UNDER SEAL



LIAISON COMMITTEE ON
MEDICAL EDUCATION

# FUNCTIONS AND STRUCTURE
# OF A MEDICAL SCHOOL

**Standards for Accreditation of
Medical Education Programs Leading to the MD Degree**

**Published March 2017
For surveys in the 2018-19 academic year
Standards and Elements Effective July 1, 2018**

UVA00012399

JA594

LCME® *Functions and Structure of a Medical School*
Standards for Accreditation of Medical Education
Programs Leading to the MD Degree

© Copyright March 2017, Association of American Medical Colleges and the American Medical Association. All material subject to this copyright may be photocopied for the noncommercial purpose of scientific or educational advancement, with citation.

LCME® is a registered trademark of the Association of American Medical Colleges and the American Medical Association.

UVA00012400

JA595

TO BE FILED UNDER SEAL

March 2017

## TABLE OF CONTENTS

Introduction...........................................................................................................................................

Standard 1: Mission, Planning, Organization, and Integrity ...................................................................

Standard 2: Leadership and Administration............................................................................................

Standard 3: Academic and Learning Environments.................................................................................

Standard 4: Faculty Preparation, Productivity, Participation, and Policies...............................................

Standard 5: Educational Resources and Infrastructure ...........................................................................

Standard 6: Competencies, Curricular Objectives, and Curricular Design...............................................

Standard 7: Curricular Content ..............................................................................................................

Standard 8: Curricular Management, Evaluation, and Enhancement .......................................................

Standard 9: Teaching, Supervision, Assessment, and Student and Patient Safety.....................................

Standard 10: Medical Student Selection, Assignment, and Progress.........................................................

Standard 11: Medical Student Academic Support, Career Advising, and Educational Records ................

Standard 12: Medical Student Health Services, Personal Counseling, and Financial Aid Services ...........

Glossary of Terms for LCME Accreditation Standards and Elements ......................................................

Mapping of the 2014-15 Standards and 2018-19 Standards and Elements Sorted by the 2014-15

Standards................................................................................................................................................

Mapping of the 2014-15 Standards and 2018-19 Standards and Elements Sorted by the 2018-19

Elements.................................................................................................................................................

JA596

**TO BE FILED UNDER SEAL**

March 2017

For further information contact

LCME Secretariat
Association of American Medical Colleges
655 K Street NW
Suite 100
Washington, DC 20001-2399
Phone: 202-828-0596

LCME Secretariat
American Medical Association
330 North Wabash Avenue
Suite 39300
Chicago, IL 60611-5885
Phone: 312-464-4933

**Visit the LCME website at www.lcme.org**

UVA00012402

JA597

# INTRODUCTION

Accreditation is a voluntary, peer-review process designed to attest to the educational quality of new and established educational programs. The Liaison Committee on Medical Education (LCME) accredits complete and independent medical education programs leading to the MD degree in which medical students are geographically located in the United States or Canada for their education and which are operated by universities or medical schools chartered in the United States or Canada. Accreditation of Canadian medical education programs are undertaken in cooperation with the Committee on Accreditation of Canadian Medical Schools (CACMS). By judging the compliance of medical education programs with nationally accepted standards of educational quality, the LCME serves the interests of the general public and of the medical students enrolled in those programs.

To achieve and maintain accreditation, a medical education program leading to the MD degree in the U.S. must meet the standards and elements contained in this document. The accreditation process requires a medical education program to provide assurances that its graduates exhibit general professional competencies that are appropriate for entry to the next stage of their training and that serve as the foundation for lifelong learning and proficient medical care. While recognizing the existence and appropriateness of diverse institutional missions and educational objectives, local circumstances do not justify accreditation of a substandard program of medical education leading to the MD degree.

The LCME regularly reviews the content of the standards and elements, and seeks feedback on their validity, importance, and clarity from members of the medical education community, including its sponsoring organizations. Changes to existing standards and elements that impose new or additional compliance requirements are reviewed by LCME's stakeholders and are considered at a public hearing before being adopted. Once approved, new or revised standards are published in the *Functions and Structure of a Medical School* (F&S) and in the relevant version of the *Data Collection Instrument* (DCI), which will indicate when the changes become effective. Such periodic review may result in the creation or elimination of a specific standard and/or element, or a substantial reorganization of the *Functions and Structure of a Medical School* document.

The *Functions and Structure of a Medical School* is organized according to 12 accreditation standards, each with an accompanying set of elements. The language of each of the 12 LCME accreditation standards is a concise statement of the expectations of that standard. The elements of a standard specify the components that collectively constitute the standard; they are statements that identify the variables that need to be examined in evaluating a medical education program's compliance with the standard. The LCME will consider performance in all the elements associated with a specific standard in the determination of the program's compliance with that standard.

**The *Glossary of Terms for LCME Accreditation Standards and Elements*** has been incorporated into the *Functions and Structure of a Medical School* for the reader's convenience. The glossary provides the LCME's definitions of terms used in the *Functions and Structure of a Medical School*.

As you read this document, please note the following:

- The 12 standards are organized to flow from the level of the institution to the level of the student.
- As a background reference, tables at the end of this document provide a mapping of the standards as formatted for academic year 2014-15 to the standards and elements format in place for academic year 2018-19.

UVA00012403

JA598

# STANDARD 1: MISSION, PLANNING, ORGANIZATION, AND INTEGRITY

A medical school has a written statement of mission and goals for the medical education program, conducts ongoing planning, and has written bylaws that describe an effective organizational structure and governance processes. In the conduct of all internal and external activities, the medical school demonstrates integrity through its consistent and documented adherence to fair, impartial, and effective processes, policies, and practices.

## 1.1    Strategic Planning and Continuous Quality Improvement

A medical school engages in ongoing planning and continuous quality improvement processes that establish short and long-term programmatic goals, result in the achievement of measurable outcomes that are used to improve programmatic quality, and ensure effective monitoring of the medical education program's compliance with accreditation standards.

## 1.2    Conflict of Interest Policies

A medical school has in place and follows effective policies and procedures applicable to board members, faculty members, and any other individuals who participate in decision-making affecting the medical education program to avoid the impact of conflicts of interest in the operation of the medical education program, its associated clinical facilities, and any related enterprises.

## 1.3    Mechanisms for Faculty Participation

A medical school ensures that there are effective mechanisms in place for direct faculty participation in decision-making related to the medical education program, including opportunities for faculty participation in discussions about, and the establishment of, policies and procedures for the program, as appropriate.

## 1.4    Affiliation Agreements

In the relationship between a medical school and its clinical affiliates, the educational program for all medical students remains under the control of the medical school's faculty, as specified in written affiliation agreements that define the responsibilities of each party related to the medical education program. Written agreements are necessary with clinical affiliates that are used regularly for required clinical experiences; such agreements may also be warranted with other clinical facilities that have a significant role in the clinical education program. Such agreements provide for, at a minimum the following:

- The assurance of medical student and faculty access to appropriate resources for medical student education
- The primacy of the medical education program's authority over academic affairs and the education/assessment of medical students
- The role of the medical school in the appointment and assignment of faculty members with responsibility for medical student teaching
- Specification of the responsibility for treatment and follow-up when a medical student is exposed to an infectious or environmental hazard or other occupational injury
- The shared responsibility of the clinical affiliate and the medical school for creating and maintaining an appropriate learning environment

UVA00012404

JA599

### 1.5    Bylaws

A medical school promulgates bylaws or similar policy documents that describe the responsibilities and privileges of its administrative officers, faculty, medical students, and committees.

### 1.6    Eligibility Requirements

A medical school ensures that its medical education program meets all eligibility requirements of the LCME for initial and continuing accreditation, including receipt of degree-granting authority and accreditation by a regional accrediting body by either the medical school or its parent institution.

UVA00012405

JA600

# STANDARD 2: LEADERSHIP AND ADMINISTRATION

A medical school has a sufficient number of faculty in leadership roles and of senior administrative staff with the skills, time, and administrative support necessary to achieve the goals of the medical education program and to ensure the functional integration of all programmatic components.

## 2.1    Administrative Officer and Faculty Appointments

The senior administrative staff and faculty of a medical school are appointed by, or on the authority of, the governing board of the institution.

## 2.2    Dean's Qualifications

The dean of a medical school is qualified by education, training, and experience to provide effective leadership in medical education, scholarly activity, patient care, and other missions of the medical school.

## 2.3    Access and Authority of the Dean

The dean of a medical school has sufficient access to the university president or other institutional official charged with final responsibility for the medical education program and to other institutional officials in order to fulfill his or her responsibilities; there is a clear definition of the dean's authority and responsibility for the medical education program.

## 2.4    Sufficiency of Administrative Staff

A medical school has in place a sufficient number of associate or assistant deans, leaders of organizational units, and senior administrative staff who are able to commit the time necessary to accomplish the missions of the medical school.

## 2.5    Responsibility of and to the Dean

The dean of a medical school with one or more regional campuses is administratively responsible for the conduct and quality of the medical education program and for ensuring the adequacy of faculty at each campus. The principal academic officer at each campus is administratively responsible to the dean.

## 2.6    Functional Integration of the Faculty

At a medical school with one or more regional campuses, the faculty at the departmental and medical school levels at each campus are functionally integrated by appropriate administrative mechanisms (e.g., regular meetings and/or communication, periodic visits, participation in shared governance, and data sharing).

UVA00012406

JA601

# STANDARD 3: ACADEMIC AND LEARNING ENVIRONMENTS

A medical school ensures that its medical education program occurs in professional, respectful, and intellectually stimulating academic and clinical environments, recognizes the benefits of diversity, and promotes students' attainment of competencies required of future physicians.

### 3.1 Resident Participation in Medical Student Education

Each medical student in a medical education program participates in one or more required clinical experiences conducted in a health care setting in which he or she works with resident physicians currently enrolled in an accredited program of graduate medical education.

### 3.2 Community of Scholars/Research Opportunities

A medical education program is conducted in an environment that fosters the intellectual challenge and spirit of inquiry appropriate to a community of scholars and provides sufficient opportunities, encouragement, and support for medical student participation in the research and other scholarly activities of its faculty.

### 3.3 Diversity/Pipeline Programs and Partnerships

A medical school has effective policies and practices in place, and engages in ongoing, systematic, and focused recruitment and retention activities, to achieve mission-appropriate diversity outcomes among its students, faculty, senior administrative staff, and other relevant members of its academic community. These activities include the use of programs and/or partnerships aimed at achieving diversity among qualified applicants for medical school admission and the evaluation of program and partnership outcomes.

### 3.4 Anti-Discrimination Policy

A medical school does not discriminate on the basis of age, creed, gender identity, national origin, race, sex, or sexual orientation.

### 3.5 Learning Environment/Professionalism

A medical school ensures that the learning environment of its medical education program is conducive to the ongoing development of explicit and appropriate professional behaviors in its medical students, faculty, and staff at all locations and is one in which all individuals are treated with respect. The medical school and its clinical affiliates share the responsibility for periodic evaluation of the learning environment in order to identify positive and negative influences on the maintenance of professional standards, develop and conduct appropriate strategies to enhance positive and mitigate negative influences, and identify and promptly correct violations of professional standards.

### 3.6 Student Mistreatment

A medical education program defines and publicizes its code of professional conduct for the relationships between medical students, including visiting medical students, and those individuals with whom students interact during the medical education program. A medical school develops effective written policies that address violations of the code, has effective mechanisms in place for a prompt response to any complaints, and supports educational activities aimed at preventing inappropriate behavior. Mechanisms for reporting violations of the code of professional conduct are understood by medical students, including visiting medical students, and ensure that any violations can be registered and investigated without fear of retaliation.

UVA00012407

JA602

# STANDARD 4: FACULTY PREPARATION, PRODUCTIVITY, PARTICIPATION, AND POLICIES

The faculty members of a medical school are qualified through their education, training, experience, and continuing professional development and provide the leadership and support necessary to attain the institution's educational, research, and service goals.

---

## 4.1  Sufficiency of Faculty

A medical school has in place a sufficient cohort of faculty members with the qualifications and time required to deliver the medical curriculum and to meet the other needs and fulfill the other missions of the institution.

## 4.2  Scholarly Productivity

The faculty of a medical school demonstrate a commitment to continuing scholarly productivity that is characteristic of an institution of higher learning.

## 4.3  Faculty Appointment Policies

A medical school has clear policies and procedures in place for faculty appointment, renewal of appointment, promotion, granting of tenure, remediation, and dismissal that involve the faculty, the appropriate department heads, and the dean and provides each faculty member with written information about his or her term of appointment, responsibilities, lines of communication, privileges and benefits, performance evaluation and remediation, terms of dismissal, and, if relevant, the policy on practice earnings.

## 4.4  Feedback to Faculty

A medical school faculty member receives regularly scheduled and timely feedback from departmental and/or other programmatic or institutional leaders on his or her academic performance and progress toward promotion and, when applicable, tenure.

## 4.5  Faculty Professional Development

A medical school and/or its sponsoring institution provides opportunities for professional development to each faculty member in the areas of discipline content, curricular design, program evaluation, student assessment methods, instructional methodology, and research to enhance his or her skills and leadership abilities in these areas.

## 4.6  Responsibility for Educational Program Policies

At a medical school, the dean and a committee of the faculty determine the governance and policymaking processes of the program.

UVA00012408

JA603

# STANDARD 5: EDUCATIONAL RESOURCES AND INFRASTRUCTURE

A medical school has sufficient personnel, financial resources, physical facilities, equipment, and clinical, instructional, informational, technological, and other resources readily available and accessible across all locations to meet its needs and to achieve its goals.

## 5.1    Adequacy of Financial Resources

The present and anticipated financial resources of a medical school are derived from diverse sources and are adequate to sustain a sound program of medical education and to accomplish other programmatic and institutional goals.

## 5.2    Dean's Authority/Resources

The dean of a medical school has sufficient resources and budgetary authority to fulfill his or her responsibility for the management and evaluation of the medical curriculum.

## 5.3    Pressures for Self-Financing

A medical school admits only as many qualified applicants as its total resources can accommodate and does not permit financial or other influences to compromise the school's educational mission.

## 5.4    Sufficiency of Buildings and Equipment

A medical school has, or is assured the use of, buildings and equipment sufficient to achieve its educational, clinical, and research missions.

## 5.5    Resources for Clinical Instruction

A medical school has, or is assured the use of, appropriate resources for the clinical instruction of its medical students in ambulatory and inpatient settings and has adequate numbers and types of patients (e.g., acuity, case mix, age, gender).

## 5.6    Clinical Instructional Facilities/Information Resources

Each hospital or other clinical facility affiliated with a medical school that serves as a major location for required clinical learning experiences has sufficient information resources and instructional facilities for medical student education.

## 5.7    Security, Student Safety, and Disaster Preparedness

A medical school ensures that adequate security systems are in place at all locations and publishes policies and procedures to ensure student safety and to address emergency and disaster preparedness.

UVA00012409

JA604

### 5.8    Library Resources/Staff

A medical school provides ready access to well-maintained library resources sufficient in breadth of holdings and technology to support its educational and other missions. Library services are supervised by a professional staff that is familiar with regional and national information resources and data systems and is responsive to the needs of the medical students, faculty members, and others associated with the institution.

### 5.9    Information Technology Resources/Staff

A medical school provides access to well-maintained information technology resources sufficient in scope to support its educational and other missions. The information technology staff serving a medical education program has sufficient expertise to fulfill its responsibilities and is responsive to the needs of the medical students, faculty members, and others associated with the institution.

### 5.10    Resources Used by Transfer/Visiting Students

The resources used by a medical school to accommodate any visiting and transfer medical students in its medical education program do not significantly diminish the resources available to already enrolled medical students.

### 5.11    Study/Lounge/Storage Space/Call Rooms

A medical school ensures that its medical students have, at each campus and affiliated clinical site, adequate study space, lounge areas, personal lockers or other secure storage facilities, and secure call rooms if students are required to participate in late night or overnight clinical learning experiences.

### 5.12    Required Notifications to the LCME

A medical school notifies the LCME of any substantial change in the number of enrolled medical students; of any decrease in the resources available to the institution for its medical education program, including faculty, physical facilities, or finances; of its plans for any major modification of its medical curriculum; and/or of anticipated changes in the affiliation status of the program's clinical facilities. The program also provides prior notification to the LCME if it plans to increase entering medical student enrollment on the main campus and/or in one or more existing regional campuses above the threshold of 10 percent, or 15 medical students in one year or 20 percent in three years; or to start a new or to expand an existing regional campus; or to initiate a new parallel curriculum (track).

UVA00012410

JA605

# STANDARD 6: COMPETENCIES, CURRICULAR OBJECTIVES, AND CURRICULAR DESIGN

The faculty of a medical school define the competencies to be achieved by its medical students through medical education program objectives and is responsible for the detailed design and implementation of the components of a medical curriculum that enable its medical students to achieve those competencies and objectives. Medical education program objectives are statements of the knowledge, skills, behaviors, and attitudes that medical students are expected to exhibit as evidence of their achievement by completion of the program.

## 6.1    Program and Learning Objectives

The faculty of a medical school define its medical education program objectives in outcome-based terms that allow the assessment of medical students' progress in developing the competencies that the profession and the public expect of a physician. The medical school makes these medical education program objectives known to all medical students and faculty. In addition, the medical school ensures that the learning objectives for each required learning experience (e.g., course, clerkship) are made known to all medical students and those faculty, residents, and others with teaching and assessment responsibilities in those required experiences.

## 6.2    Required Clinical Experiences

The faculty of a medical school define the types of patients and clinical conditions that medical students are required to encounter, the skills to be performed by medical students, the appropriate clinical settings for these experiences, and the expected levels of medical student responsibility.

## 6.3    Self-Directed and Life-Long Learning

The faculty of a medical school ensure that the medical curriculum includes self-directed learning experiences and time for independent study to allow medical students to develop the skills of lifelong learning. Self-directed learning involves medical students' self-assessment of learning needs; independent identification, analysis, and synthesis of relevant information; and appraisal of the credibility of information sources.

## 6.4    Inpatient/Outpatient Experiences

The faculty of a medical school ensure that the medical curriculum includes clinical experiences in both outpatient and inpatient settings.

## 6.5    Elective Opportunities

The faculty of a medical school ensure that the medical curriculum includes elective opportunities that supplement required learning experiences and that permit medical students to gain exposure to and deepen their understanding of medical specialties reflecting their career interests and to pursue their individual academic interests.

UVA00012411

JA606

**6.6     Service-Learning**

The faculty of a medical school ensure that the medical education program provides sufficient opportunities for, encourages, and supports medical student participation in service-learning and community service activities.

**6.7     Academic Environments**

The faculty of a medical school ensure that medical students have opportunities to learn in academic environments that permit interaction with students enrolled in other health professions, graduate and professional degree programs, and in clinical environments that provide opportunities for interaction with physicians in graduate medical education programs and in continuing medical education programs.

**6.8     Education Program Duration**

A medical education program includes at least 130 weeks of instruction.

UVA00012412

JA607

## STANDARD 7: CURRICULAR CONTENT

The faculty of a medical school ensure that the medical curriculum provides content of sufficient breadth and depth to prepare medical students for entry into any residency program and for the subsequent contemporary practice of medicine.

### 7.1    Biomedical, Behavioral, Social Sciences

The faculty of a medical school ensure that the medical curriculum includes content from the biomedical, behavioral, and socioeconomic sciences to support medical students' mastery of contemporary scientific knowledge and concepts and the methods fundamental to applying them to the health of individuals and populations.

### 7.2    Organ Systems/Life Cycle/Primary Care/Prevention/Wellness/Symptoms/Signs/Differential Diagnosis, Treatment Planning, Impact of Behavioral and Social Factors

The faculty of a medical school ensure that the medical curriculum includes content and clinical experiences related to each organ system; each phase of the human life cycle; continuity of care; and preventive, acute, chronic, rehabilitative, end-of-life, and primary care in order to prepare students to:

- Recognize wellness, determinants of health, and opportunities for health promotion and disease prevention
- Recognize and interpret symptoms and signs of disease
- Develop differential diagnoses and treatment plans
- Recognize the potential health-related impact on patients of behavioral and socioeconomic factors
- Assist patients in addressing health-related issues involving all organ systems

### 7.3    Scientific Method/Clinical/Translational Research

The faculty of a medical school ensure that the medical curriculum includes instruction in the scientific method (including hands-on or simulated exercises in which medical students collect or use data to test and/or verify hypotheses or address questions about biomedical phenomena) and in the basic scientific and ethical principles of clinical and translational research (including the ways in which such research is conducted, evaluated, explained to patients, and applied to patient care).

### 7.4    Critical Judgment/Problem-Solving Skills

The faculty of a medical school ensure that the medical curriculum incorporates the fundamental principles of medicine, provides opportunities for medical students to acquire skills of critical judgment based on evidence and experience, and develops medical students' ability to use those principles and skills effectively in solving problems of health and disease.

### 7.5    Societal Problems

The faculty of a medical school ensure that the medical curriculum includes instruction in the diagnosis, prevention, appropriate reporting, and treatment of the medical consequences of common societal problems.

UVA00012413

JA608

**7.6    Cultural Competence and Health Care Disparities**

The faculty of a medical school ensure that the medical curriculum provides opportunities for medical students to learn to recognize and appropriately address gender and cultural biases in themselves, in others, and in the health care delivery process. The medical curriculum includes instruction regarding the following:

- The manner in which people of diverse cultures and belief systems perceive health and illness and respond to various symptoms, diseases, and treatments
- The basic principles of culturally competent health care
- The recognition and development of solutions for health care disparities
- The importance of meeting the health care needs of medically underserved populations
- The development of core professional attributes (e.g., altruism, accountability) needed to provide effective care in a multidimensional and diverse society

**7.7    Medical Ethics**

The faculty of a medical school ensure that the medical curriculum includes instruction for medical students in medical ethics and human values both prior to and during their participation in patient care activities and requires its medical students to behave ethically in caring for patients and in relating to patients' families and others involved in patient care.

**7.8    Communication Skills**

The faculty of a medical school ensure that the medical curriculum includes specific instruction in communication skills as they relate to communication with patients and their families, colleagues, and other health professionals.

**7.9    Interprofessional Collaborative Skills**

The faculty of a medical school ensure that the core curriculum of the medical education program prepares medical students to function collaboratively on health care teams that include health professionals from other disciplines as they provide coordinated services to patients. These curricular experiences include practitioners and/or students from the other health professions.

UVA00012414

JA609

# STANDARD 8: CURRICULAR MANAGEMENT, EVALUATION, AND ENHANCEMENT

The faculty of a medical school engage in curricular revision and program evaluation activities to ensure that medical education program quality is maintained and enhanced and that medical students achieve all medical education program objectives and participate in required clinical experiences and settings.

## 8.1    Curricular Management

A medical school has in place an institutional body (e.g., a faculty committee) that oversees the medical education program as a whole and has responsibility for the overall design, management, integration, evaluation, and enhancement of a coherent and coordinated medical curriculum.

## 8.2    Use of Medical Educational Program Objectives

The faculty of a medical school, through the faculty committee responsible for the medical curriculum, ensure that the medical curriculum uses formally adopted medical education program objectives to guide the selection of curriculum content, review and revise the curriculum, and establish the basis for evaluating programmatic effectiveness. The faculty leadership responsible for each required course and clerkship link the learning objectives of that course or clerkship to the medical education program objectives.

## 8.3    Curricular Design, Review, Revision/Content Monitoring

The faculty of a medical school are responsible for the detailed development, design, and implementation of all components of the medical education program, including the medical education program objectives, the learning objectives for each required curricular segment, instructional and assessment methods appropriate for the achievement of those objectives, content and content sequencing, ongoing review and updating of content, and evaluation of course, clerkship, and teacher quality. These medical education program objectives, learning objectives, content, and instructional and assessment methods are subject to ongoing monitoring, review, and revision by the faculty to ensure that the curriculum functions effectively as a whole to achieve medical education program objectives.

## 8.4    Program Evaluation

A medical school collects and uses a variety of outcome data, including national norms of accomplishment, to demonstrate the extent to which medical students are achieving medical education program objectives and to enhance medical education program quality. These data are collected during program enrollment and after program completion.

## 8.5    Medical Student Feedback

In evaluating medical education program quality, a medical school has formal processes in place to collect and consider medical student evaluations of their courses, clerkships, and teachers, and other relevant information.

## 8.6    Monitoring of Completion of Required Clinical Experiences

A medical school has in place a system with central oversight that monitors and ensures completion by all medical students of required clinical experiences in the medical education program and remedies any identified gaps.

UVA00012415

JA610

### 8.7    Comparability of Education/Assessment

A medical school ensures that the medical curriculum includes comparable educational experiences and equivalent methods of assessment across all locations within a given course and clerkship to ensure that all medical students achieve the same medical education program objectives.

### 8.8    Monitoring Student Time

The medical school faculty committee responsible for the medical curriculum and the program's administration and leadership ensure the development and implementation of effective policies and procedures regarding the amount of time medical students spend in required activities, including the total number of hours medical students are required to spend in clinical and educational activities during clerkships.

UVA00012416

JA611

# STANDARD 9: TEACHING, SUPERVISION, ASSESSMENT, AND STUDENT AND PATIENT SAFETY

A medical school ensures that its medical education program includes a comprehensive, fair, and uniform system of formative and summative medical student assessment and protects medical students' and patients' safety by ensuring that all persons who teach, supervise, and/or assess medical students are adequately prepared for those responsibilities.

## 9.1    Preparation of Resident and Non-Faculty Instructors

In a medical school, residents, graduate students, postdoctoral fellows, and other non-faculty instructors in the medical education program who supervise or teach medical students are familiar with the learning objectives of the course or clerkship and are prepared for their roles in teaching and assessment. The medical school provides resources to enhance residents' and non-faculty instructors' teaching and assessment skills, and provides central monitoring of their participation in those opportunities.

## 9.2    Faculty Appointments

A medical school ensures that supervision of medical student learning experiences is provided throughout required clerkships by members of the school's faculty.

## 9.3    Clinical Supervision of Medical Students

A medical school ensures that medical students in clinical learning situations involving patient care are appropriately supervised at all times in order to ensure patient and student safety, that the level of responsibility delegated to the student is appropriate to his or her level of training, and that the activities supervised are within the scope of practice of the supervising health professional.

## 9.4    Assessment System

A medical school ensures that, throughout its medical education program, there is a centralized system in place that employs a variety of measures (including direct observation) for the assessment of student achievement, including students' acquisition of the knowledge, core clinical skills (e.g., medical history-taking, physical examination), behaviors, and attitudes specified in medical education program objectives, and that ensures that all medical students achieve the same medical education program objectives.

## 9.5    Narrative Assessment

A medical school ensures that a narrative description of a medical student's performance, including his or her non-cognitive achievement, is included as a component of the assessment in each required course and clerkship of the medical education program whenever teacher-student interaction permits this form of assessment.

## 9.6    Setting Standards of Achievement

A medical school ensures that faculty members with appropriate knowledge and expertise set standards of achievement in each required learning experience in the medical education program.

UVA00012417

JA612

### 9.7 Formative Assessment and Feedback

The medical school's curricular governance committee ensures that each medical student is assessed and provided with formal formative feedback early enough during each required course or clerkship to allow sufficient time for remediation. Formal feedback occurs at least at the midpoint of the course or clerkship. A course or clerkship less than four weeks in length provides alternate means by which a medical student can measure his or her progress in learning.

### 9.8 Fair and Timely Summative Assessment

A medical school has in place a system of fair and timely summative assessment of medical student achievement in each course and clerkship of the medical education program. Final grades are available within six weeks of the end of a course or clerkship.

### 9.9 Student Advancement and Appeal Process

A medical school ensures that the medical education program has a single standard for the advancement and graduation of medical students across all locations and a fair and formal process for taking any action that may affect the status of a medical student, including timely notice of the impending action, disclosure of the evidence on which the action would be based, an opportunity for the medical student to respond, and an opportunity to appeal any adverse decision related to advancement, graduation, or dismissal.

UVA00012418

JA613

# STANDARD 10: MEDICAL STUDENT SELECTION, ASSIGNMENT, AND PROGRESS

A medical school establishes and publishes admission requirements for potential applicants to the medical education program, and uses effective policies and procedures for medical student selection, enrollment, and assignment.

### 10.1   Premedical Education/Required Coursework

Through its requirements for admission, a medical school encourages potential applicants to the medical education program to acquire a broad undergraduate education that includes the study of the humanities, natural sciences, and social sciences, and confines its specific premedical course requirements to those deemed essential preparation for successful completion of its medical curriculum.

### 10.2   Final Authority of Admission Committee

The final responsibility for accepting students to a medical school rests with a formally constituted admission committee. The authority and composition of the committee and the rules for its operation, including voting privileges and the definition of a quorum, are specified in bylaws or other medical school policies. Faculty members constitute the majority of voting members at all meetings. The selection of individual medical students for admission is not influenced by any political or financial factors.

### 10.3   Policies Regarding Student Selection/Progress and Their Dissemination

The faculty of a medical school establish criteria for student selection and develop and implement effective policies and procedures regarding, and make decisions about, medical student application, selection, admission, assessment, promotion, graduation, and any disciplinary action. The medical school makes available to all interested parties its criteria, standards, policies, and procedures regarding these matters.

### 10.4   Characteristics of Accepted Applicants

A medical school selects applicants for admission who possess the intelligence, integrity, and personal and emotional characteristics necessary for them to become competent physicians.

### 10.5   Technical Standards

A medical school develops and publishes technical standards for the admission, retention, and graduation of applicants or medical students in accordance with legal requirements.

### 10.6   Content of Informational Materials

A medical school's catalog and other informational, advertising, and recruitment materials present a balanced and accurate representation of the mission and objectives of the medical education program, state the academic and other (e.g., immunization) requirements for the MD degree and all associated joint degree programs, provide the most recent academic calendar for each curricular option, and describe all required courses and clerkships offered by the medical education program.

UVA00012419

JA614

#### 10.7 Transfer Students

A medical school ensures that any student accepted for transfer or admission with advanced standing demonstrates academic achievements, completion of relevant prior coursework, and other relevant characteristics comparable to those of the medical students in the class that he or she would join. A medical school accepts a transfer medical student into the final year of a medical education program only in rare and extraordinary personal or educational circumstances.

#### 10.8 Visiting Students

A medical school does all of the following:

- Verifies the credentials of each visiting medical student
- Ensures that each visiting medical student demonstrates qualifications comparable to those of the medical students he or she would join in educational experiences
- Maintains a complete roster of visiting medical students
- Approves each visiting medical student's assignments
- Provides a performance assessment for each visiting medical student
- Establishes health-related protocols for such visiting medical students
- Identifies the administrative office that fulfills these responsibilities

#### 10.9 Student Assignment

A medical school assumes ultimate responsibility for the selection and assignment of medical students to each location and/or parallel curriculum (i.e., track) and identifies the administrative office that fulfills this responsibility. A process exists whereby a medical student with an appropriate rationale can request an alternative assignment when circumstances allow for it.

UVA00012420

JA615

# STANDARD 11: MEDICAL STUDENT ACADEMIC SUPPORT, CAREER ADVISING, AND EDUCATIONAL RECORDS

A medical school provides effective academic support and career advising to all medical students to assist them in achieving their career goals and the school's medical education program objectives. All medical students have the same rights and receive comparable services.

## 11.1    Academic Advising

A medical school has an effective system of academic advising in place for medical students that integrates the efforts of faculty members, course and clerkship directors, and student affairs staff with its counseling and tutorial services and ensures that medical students can obtain academic counseling from individuals who have no role in making assessment or promotion decisions about them.

## 11.2    Career Advising

A medical school has an effective career advising system in place that integrates the efforts of faculty members, clerkship directors, and student affairs staff to assist medical students in choosing elective courses, evaluating career options, and applying to residency programs.

## 11.3    Oversight of Extramural Electives

If a medical student at a medical school is permitted to take an elective under the auspices of another medical school, institution, or organization, a centralized system exists in the dean's office at the home school to review the proposed extramural elective prior to approval and to ensure the return of a performance assessment of the student and an evaluation of the elective by the student. Information about such issues as the following are available, as appropriate, to the student and the medical school in order to inform the student's and the school's review of the experience prior to its approval:

- Potential risks to the health and safety of patients, students, and the community
- The availability of emergency care
- The possibility of natural disasters, political instability, and exposure to disease
- The need for additional preparation prior to, support during, and follow-up after the elective
- The level and quality of supervision
- Any potential challenges to the code of medical ethics adopted by the home school

## 11.4    Provision of MSPE

A medical school provides a Medical Student Performance Evaluation required for the residency application of a medical student only on or after October 1 of the student's final year of the medical education program.

## 11.5    Confidentiality of Student Educational Records

At a medical school, medical student educational records are confidential and available only to those members of the faculty and administration with a need to know, unless released by the student or as otherwise governed by laws concerning confidentiality.

UVA00012421

JA616

**11.6    Student Access to Educational Records**

A medical school has policies and procedures in place that permit a medical student to review and to challenge his or her educational records, including the Medical Student Performance Evaluation, if he or she considers the information contained therein to be inaccurate, misleading, or inappropriate.

JA617

# STANDARD 12: MEDICAL STUDENT HEALTH SERVICES, PERSONAL COUNSELING, AND FINANCIAL AID SERVICES

A medical school provides effective student services to all medical students to assist them in achieving the program's goals for its students. All medical students have the same rights and receive comparable services.

## 12.1 Financial Aid/Debt Management Counseling/Student Educational Debt

A medical school provides its medical students with effective financial aid and debt management counseling and has mechanisms in place to minimize the impact of direct educational expenses (i.e., tuition, fees, books, supplies) on medical student indebtedness.

## 12.2 Tuition Refund Policy

A medical school has clear, reasonable, and fair policies for the refund of a medical student's tuition, fees, and other allowable payments (e.g., payments made for health or disability insurance, parking, housing, and other similar services for which a student may no longer be eligible following withdrawal).

## 12.3 Personal Counseling/Well-Being Programs

A medical school has in place an effective system of personal counseling for its medical students that includes programs to promote their well-being and to facilitate their adjustment to the physical and emotional demands of medical education.

## 12.4 Student Access to Health Care Services

A medical school provides its medical students with timely access to needed diagnostic, preventive, and therapeutic health services at sites in reasonable proximity to the locations of their required educational experiences and has policies and procedures in place that permit students to be excused from these experiences to seek needed care.

## 12.5 Non-Involvement of Providers of Student Health Services in Student Assessment/Location of Student Health Records

The health professionals who provide health services, including psychiatric/psychological counseling, to a medical student have no involvement in the academic assessment or promotion of the medical student receiving those services. A medical school ensures that medical student health records are maintained in accordance with legal requirements for security, privacy, confidentiality, and accessibility.

## 12.6 Student Health and Disability Insurance

A medical school ensures that health insurance and disability insurance are available to each medical student and that health insurance is also available to each medical student's dependents.

## 12.7 Immunization Requirements and Monitoring

A medical school follows accepted guidelines in determining immunization requirements for its medical students and monitors students' compliance with those requirements.

UVA00012423

JA618

### 12.8    Student Exposure Policies/Procedures

A medical school has policies in place that effectively address medical student exposure to infectious and environmental hazards, including the following:

- The education of medical students about methods of prevention
- The procedures for care and treatment after exposure, including a definition of financial responsibility
- The effects of infectious and environmental disease or disability on medical student learning activities

All registered medical students (including visiting students) are informed of these policies before undertaking any educational activities that would place them at risk.

UVA00012424

JA619

# GLOSSARY OF TERMS FOR LCME ACCREDITATION STANDARDS AND ELEMENTS

**Adequate types and numbers of patients (e.g., acuity, case mix, age, gender)**: Medical student access, in both ambulatory and inpatient settings, to a sufficient mix of patients with a range of severity of illness and diagnoses, ages, and both genders to meet medical educational program objectives and the learning objectives of specific courses, modules, and clerkships. (Element 5.5)

**Admission requirements**: A comprehensive listing of both objective and subjective criteria used for screening, selection, and admission of applicants to a medical education program. (Standard 10)

**Admission with advanced standing**: The acceptance by a medical school and enrollment in the medical curriculum of an applicant (e.g., a doctoral student), typically as a second or third-year medical student, when that applicant had not previously been enrolled in a medical education program. (Element 10.7)

**Any related enterprises**: Any additional medical school-sponsored activities or entities. (Element 1.2)

**Assessment**: The systematic use of a variety of methods to collect, analyze, and use information to determine whether a medical student has acquired the competencies (e.g., knowledge, skills, behaviors, and attitudes) that the profession and the public expect of a physician. (Element 1.4)

**Benefits of diversity**: In a medical education program, the facts that having medical students and faculty members from a variety of socioeconomic backgrounds, racial and ethnic groups, and other life experiences can: 1) enhance the quality and content of interactions and discussions for all students throughout the preclinical and clinical curricula; and 2) result in the preparation of a physician workforce that is more culturally aware and competent and better prepared to improve access to healthcare and address current and future health care disparities. (Standard 3)

**Central [or centralized] monitoring**: Tracking by institutional (e.g., decanal) level offices and/or committees (e.g., the curriculum committee) of desired and expected learning outcomes by students and their completion of required learning experiences. (Element 8.6)

**Clinical affiliates**: Those institutions providing inpatient medical care that have formal agreements with a medical school to provide clinical experiences for the education of its medical students. (Element 1.4)

**Clinical and translational research**: The conduct of medical studies involving human subjects, the data from which are intended to facilitate the translation and application of the studies' findings to medical practice in order to enhance the prevention, diagnosis, and treatment of medical conditions. (Element 7.3)

**Clinical reasoning**: The integration, organization, and interpretation of information gathered as a part of medical problem-solving.

**Comparable educational experiences**: Learning experiences that are sufficiently similar so as to ensure that medical students are achieving the same learning objectives at all educational sites at which those experiences occur. (Element 8.7)

**Coherent and coordinated curriculum**: The design of a complete medical education program, including its content and modes of presentation, to achieve its overall educational objectives. Coherence and coordination include the following characteristics: 1) the logical sequencing of curricular segments, 2) coordinated and integrated content within and across academic periods of study (i.e., horizontal and vertical integration), and 3) methods of instruction and student assessment appropriate to the achievement of the program's educational objectives. (Element 8.1)

UVA00012425

JA620

**Competency**: Statements of defined skills or behavioral outcomes (i.e., that a physician should be able to do) in areas including, but not limited to, patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism and ethics, and systems-based practice for which a medical student is required to demonstrate mastery prior to completion of his or her medical education program and receipt of the MD degree. (Element 8.7)

**Core curriculum**: The required components of a medical curriculum, including all required courses/modules and clinical clerkships/rotations. (Element 7.9)

**Critical judgment/critical thinking**: The consideration, evaluation, and organization of evidence derived from appropriate sources and related rationales during the process of decision-making. The demonstration of critical thinking requires the following steps: 1) the collection of relevant evidence; 2) the evaluation of that evidence; 3) the organization of that evidence; 4) the presentation of appropriate evidence to support any conclusions; and 5) the coherent, logical, and organized presentation of any response. (Elements 7.4)

**Curriculum management**: Involves the following activities: leading, directing, coordinating, controlling, planning, evaluating, and reporting. An effective system of curriculum management exhibits the following characteristics: 1) evaluation of program effectiveness by outcomes analysis, using national norms of accomplishment as a frame of reference, 2) monitoring of content and workload in each discipline, including the identification of omissions and unplanned redundancies, and 3) review of the stated objectives of each individual curricular component and of methods of instruction and student assessment to ensure their linkage to and congruence with programmatic educational objectives. (Element 8.1)

**Direct educational expenses**: The following educational expenses of an enrolled medical student: tuition, mandatory fees, books and supplies, and a computer, if one is required by the medical school. (Element 12.1)

**Direct faculty participation in decision-making**: Faculty involvement in institutional governance wherein faculty input to decisions are made by the faculty members themselves or by representatives chosen by faculty members (e.g., versus appointed by administrators). (Element 1.3)

**Diverse sources [of financial revenues]**: Multiple sources of predictable revenues that include, but are not unduly dependent upon any one of, the following: tuition, gifts, clinical revenue, governmental support, research grants, endowment, etc. (Element 5.1)

**Effective**: Supported by evidence that the policy, practice, and/or process has produced the intended or expected result(s). (Standard 1)

**Eligibility requirements…for initial and continuing accreditation**: Receipt and maintenance of authority to grant the MD degree from the appropriate governmental agency and initial and continuing accreditation by one of the six regional accrediting bodies. (Element 1.6)

**Equivalent methods of assessment**: The use of methods of medical student assessment that are as close to identical as possible across all educational sites at which core curricular activities take place, but which may not occur in the same timeframe. (Element 8.7)

**Evaluation**: The systematic use of a variety of methods to collect, analyze, and use information to determine whether a program is fulfilling its mission(s) and achieving its goal(s). (Element 3.3)

**Fair and formal process for taking any action that may affect the status of a medical student**: The use of policies and procedures by any institutional body (e.g., student promotions committee) with responsibility for making decisions about the academic progress, continued enrollment, and/or graduation of a medical

UVA00012426

JA621

student in a manner that ensures: 1) that the student will be assessed by individuals who have not previously formed an opinion of the student's abilities, professionalism, and/or suitability to become a physician; and 2) that the student has received timely notice of the proceedings, information about the purpose of the proceedings, and any evidence to be presented at the proceedings; his or her right to participate in and provide information or otherwise respond to participants in the proceedings; and any opportunity to appeal any adverse decision resulting from the proceedings. (Element 9.9)

**Fair and timely summative assessment**: A criterion-based determination, made as soon as possible after the conclusion of a curricular component (e.g., course/module, clinical clerkship/rotation) by individuals familiar with a medical student's performance, regarding the extent to which he or she has achieved the learning objective(s) for that component such that the student can use the information provided to improve future performance in the medical curriculum. (Element 9.8)

**Final responsibility for accepting students rests with a formally constituted admission committee**: Ensuring that the sole basis for selecting applicants for admission to the medical education program are the decisions made by the faculty committee charged with medical student selection in accordance with appropriately approved selection criteria. (Element 10.2)

**Formative feedback**: Information communicated to a medical student in a timely manner that is intended to modify the student's thinking or behavior in order to improve his or her subsequent learning and performance in the medical curriculum. (Element 9.7)

**Functionally integrated**: Coordination of the various components of the medical school and medical education program by means of policies, procedures, and practices that define and inform the relationships among them. (Element 2.6)

**Health care disparities**: Differences between groups of people, based on a variety of factors including, but not limited to, race, ethnicity, residential location, sex, age, and socioeconomic status, educational status, and disability status, that affect their access to health care, the quality of the health care they receive, and the outcomes of their medical conditions. (Element 7.6)

**Independent study**: Opportunities either for medical student-directed learning in one or more components of the core medical curriculum, based on structured learning objectives to be achieved by students with minimal faculty supervision, or for student-directed learning on elective topics of specific interest to the student. (Element 6.3)

**Integrated institutional responsibility**: Oversight by an appropriate central institutional body (commonly a curriculum committee) of the medical education program as a whole. An effective central curriculum authority exhibits the following characteristics: 1) participation by faculty, students, and administrators; 2) the availability of expertise in curricular design and methods of instruction, student assessment, and program evaluation; and 3) empowerment, through bylaws or decanal mandate, to work in the best interests of the medical education program without regard for parochial or political influences or departmental pressures. (Element 8.1)

**Learning objectives**: A statement of the specific, observable, and measurable expected outcomes (i.e., what the medical students will be able to do) of each specific component (e.g., course, module, clinical clerkship, rotation) of a medical education program that defines the content of the component and the assessment methodology and that is linked back to one or more of the medical education program objectives. (Element 6.1)

**Major location for required clinical learning experiences**: A clinical affiliate of the medical school that is the site of one or more required clinical experiences for its medical students. (Element 5.6)

UVA00012427

JA622

**Medical education program objectives**: Broad statements, in measurable terms, of the knowledge, skills, behaviors, and attitudes (typically linked to a statement of expected competencies) that a medical student is expected to exhibit as evidence of his or her achievement of all programmatic requirements by the time of medical education program completion. (Standard 6 and Element 6.1)

**Medical education parallel curriculum (track)**: A parallel program of study for a subset of the medical student body that requires participating students to complete specific programmatic learning objectives (e.g., in research, primary care, leadership) in addition to the medical educational program objectives required of all medical students. (Element 5.12)

**Medical problem-solving**: The initial generation of hypotheses that influence the subsequent gathering of information. (Elements 7.4)

**Mission-appropriate diversity**: The inclusion, in a medical education program's student body and among its faculty and staff and based on the program's mission, goals, and policies, of persons from different racial, ethnic, economic, and/or social backgrounds and with differing life experiences to enhance the educational environment for all medical students. (Element 3.3)

**Narrative assessment**: Written comments from faculty that assess student performance and achievement in meeting the objectives of a course or clerkship. (Element 9.5)

**National norms of accomplishment**: Those data sources that would permit comparison of relevant medical school-specific medical student performance data to national data for all medical schools and medical students (e.g., USMLE scores, AAMC GQ data, specialty certification rates). (Element 8.4)

**Need to know**: The requirement that information in a medical student's educational record be provided only to those members of the medical school's faculty or administration who have a legitimate reason to access that information in order to fulfill the responsibilities of their faculty or administrative position. (Element 11.5)

**Outcome-based terms**: Descriptions of observable and measurable desired and expected outcomes of learning experiences in a medical curriculum (e.g., knowledge, skills, attitudes, and behavior). (Element 6.1)

**Primacy of the medical education program's authority over academic affairs and the education/assessment of medical students**: The affirmation and acknowledgement that all decisions regarding the creation and implementation of educational policy and the teaching and assessment of medical students are, first and foremost, the prerogative of the medical education program. (Element 1.4)

**Principal academic officer at each campus is administratively responsible to the dean**: The administrator identified by the dean or the dean's designee (e.g., associate or assistant dean, site director) as having primary responsibility for implementation and evaluation of the components of the medical education program that occur at that campus. (Element 2.5)

**Program objectives**: See definition for Medical education program objectives above.

**Publishes**: Communicates in hard-copy and/or on-line in a manner that is easily available to and accessible by the public. (Standard 10)

**Regional accrediting body**: The six bodies recognized by the US Department of Education that accredit institutions of higher education located in their regions of the US: 1) Higher Education Commission; 2) Middle States Commission on Higher Education; 3) New England Association of Schools and Colleges Commission on Institutions of Higher Education;4) Northwest Commission on Colleges and Universities;5)

UVA00012428

JA623

Southern Association of Colleges and Schools Commission on Colleges; and 6) Western Association of Schools and Colleges Senior Colleges and University Commission. (Element 1.6)

**Regional campus**: A regional campus is an instructional site that is distinct from the central/administrative campus of the medical school and at which some students spend one or more complete curricular years. (Element 2.5)

**Regularly scheduled and timely feedback**: Information communicated periodically and sufficiently often (based on institutional policy, procedure, or practice) to a faculty member to ensure that the faculty member is aware of the extent to which he or she is (or is not) meeting institutional expectations regarding future promotion and/or tenure. (Element 4.4)

**Scientific method:** A method of procedure consisting in systematic observation, measurement, and experiment, and the formulation, testing, and modification of hypotheses. Typically the method consists of the following steps: 1) identifying and defining a problem; 2) accumulating relevant data; 3) formulating a tentative hypothesis; 4) conducting experiments to test the hypothesis; 5) interpreting the results objectively; and 6) repeating the steps until an acceptable solution is found. (Element 7.3)

**Self-directed learning**: Includes all of the following components as a unified sequence: 1) the medical student's self-assessment of his/her learning needs; 2) the medical student's independent identification, analysis, and synthesis of relevant information; and 3) the medical student's appraisal of the credibility of information sources. (Element 6.3)

**Senior administrative staff**: People in academic leadership roles, to include but not limited to, associate/assistant deans, directors, academic department chairs, and people who oversee the operation of affiliated clinical facilities and other educational sites. Many, if not most, of these people also have faculty appointments, and for tracking purposes should only be counted in one category when completing tables such as those listed in the DCI under Element 3.3. (Standard 2 and Elements 2.1, 2.4, and 3.3)

**Service-learning**: Educational experiences that involve all of the following components: 1) medical students' service to the community in activities that respond to community-identified concerns; 2) student preparation; and 3) student reflection on the relationships among their participation in the activity, their medical school curriculum, and their roles as citizens and medical professionals. (Element 6.6)

**Single standard for the promotion and graduation of medical students across all locations**: The academic and non-academic criteria and levels of performance defined by a medical education program and published in programmatic policies that must be met by all medical students on all medical school campuses at the conclusion of each academic year for promotion to the next academic year and at the conclusion of the medical education program for receipt of the MD degree and graduation. (Element 9.9)

**Standards of achievement**: Criteria by which to measure a medical student's attainment of relevant learning objectives and that contribute to a summative grade. (Element 9.6)

**Technical standards for admission, retention, and graduation of medical students**: A statement by a medical school of the: 1) essential academic and non-academic abilities, attributes, and characteristics in the areas of intellectual-conceptual, integrative, and quantitative abilities; 2) observational skills; 3) physical abilities; 4) motor functioning; 5) emotional stability; 6) behavioral and social skills; and 7) ethics and professionalism that a medical school applicant or enrolled medical student must possess or be able to acquire, with or without reasonable accommodation, in order to be admitted to, be retained in, and graduate from that school's medical educational program. (Element 10.5)

UVA00012429

JA624

**Transfer**: The permanent withdrawal by a medical student from one medical school followed by his or her enrollment (typically in the second or third year of the medical curriculum) in another medical school. (Element 5.10)

**Visiting students**: Students enrolled at one medical school who participate in clinical (typically elective) learning experiences for a grade sponsored by another medical school without transferring their enrollment from one school to the other. (Element 5.10)

UVA00012430

JA625

## MAPPING OF THE 2014-15 STANDARDS AND 2018-19 STANDARDS AND ELEMENTS SORTED BY THE 2014-15 STANDARDS

| 2014-15 STANDARD | 2018-19 ELEMENT |
|---|---|
| IS-1 | 1.1 |
| IS-2 | deleted |
| IS-3 | 1.6 |
| IS-4 | 1.5 |
| IS-5 | 1.2 |
| IS-6 | deleted |
| IS-7 | 2.1 |
| IS-8 | 2.3 |
| IS-9 | 2.3 |
| IS-10 | 2.2 |
| IS-11 | 2.4 |
| IS-12 | 6.7 |
| IS-13 | 3.2 |
| IS-14 | 3.2 |
| IS-14-A | 6.6 |
| IS-16 | 3.3 and 7.6 |

| 2014-15 STANDARD | 2018-19 ELEMENT |
|---|---|
| ED-1 | 8.2 |
| ED-1-A | 6.1 |
| ED-2 | 6.2 and 8.6 |
| ED-3 | 6.1 |
| ED-4 | 6.8 |
| ED-5 | reflected in Standard 7 |
| ED-5-A | 6.3 |
| ED-6 | 7.4 |
| ED-7 | deleted |
| ED-8 | 8.7 |
| ED-9 | 5.12 |
| ED-10 | 7.1 and 7.2 |
| ED-11 | 7.1 |
| ED-12 | 7.3 |
| ED-13 | 7.2 |
| ED-14 | 7.2 |
| ED-15 | 7.2 |
| ED-16 | 6.4 |

UVA00012431

JA626

| 2014-15 STANDARD | 2018-19 ELEMENT |
|---|---|
| ED-17 | requested in data collection instrument |
| ED-17-A | 7.3 |
| ED-18 | 6.5 |
| ED-19 | 7.8 |
| ED-19-A | 7.9 |
| ED-20 | 7.5 |
| ED-21 | 7.6 |
| ED-22 | 7.6 |
| ED-23 | 7.7 |
| ED-24 | 9.1 |
| ED-25 | 9.2 |
| ED-25-A | 9.3 |
| ED-26 | 9.4 |
| ED-27 | 9.4 |
| ED-28 | 9.4 |
| ED-29 | 9.6 |
| ED-30 | 4.5 and 9.8 |
| ED-31 | 9.7 |
| ED-32 | 9.5 |
| ED-33 | 8.1 |
| ED-34 | 8.3 and Standard 6 |
| ED-35 | 8.3 |
| ED-36 | 5.2 |
| ED-37 | 8.3 |
| ED-38 | 8.8 |
| ED-39 | 2.5 |
| ED-40 | 2.5 |
| ED-41 | 2.6 |
| ED-42 | 9.9 |
| ED-43 | 10.9 |
| ED-44 | reflected in Standards 11 and 12 |
| ED-46 | 8.4 |
| ED-47 | 8.5 |

UVA00012432

JA627

| 2014-15 STANDARD | 2018-19 ELEMENT |
|---|---|
| MS-1 | 10.1 |
| MS-2 | 10.1 |
| MS-3 | 10.3 |
| MS-4 | 10.2 |
| MS-5 | 10.4 |
| MS-6 | 10.4 |
| MS-7 | 10.2 |
| MS-8 | 3.3 |
| MS-9 | 10.5 |
| MS-10 | 10.6 |
| MS-11 | 10.3 |
| MS-12 | 5.10 |
| MS-13 | 10.7 |
| MS-14 | 10.7 |
| MS-15 | 10.7 |
| MS-16 | 10.8 |
| MS-17 | 10.8 |
| MS-18 | 11.1 |
| MS-19 | 11.2 |
| MS-20 | 11.3 |
| MS-21 | deleted |
| MS-22 | 11.4 |
| MS-23 | 12.1 |
| MS-24 | 12.1 |
| MS-25 | 12.2 |
| MS-26 | 12.3 |
| MS-27 | 12.4 |
| MS-27-A | 12.5 |
| MS-28 | 12.6 |
| MS-29 | 12.7 |
| MS-30 | 12.8 |
| MS-31 | 3.4 |
| MS-31-A | 3.5 |
| MS-32 | 3.6 |
| MS-33 | 10.3 |
| MS-34 | 9.9 |
| MS-35 | 11.5 |
| MS-36 | 11.6 |
| MS-37 | 5.11 |

UVA00012433

JA628

| 2014-15 STANDARD | 2018-19 ELEMENT |
|---|---|
| FA-2 | 4.1 |
| FA-3 | deleted |
| FA-4 | 4.5 |
| FA-5 | 4.2 |
| FA-6 | 10.3 and 11.2 |
| FA-7 | 4.3 |
| FA-8 | 1.2 |
| FA-9 | 4.3 |
| FA-10 | 4.4 |
| FA-11 | 4.5 |
| FA-12 | 4.6 |
| FA-13 | 1.3 |
| FA-14 | 1.3 |

| 2014-15 STANDARD | 2018-19 ELEMENT |
|---|---|
| ER-1 | 5.12 |
| ER-2 | 5.1 |
| ER-3 | 5.3 |
| ER-4 | 5.4 |
| ER-5 | 5.7 |
| ER-6 | 5.5 |
| ER-7 | 5.6 and 5.11 |
| ER-8 | 3.1 |
| ER-9 | 1.4 and 5.12 |
| ER-10 | 1.4 |
| ER-11 | 5.8 |
| ER-12 | 5.8 |
| ER-13 | 5.9 |
| ER-14 | 5.9 |

UVA00012434

JA629

# MAPPING OF THE 2014-15 STANDARDS AND 2018-19 STANDARDS AND ELEMENTS SORTED BY THE 2018-19 ELEMENTS

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 1.1 | IS-1 |
| 1.2 | IS-5 and FA-8 |
| 1.3 | FA-13 and FA-14 |
| 1.4 | ER-9 and ER-10 |
| 1.5 | IS-4 |
| 1.6 | IS-3 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 2.1 | IS-7 |
| 2.2 | IS-10 |
| 2.3 | IS-8 and IS-9 |
| 2.4 | IS-11 |
| 2.5 | ED-39 and ED-40 |
| 2.6 | ED-41 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 3.1 | ER-8 |
| 3.2 | IS-13 and IS-14 |
| 3.3 | IS-16 and MS-8 |
| 3.4 | MS-31 |
| 3.5 | MS-31-A |
| 3.6 | MS-32 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 4.1 | FA-2 |
| 4.2 | FA-5 |
| 4.3 | FA-7 and FA-9 |
| 4.4 | FA-10 |
| 4.5 | ED-30, FA-4, FA-11 |
| 4.6 | FA-12 |

UVA00012435

JA630

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 5.1 | ER-2 |
| 5.2 | ED-36 |
| 5.3 | ER-3 |
| 5.4 | ER-4 |
| 5.5 | ER-6 |
| 5.6 | ER-7 |
| 5.7 | ER-5 |
| 5.8 | ER-11 and ER-12 |
| 5.9 | ER-13 and ER-14 |
| 5.10 | MS-12 |
| 5.11 | MS-37 and ER-7 |
| 5.12 | ED-9, ER-1, ER-9 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 6.1 | ED-1-A and ED-3 |
| 6.2 | ED-2 |
| 6.3 | ED-5-A |
| 6.4 | ED-16 |
| 6.5 | ED-18 |
| 6.6 | IS-14-A |
| 6.7 | IS-12 |
| 6.8 | ED-4 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 7.1 | ED-10 and ED-11 |
| 7.2 | ED-10, ED-13, ED-14, ED-15 |
| 7.3 | ED-12 and ED-17-A |
| 7.4 | ED-6 |
| 7.5 | ED-20 |
| 7.6 | IS-16, ED-21, ED-22 |
| 7.7 | ED-23 |
| 7.8 | ED-19 |
| 7.9 | ED-19-A |

UVA00012436

JA631

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 8.1 | ED-33 |
| 8.2 | ED-1 |
| 8.3 | ED-34, ED-35, ED-37 |
| 8.4 | ED-46 |
| 8.5 | ED-47 |
| 8.6 | ED-2 |
| 8.7 | ED-8 |
| 8.8 | ED-38 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 9.1 | ED-24 |
| 9.2 | ED-25 |
| 9.3 | ED-25-A |
| 9.4 | ED-26, ED-27, ED-28 |
| 9.5 | ED-32 |
| 9.6 | ED-29 |
| 9.7 | ED-31 |
| 9.8 | ED-30 |
| 9.9 | ED-42 and MS-34 |

| 2018-19 ELEMENT | 2014-15 STANDARD |
|---|---|
| 10.1 | MS-1 and MS-2 |
| 10.2 | MS-4 and MS-7 |
| 10.3 | MS-3, MS-11, MS-33, FA-6 |
| 10.4 | MS-5, MS-6 |
| 10.5 | MS-9 |
| 10.6 | MS-10 |
| 10.7 | MS-13, MS-14, MS-15 |
| 10.8 | MS-16, MS-17 |
| 10.9 | ED-43 |

UVA00012437

JA632

| 2018-19 ELEMENT | | 2014-15 STANDARD |
|---|---|---|
| 11.1 | | MS-18 |
| 11.2 | | MS-19 and FA-6 |
| 11.3 | | MS-20 |
| 11.4 | | MS-22 |
| 11.5 | | MS-35 |
| 11.6 | | MS-36 |

| 2018-19 ELEMENT | | 2014-15 STANDARD |
|---|---|---|
| 12.1 | | MS-23 and MS-24 |
| 12.2 | | MS-25 |
| 12.3 | | MS-26 |
| 12.4 | | MS-27 |
| 12.5 | | MS-27-A |
| 12.6 | | MS-28 |
| 12.7 | | MS-29 |
| 12.8 | | MS-30 |

UVA00012438

JA633

# EXHIBIT DX5

# University of Virginia      Graduate Record 2018-2019

[ARCHIVED RECORD]

## Academic Rules Medicine

---

◁ Return to: School of Medicine: Academic Rules

---

Click on a link to be taken to the entry below.

- Admission Requirements
- Academic Advising
- Academic Standing
- Appeals from Students
- Awards for Academic Excellence
- Curricular Requirements
- Course Rules
- Degree Information
- Final Examinations
- Grades
- Intra-University Transfers
- Leaving and Returning to the University
- Majors and Minors
- Study Abroad
- Transfer Credit

---

## ADMISSION REQUIREMENTS

---

### General Requirements

All applicants must have completed a minimum of 90 semester hours of course work, at the time of application, in an accredited in a U.S. or Canadian or United Kingdom college or university.

Applicants who are not U.S. citizens or permanent residents of the U.S. are eligible to apply provided they have completed at least 90 semester hours of coursework, at the time of application, in a U.S. or Canadian college or university.

We strongly prefer a bachelor's degree from those that have attended college in the U.S.

Admissions Policies and Procedures (PDF)

### Course Recommendations

The University of Virginia School of Medicine no longer has required pre-requisite courses

We have no science or humanities requirements. However, it is recommended that students consider courses in Cell Biology, Biochemistry, Human Behavior and Statistics as students find these courses to be helpful during medical school.

MCAT Requirements:

The Medical College Admission Test (MCAT) is required of all applicants. We will accept the current version of the MCAT and the future version of the MCAT. We will not give preference to either. All applicants must present scores from tests taken no later than September 30th of the year prior to matriculation, and no earlier than April 1st of the three years prior to matriculation.

Information regarding the MCAT and registration materials are available from premedical advisors or from MCAT Registration, phone: (202) 828-0690, http://www.aamc.org/.

### AP Credit

The University of Virginia will accept AP credit, provided your undergraduate institution awarded you credit towards graduation (not just exemptions) and those credits appear on your official transcript.

### Technical Standards

All matriculants and current students ("Candidates") must possess the physical, cognitive, emotional and interpersonal capabilities necessary to complete the medical education program and to provide highly effective patient care within the medical education pro-

UVA00000041

JA635

gram. These capabilities are called Technical Standards, the essential functions that all medical students must demonstrate to meet the requirements of a general medical education. Candidates whether for admission, academic promotion, or graduation must meet these Technical Standards, with or without reasonable accommodation.

See for details of these capabilities.

These technical standards are predicated on the school's learning objectives that are considered essential for completion of the M.D. degree. They have been approved by the Curriculum Committee and the Dean of the School of Medicine.

## Criminal Background Check Requirement

If legal or criminal proceedings are filed against you prior to matriculation, or if you are the recipient of any institutional disciplinary action, it is your responsibility to inform the Admissions Office immediately. Additionally, all students must undergo a mandatory criminal background check as a condition of acceptance to the School of Medicine. See the full Criminal Background Check Policy here.

# ACADEMIC ADVISING

Students in pursuit of a Doctor of Medicine are divided into 4 "colleges" within each cohort. Each college is lead by a Dean of Student Affairs providing the students with academic and career advising. The current deans are:

- Dunglison College - Dr. Meg Keeley
- Hunter College – Dr. John Densmore
- Pinn College – Dr. Christine Peterson
- Reed College – Dr. Sean Reed

# ACADEMIC STANDING

## Definitions of Academic Status

A student may be placed on *academic warning* by ASAC during a specified period in which the student's academic and/or professional deficiencies must be remediated or they will risk progression to *academic probation*.

A student may be placed on *academic probation* by ASAC during a specified period in which the student's academic progress and/or professional behaviors are monitored closely with periodic required reviews by ASAC. The student remains enrolled during this time. The committee may appoint specific faculty to implement remediation and evaluate the student's progress. If deficiencies or failures are not rectified according to the remediation plan set by ASAC within the specified period of time, the student is subject to dismissal from the University. *Academic probation* is reflected on the MSPE.

## Definitions of Academic Standing

A student is in good academic standing if the student makes satisfactory progress, defined as progressing at a pace of completion allowing the student to meet academic requirements to achieve the Doctor of Medicine degree within a six-year limit (150% of the program length) set from matriculation.

A student is not in good academic standing if making inadequate academic progress that threatens their ability to achieve the Doctor of Medicine degree within a six-year limit set from matriculation as determined by the Academic Standards and Achievement Committee.

The following are standards for each phase of the curriculum to determine whether or not students are maintaining Satisfactory Academic Progress (SAP).

### PRE-CLERKSHIP PHASE

- A student is declared *not in good academic standing* if he/she has failures or an unsatisfactory in any course or system that are not successfully remediated at the time of the first day of class, third semester.
- A student is declared *not in good academic standing* if he/she has >2 course Incompletes and/or Withdrawals and if the Incompletes or Withdrawals are not remedied at the time of the first day of class, third semester.

UVA00000042

JA636

- A student is declared *not in good academic standing* if he/she has failures or an unsatisfactory in any course that are not successfully remediated at the time of the first day of period one of the clerkships.
- A student is declared *not in good academic standing* if he/she has >2 course Incompletes and/or Withdrawals and if the Incompletes or Withdrawals are not remedied at the time of the first day of period one of the clerkships.
- A student is declared not in good academic standing if he/she does not pass USMLE Step 1 on the second attempt.

## CLERKSHIP PHASE

- A student is declared *not in good academic standing* if he/she has >2 deficiencies (failing 2 or more clerkships with an F) and if the deficiencies are not remediated at the time of four months from the end of the 48-week clerkship period.
- A student is declared *not in good academic standing* if he/she has >2 Incompletes or Withdrawals and if the Incompletes and/or Withdrawals are not remedied at the time of four months from the end of the 48-week clerkship period.
- A student is declared *not in good academic standing* if they fail to pass either part of USMLE Step 2 on the second attempt.

## POST-CLERKSHIP (ELECTIVE) PHASE

- The student is declared *not in good academic standing* if not making adequate progress to achieve the Doctor of Medicine degree within the time limit set from matriculation.
- The student is declared *not in good academic standing* if he/she receives two or more unsatisfactory elective evaluations.

# APPEALS FROM STUDENTS

If ASAC requires a dismissal from the School of Medicine or repetition of an academic period, the notification to the student will provide the option of an appeal and a description of the appeals process. This option will not be granted to those students failing to pass Steps 1, 2 CK or 2 CS of the USMLE within three attempts. The student may formally request that the Associate Dean for Student Affairs appoint an ad hoc Appeals Committee to review the decision of ASAC. The student must file his/her appeal no later than 14 days from receipt of notification or lose the right to appeal.

The three-person ad hoc Appeals Committee is drawn from a pool of 10 faculty members named by the Associate Dean for Student Affairs, none of whom are current members of ASAC. The student selects one member, the Senior Associate Dean for Education selects one member, and the Dean selects the third member (who chairs the ad hoc Appeals Committee). The Associate Dean for Student Affairs serves as staff liaison, ex officio, without vote.

The student is permitted to inspect his/her entire medical school file, including any material upon which the decision of ASAC was based.

The student is permitted to have counsel, to submit affidavits and exhibits and to summon witnesses at the Appeals Committee hearing. Legal counsel may be present to provide advice, but legal counsel will not be permitted to participate actively in presentation of testimony, examination/cross examination of witnesses or oral arguments.

The Appeals Committee is to conduct a hearing as soon as possible (ordinarily within 14 days) and will uphold, modify or reverse the decision(s) of ASAC.

The Appeals Committee will provide the student with all the evidence against him or her, including the academic grades and written evaluations, and will base its recommendations upon the evidence presented at the hearing.

The Appeals Committee will send its decision, along with a written record of its proceedings, to the Dean of the School of Medicine. The decision of the Appeals Committee will be final.

# AWARDS FOR ACADEMIC EXCELLENCE

## Honorary Societies

### ALPHA OMEGA ALPHA

Alpha Omega Alpha is the only national honor medical society in the world. Membership in AOA recognizes and perpetuates excellence in the medical profession. At UVa the goal of AOA is also to promote contact between the students and members who are

UVA00000043

JA637

practicing physicians, both here in the University and in private practice.

From the top quartile of students, each chapter may elect to AOA membership up to one-sixth of the projected number of students that will graduate. Those students chosen from the top quartile for election are picked not only for their high academic standing, but as well for leadership among their peers, professionalism and a firm sense of ethics, promise of future success in medicine, and a commitment to service in the school and community.

Approximately 6-9 students are elected following their second year based on a vote of peers and overall academic performance in an unweighted manner. Approximately 17 more are elected after their third year based on a vote of peers and cumulative academic performance in an unweighted manner.

## GOLD HUMANISM HONOR SOCIETY

Started in 2003, the Gold Humanism Honor Society recognizes approximately 20 students in each class (1/6th) nominated by their peers for the following qualities and characteristics:

- Cares for patients with obvious compassion and empathy
- Maintains thoroughly professional demeanor and highest ethical standards
- Respects everyone
- Engenders patients' trust and confidence
- Listens and communicates well, establishing good rapport with patients
- Shows cultural sensitivity to all personals, especially those of different ethnic/racial/spiritual backgrounds
- Seeks to help patients and families understand nature and impact of illness and treatment
- Attends to patients' psychological well-being
- Advocates on behalf of patients with attending physician and team
- Works collegially as member of interprofessional health-care team
- Seeks and accepts help, criticism, and advice in order to improve performance
- Is committed to reflecting on and evaluating own attitudes, skills, and behaviors
- Engages in community activities and volunteer service

## THE RAVEN SOCIETY

The Raven Society was founded at the University of Virginia in 1904. The Society's objective is to promote fellowship among people of similar intellectual interests beyond the limits of the classroom. It has the interests of the University at heart and directs its efforts toward expansion of Virginia's influence and prestige. Undergraduates, graduate students, and members of the faculty and alumni are eligible for membership; they are selected on the basis of excellence in their field and contributions to the University. The Society meets regularly during the year to conduct business meetings, hear speakers, and hold elections for new members. Its activities culminate each year in a formal Spring banquet at which officers are elected, new members are initiated, and highly-coveted Raven awards are presented to people outstanding in their manifold contributions to the University. Each year four students from the medical school are elected.

## OMICRON DELTA KAPPA

ODK, founded in 1914, is a national honor society with a threefold purpose: to recognize students who have attained a high standard of leadership in collegiate activities; to bring together individuals representing all phases of college life; and to bring together members of the faculty and the student body on a basis of mutual interest, understanding, and helpfulness. Each year two or three students from the medical school are elected.

## Awards

- **Medical Student Teaching Award**
  The award was established in 2002. Students participating in any of the Basic Science or Clinical Science teaching electives are eligible for the annual Medical Student Teaching Award. Awards are given each year to one or more students demonstrating excellence in attaining or surpassing the self-directed goals of the elective. Winners are selected by a committee of faculty and medical students.
- **Robert M. Blizzard Pediatric Scholar Award**
  The award was established by the Department of Pediatrics to honor Dr. Robert Blizzard, who served as chair from 1974

UVA00000044

JA638

through 1987. The recipient is an individual who is committed to a career in Pediatrics and has demonstrated outstanding academic achievement, particularly during the Pediatric clerkship.

- **C. Richard Bowman Scholarship Award**
  The award is made in memory of C. Richard Bowman, 1974 graduate of the University of Virginia School of Medicine. The award is based upon performance during the clerkships and is awarded to the student who embodies the ideals and spirit of Dr. Bowman.
- **Class of 1954 Community Service Award**
  The award is sponsored by the graduating class of 1954 and is awarded to the graduating student who has done exemplary work in the community.
- **The Richard F. Edlich Medical Student Research Award in Emergency Medicine**
  The award was established in 1995 to recognize the contributions of Dr. Richard F. Edlich, Alumni Distinguished Professor, to Emergency Medicine at the University of Virginia. The award is presented to a graduating medical student whose innovative research in Emergency Medicine has resulted in significant improvement in patient care.
- **Award for Excellence in Practice of Medicine-2 (formerly Introduction to Clinical Medicine)**
  This award is presented to the graduating student who achieved the highest grade in the second year course, Practice of Medicine-2 (2002-2011); (Introduction to Clinical Medicine, 1986-2001).
- **Samuel Michael Brooke Memorial Award in Hematology**
  The award is made in the memory of Samuel M. Brooke, Class of 1994. The award recognizes scholastic excellence in Hematology (as of 2012, The Hematology System).
- **James R. Cash Pathology Book Award**
  The award was created by alumni and faculty on the occasion of the retirement of Dr. James R. Cash, Walter Reed Professor of Pathology for 32 years. It is awarded annually for the best scholastic achievement in Pathology.
- **Leonard Tow Humanism in Medicine Award**
  The award recognizes a student for their compassion and sensitivity in the delivery of care to patients and their families.
- **Herbert R. Farber Award in Internal Medicine**
  The award is given in memory of Dr. Herbert R. Farber, a 1940 graduate of the University of Virginia School of Medicine. It is presented to a graduating student who has demonstrated excellence in Internal Medicine and in the fine arts or athletics.
- **Gratton Alexander Litz, III Award in Internal Medicine**
  The award is given in memory of Gratton Alexander Litz, III, a 1983 graduate of the University of Virginia School of Medicine. The award is based upon outstanding performance during the clerkship in Internal Medicine and recognizes an individual who has the ability to apply medical knowledge clinically and who demonstrates compassion for patients.
- **Douglas W. Eastwood Award in Anesthesiology**
  The award was established in 1972 to honor Dr. Eastwood, the first Chair of the University of Virginia Department of Anesthesiology. It is awarded to a fourth year student who demonstrates excellence in Anesthesiology.
- **Medical Alumni Association Outstanding Student Award**
  The award is presented by the University of Virginia Medical Alumni Association to a member of the graduating class who has contributed in unique ways to excellence in the School of Medicine and fostered new student programs and initiatives.
- **Leadership Award**
  The award is given in recognition of exceptional leadership.
- **The McGilvery Memorial Book Award in Biochemistry**
  This book award is given in memory of Robert W. McGilvery, former chair of the Biochemistry Department. The award is given to the outstanding medical student in the Human Biochemistry course.
- **Larry S. Nichter Award for Plastic Surgical Research**
  The award honors a fourth year medical student for exemplary research in Plastic Surgery, leading to improved quality and outcome of patient care.
- **Carlos & Amparo Villar-Palasi Prize in Pharmacology (formerly Amparo Villar-Palasi Memorial Award)**
  The award is presented to two outstanding students in the second year course in Pharmacology. It honors both Professor Carlos Villar-Palasi, a faculty member in Pharmacology, and his wife, Amparo.
- **Edgar F. Shannon Award of the Z Society**
  The award is presented in honor of former University President Edgar F. Shannon, Jr., by the Z Society to a student who has contributed in an outstanding way to the academic excellence of that School. Since 2008, the student body has voted on this award and considered excellence in extracurricular activities as well as academic – the "best" student.
- **R. Scott Jones Award in Surgery**
  This award, established in 2002, is presented in honor of the former chair of the Department of Surgery, R. Scott Jones, M.D.

UVA00000045

JA639

The award is presented to a graduating student in recognition for their academic excellence in the surgical disciplines and their demonstrated humanity in patient care.

- Robert Bennett Bean Award

  Established by the Class of 1966 in honor of Dr. Robert Bennett Bean, anatomist, anthropologist, and chair of the Department of Anatomy from 1916 to 1942. The award is presented by the second year class to a member of the faculty for excellence in teaching the basic medical sciences.

- **James Ernest Kindred Award**

  The award was established by the Class of 1966 to honor the former Professor of Anatomy. It is given to a member of the House Staff (intern, resident, or fellow) felt by the graduating class to have displayed the greatest enthusiasm for teaching students while inspiring them through the common experience of uncertainty assuaged by ideas.

- **Robley Dunglison Award**

  The award was established by a gift from the Class of 1964 in honor of the first fculty member of the School of Medicine. It is given by the graduating class to a member of the faculty in recognition of outstanding teaching efforts and personal contributions toward arousing interests and inspiring the endeavors of students.

- **Mulholland Society/Class of 1988 Departmental Teaching Award**

  The award was established in 1988 by the Mulholland Society and the Class of 1988 to emphasize the importance of departmental attitudes, dedication and teamwork toward effective teaching. It is given to the department selected by the graduating class in recognition of superior teaching by the faculty and house staff.

- **McGilvery Award for Academic Excellence in Molecular and Cellular Medicine.**
- **System Award for Academic Excellence in Microbes: The Essentials.**
- **Award for Academic Excellence in the Musculoskeletal and Integument System.**
- **Award for Academic Excellence in the Mind, Brain and Behavior System.**
- **Award for Academic Excellence in the Gastrointestinal System.**
- **Award for Academic Excellence in the Cardiovascular System.**
- **Award for Academic Excellence in the Pulmonary System.**
- **Award for Academic Excellence in the Renal System.**
- **Award for Academic Excellence in the Endocrine/Reproductive System.**
- **Award for Academic Excellence in the Hematology System.**
- **Collaborative Learning Award**

  The award is given to recognize and reward students identified by their peers at the end of their pre-clinical clerkship as being most helpful to others in problem solving, active listening, and cooperative learning. The award is sponsored by the Medical Alumni Association.

- **John Jones Memorial Scholarship Award**

  The award is endowed by the School of Medicine Class of 2012 to honor the memory of their classmate who died in a tragic caving accident during his second year at UVA. The recipient is an individual who shares John's desire to serve the under-privileged members of our community and embodies his core values – kindness, compassion, and professional excellence.

# CURRICULAR REQUIREMENTS

## GRADUATION

In order receive the recommendation from ASAC for graduation and conferral of the MD degree, a student must satisfy all academic and professionalism graduation requirements with no outstanding deficiencies. In addition, passing scores on the CPX, USMLE Step 1, USMLE Step 2 Clinical Knowledge and the USMLE Step 2 Clinical Skills are required for graduation.

## Professionalism

Professional attitudes and behaviors are components of the 12 Competencies Required of the Contemporary Physician that enable the independent performance of the responsibilities of a physician and therefore are a requirement for the successful award of the degree of Doctor of Medicine. The School of Medicine's Professionalism Objectives (http://www.medicine.virginia.edu/ume/wp-content/uploads/sites/216/2015/09/Professionalism-objectives-clerkships3.pdf) establish general standards applicable to all students in the School of Medicine. However, it is the responsibility of the faculty and the ASAC, as appropriate, to interpret and apply the general Professionalism Objectives to specific situations in when concerns are raised about student performance or behaviors.

UVA00000046

JA640

Evaluation of professional attitudes and behaviors is an integral part of a student's assessment and generally is accomplished through observation and narrative recording. Praise/Concern Cards and written narratives are assessment tools used to describe behaviors in areas of altruism; honesty and integrity; caring, compassion and communication; respect for others; respect for differences; responsibility and accountability; excellence and scholarship; leadership and knowledge and other skills related to professionalism. These professional attitudes and behaviors are monitored and recorded throughout undergraduate medical education.

Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by his/her college dean and documentation of the discussion must be recorded. If a student receives three or more written observations of concern, or is reported for two breaches of the Health Insurance Portability and Accountability Act (HIPAA), or is cited for a single egregious breach of professionalism, notice will be sent to ASAC for review. A student identified as having a pattern of unprofessional behavior may be directed to further counseling and /or to supportive remediation and/or placed on academic warning or academic probation (as defined below), or if the professional violations are severe, a student may be dismissed from school even if he/she has passing grades in all courses. ASAC will assess the severity of the problem, the management and the consequences, including possibly reporting the behaviors in the student's Medical Student Performance Evaluation (MSPE). Egregious behaviors, such as but not limited to assault on or threat to a patient, patient's family member, student, GME trainee or faculty member, conduct that may constitute a felony, etc., regardless of whether criminal prosecutions are initiated or pursued, will be referred immediately to ASAC, irrespective of whether previous observations of concern exist, with the recommendation for dismissal from school.

## Technical Standards

The practice of medicine requires a broad combination of cognitive, emotional, physical, interpersonal and other skills and personal characteristics in order to provide highly effective patient care within the system of health care. Consequently, the School of Medicine has identified minimum standards required of all students who matriculate. These standards must be met throughout medical school in order to progress and graduate; they are predicated on the school's learning objectives that are considered essential for completion of the M.D. degree. They have been approved by the Curriculum Committee, the Dean and the Office of General Counsel and are reviewed for currency and re-confirmed on an annual basis.

Students are required to attest at the time they accept an offer to matriculate that they meet the School of Medicine's Technical Standards, and they must attest on an annual basis that they continue to meet the standards. These standards are not intended to deter any student who might be able to complete the requirements of the curriculum with reasonable accommodations. Requests from students or prospective students for reasonable accommodations in meeting the technical standards will be considered by the Technical Standards Committee.

**Resources for Students:** Admitted students with physical or learning disabilities or students who develop physical or learning disabilities have access to the University's Student Disability Access Center for an evaluation of what accommodations might be necessary for the student to succeed. The University also provides Physical Medicine and Rehabilitation services for students at the student's expense.

**Technical Standards:** The standards listed below are based on the skills necessary to meet the requirements of the curriculum.

1. Cognitive Abilities

- Recall and explain facts and concepts
- Apply facts and concepts in novel clinical and research contexts
- Integrate and analyze clinical and research data and draw appropriate conclusions (measurement, calculation, reasoning, synthesis). The student must be able to execute these skills and act quickly in situations such as cardio-pulmonary resuscitation.
- Justify one's analysis and conclusions
- Acquire and develop clinical reasoning and judgment skills
- Create new knowledge
- Complete multiple choice, clinical skills and other assessments in a timely manner
- Communicate effectively in both oral and written formats
- Solicit and record accurately and clearly information from patients, families and others
- Demonstrate proficiency in both oral and written English language
- Demonstrate self-awareness and self-assessment of one's abilities and deficiencies or limitations
- Self-awareness to request help when needed

2. Emotional, Attitudinal and Behavioral Skills

UVA00000047

JA641

- Demonstrate empathy
- Demonstrate integrity
- Demonstrate honesty
- Demonstrate concern for others and ability to put the welfare of others before one's own
- Demonstrate interest and motivation
- Demonstrate timely response and completion of assignments and duties
- Demonstrate adherence to universal precautions and safety standards in the laboratory and clinical settings
- Demonstrate self-awareness and self-analysis of one's emotional state and reactions
- Modulate affect under adverse and stressful conditions and fatigue
- Modulate behavior under adverse and stressful conditions and fatigue
- Exhibit emotional resilience
- Engage in self-reflection
- Adapt to changing environments and roles
- Accept feedback, suggestions and criticism in a constructive manner
- Identify personal reactions, recognize multiple points of view and integrate these appropriately into clinical decision making
- Communicate and care for, in a non-judgmental way, persons who differ from oneself and one's beliefs in a variety of ways, including but not limited to gender, age, race, ethnicity, socio-economic status, culture, creed, military status, sexual orientation and identity, and religious or spiritual beliefs
- Demonstrate freedom from impairment due to alcohol or other drugs

3. Physical ability to learn, perform, and become competent in the following:

- Execute motor movements necessary for cadaver dissection and for general and emergency patient care, including conducting a full physical examination (including manual vital signs), assisting in surgery, obstetrics and emergencies such as cardio-pulmonary resuscitation as well as suturing/stapling of wounds (and removal), inserting an intravenous catheter, inserting a urinary catheter, splinting and other basic general medical and surgical care
- Stand for extended periods of time
- Assist in lifting and positioning patients for procedures
- Dress in protective gowns, gloves and other garments
- Scrub one's hands for sterile procedures
- Demonstrate physical stamina to work for 28 hours without sleeping
- Demonstrate skills necessary to use a computer, e.g. the electronic medical record
- Use a microscope
- Perform an electrocardiogram and place a patient on a cardiac monitor
- Demonstrate physical skills and senses necessary to use a stethoscope, ophthalmoscope, otoscope, FAST ultrasound and other basic medical equipment
- Demonstrate adequate sensory function (vision, hearing, touch, equilibrium) and motor function in order to palpate, percuss, auscultate and perform other diagnostic maneuvers (to observe and differentiate normal from abnormal findings on physical and mental status examinations)
- Draw venous and arterial blood
- Ventilate a patient effectively using a bag-mask apparatus

4. Interpersonal Skills

- Establish effective working relationships with patients, families, fellow students, faculty, nurses and other professionals in a variety of work environments (classroom, laboratories and clinical settings)
- Function effectively and productively as a member of an interprofessional healthcare team

**Process for Determining Compliance with the Technical Standards for Matriculation, Promotion, and Graduation:** All matriculants and current students ("Candidates") must possess the physical, cognitive, emotional and interpersonal capabilities necessary to complete the medical education program and to provide highly effective patient care within the medical education program. These capabilities are called Technical Standards, the essential functions that all medical students must demonstrate to meet the requirements of a general medical education. Candidates—whether for admission, academic promotion, or graduation—must meet these Technical Standards, with or without reasonable accommodation. (*See the "Technical Standards" for details of these capabilities.*) These technical standards are predicated on the school's learning objectives that are considered es-

UVA00000048

JA642

sential for completion of the M.D. degree. They have been approved by the Curriculum Committee and the Dean of the School of Medicine.

**Annual Declaration:** Each year, all Candidates must sign and return to the Office of Student Affairs a copy of the form "Declaration of Meeting Technical Standards for the University of Virginia School of Medicine." Failure to sign and return the form could delay or prevent promotion or graduation. Falsification of a form is a violation of the Honor Code and could lead to dismissal from the School. Each year, the Office of Student Affairs will notify students of the deadline for filing the Declaration but it is the student's responsibility to complete, sign, and return the form by the deadline. *(See the form at the foot of this document.)*

**Review of Technical Standards:** The standards are reviewed, revised as needed, and reconfirmed by the Technical Standards Committee annually. This review takes into account the School of Medicine's ongoing curriculum and clinical standards evaluation, and changes in applicable law and/or University policy.

**Technical Standards Committee:** The Technical Standards Committee is charged with determining whether Candidates meet the School's Technical Standards and, if not, whether reasonable accommodation would allow them to meet the standards. If the Committee determines that a case does not fall within the scope of a technical standards issue, the Committee will triage the case to the appropriate group, e.g., the Academic Standards and Achievement Committee, the Threat Assessment Team, etc.

The Technical Standards Committee consists of the Senior Associate Dean for Medical Education, Associate Dean for Admissions and Student Affairs, Associate Dean for Undergraduate Medical Education, Associate Dean for Diversity, and the Assistant Dean for Medical Education. Review and advice will be sought as appropriate, and may include General Counsel for the Medical School, the UVA Office of Equal Opportunity Programs and/or the Learning Needs and Evaluation Center.

**Students with Disabilities:** The University of Virginia does not discriminate against qualified applicants or enrolled students with disabilities. These Technical Standards are not intended to deter any candidate or enrolled student for whom reasonable accommodation will allow the fulfillment of the complete curriculum.

Admitted and enrolled students with disabilities have access to resources at the University. See the ADA Coordinator's web page at http://www.virginia.edu/accessibility/.

**Request for review and/or accommodations**

**(1) Candidates for matriculation:** Candidates with disabilities who are offered admission should begin discussions with the Technical Standards Committee as soon as the offer is received. It is the Candidate's responsibility to provide sufficiently current information that documents the general nature and extent of the disability, the functional limitations that would need to be accommodated, and the accommodations that are requested. Guidelines as to when information and documentation are deemed sufficiently current vary by type of disability and may be found on the University's Learning Needs and Evaluation Center website at http://www.virginia.edu/studenthealth/lnec.html. The Technical Standards Committee is responsible for determining whether Candidates meet the School's Technical Standards and, if not, whether reasonable accommodation would allow them to meet the standards. In making that determination, the Committee may seek additional information about a candidate's disabilities and about possible accommodations from knowledgeable persons within or outside the School. The Committee may require a candidate to undergo examination by appropriate specialists. Such examination will be at the candidate's expense.

The Committee will review each candidate case by case, with careful consideration of all the candidate's skills and attributes. Candidates currently abusing alcohol or other substances are not suitable candidates for enrollment.

**Reasonable/unreasonable accommodation:** An accommodation is unreasonable if it poses a direct threat to the health or safety of the Candidate or others, if making it requires a substantial modification in an essential element of the curriculum, if it lowers academic standards, or if it poses an undue administrative or financial burden on the School. No disability can be accommodated with an auxiliary aid or intermediary that provides a selective function, cognitive support, or medical knowledge. Aids and intermediaries also may not act as a substitute in performing essential skills, or supplement clinical and ethical judgment. That is to say, accommodations cannot eliminate essential program elements.

**(2) Candidates for academic promotion or graduation:** Enrolled Candidates who develop a disability or condition shall provide current information documenting the general nature and extent of the disability, the functional limitations that would need to be accommodated, and the accommodations that are requested. Guidelines as to when information and documentation are deemed sufficiently current vary by type of disability and may be found on the University's Learning Needs and Evaluation Center website at http://www.virginia.edu/studenthealth/lnec.html.

**Review by the Technical Standards Committee:** The Committee will review the enrolled Candidate's disability and possible reasonable accommodations by applying the same standards and following the same procedures used for candidates for matriculation, as described above. Enrolled Candidates who develop a disability or condition that places patients or others at risk and/or that

UVA00000049

JA643

jeopardizes the ability to complete medical student education, and that cannot be eliminated with a reasonable accommodation, will be dismissed from the School. Candidates currently impaired by alcohol or other substance abuse are not suitable for promotion or graduation.

## Steps 1 and 2 of United States Medical Licensing Examination (USMLE)

In order to advance to the clerkships, a student must successfully complete the pre-clerkship curriculum and must have taken USMLE Step 1 at least 10 days before the Transition course. A student may begin the clerkships pending notification of their Step 1 score. If notification of a failing score on Step 1 is received after a student has begun a clerkship, they generally will be allowed to complete that clerkship. The student then will discontinue clerkships in order to concentrate on retaking and passing Step 1. The Step 1 examination may be taken no more than three times. Three failures of Step 1 will result in the student's dismissal from the School of Medicine, without recourse to the appeals process. The college deans in consultation with the Director of Academic Enhancement may determine, based on a student's academic performance, that the student is at risk of failing USMLE Step 1 and may recommend that the student delay sitting for the examination in order to have more time for preparation. In this circumstance, the student will complete the Transitions Course so the student can return to the clerkships upon satisfactory completion of USMLE Step 1. After successful completion of the core clerkships, the student must take both parts of Step 2 of the USMLE (2 CK and 2 CS). Passing both Step 2 CK and Step 2 CS is required for graduation. Students are allowed a total of three attempts to pass each of the two Step 2 examinations; failure to pass either Step 2 examination for a third time will result in dismissal from medical school, without recourse to the appeals process. Students must pass all required clerkships and take USMLE Step 2 CS and 2 CK no later than November 1 of their last academic year in medical school to ensure an opportunity for remediation prior to residency match and graduation, should a failure occur.

## Clinical Performance Examination

Students are required to take and pass the Clinical Practice Examination (CPX) after the completion of the clerkships. This is a requirement for graduation. Students failing the CPX are referred to ASAC and should review their performance and address their deficiencies prior to retaking the examination.

## Overall Time Limits

All requirements for graduation, including passing Step 1, Step 2 CK and Step 2 CS of the USMLE, must be completed within six years from the date the student matriculated in the School of Medicine. For students in the MD/PhD dual degree program, graduation requirements must be completed within nine years; students in the MD/JD program must complete graduation requirements within eight years; for students in other dual degree programs graduation requirements must be completed within seven years. Exceptions to this policy are rare, and must be approved by ASAC.

# COURSE RULES

## Testing Accommodations

When testing accommodations have been granted to a student by the SOM, a student must share their desire to invoke that accommodation at least two weeks prior to a summative assessment and at the time of orientation for clerkships.

## Procedure for Handling a Deficiency or Failure

- The Course, System or Clerkship Director notifies both the student and the School of Medicine Registrar/college dean of deficiency or failure.
- The student is withdrawn from clinical responsibilities (if applicable).
- The student is required to meet with his/her college dean. At this meeting, the Policy on Academic and Professional Advancement is discussed and the student is notified of the next ASAC meeting. The ASAC meetings usually occur monthly. In the pre-clerkship phase of the curriculum, a student who scores less than 70% on a summative assessment shall meet with the system leader and/or the Director of Academic Enhancement to discuss learning strategies to improve performance.
- The student shall be reviewed by ASAC.
- Students may submit a written statement, results of a drug test, results of a Counseling and Psychological Services (CAPS) screening or any other relevant data to ASAC and/or request to meet in person with ASAC.

UVA00000050

JA644

- All students subject to dismissal or who may be required to repeat an academic period will be offered the opportunity to meet with ASAC.
- ASAC reviews each student's academic record, takes into account any other relevant information or data and recommendations from a Course or Clerkship Director, and determines remediation or other action based upon the Policy on Academic and Professional Advancement.
- The Chair of ASAC notifies the student in writing of the Committee's decision.
- If applicable and approved, the Office of Student Affairs schedules the remediation required by ASAC in collaboration with Course or Clerkship Directors taking into account the make-up schedule for that academic year.
- In the cases where a student is asked to repeat an entire segment of the curriculum or is dismissed from the School of Medicine, he/she can appeal the decision of ASAC following the Appeals Process described below.
- ASAC decisions regarding promotion or graduation due to failure to pass Steps 1, 2 CK or 2 CS of the USMLE or dismissal resulting from three failures cannot be appealed.
- The SOM registrar shall communicate with student, college dean and ASAC to confirm when deficiencies or examination failures have been remediated.

## Enrollment and Withdrawal from Courses and Clerkships

### PRE-CLERKSHIP AND POST-CLERKSHIP COURSES

Note: Courses cannot be dropped in the pre-clerkship curriculum without withdrawing from the University.

#### Drop without penalty (course removed from transcript)

If a student withdraws or goes on a LOA from the School of Medicine prior to completion of 10% of the timeframe of a course, the enrollment will be voided.

#### Drop with W grade

After completion of 10% of the course, a grade of W will be assigned. If the student re-enters the course, he/she will be reenrolled in the course according to the Leave of Absence, Withdrawal and Readmission Policy. Withdrawal deadline After 80% of a course is completed, students can no longer receive a W grade. If there are extenuating circumstances, and if it is feasible, a student may petition for a grade of Incomplete. Feasibility is determined by the course director after a review of the coursework not completed and other practical considerations in accordance with the School of Medicine's Policy on Academic and Professional Advancement.

### ELECTIVES (INCLUDING ADVANCED CLINICAL ELECTIVES)

#### Adding a Fourth Year Elective

Electives must be added at least one month prior to the start of the Elective. Students add Lottery Electives through OASIS. In order to enroll in an arranged elective, a student must secure in writing approval from the elective supervisor who also notifies the Office of Student Affairs for entry into OASIS. Participation in electives at non-UVA, LCME-approved sites requires submission of an acceptance letter (or email) to the Office of Student Affairs. Participation in electives at non-LCME approved sites that are not listed on the Student Source or in the Electives Handbook requires submission of a Specially Arranged elective form to the Director of the 4th Year Program. Participation in research electives requires submission of a Research Proposal form to the Director of the 4th Year. Participation in international electives requires submission of the UVA SOM International Elective Form to the Office of Student Affairs. Additional requirements include submission of the International Studies Office online form, documentation of having received the CDC vaccination requirements, documentation of evacuation insurance and attendance at required orientation. At the discretion of the Director of the 4th Year Program, a student may add a UVA elective through the Friday prior to the beginning of the elective on Monday. The scheduling form, signed by the elective supervisor and approved by the student's advisor, must be received in the Office for Student Affairs by Friday.

#### Dropping an Elective

Dropping an elective requires the approval from the Office of Student Affairs no later than 28 days prior to the start of the elective. To drop an arranged elective, students must obtain approval from the elective supervisor, which must be forwarded to the Office of Student Affairs. Dropping an elective after the deadline, unless approved by the Director of the 4th year Program, will result in no credit for the elective. Exceptions may be considered for reasons such as illness requiring extended absenteeism, family emergencies, extreme hardship or a change in career goals. Students will lose one week of credit for each week (or partial week) for which the drop request is past the deadline. Students who drop after the deadline cannot earn credit for other elective work during the period of the dropped elective.

UVA00000051

JA645

## CLERKSHIPS (INCLUDING GERIATRICS)

**Drop without penalty (clerkship removed from transcript)**

With the approval of the student's college dean, a student may drop and void registration in a clerkship only before 10% of the clerkship has been completed. Drop with W grade After 10% of the clerkship is completed, but before the withdrawal deadline, a grade of W will be assigned. If the student subsequently re-enters the clerkship, he/she will be reenrolled in the clerkship according to the Leave of Absence, Withdrawal and Readmission Policy. Withdrawal deadline After 80% of a clerkship is completed, a student can no longer drop. If there are extenuating circumstances, and if it is feasible, a student may petition for a grade of Incomplete. Feasibility is determined by the clerkship director after a review of the work not completed and other practical considerations in accordance with the School of Medicine's Policy on Academic and Professional Advancement.

# DEGREE INFORMATION

Students who complete all course requirements will be awarded a Doctor of Medicine Degree. Students who participate in a dual degree program will recieve a seperate diploma from those schools of enrollment.

# FINAL EXAMINATIONS

## Summative Examinations

A passing score on a summative examination within a course is 70%. Students achieving less than 70% on a summative assessment will be referred to ASAC with the recommendation from the respective system leader for remediation. If the student is in good standing professionally, has done well formatively, and has no other academic deficiencies, ASAC generally will allow the student to take a reexamination. The reexamination score, if passing, will be an additional score factored into the cumulative total. If the summative examination is failed the second time with a score lower than 70%, ASAC will review the student's performance again and decide either to allow the student to make a third attempt at a reexamination or repeat the course. The final decision regarding reexamination rests with ASAC. Failure to pass a summative on the third attempt constitutes a failure of the system and therefore failure of the course. Any approved summative reexaminations must be taken according to the approved make-up schedule for the current academic year at the next available examination time as determined by ASAC.A student failing 5 total summative examinations in the pre-clerkship phase of the curriculum will be referred to ASAC and will be considered for dismissal. A student who does not take an examination and who does not have an excused absence, will receive a professionalism concern card and a referral to ASAC.

## Anatomy Practical Examinations

With regard to anatomy practical examinations, a score of 70% or higher is passing. Individual anatomy practical exam scores factor into the respective organ system grades, e.g., an anatomy practical examination score in MSI factors into the MSI grade and an MBB anatomy practical exam score factors into the MBB grade. Anatomy practical examinations also are graded as a thread across the Integrated System in which they occur, i.e., Integrated Systems II or III. A cumulative score of 70% or higher across the anatomy thread is required to progress to the clerkship phase of the curriculum. Students achieving a cumulative anatomy score of less than 70% for Integrated Systems II (consisting of anatomy practical examinations from MSI, GI and MBB) or Integrated System III (consisting of anatomy practical examinations from CV, Pulmonary, Renal and Endo-Repro) will be referred to ASAC and require remediation. Any remediation required by ASAC will include all anatomy from the semester failed, and the format for reexamination will be at the discretion of the anatomy director. Reexamination must occur by the end of the semester break immediately following the course in which the failure occurred. With approval of the Anatomy Director, remediation may occur during spring break, early summer break or fall break.

## USMLE SUBJECT EXAMINATIONS IN CLERKSHIPS

A passing score on each subject (shelf) examination will be set by the annual recommended passing score determined by the National Board of Medical Examiners. Not achieving this score constitutes a failure of the examination and therefore a deficiency for the clerkship. The student will be assigned an Incomplete on their transcript until the deficiency is removed when the examination is passed. Students who do not achieve a passing score on a shelf examination will be referred to ASAC with the recommendation from the clerkship director for appropriate remediation. Generally, if the student performed well clinically and is in good standing professionally, the student would be able to take a reexamination unless the score on the subject examination is so low that remov-

UVA00000052

JA646

ing the deficiency still will result in a failure. The reexamination grade, if passing, will remove the deficiency from the course; however, the initial score is the only one that will be factored into the final clerkship grade. The final grade then will replace the Incomplete on the transcript. A second failure of the shelf exam will be referred to ASAC for review and action. Should ASAC permit the student to take the shelf examination a third time and the student passes, the clerkship deficiency will be satisfied; however, the first score is still the only one calculated into the clerkship grade. Failure to pass a shelf examination on the third attempt constitutes a failure of the clerkship and will be referred to ASAC for review and action. If approved, shelf reexaminations will occur at the completion of the student's third year. By special arrangement with the clerkship director, a shelf re-examination may be scheduled during summer break, Thanksgiving break, or during the winter holiday break. Depending upon the timing of the clerkship with the deficiency, a student with an outstanding deficiency in a single clerkship may be allowed to continue into the elective portion of the curriculum but will not be allowed to take an elective in the discipline of the clerkship deficiency until the deficiency has been remediated. If a student fails shelf examinations in three different clerkships, the student will be referred to ASAC for review and, unless there are mitigating circumstances, will be considered for dismissal from school.

## OSCEs

One component of assessment in FCM 1 is tOSCEs. The OSCEs for FCM1 A (end of fall semester) and FCM-1 B (end of spring semester) are formative; students will receive feedback regarding their performance with guidance to to address any deficiencies noted. The OSCE for FCM-1 C is summative and a passing grade is required to pass FCM-1C and begin clerkships. A failure on the FCM 1 C OSCE is referred to ASAC for review and action. Typically, ASAC allows a student in good standing to remediate and retest. A second failure FCM1 C OSCE results in an F in FCM-1C and the student will be referred to ASAC for review and action.The FCM 1 C OSCE must be passed prior to starting clerkships.

Completion of the National Board of Medical Examiners Comprehensive Basic Science Exam in the third semester is a requirement of the pre-clerkship curriculum.

---

# GRADES

## Definition of Academic Failure

The courses and electives in the pre-clerkship and post-clerkship phases of the Next Generation Curriculum, the Family Medicine, Perioperative Medicine and Surgical Subspecialties clerkships are graded as pass/fail (P/F); any F constitutes a failure. The other clerkships are graded with letter grades (A, B, C or F). A score of 70% or higher is required for successful completion of each course and clerkship. A score lower than 70% constitutes an F; each F constitutes a failure and is documented on the official transcript and the Medical Student Performance Evaluation (MSPE).

## Grading during the Pre-clerkship phase

The pre-clerkship phase of the Next Generation Curriculum comprises the first three semesters of the educational program. This phase consists of ten graded courses, each assigned a pass/fail grade at the end of the course.

Integrated Systems I consists of the following course components or "systems": Cells to Society, Foundations of Medicine (FoM), Cells, Blood and Cancer and Microbes, Immunity, Transfusion and Transplantation (MITT). Integrated Systems II consists of the following course components: Musculoskeletal Integument System (MSI), Gastrointestinal System (GI) and Mind, Brain and Behavior (MBB). Integrated Systems III consists of the following course components: Cardiovascular System (CV), Pulmonary System (Pulm), Renal System, Endocrine-Reproductive System (Endo-Repro) and Hematology (Heme). In order to receive a passing grade for an integrated system course, a student must have an average score for all systems of 70% or above.

Foundations of Clinical Medicine 1 (FCM-1) is three discrete courses.Students must pass the FCM 1 C Objective Structured Clinical Examination (OSCE) in order to pass FCM 1C.

Patient Student Partnership 1 (three courses) runs in tandem with Foundations of Clinical Medicine 1 and introduces students to a longitudinal patient experience. Performance is assessed in at each semester by a P/F grade. Students must achieve an 80% or greater on the requirements for this course in order to pass.

In order to progress to the third semester of the curriculum, a student must have achieved an average score of 70% or higher on Integrated Systems I and Integrated Systems II, and have received a P for FCM-1A and 1B, PSP-1A and 1B, as well as Social Issues in

UVA00000053

JA647

Medicine. Failure to meet any one of these criteria will result in a referral to ASAC for review and action. Any requirement for re-mediation must be completed prior to the beginning of the third semester.

Successful completion of the third semester requires an average score of 70% or higher in the Integrated Systems III course, and a grade of P in FCM-1C and PSP-1C. Failure to meet any one of these criteria will result in a referral to the ASAC for review and action.

## Remediation of Academic Deficiencies in Clerkships

A passing cumulative numerical score of 70% must be achieved in order to pass a clerkship. The score achieved correlates to an as-signed letter grade of A+, A, A-, B+, B, B-, C+, C or C-. Earning a cumulative score of less than 70% constitutes a failure and auto-matic referral to ASAC, and also requires repeating the clerkship and all its requirements. Even if a student numerically achieves a passing score of 70%, the Clerkship Director may decline to pass a student based upon poor clinical performance and/or concern-ing issues of professionalism. In this circumstance, the clerkship director will make a recommendation to ASAC regarding their concerns with appropriate documentation. If failure is upheld by ASAC, remediation likely will include repeating the clerkship. When a clerkship requires repeating it will be noted in the MSPE, and the student's transcript will show two enrollments in the same course with two separately determined and reported grades.

## Remediation of Academic Deficiencies in the Post-clerkship Phase

A passing cumulative score of 70% must be achieved to pass the Geriatrics Clerkship in fourth year. Earning less than a 70% consti-tutes a failure and requires repeating the clerkship and all its requirements. The ACE is a required single 4-week clinical experience selected by the student and is graded Pass/Fail. Students must achieve a passing grade in this course to receive credit. Remedi-ation of a deficiency in an ACE is required. A student must pass the Geriatrics clerkship as well as their selected ACE to meet graduation requirements.

Remediation of a deficiency in an elective is not required, however the student will not receive credit toward the MD degree for that elective. A student must meet the elective credit requirements in order to fulfill graduation requirements.

## Incompletes and University Withdrawals

An Incomplete may be assigned to a course or clerkship on a student's transcript should an emergent situation, e.g., death of im-mediate family member, illness or accident, etc., arise after the student successfully has completed the majority of the require-ments. An Incomplete cannot be assigned as a grade when the student is failing the course or clerkship. When the requirements have been completed, the Incomplete will be removed and replaced by the course or clerkship grade. An Incomplete grade will be-come an F one year after it is issued if not remediated. Grades of F will not be changed after remediation.

Should a student need extended time off from medical school, interrupting a course or clerkship, the student must request a leave of absence or withdrawal per School of Medicine Leave of Absence, Withdrawal, Readmission Policy. Any course or clerkship in progress will be graded as W. If and when the student is readmitted from a withdrawal, ASAC will determine how much, if any, of the course or clerkship will need to be repeated. The grade of W will remain on the student's transcript.

# INTRA-UNIVERSITY TRANSFERS

The Doctor of Medicine Program does not awards advance standing to students entering the program from within or outside of the University

# LEAVING AND RETURNING TO THE UNIVERSITY

When a student's course of study is interrupted, the interruption is categorized either as a leave of absence or a withdrawal.

In general, a leave of absence is intended for a student who is in good standing, who needs to suspend his or her enrollment for a short period of time (for example, due to a medical condition), and who intends to return to the School of Medicine immediately following a leave of absence of a specific timeframe.

A withdrawal generally is intended for other situations, such as when a student needs to suspend his or her enrollment for a longer period of time or does not intend to return to the School of Medicine. The process for return following a leave of absence is less de-manding than readmission following a withdrawal. Regardless of the time of the absence or withdrawal, the graduation require-

UVA00000054

JA648

ments for the MD degree only must be completed within six years of matriculation. For students in the MD/PhD and MD/JD dual degree programs, graduation requirements must be completed within eight years; graduation requirements for students in other dual degree programs must be completed within seven years.

## Leave of Absence

**Description and Conditions:** The Associate Dean for Admissions and Student Affairs has the authority to grant or deny a request for a leave of absence (LOA). A student who is in good standing may submit a written petition requesting a LOA to the Associate Dean for Admissions and Student Affairs. The petition should provide an explanation of the reasons for the requested leave and the expected length of the leave. If the LOA is not granted, the student may instead withdraw from the School of Medicine. A student may be granted only one LOA, and any further absence will be considered a withdrawal. A LOA normally is granted for no more than one year; under no circumstance will a LOA be granted for more than two years.

If a student is granted a LOA from the School of Medicine, interrupting a course or clerkship, a grade of W (withdrawal) will be entered on the transcript, designating uncompleted coursework. If/when the student is then re-enrolled, the Academic Standards and Achievement Committee (ASAC) will determine how much of the course or clerkship graded with a W will need to be repeated. If the student is reenrolled in the course, the final grade will appear in the term in which the coursework is completed. The grade of W remains on the transcript along with any grade subsequently achieved.

Any student requesting a LOA also must meet with the Director of Financial Aid as a condition of approval from the Associate Dean for Admissions and Student Affairs. The meeting may be held in person, by interactive video-conference or by telephone, but not by email or other electronic means. Any student on a LOA must continue to abide by the University's student conduct requirements. The Associate Dean for Admissions and Student Affairs may impose additional conditions upon which the leave is granted.

**Return from LOA:** A student who has satisfied all of the conditions of his or her leave of absence may request a return to the School of Medicine by submitting a request to the Associate Dean for Admissions and Student Affairs and the School of Medicine Registrar (email: som-registrar@virginia.edu) at least sixty (60) days prior to the return date requested. The student must meet any additional conditions that are deemed warranted by the Associate Dean for Student Affairs and Admission upon return to registration.

A student granted a LOA for medical reasons will require subsequent medical clearance from the Student Health Center as a condition for returning. All students returning from LOA must re-attest to their ability to meet the Technical Standards, with or without reasonable accommodation. A student who has failed to comply with any conditions of his or her LOA, or who does not return to the School of Medicine within the length of time granted, will be deemed to have withdrawn voluntarily, and any request for readmission, as long as the six year time limit still can be met, must be determined by a vote of ASAC.

## Withdrawals

**Description and Conditions:** There are four types of withdrawals from the School of Medicine—medical, academic, administrative or voluntary. University policy dictates that a grade of W will be entered for each course or clerkship the student attempted but did not complete. The grade of W will remain on the transcript.

• Medical Withdrawal—only approved with recommendation of a physician. Applications for withdrawal for medical reasons must be made in writing to and approved by the Associate Dean for Admissions and Student Affairs. Subsequent medical clearance from the Student Health Service is required for readmission.

• Academic Withdrawal—by action of the ASAC in accordance with the Policy on Academic and Professional Advancement, the Criteria for Graduation Policy, and the Policy on Technical Standards Required for Matriculation, Progression and Graduation. These withdrawals may be for academic or professionalism deficiencies, or for dismissal.

• Administrative Withdrawal—by action of the School of Medicine Office of Student Affairs and/or the University Dean of Students. On rare occasions an emergency may arise in which the health of a student, faculty member, patient, or other member of the community is placed at risk by the presence of a student. In such an unusual situation, the Associate Dean for Admissions and Student Affairs, in consultation with the University Dean of Students, may suspend a student provisionally pending formal consideration of the relevant issues by the appropriate committee, e.g., ASAC, University Judiciary Committee, at the earliest possible opportunity.

• Voluntary Withdrawal—an action taken when a student voluntarily leaves the School of Medicine. Applications for withdrawal must be made to the Office of Student Affairs and must be approved by the Associate Dean for Admissions and Student Affairs. Students who withdraw voluntarily from the University will have the notation "Withdrew: DATE" recorded on their permanent academic record and their official transcript. Any courses that have not begun will be dropped from the student's record. A grade of W will be entered for each course or clerkship in progress at the time of withdrawal. The grade of W will remain on the transcript.

UVA00000055

JA649

## Readmission

Unless dismissed by the University or the School of Medicine, a student who has withdrawn may seek readmission by submitting a request to the Associate Dean for Admissions and Student Affairs and the School of Medicine Registrar (email: som-registrar@virginia.edu) at least sixty (60) days prior to the return date requested. A longer period of notification might be necessary if scheduling of clerkships or electives is involved. Acceptance for readmission will depend on availability of positions in the clerkships/electives. Applications for readmission will be kept on file and will be considered in the order received, as positions become available. Students who withdraw before taking Step 1 3 and the Transition Course (Introduction to the Clerkships) can re-apply for the spring semester in the next academic year. Once enrolled the student can take Step 1 and the Transition Course (only offered once per year). Clerkship assignment will be based on current availability and any assignments made prior to the withdrawal will not be reserved.

All students returning from a withdrawal must receive clearance from the University's Dean of Students to return. This will be coordinated by the School of Medicine's Registrar. A student granted a withdrawal for medical reasons will require subsequent medical clearance from the Department of Student Health as a condition for readmission. • A student withdrawn for academic, professionalism or administrative reasons or a student who has academic or professionalism deficiencies at the time of withdrawal must be reviewed and approved to return by ASAC. Students whose request for readmission is denied by ASAC will have the right of appeal, per the Policy on Academic and Professional Advancement. All students returning from a withdrawal must re-attest to their ability to meet the Technical Standards, with or without reasonable accommodation.

If granted readmission, the student will be required to adhere to any changes in policy or curriculum that occurred during the absence. Students who have been dismissed will not be offered readmission.

**Repeated courses:** Students approved for readmission will be re-enrolled in any courses that were graded W or F at the time of withdrawal. Both of these grades remain on the transcript, along with subsequent grades. The ASAC will determine how much of the course or clerkship will need to be repeated to satisfy requirements. They will make this decision with consideration of the recommendation of the Course/Clerkship Director and based upon the Policy on Academic and Professional Advancement. The chair of ASAC will notify the student in writing of the committee's decision. Failed courses will be repeated in their entirety.

Students whose period of withdrawal is greater than two years must reapply to the School of Medicine through the Office of Admissions. The School of Medicine reserves the right to impose any additional conditions upon a student seeking readmission after a withdrawal, and to refuse consideration based on the relevant time limit on matriculation to graduation. (see paragraph one of this document) All students must graduate from the School of Medicine within six years after matriculation – time spent withdrawn counts in the six year time limit. For students in the MD/PhD and MD/JD dual degree programs, graduation requirements must be completed within eight years; graduation requirements for students in other dual degree programs must be completed within seven years.

# MAJORS AND MINORS

Students working towards a Doctor of Medicine degree are not eligible to pursue other majors or minors. They may pursue a dual degree through one of our approved dual degree programs.

# STUDY ABROAD

Students pursuing the Doctor of Medicine degree may participate in one of several approved global health electives. These electives change annually. For more information please contact the School of Medicine Office for Student Affairs' Elective Coordinator.

# TRANSFER CREDIT

The Doctor of Medicine Program does not awards advance standing to students entering the program from within or outside of the University. The only credit awarded for academic work outside of our standard curriculum comes in the form of weeks of credit towards electives earned through participation in one of our approved Dual Degrees.

UVA00000056

JA650

UVA00000057

JA651

TO BE FILED UNDER SEAL

# EXHIBIT DX6

*Q1.* Enter your UVA computing ID (ex: MST3K)

krb6yg

*Q2.* Please enter your FULL LEGAL name.
It is very important that your academic records reflect your full and legal name for licensure purposes.

| First Name | kieran |
|---|---|
| Middle Name | R |
| Last Name | bhattacharya |

*Q14.* **Acknowledgement of Technical Standards**

*Q9.*

Students are required to attest at the time they accept an offer to matriculate that they meet the School of Medicine's Technical Standards, and they must attest on an annual basis that they continue to meet the standards. These standards are not intended to deter any student who might be able to complete the requirements of the curriculum with reasonable accommodations. Requests from students or prospective students for reasonable accommodations in meeting the technical standards will be considered by the Technical Standards Committee.

Resources for Students: Admitted students with physical or learning disabilities or students who develop physical or learning disabilities have access to the University's Student Disability Access Center for an evaluation of what accommodations might be necessary for the student to succeed. The University also provides Physical Medicine and Rehabilitation services for students at the student's expense.
Technical Standards: The standards listed below are based on the skills necessary to meet the requirements of the curriculum.
1. Cognitive Abilities
· Recall and explain facts and concepts
· Apply facts and concepts in novel clinical and research contexts
· Integrate and analyze clinical and research data and draw appropriate conclusions (measurement, calculation, reasoning, synthesis).
The student must be able to execute these skills and act quickly in situations such as cardio-pulmonary resuscitation.
  Justify one's analysis and conclusions
  Acquire and develop clinical reasoning and judgment skills
· Create new knowledge
· Complete multiple choice, clinical skills and other assessments in a timely manner
· Communicate effectively in both oral and written formats
· Solicit and record accurately and clearly information from patients, families and others
· Demonstrate proficiency in both oral and written English language
· Demonstrate self-awareness and self-assessment of one's abilities and deficiencies or limitations
· Self-awareness to request help when needed
2. Emotional, Attitudinal and Behavioral Skills
· Demonstrate empathy
· Demonstrate integrity
· Demonstrate honesty
· Demonstrate concern for others and ability to put the welfare of others before one's own
· Demonstrate interest and motivation
· Demonstrate timely response and completion of assignments and duties
· Demonstrate adherence to universal precautions and safety standards in the laboratory and clinical settings
· Demonstrate self-awareness and self-analysis of one's emotional state and reactions
· Modulate affect under adverse and stressful conditions and fatigue
· Modulate behavior under adverse and stressful conditions and fatigue
· Exhibit emotional resilience
· Engage in self-reflection
· Adapt to changing environments and roles
· Accept feedback, suggestions and criticism in a constructive manner
· Identify personal reactions, recognize multiple points of view and integrate these appropriately into clinical decision making
· Communicate and care for, in a non-judgmental way, persons who differ from oneself and one's beliefs in a variety of ways, including but not limited to gender, age, race, ethnicity, socio-economic status, culture, creed, military status, sexual orientation and identity,

and religious or spiritual beliefs
• Demonstrate freedom from impairment due to alcohol or other drugs
3. Physical ability to learn, perform, and become competent in the following:
• Execute motor movements necessary for cadaver dissection and for general and emergency patient care, including conducting a full physical examination (including manual vital signs), assisting in surgery, obstetrics and emergencies such as cardio-pulmonary resuscitation as well as suturing/stapling of wounds (and removal), inserting an intravenous catheter, inserting a urinary catheter, splinting and other basic general medical and surgical care
• Stand for extended periods of time
• Assist in lifting and positioning patients for procedures
• Dress in protective gowns, gloves and other garments
• Scrub one's hands for sterile procedures
• Ability to demonstrate physical stamina to work a mid-level resident shift
• Demonstrate skills necessary to use a computer, e.g. the electronic medical record
• Use a microscope
• Perform an electrocardiogram and place a patient on a cardiac monitor
• Demonstrate physical skills and senses necessary to use a stethoscope, ophthalmoscope, otoscope, FAST ultrasound and other basic medical equipment
• Demonstrate adequate sensory function (vision, hearing, touch, equilibrium) and motor function in order to palpate, percuss, auscultate and perform other diagnostic maneuvers (to observe and differentiate normal from abnormal findings on physical and mental status examinations)
• Draw venous and arterial blood
• Ventilate a patient effectively using a bag-mask apparatus
4. Interpersonal Skills
• Establish effective working relationships with patients, families, fellow students, faculty, nurses and other professionals in a variety of work environments (classroom, laboratories and clinical settings)
• Function effectively and productively as a member of an interprofessional healthcare team

Q10.
**Process for Determining Compliance with the Technical Standards for Matriculation, Promotion, and Graduation**

All matriculants and current students ("Candidates") must possess the physical, cognitive, emotional and interpersonal capabilities necessary to complete the medical education program and to provide highly effective patient care within the medical education program. These capabilities are called Technical Standards, the essential functions that all medical students must demonstrate to meet the requirements of a general medical education. Candidates—whether for admission, academic promotion, or graduation—must meet these Technical Standards, with or without reasonable accommodation. (*See the "Technical Standards" for details of these capabilities.*) These technical standards are predicated on the school's learning objectives that are considered essential for completion of the M.D. degree. They have been approved by the Curriculum Committee and the Dean of the School of Medicine.

**Annual Declaration:** Each year, all Candidates must sign and return to the Office of Student Affairs a copy of the form "Declaration of Meeting Technical Standards for the University of Virginia School of Medicine." Failure to sign and return the form could delay or prevent promotion or graduation. Falsification of a form is a violation of the Honor Code and could lead to dismissal from the School. Each year, the Office of Student Affairs will notify students of the deadline for filing the Declaration but it is the student's responsibility to complete, sign, and return the form by the deadline. *(See the form at the foot of this document.)*

**Review of Technical Standards:** The standards are reviewed, revised as needed, and reconfirmed by the Technical Standards Committee annually. This review takes into account the School of Medicine's ongoing curriculum and clinical standards evaluation, and changes in applicable law and/or University policy.

**Technical Standards Committee:** The Technical Standards Committee is charged with determining whether Candidates meet the School's Technical Standards and, if not, whether reasonable accommodation would allow them to meet the standards. If the Committee determines that a case does not fall within the scope of a technical standards issue, the Committee will triage the case to the appropriate group, e.g., the Academic Standards and Achievement Committee, the Threat Assessment Team, etc.
     The Technical Standards Committee consists of the Senior Associate Dean for Medical Education, Associate Dean for Admissions and Student Affairs, Associate Dean for Undergraduate Medical Education, Associate Dean for Diversity, and the Assistant Dean for Medical Education. Review and advice will be sought as appropriate, and may include General Counsel for the Medical School, the UVA Office of Equal Opportunity Programs and/or the Learning Needs and Evaluation Center.

**Students with Disabilities:**

The University of Virginia does not discriminate against qualified applicants or enrolled students with disabilities. These Technical Standards are not intended to deter any candidate or enrolled student for whom reasonable accommodation will allow the fulfillment of the complete curriculum.

Admitted and enrolled students with disabilities have access to resources at the University. See the ADA Coordinator's web page at http://www.virginia.edu/accessibility/.

**Request for review and/or accommodations**
     **(1) Candidates for matriculation:** Candidates with disabilities who are offered admission should begin discussions with

the Technical Standards Committee as soon as the offer is received.  It is the Candidate's responsibility to provide sufficiently current information that documents the general nature and extent of the disability, the functional limitations that would need to be accommodated, and the accommodations that are requested.  Guidelines as to when information and documentation are deemed sufficiently current vary by type of disability and may be found on the University's Learning Needs and Evaluation Center website at http://www.virginia.edu/studenthealth/lnec.html. The Technical Standards Committee is responsible for determining whether Candidates meet the School's Technical Standards and, if not, whether reasonable accommodation would allow them to meet the standards. In making that determination, the Committee may seek additional information about a candidate's disabilities and about possible accommodations from knowledgeable persons within or outside the School.  The Committee may require a candidate to undergo examination by appropriate specialists. Such examination will be at the candidate's expense.

The Committee will review each candidate case by case, with careful consideration of all the candidate's skills and attributes.  Candidates currently abusing alcohol or other substances are not suitable candidates for enrollment.

**Reasonable/unreasonable accommodation:** An accommodation is unreasonable if it poses a direct threat to the health or safety of the Candidate or others, if making it requires a substantial modification in an essential element of the curriculum, if it lowers academic standards, or if it poses an undue administrative or financial burden on the School.  No disability can be accommodated with an auxiliary aid or intermediary that provides a selective function, cognitive support, or medical knowledge. Aids and intermediaries also may not act as a substitute in performing essential skills, or supplement clinical and ethical judgment. That is to say, accommodations cannot eliminate essential program elements.

**(2) Candidates for academic promotion or graduation:** Enrolled Candidates who develop a disability or condition shall provide current information documenting the general nature and extent of the disability, the functional limitations that would need to be accommodated, and the accommodations that are requested.  Guidelines as to when information and documentation are deemed sufficiently current vary by type of disability and may be found on the University's Learning Needs and Evaluation Center website at http://www.virginia.edu/studenthealth/lnec.html.

**Review by the Technical Standards Committee:** The Committee will review the enrolled Candidate's disability and possible reasonable accommodations by applying the same standards and following the same procedures used for candidates for matriculation, as described above. Enrolled Candidates who develop a disability or condition that places patients or others at risk and/or that jeopardizes the ability to complete medical student education, and that cannot be eliminated with a reasonable accommodation, will be dismissed from the School.  Candidates currently impaired by alcohol or other substance abuse are not suitable for promotion or graduation.

*Q13.*
*Reminder:* It is your responsibility to (a) notify the Office of Student Affairs in writing if you can no longer meet the Technical Standards without accommodation and (b) provide adequate current documentation of the nature and extent of the condition and/or functional limitations to be accommodated.

*Q11.*
**Are you capable of meeting the School of Medicine's Technical Standards as described in the above document?**

(•) Yes, without accommodations

( ) Yes, with existing accommodations as approved by the Technical Standards Committee

( ) No; review and accommodations are needed

*Q12.* I certify that I have answered all questions accurately and truthfully.

_____  clear

**Location Data**

*Q1.* Enter your UVA computing ID (ex: MST3K)

krb6yg

*Q2.* Please enter your FULL LEGAL name.
It is very important that your academic records reflect your full and legal name for licensure purposes.

| First Name | kieran |
| Middle Name | R |
| Last Name | bhattacharya |

# *Q14.* **Acknowledgement of Technical Standards**

*Q9.*

Students are required to attest at the time they accept an offer to matriculate that they meet the School of Medicine's Technical Standards, and they must attest on an annual basis that they continue to meet the standards. These standards are not intended to deter any student who might be able to complete the requirements of the curriculum with reasonable accommodations. Requests from students or prospective students for reasonable accommodations in meeting the technical standards will be considered by the Technical Standards Committee.

Resources for Students: Admitted students with physical or learning disabilities or students who develop physical or learning disabilities have access to the University's Student Disability Access Center for an evaluation of what accommodations might be necessary for the student to succeed. The University also provides Physical Medicine and Rehabilitation services for students at the student's expense.
Technical Standards: The standards listed below are based on the skills necessary to meet the requirements of the curriculum.
1. Cognitive Abilities
• Recall and explain facts and concepts
• Apply facts and concepts in novel clinical and research contexts
• Integrate and analyze clinical and research data and draw appropriate conclusions (measurement, calculation, reasoning, synthesis). The student must be able to execute these skills and act quickly in situations such as cardio-pulmonary resuscitation.
• Justify one's analysis and conclusions
• Acquire and develop clinical reasoning and judgment skills
• Create new knowledge
• Complete multiple choice, clinical skills and other assessments in a timely manner
• Communicate effectively in both oral and written formats
• Solicit and record accurately and clearly information from patients, families and others
• Demonstrate proficiency in both oral and written English language
• Demonstrate self-awareness and self-assessment of one's abilities and deficiencies or limitations

- Self-awareness to request help when needed
2. Emotional, Attitudinal and Behavioral Skills

TO BE FILED UNDER SEAL

- Demonstrate empathy
- Demonstrate integrity
- Demonstrate honesty
- Demonstrate concern for others and ability to put the welfare of others before one's own
- Demonstrate interest and motivation
- Demonstrate timely response and completion of assignments and duties
- Demonstrate adherence to universal precautions and safety standards in the laboratory and clinical settings
- Demonstrate self-awareness and self-analysis of one's emotional state and reactions
- Modulate affect under adverse and stressful conditions and fatigue
- Modulate behavior under adverse and stressful conditions and fatigue
- Exhibit emotional resilience
- Engage in self-reflection
- Adapt to changing environments and roles
- Accept feedback, suggestions and criticism in a constructive manner
- Identify personal reactions, recognize multiple points of view and integrate these appropriately into clinical decision making
- Communicate and care for, in a non-judgmental way, persons who differ from oneself and one's beliefs in a variety of ways, including but not limited to gender, age, race, ethnicity, socio-economic status, culture, creed, military status, sexual orientation and identity, and religious or spiritual beliefs
- Demonstrate freedom from impairment due to alcohol or other drugs
3. Physical ability to learn, perform, and become competent in the following:
- Execute motor movements necessary for cadaver dissection and for general and emergency patient care, including conducting a full physical examination (including manual vital signs), assisting in surgery, obstetrics and emergencies such as cardio-pulmonary resuscitation as well as suturing/stapling of wounds (and removal), inserting an intravenous catheter, inserting a urinary catheter, splinting and other basic general medical and surgical care
- Stand for extended periods of time
- Assist in lifting and positioning patients for procedures
- Dress in protective gowns, gloves and other garments
- Scrub one's hands for sterile procedures
- Ability to demonstrate physical stamina to work a mid-level resident shift
- Demonstrate skills necessary to use a computer, e.g. the electronic medical record
- Use a microscope
- Perform an electrocardiogram and place a patient on a cardiac monitor
- Demonstrate physical skills and senses necessary to use a stethoscope, ophthalmoscope, otoscope, FAST ultrasound and other basic medical equipment
- Demonstrate adequate sensory function (vision, hearing, touch, equilibrium) and motor function in order to palpate, percuss, auscultate and perform other diagnostic maneuvers (to observe and differentiate normal from abnormal findings on physical and mental status examinations)
- Draw venous and arterial blood
- Ventilate a patient effectively using a bag-mask apparatus
4. Interpersonal Skills
- Establish effective working relationships with patients, families, fellow students, faculty, nurses and other professionals in a variety of work environments (classroom, laboratories and clinical settings)
- Function effectively and productively as a member of an interprofessional healthcare team

*Q10.*
**Process for Determining Compliance with the Technical Standards for Matriculation, Promotion, and Graduation**

All matriculants and current students ("Candidates") must possess the physical, cognitive, emotional and interpersonal capabilities necessary to complete the medical education program and to provide highly effective patient care within the medical education program. These capabilities are called Technical

Standards, the essential functions that all medical students must demonstrate to meet the requirements of a general medical education. Candidates—whether for admission, academic promotion, or graduation—must meet these Technical Standards, with or without reasonable accommodation. (*See the "Technical Standards" for details of these capabilities.*) These technical standards are predicated on the school's learning objectives that are considered essential for completion of the M.D. degree. They have been approved by the Curriculum Committee and the Dean of the School of Medicine.

TO BE FILED UNDER SEAL

**Annual Declaration:** Each year, all Candidates must sign and return to the Office of Student Affairs a copy of the form "Declaration of Meeting Technical Standards for the University of Virginia School of Medicine." Failure to sign and return the form could delay or prevent promotion or graduation. Falsification of a form is a violation of the Honor Code and could lead to dismissal from the School. Each year, the Office of Student Affairs will notify students of the deadline for filing the Declaration but it is the student's responsibility to complete, sign, and return the form by the deadline. *(See the form at the foot of this document.)*

**Review of Technical Standards:** The standards are reviewed, revised as needed, and reconfirmed by the Technical Standards Committee annually. This review takes into account the School of Medicine's ongoing curriculum and clinical standards evaluation, and changes in applicable law and/or University policy.

**Technical Standards Committee:** The Technical Standards Committee is charged with determining whether Candidates meet the School's Technical Standards and, if not, whether reasonable accommodation would allow them to meet the standards. If the Committee determines that a case does not fall within the scope of a technical standards issue, the Committee will triage the case to the appropriate group, e.g., the Academic Standards and Achievement Committee, the Threat Assessment Team, etc.

      The Technical Standards Committee consists of the Senior Associate Dean for Medical Education, Associate Dean for Admissions and Student Affairs, Associate Dean for Undergraduate Medical Education, Associate Dean for Diversity, and the Assistant Dean for Medical Education. Review and advice will be sought as appropriate, and may include General Counsel for the Medical School, the UVA Office of Equal Opportunity Programs and/or the Learning Needs and Evaluation Center.

**Students with Disabilities:**

The University of Virginia does not discriminate against qualified applicants or enrolled students with disabilities. These Technical Standards are not intended to deter any candidate or enrolled student for whom reasonable accommodation will allow the fulfillment of the complete curriculum.

Admitted and enrolled students with disabilities have access to resources at the University. See the ADA Coordinator's web page at http://www.virginia.edu/accessibility/.

**Request for review and/or accommodations**

      **(1) Candidates for matriculation**: Candidates with disabilities who are offered admission should begin discussions with the Technical Standards Committee as soon as the offer is received. It is the Candidate's responsibility to provide sufficiently current information that documents the general nature and extent of the disability, the functional limitations that would need to be accommodated, and the accommodations that are requested. Guidelines as to when information and documentation are deemed sufficiently current vary by type of disability and may be found on the University's Learning Needs and Evaluation Center website at http://www.virginia.edu/studenthealth/lnec.html. The Technical Standards Committee is responsible for determining whether Candidates meet the School's Technical Standards and, if not, whether reasonable accommodation would allow them to meet the standards. In making that determination, the Committee may seek additional information about a candidate's disabilities and about possible accommodations from knowledgeable persons within or outside the School. The Committee may require a candidate to undergo examination by appropriate specialists. Such examination will be at the candidate's expense.

      The Committee will review each candidate case by case, with careful consideration of all the candidate's skills and attributes. Candidates currently abusing alcohol or other substances are not suitable candidates for enrollment.

      **Reasonable/unreasonable accommodation:** An accommodation is unreasonable if it poses a direct threat to the health or safety of the Candidate or others, if making it requires a substantial modification in an essential element of the curriculum, if it lowers academic standards, or if it poses an undue administrative or financial burden on the School. No disability can be accommodated with an auxiliary aid or

intermediary that provides a selective function, cognitive support, or medical knowledge. Aids and intermediaries also may not act as a substitute in performing essential skills, or supplement clinical and ethical judgment. That is to say, accommodations cannot eliminate essential program elements.

**TO BE FILED UNDER SEAL**

    **(2) Candidates for academic promotion or graduation:** Enrolled Candidates who develop a disability or condition shall provide current information documenting the general nature and extent of the disability, the functional limitations that would need to be accommodated, and the accommodations that are requested. Guidelines as to when information and documentation are deemed sufficiently current vary by type of disability and may be found on the University's Learning Needs and Evaluation Center website at http://www.virginia.edu/studenthealth/lnec.html.

    **Review by the Technical Standards Committee:** The Committee will review the enrolled Candidate's disability and possible reasonable accommodations by applying the same standards and following the same procedures used for candidates for matriculation, as described above. Enrolled Candidates who develop a disability or condition that places patients or others at risk and/or that jeopardizes the ability to complete medical student education, and that cannot be eliminated with a reasonable accommodation, will be dismissed from the School. Candidates currently impaired by alcohol or other substance abuse are not suitable for promotion or graduation.

*Q13.*
*Reminder:* It is your responsibility to (a) notify the Office of Student Affairs in writing if you can no longer meet the Technical Standards without accommodation and (b) provide adequate current documentation of the nature and extent of the condition and/or functional limitations to be accommodated.

*Q11.*
**Are you capable of meeting the School of Medicine's Technical Standards as described in the above document?**

◉ Yes, without accommodations

○ Yes, with existing accommodations as approved by the Technical Standards Committee

○ No; review and accommodations are needed

*Q12.* I certify that I have answered all questions accurately and truthfully.



clear

  **Location Data**

CONFIDENTIAL                          UVA00012673

JA659

**Location:** (38.088806152344, -78.559196472168)

**Source:** GeoIP Estimation



CONFIDENTIAL

UVA00012674

TO BE FILED UNDER SEAL

# EXHIBIT DX9

Page 1

1

2      IN THE UNITED STATES DISTRICT COURT

3      FOR THE WESTERN DISTRICT OF VIRGINIA

4      CHARLOTTESVILLE DIVISION

5       - - - - - - - - - - - - - - - - - - -x

6      KIERAN RAVI BHATTACHARYA,

7                           Plaintiff,

8            -against-

9      JAMES B. MURRAY, JR., et al.,

10                          Defendants.

11      - - - - - - - - - - - - - - - - - - -x

12                     Virtual Zoom Deposition

13

                        May 12, 2022

14                      10:00 a.m.

15

16        VIRTUAL VIDEO DEPOSITION of PAMILA A.

17     HERRINGTON, M.D., in the above-entitled

18     action, held at the above time and place,

19     taken before Jeremy Richman, a Shorthand

20     Reporter and Notary Public of the State of

21     New York, pursuant to the Federal Rules of

22     Civil Procedure, and stipulations between

23     Counsel.

24

25                  *      *      *

JA662

Page 88

```
 1              P. HERRINGTON, M.D.
 2       A.    I smoke whenever I have weed.    12:10:29
 3       Q.    Okay.  Turn to, what is your     12:10:31
 4   recollection of your interviewing,         12:10:41
 5   examining Kieran Bhattacharya on           12:10:54
 6   November 15th, 2018?  And if you need      12:10:57
 7   to be refreshed, it's UVAHS00003839.       12:11:09
 8              MR. LOCKERBY:  If you can        12:11:32
 9         give me a minute to get there,       12:11:32
10         please, it's a little slower online  12:11:34
11         than with the hardcopy.              12:11:38
12              MR. BLANK:  Tell us when         12:12:24
13         you're there, Mike.                  12:12:26
14              MR. LOCKERBY:  Getting warm.     12:12:28
15         I'm there, I think.  3839, correct?  12:12:30
16              MR. BLANK:  Yep.                 12:12:34
17       Q.    What is your recollection of     12:12:36
18   interviewing, examining Kieran             12:12:38
19   Bhattacharya on November 15, 2018?         12:12:40
20       A.    So my documentation for          12:12:42
21   November 15, 2018, is that on our          12:12:45
22   interview he was irritable, abrasive       12:12:49
23   and defensive as he spoke to the team,     12:12:51
24   but he did say that he was doing well      12:12:55
25   with Latuda.  That was a new medication    12:12:58
```

1          P. HERRINGTON, M.D.

2    he had been on.  Well, new compared to     12:13:02

3    the previous admission.  But he had         12:13:05

4    stopped the Lithium over the summer,        12:13:09

5    and prefers not to take that again.  He     12:13:11

6    was open to further titrating the           12:13:14

7    Latuda, and so we made a plan to            12:13:18

8    increase that to 60 milligrams, and he      12:13:21

9    presented as having capacity to make        12:13:23

10   that decision.  He didn't -- he doesn't     12:13:25

11   have good insight into his current          12:13:27

12   symptoms, and is defensive when asked       12:13:30

13   about what changes others have noticed      12:13:32

14   in him.  He says he thinks he's doing       12:13:34

15   fine.  No suicidality or homicidality.      12:13:36

16          And then I noted he's on a           12:13:40

17   TDO, and will have a hearing tomorrow.      12:13:43

18   He requested information on the             12:13:45

19   Virginia statutes for commitment so he      12:13:47

20   could read up and prepare for the           12:13:49

21   hearing.                                    12:13:51

22          Q.   And what did you do in terms    12:13:51

23   of reviewing the history, including the     12:13:55

24   day before, November 14, 2018,              12:13:57

25   documents?                                  12:14:00

```
 1              P. HERRINGTON, M.D.
 2      A.   Yes, his history and physical    12:14:07
 3 from when he had presented through the     12:14:08
 4 emergency room was reviewed.               12:14:11
 5      Q.   And did you review it?           12:14:16
 6      A.   Yes.                             12:14:17
 7      Q.   And did you attest to that in    12:14:17
 8 the record?                                12:14:19
 9      A.   I did.                           12:14:20
10      Q.   Okay.  What was his             12:14:21
11 diagnosis, AXIS I diagnosis on November    12:14:24
12 the 15th, 2018, when you examined him?     12:14:28
13      A.   Bipolar I disorder, manic,       12:14:31
14 with psychotic features, with cannabis     12:14:36
15 use disorder.                              12:14:40
16      Q.   Do you hold that opinion to a    12:14:41
17 reasonable degree of medical              12:14:43
18 probability?                               12:14:43
19           MR. LOCKERBY:  Object to the    12:14:43
20      form.                                 12:14:44
21      A.   Yes.                             12:14:44
22      Q.   And what is the basis of your    12:14:44
23 opinion?                                   12:14:45
24      A.   Well, having cared for him on    12:14:46
25 the prior admission, the diagnosis of      12:14:50
```

```
 1              P. HERRINGTON, M.D.

 2     bipolar disorder does, in fact, carry      12:14:54

 3     through, because he's had a history of     12:14:57

 4     mania in the past.  Bipolar I disorder     12:15:02

 5     is an appropriate diagnosis, and then      12:15:07

 6     with the current symptoms of, again,       12:15:11

 7     having the irritability, abrasiveness,     12:15:17

 8     grandiosity, maybe some issues with        12:15:27

 9     judgment and impulse control would         12:15:31

10     constitute an exacerbation of that         12:15:33

11     condition.                                 12:15:41

12          Q.    And what was the opinion as     12:15:52

13     to his requirement for impatient          12:15:55

14     psychiatric hospitalization at that        12:16:01

15     time?                                      12:16:05

16          A.    That he did, in fact, require   12:16:05

17     inpatient psychiatric hospitalization,     12:16:07

18     and was required to be there because he    12:16:10

19     was under a TDO.                           12:16:13

20          Q.    And do you hold that opinion    12:16:14

21     to a reasonable degree of medical          12:16:16

22     probability?                               12:16:17

23          A.    Yes.                            12:16:17

24          Q.    And what was the basis for      12:16:17

25     your opinion that he required the          12:16:19
```

JA666

```
 1              P. HERRINGTON, M.D.
 2     inpatient psychiatric hospitalization?      12:16:21
 3              MR. LOCKERBY:  Object to the        12:16:26
 4        form.                                     12:16:27
 5        A.    Well, the fact that he was          12:16:27
 6     having an exacerbation of his                12:16:29
 7     underlying mood disorder, and again,         12:16:32
 8     legally he would be required to be           12:16:34
 9     there, because he had been assessed and      12:16:36
10     placed under a temporary detention           12:16:37
11     order, which mandates that he would be       12:16:39
12     there.                                       12:16:42
13        Q.    What was Kieran                     12:16:43
14     Bhattacharya's position with regard to       12:17:40
15     taking the Lithium, if you recall?          12:17:45
16              MR. LOCKERBY:  Object to the        12:17:48
17        form.                                     12:17:49
18        A.    He did not want to take the         12:17:49
19     medication.                                  12:17:54
20        Q.    And did Kieran Bhattacharya         12:17:54
21     -- how did he express that, if you           12:17:59
22     recall?  I can refresh your                  12:18:01
23     recollection.  You can go to 0003856.        12:18:16
24        A.    Yes, he didn't want to take         12:18:39
25     the Lithium.  Essentially, the               12:18:42
```

```
 1              P. HERRINGTON, M.D.
 2    and he asked to be released, so we      12:27:19
 3    discharged him.                         12:27:24
 4         Q.   And what was the -- what was  12:27:25
 5    the plan for him that was -- what plan  12:27:34
 6    was provided to him for his release?    12:27:37
 7              MR. LOCKERBY:  Object to the   12:27:41
 8       form.                                12:27:41
 9         A.   That he continued to follow   12:27:42
10    up with his outpatient psychiatrist,    12:27:49
11    and that he take Latuda 60 milligrams   12:27:52
12    daily.                                  12:27:58
13         Q.   And again, did you review the 12:27:59
14    history, exam, assessment and           12:28:02
15    management plans, and personally        12:28:06
16    interview and examine Kieran            12:28:07
17    Bhattacharya on November 16, 2018?      12:28:09
18         A.   Yes, I did.                   12:28:11
19         Q.   If you will, I'm going to     12:28:12
20    take a two-minute break, and I will be  12:28:17
21    right back.                             12:28:18
22              THE VIDEOGRAPHER:  Stand by.  12:28:20
23       Off the record at 12:28 p.m.         12:28:23
24              (Recess.)                     12:28:25
25              THE VIDEOGRAPHER:  On the     12:32:22
```

JA668

TO BE FILED UNDER SEAL

# EXHIBIT DX10

TO BE FILED UNDER SEAL

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

KIERAN RAVI BHATTACHARYA,      )
                               )
         Plaintiff,            )   Civil Action No.
                               )   3:19-CV-00054
v.                             )
                               )
JAMES B. MURRAY, JR., et al.,  )
                               )
         Defendants.           )
_____)

Deposition of JOHN DENSMORE

May 9, 2022

Karen Kidwell, RMR, CRR, Notary Public
483025



**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

JA670

**TO BE FILED UNDER SEAL**

1              UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF VIRGINIA
2               CHARLOTTESVILLE DIVISION

3

KIERAN RAVI BHATTACHARYA,            )
4                                     )
         Plaintiff,                   )   Civil Action No.
5                                     )   3:19-CV-00054
v.                                    )
6                                     )
JAMES B. MURRAY, JR., et al.,         )
7                                     )
         Defendants.                  )
8    _____)

9

10

11

12        Videotaped Deposition of JOHN DENSMORE

13                  (Given Remotely)

14               Monday, May 9, 2022

15          9:36 a.m. Eastern Standard Time

16

17

18

19

20   Reported by:  Karen Kidwell, RMR, CRR

21

22

23

24

25

                        1

JOHN DENSMORE



JA671

TO BE FILED UNDER SEAL

```
 1    REMOTE APPEARANCES:

 2

 3    On Behalf of Plaintiff:

 4          MICHAEL J. LOCKERBY, ESQ.
            WHITNEY M. SWART, ESQ.
 5          DAVID R. LEVINTOW, ESQ.
            Foley & Lardner, LLP
 6          Washington Harbour
            3000 K Street, N.W.
 7          Suite 600
            Washington, D.C.  20007
 8          202.672.5300
            mlockerby@foley.com
 9          wswart@foley.com
            dlevintow@foley.com
10

11             - and -

12

13          STEVEN C. LOCKHART, ESQ.
            BRANDON C. MARX, ESQ.
            Foley & Lardner, LLP
14          2021 McKinney Avenue
            Suite 1600
15          Dallas, TX  75201
            214.999.4668
16          slockhart@foley.com

17

18             - and -

19          JAMES J. MUNISTERI, ESQ.
            Foley & Lardner, LLP
20          1000 Louisiana
            Suite 2000
21          Houston, TX  77002
            713.276.5752
22          jmunisteri@foley.com

23

24

25
```

2

JOHN DENSMORE



JA672

TO BE FILED UNDER SEAL

```
 1   REMOTE APPEARANCES CONTINUED:

 2   On Behalf of all Defendants except Sara Rasmussen,
     M.D.:
 3
             FARNAZ FARKISH THOMPSON, ESQ.
 4           McGuireWoods LLP
             888 16th Street N.W.
 5           Suite 500
             Black Lives Matter Plaza
 6           Washington, DC  20006
             202.857.2488
 7           fthompson@mcguirewoods.com

 8

 9   On Behalf of Defendant Sara Rasmussen, M.D.:

10           H. ROBERT YATES, III, ESQ.
             O'Hagan Meyer, PLLC
11           411 East Franklin Street
             Suite 500
12           Richmond, VA  23219
             804.403.7108
13           ryates@ohaganmeyer.com

14

15

16

17

18   Also Remotely Present:

19           Melissa Riley, In-house Counsel,
              University of Virginia
20
             Mary Dugan, Paralegal, McGuireWoods
21
             Kieran Ravi Bhattacharya
22
             Rob Chang, Videographer/Document Technician
23

24

25                   * * * * *
```

                                3

                        JOHN DENSMORE



JA673

TO BE FILED UNDER SEAL

```
1                    I N D E X

2    WITNESS/EXAMINATION                           Page

3    JOHN JOSEPH DENSMORE

4      By Mr. Lockerby                               17

5      By Ms. Thompson                              248

6      Further by Mr. Lockerby                      250

7

8

9

10                   E X H I B I T S

11     Number            Description             Page

12   Exhibit 1   10/25/2018 E-mail, Christine ......30
                 Peterson to krb6yg and John
13               Densmore, Subject: The panel
                 today, Confidential, Bates
14               UVA00002441

15   Exhibit 2   E-mail chain, top e-mail .........35
                 10/26/2018, Christine Peterson
16               to John Densmore, Subject: RE:
                 The panel today, Confidential,
17               Bates UVA00002468

18   Exhibit 3   E-mail chain, top e-mail .........45
                 10/26/2018, Joanne Mendoza to
19               Christine Peterson and John
                 Densmore, Subject: FW: Coach
20               issue, Confidential, Bates
                 UVA00002469-2470
21
     Exhibit 4   E-mail chain, top e-mail .........47
22               10/27/2018, R.J. Canterbury to
                 John Densmore and Lesley
23               Thomas, Subject: Fw: Listening
                 post - General Evaluation,
24               Confidential, Bates
                 UVA00002482-2483
25
```

4

JOHN DENSMORE

BARKLEY
Court Reporters

JA674

TO BE FILED UNDER SEAL

```
1                    MONDAY, MAY 9, 2022

2                 P R O C E E D I N G S

3                         - - -

4            VIDEOGRAPHER:  Madam Court Reporter,

5       Counselors, we are now going on the record.

6            Good morning.  My name is Rob Chang.  I am

7       a videographer associated with Barkley Court

8       Reporters.  The date is May 9th, 2022.  The time

9       is 9:36 a.m., Eastern Standard Time.

10           This deposition is taking place via remote

11      method in the matter of Kieran Ravi Bhattacharya

12      versus James B. Murray, et al., Case Number

13      3:19-CV-00054.  This is the video deposition of

14      John Densmore, being taken on behalf of

15      Plaintiff.

16           Will counselors for all the parties please

17      identify yourselves, beginning with Plaintiff

18      counsel.

19           MR. LOCKERBY:  Yes.  On behalf of the

20      Plaintiff, Michael Lockerby, with

21      Foley & Lardner.

22           MR. YATES:  Bob Yates, on behalf of

23      Dr. Sara Rasmussen.

24           MS. THOMPSON:  Farnaz Thompson, on behalf

25      of all Defendants except for Dr. Sara Rasmussen.
```

16

JOHN DENSMORE

BARKLEY
Court Reporters

JA675

TO BE FILED UNDER SEAL

```
 1              VIDEOGRAPHER:  Thank you.

 2              The court reporter may now swear in the

 3         witness.

 4              COURT REPORTER:  Good morning.  All

 5         parties to this deposition are appearing

 6         remotely and have agreed to the witness being

 7         sworn in remotely.

 8                   JOHN JOSEPH DENSMORE

 9    being first duly sworn, testified as follows:

10              MR. LOCKERBY:  Thank you.

11                        EXAMINATION

12    BY MR. LOCKERBY:

13         Q.   Good morning, Dr. Densmore.  My name is

14    Mike Lockerby.  Our law firm, Foley & Lardner LLP,

15    represents the Plaintiff in this action, Kieran Ravi

16    Bhattacharya.

17              If I ask you any questions that are

18    ambiguous or that you don't understand, please ask me

19    to rephrase them.  Also if at any time you'd like to

20    take a break for any reason, please speak up, and

21    I'll be happy to accommodate you.  However, I would

22    ask that you not request a break while a question is

23    pending.

24              First of all, would you please state your

25    name for the record.
```

17

JOHN DENSMORE

BARKLEY
Court Reporters

JA676

TO BE FILED UNDER SEAL

```
 1          A.    My name is John Joseph Densmore.

 2          Q.    And what is your date and place of birth?

 3          A.    ██████████  █████, in Boston,

 4     Massachusetts.

 5          Q.    What is your current address?

 6          A.    1292 Dunlora Drive, Charlottesville,

 7     Virginia.

 8          Q.    Have you ever been a witness before,

 9     either in a deposition or trial?

10          A.    I was in a deposition when I was 17 years

11     old, after a car accident.

12          Q.    Have you ever been a Defendant in

13     litigation before?

14          A.    No.

15          Q.    Have you ever been an expert witness in

16     litigation before?

17          A.    No.

18          Q.    Starting with secondary school, please

19     briefly describe your educational and employment

20     background.

21          A.    "Secondary school" meaning high school?

22          Q.    Yes, sir.

23          A.    Okay.  I went to Cumberland High School in

24     Cumberland, Rhode Island, graduated in 1985.  Went to

25     Cornell University for my undergraduate degree,
```

18

JOHN DENSMORE

BARKLEY
Court Reporters

JA677

TO BE FILED UNDER SEAL

```
 1   graduated in 1989.  Came to the University of

 2   Virginia, where I did my M.D. and Ph.D. degrees,

 3   which I finished in 1995.  I was then a resident in

 4   internal medicine at the University of Virginia

 5   from 1995 to 1998.  I was in -- a fellow in

 6   hematology/oncology from 1998 to 2001, and then

 7   joined the faculty in 2001.

 8        Q.   Is oncology/hematology your specialty,

 9   your area of specialty?

10        A.   Yes.

11        Q.   Is your area of specialty psychiatry?

12        A.   No.

13        Q.   During the period 2016 through today, have

14   you held any administrative positions within UVA med

15   school?

16        A.   Yes.

17        Q.   What position or positions did you hold?

18        A.   Associate dean for admissions and student

19   affairs.

20        Q.   And during that time period, did you have

21   any responsibility for the professionalism standards

22   that UVA med school expects of its students?

23        A.   Yes.

24        Q.   First of all, what are those

25   professionalism standards?  Are they reduced to
```

19

TO BE FILED UNDER SEAL

```
 1              THE WITNESS:  No.  Not that I can
 2         remember.
 3    BY MR. LOCKERBY:
 4         Q.   How did you first become aware of the
 5    October 25th, 2018, microaggresion panel discussion?
 6         A.   I don't remember.
 7              MR. LOCKERBY:  Well, I'd like to have
 8         marked as Exhibit 1 a document -- and
 9         unfortunately, in the folder, these aren't
10         numbered; but it's 2018.10.25 UVA000024441.
11              MS. THOMPSON:  Mr. Chang, do you mind
12         letting us know when it's in the folder?
13              VIDEOGRAPHER:  Counselor, I will do that.
14              Counselor, the document is in the
15         OneDrive.
16         (Exhibit 1 was marked for identification.)
17    BY MR. LOCKERBY:
18         Q.   Dr. Densmore, did you review or receive
19    this e-mail from Christine Peterson on October 25th,
20    2018?
21         A.   Yes.  It looks like I was copied on it.
22         Q.   And you were shown, according to this, as
23    a blind copy on it, correct?
24              MS. THOMPSON:  Take a minute.  You can
25         read through this.
```

                              30

                    JOHN DENSMORE



JA679

**TO BE FILED UNDER SEAL**

```
 1              THE WITNESS:  Is that what "bcc" means?
 2    BY MR. LOCKERBY:
 3         Q.   So that would be a "yes"?
 4         A.   Okay.  Yes.
 5         Q.   Did you discuss this e-mail with Christine
 6    Peterson before she sent it?
 7         A.   I don't remember.
 8         Q.   Did you discuss it with her after she sent
 9    it?
10         A.   I discussed it with her at some point.  I
11    don't remember if it was before or after.
12         Q.   And what do you recall having discussed
13    with Christine Peterson about this e-mail?
14         A.   That because she was present, she offered
15    to meet with him, because I was not there.
16         Q.   Did you discuss with Christine Peterson
17    her opinion about what transpired at the
18    microaggresion panel discussion on October 25th,
19    2018?
20         A.   I don't remember.
21         Q.   So as far as you remember, Christine
22    Peterson agreed with what Mr. Bhattacharya said and
23    the way in which he said it?  Is that your testimony?
24              MS. THOMPSON:  Objection to form.
25              You're welcome to respond.
```

31

JOHN DENSMORE

BARKLEY
Court Reporters

JA680

TO BE FILED UNDER SEAL

```
 1              VIDEOGRAPHER:  Counselors, the document is
 2       in the OneDrive.
 3              MS. THOMPSON:  Thank you.
 4   BY MR. LOCKERBY:
 5       Q.   Dr. Densmore, do you have Exhibit 2 in
 6   front of you?
 7       A.   Yes, I do.
 8       Q.   In the -- in the middle of the page,
 9   there's an e-mail from you to Christine Peterson on
10   October 26th saying, "Thanks Chris.  I spoke to Nora
11   and she was concerned that he was very pressured."
12              The reference to "Nora," is that Nora
13   Kern?
14       A.   Yes, I believe so.
15       Q.   And how was it that you came to speak to
16   Nora Kern about the microaggresion panel discussion?
17       A.   I don't remember.
18       Q.   What do you recall having discussed with
19   Nora Kern about the microaggresion panel discussion?
20       A.   I don't remember.
21       Q.   When you wrote "very pressured," what did
22   you mean by that?
23       A.   I think that she was indicating that
24   his -- his speech was pressured.
25       Q.   What do you mean by his speech being
```

36

JOHN DENSMORE



JA681

TO BE FILED UNDER SEAL

```
 1   pressured?
 2        A.    Very -- kind of rapid speech.
 3        Q.    So he's a fast talker?
 4              MS. THOMPSON:  Objection.
 5        Mischaracterizes the witness's prior testimony.
 6              THE WITNESS:  I don't know.
 7   BY MR. LOCKERBY:
 8        Q.    In your view, does someone who speaks
 9   rapidly talk fast?
10              MS. THOMPSON:  Objection.
11        Mischaracterizes the witness's prior testimony.
12              THE WITNESS:  I don't know.
13   BY MR. LOCKERBY:
14        Q.    Had you ever observed Mr. Bhattacharya to
15   speak rapidly?
16        A.    Not that I remember.
17        Q.    You went on to write, "Do you get the
18   feeling he's not in a good place medically?"
19              What prompted you to write that?
20        A.    I think the fact that there was concern
21   that he had pressured speech.
22        Q.    Would pressured speech suggest to you some
23   oncological problem?
24        A.    No.
25        Q.    If he had pressured speech, what would
```

37

JOHN DENSMORE

BARKLEY
Court Reporters

JA682

TO BE FILED UNDER SEAL

```
 1   that -- what concern would that raise in your mind?
 2            MS. THOMPSON:  Objection.  Calls for
 3        hypothetical and opinion.
 4            You're welcome to respond.
 5            THE WITNESS:  He and I had previously
 6        discussed his diagnosis of bipolar disorder; and
 7        given that this is -- my understanding is a
 8        feature of that, that I was concerned that his
 9        disease may be worsening.
10   BY MR. LOCKERBY:
11        Q.   When you say you had previously discussed
12   that, had that been back in 2017?
13        A.   Yes.
14        Q.   You never even -- did you ever see any of
15   Mr. Bhattacharya's medical records at the time?
16        A.   No.
17        Q.   And you were not his treating physician
18   then, were you?
19        A.   No, I was not.
20        Q.   And you never discussed what you believed
21   his diagnosis to be with any of the treating
22   physicians, did you?
23        A.   No.
24        Q.   And when you saw -- or back in 2017, you
25   had seen Mr. Bhattacharya in 5 East at UVA Medical
```

38

JOHN DENSMORE

BARKLEY
Court Reporters

JA683

```
 1    Center, correct?
 2         A.   Yes.
 3              MS. THOMPSON:  Objection to form.
 4              THE WITNESS:  Yes.
 5    BY MR. LOCKERBY:
 6         Q.   How did you find out that he was even
 7    there?
 8         A.   I don't remember.
 9         Q.   Did Dr. Canterbury tell you that?
10         A.   I don't remember.
11         Q.   And were you aware of any events involving
12    ████████ that preceded Mr. Bhattacharya's admission
13    to the hospital in 2017?
14              MS. THOMPSON:  Objection to form.  Assumes
15         facts not in evidence.
16              You may respond.
17              THE WITNESS:  Not that I remember.
18    BY MR. LOCKERBY:
19         Q.   Did you know that the two of them had had
20    an argument about the fact that ████████ had given
21    Mr. Bhattacharya a sexually transmitted disease?
22              MS. THOMPSON:  Objection to form.
23         Relevance.
24              You're welcome to respond.
25              THE WITNESS:  Not that I remember.
```

39

JOHN DENSMORE



JA684

TO BE FILED UNDER SEAL

```
 1        Reporter, Gentleman Witness, we are now going

 2        back on the record.  The time is 11:46.

 3             Please proceed.

 4   BY MR. LOCKERBY:

 5        Q.   Dr. Densmore, when you met with

 6   Mr. Bhattacharya about his test score, that wasn't

 7   the only subject that you discussed, was it?

 8        A.   I don't remember.

 9        Q.   Well, in fact you raised the issue of his

10   mental health, did you not?

11             MS. THOMPSON:  Objection to form.  Assumes

12        facts not in evidence.

13             You may respond.

14             THE WITNESS:  I don't remember.

15   BY MR. LOCKERBY:

16        Q.   In fact you did have a discussion with

17   Mr. Bhattacharya about whether he was seeing a

18   psychiatrist in November 2018, did you not?

19        A.   I don't remember.

20        Q.   Do you deny having had such a discussion?

21        A.   I don't remember, so I can't confirm or

22   deny.

23        Q.   And in fact, you also -- you demanded to

24   see Mr. Bhattacharya's medical records; isn't that

25   right?
```

89

JOHN DENSMORE



JA685

TO BE FILED UNDER SEAL

```
 1              MS. THOMPSON:  Objection to form.  Assumes
 2       facts not in evidence.
 3              You may respond.
 4              THE WITNESS:  No.
 5   BY MR. LOCKERBY:
 6       Q.   You also escorted Mr. Bhattacharya to CAPS
 7   on November 14, 2018; isn't that right?
 8       A.   Yes.
 9              MS. THOMPSON:  Objection.  Just for the
10       record, objection to form.  You may --
11              THE WITNESS:  Yes.
12   BY MR. LOCKERBY:
13       Q.   And why did you escort Mr. Bhattacharya to
14   CAPS?
15       A.   I was worried about his health.
16       Q.   And what caused you to be concerned about
17   his health?  Or to claim concern?
18       A.   I don't know.  I don't remember.
19       Q.   Well, in fact it was information that
20   Christine Peterson had provided to you that she had
21   obtained from ████████; isn't that right?
22       A.   No.
23              MS. THOMPSON:  Objection to form.
24   BY MR. LOCKERBY:
25       Q.   So your answer is "no"?
```

JOHN DENSMORE

**BARKLEY**
Court Reporters

JA686

TO BE FILED UNDER SEAL

```
 1          A.    No.
 2          Q.    So that -- that information had nothing to
 3   do with your concern about his health; is that your
 4   sworn testimony under oath?
 5          A.    Can you restate the question?
 6               MR. LOCKERBY:  Let's have the question
 7          read back, please.
 8               (Whereupon the Court Reporter read the
 9               previous question.)
10               THE WITNESS:  I don't know.
11   BY MR. LOCKERBY:
12          Q.    Were you concerned about his health
13   because of his grade on the summative exam?
14          A.    Not -- not entirely.
15          Q.    Were you concerned about his health
16   because of the reports you had received about the
17   microaggresion panel discussion?
18          A.    No.
19          Q.    So what caused you, all of a sudden, as of
20   November 13, 2018, to be concerned about
21   Mr. Bhattacharya's health?
22               MS. THOMPSON:  Objection.
23          Mischaracterizes the witness's prior testimony.
24          Assumes facts not in evidence.  Objection to
25          form.
```

91

JOHN DENSMORE

BARKLEY
Court Reporters

JA687

TO BE FILED UNDER SEAL

```
 1   BY MR. LOCKERBY:

 2       Q.   In fact you had discussed with Christine

 3   Peterson the possibility that one of you would call

 4   the police on November 19, 2018, depending upon who

 5   met with him?

 6            MS. THOMPSON:  Objection to form.  Assumes

 7       facts not in evidence.

 8            You may respond.

 9            THE WITNESS:  I do not remember that.

10   BY MR. LOCKERBY:

11       Q.   Do you deny that?

12       A.   I don't remember.  I can't confirm or

13   deny.

14       Q.   I'd like to have marked as Exhibit 26,

15   please, a document number 2018.11.19 UVA CAPS 3481.

16       (Exhibit 26 was marked for identification.)

17            VIDEOGRAPHER:  Counselors, the document is

18       in OneDrive.

19   BY MR. LOCKERBY:

20       Q.   Down at the bottom of the page, there's an

21   e-mail from Sarah Cooper to "Crisis Team."  Do you

22   know what the crisis team is?

23       A.   No.

24       Q.   And the e-mail says, "Chris Peterson just

25   walked into my office to let me know that this
```

124

JOHN DENSMORE

BARKLEY
Court Reporters

```
 1   student has requested to meet with her today at

 2   3:00 p.m.  Just a heads up in case he is presenting

 3   the same as he did last week, if so, she would walk

 4   him over.  Hopefully that doesn't happen.  I told her

 5   the basics that he was not happy with CAPS and that

 6   he was ECO'd."

 7            You were aware in fact that Christine

 8   Peterson at one point was scheduled to meet with

 9   Mr. Bhattacharya on November 19, 2018, correct?

10        A.   I don't remember that.

11        Q.   Well, in fact on November 19, 2018, in the

12   morning, you had texted her, according to Exhibit 15,

13   that you were meeting with Mr. Bhattacharya at 11:30

14   that day, correct?

15        A.   Yes.

16        Q.   And up above, there's an e-mail from

17   Sarah Cooper, Monday, November 19, 2018, at

18   2:05 p.m.:  "Crisis Team, I just got an update from

19   Chris Peterson that this student meet with Dean

20   Densmore today and was behaving in the same was as

21   when he was TDO'd and the police were called and he

22   was TDO'd again, so he will not be meeting with her

23   this afternoon."

24            If someone called the police on

25   November 19, 2018, it wasn't you, correct?
```

125

JOHN DENSMORE

BARKLEY
Court Reporters

TO BE FILED UNDER SEAL

1          A.   I did not call the police.

2          Q.   And in the video that we just watched,

3    that was Exhibit 25, was there any conduct on the

4    part of Mr. Bhattacharya that you considered to be

5    the same type of behavior as when you met with him on

6    November 14, 2018?

7          A.   Yes.

8          Q.   What was that?

9          A.   He was -- he was very pressured.  He was

10   threatening.  And intimidating.

11         Q.   What did Mr. Bhattacharya say or do on

12   November 19, 2018, that you believed was threatening?

13         A.   He -- he stood and paced in front of my

14   desk, and as you can see, I was seated.  Paced back

15   and forth, and spoke to me in a very accusatory

16   manner.

17         Q.   Do you believe that Mr. Bhattacharya was

18   upset about having been hospitalized a few days

19   earlier?

20              MS. THOMPSON:  Objection.  Calls for

21         speculation.

22              You may respond.

23              THE WITNESS:  Yes.

24   BY MR. LOCKERBY:

25         Q.   Have you ever met with anybody who was

126

JOHN DENSMORE

BARKLEY
Court Reporters

JA690

TO BE FILED UNDER SEAL

1   involuntarily hospitalized, tranquilized, had blood

2   taken forcibly, had a catheter stuck up his penis to

3   get a urine sample?  Have you ever met with anyone

4   who's been through that recently?

5          A.   Not that I remember.

6          Q.   So you -- you don't have a frame of

7   reference for your meeting with Mr. Bhattacharya, do

8   you?

9               MS. THOMPSON:  Objection.

10              MR. YATES:  Object to the form.

11              MS. THOMPSON:  Yeah, object to the form.

12       And assumes facts not in evidence.

13              You're welcome to respond.

14              THE WITNESS:  I -- I guess I don't

15       understand what the question was.

16   BY MR. LOCKERBY:

17          Q.   Let me ask you a different question, if

18   you don't understand that.

19              Other than pacing, and other than being

20   accusatory, what was it that Mr. Bhattacharya said or

21   did that you considered to be threatening?

22          A.   He demanded to see my medical license.

23          Q.   And in fact he referenced the possibility

24   of litigation, did he not?

25              MS. THOMPSON:  Objection to form.  Assumes

127

JOHN DENSMORE



JA691

TO BE FILED UNDER SEAL

```
1          facts not in evidence.  Hearsay.
2                  You may respond.
3                  THE WITNESS:  He told me I needed to watch
4          myself.
5     BY MR. LOCKERBY:
6          Q.   And he suggested that you get a lawyer,
7     right?
8                  MS. THOMPSON:  Objection.
9          Mischaracterizes the witness's prior testimony.
10                 You may respond.
11                 THE WITNESS:  I don't remember.
12    BY MR. LOCKERBY:
13         Q.   He did not read you your Miranda rights,
14    did he?
15         A.   I -- I don't remember.
16         Q.   Do you know what Miranda rights are?
17         A.   Roughly.
18         Q.   And that would include "You have the right
19    to remain silent; anything you say will -- will be
20    used against you in a court of law," et cetera?
21         A.   That's my understanding.
22         Q.   And it's -- you understand it's something
23    that a police officer reads a suspect when the
24    suspect is arrested, correct?
25         A.   I don't know when it's used.
```

128

JOHN DENSMORE

BARKLEY
Court Reporters

JA692

TO BE FILED UNDER SEAL

1        Q.   But Mr. Bhattacharya did not read you your

2    Miranda rights, did he?

3        A.   I don't remember.

4        Q.   And you didn't feel threatened enough to

5    call the police that day, did you?

6        A.   I did not.

7        Q.   And in fact, Mr. Bhattacharya left your

8    office voluntarily and peacefully, did he not?

9        A.   I asked him to leave, and he did leave.

10       Q.   And other than pacing and being

11   accusatory, did he do anything else that you

12   considered to be intimidating?

13            MR. YATES:  Object to the form.  He stated

14       more than that.

15            MS. THOMPSON:  Object -- yeah, object to

16       the form.  Mischaracterizes the witness's prior

17       testimony.

18            You may respond.

19            MR. LOCKERBY:  Object to the speaking

20       objections, which are improper.

21            MS. THOMPSON:  They're not improper, Mike.

22            You may respond.

23            MR. LOCKERBY:  I'm not going to debate

24       this with you on the record, but they are

25       improper.

129

JOHN DENSMORE

BARKLEY
Court Reporters

JA693

TO BE FILED UNDER SEAL

```
 1              C E R T I F I C A T E

 2

 3         I, KAREN K. KIDWELL, RMR, CRR, Notary Public

 4    for the Commonwealth of Virginia, do hereby certify

 5    that the witness whose deposition is hereinbefore set

 6    forth, was virtually sworn by me and that such

 7    deposition is a true record of the testimony given by

 8    such witness.

 9

10         I further certify that I am not related to any

11    of the parties to this action by blood or marriage;

12    and that I am in no way interested in the outcome of

13    this matter.

14

15

16                    _____

17                    KAREN K. KIDWELL, RMR, CRR
                      Registered Merit Reporter
                      Certified Realtime Reporter
18                    Registration #7625774
                      My Commission expires:
19                    September 30, 2023

20

21

22

23

24

25


                         254
```

JOHN DENSMORE

**BARKLEY**
Court Reporters

JA694

TO BE FILED UNDER SEAL

# EXHIBIT DX11

to SFS 2/23/17

WD 1172

**TO BE FILED UNDER SEAL**


# University of Virginia
# Official Withdrawal Form

**Instructions**
1. Complete student portions of form
2. Present form to dean of school for approval
3. Present form to Dean of Students

I.D. Number: 655366724    2582347

Name: Bhattacharya    Kiran    Ravi
      Last              First and Middle

Permanent Address: 504A Brandon Ave

Charlottesville, VA, 22903

School of Enrollment: Medicine

---

Reason(s) for withdrawal:    Medical
                             Other: Personal

By affixing my signature to this document, I certify the following:
1. I am over 18 years of age *or* have consent of my parent or guardian to withdraw from the University.
2. I understand that I remain liable for any obligation to the University, and that withdrawal does not cancel any such liability.
3. If I wish to apply for readmission, I must do so in writing to my academic dean's office at least 30̶ 60 days in advance of the start of the semester. (This deadline may be waived by the dean of the school.)
4. I am ___/ ✓ am not an international student studying in the United States on a visa. If I am, I have notified the International Students Office in advance that I am withdrawing.
5. I do ✓/___ do not have a federal loan (Ford Federal Direct, Perkins, Health Professions, Nursing, institutional, etc.). If I do, I understand my responsibility for repayment and an exit interview.
6. I do ___/ ✓ do not reside in University housing and/or have a meal plan. If I do, I understand my responsibility for an exit interview with the Housing Division and/or Dining Services.
7. I am ___/ ✓ am not requesting this withdrawal because I have been arrested for, charged with, convicted of, or must serve a criminal sentence for any crime, excluding only minor traffic violations which do not involve bodily injury to others. (If yes, attach an explanation providing a complete and truthful account of the circumstances.)

Signature: _____

Date: 02/07/17

---

**Dean of School**    Effective Withdrawal Date: 2-7-17

Authorized Signature: _____ DrJMoore

**Dean of Students**    Date: 2/21/2017

Authorized Signature: _____

**Registrar**    Withdrawal Type: GW

---

In accordance with University regulations, notification of your withdrawal will be made to the following offices as appropriate: Athletics, Communication Services, Dining Services, Honor Committee, Housing Division, International Students, ITC, Judiciary Committee, Library, Student Financial Services, and the University Registrar.

0205                                                     UPJ 3*5200/PVRE

Confidential                                             UVA00000319

JA696

TO BE FILED UNDER SEAL

# EXHIBIT DX12

JA697

From: Reed, Sean *HS
Sent: Tue Feb 14 22:54:41 2017
To: Densmore, John J. (jjd2q)
Cc: Keeley, Meg G. (mmg4z);Peterson, Christine M. (cmp8x)
Subject: Re: student LOA
Importance: Normal

Re: student LOA
That is good to hear -- the bit about his new found "insight." Perhaps he can share where he found it with some others whom I know are in need of it.

Sent from my iPhone

> On Feb 7, 2017, at 1:40 PM, Densmore, John J *HS (MD-Internal Medicine) <JJD2Q@hscmail.mcc.virginia.edu> wrote:
>
> He developed insight.  Met with new psychiatrist yesterday, who talked about the time course of months to improvement.  Came to the decision on his own, which I supported.
> _____
> From: Keeley, Meg M. *HS
> Sent: Tuesday, February 7, 2017 1:38 PM
> To: Peterson, Christine M
> Cc: Densmore, John J *HS (MD-Internal Medicine); Reed, Sean *HS
> Subject: Re: student LOA
>
> Did something happen yesterday John?  I talked to him for a long time on Friday night and encouraged a LOA every which way I could but he did not seem to want to do that.  Although he had just had the epiphany about taking his meds at that point.
>
> Sent from my iPhone
>
> On Feb 7, 2017, at 1:34 PM, Peterson, Christine M. (cmp8x) <CMP8X@eservices.virginia.edu< mailto:CMP8X@eservices.virginia.edu>> wrote:
>
> Whew.
> Though his girlfriend texted me on Thursday that he was "doing much better"…
> Now he can concentrate on recovering.
>
> From: Yates, Katherine M *HS [ mailto:KAM5VD@hscmail.mcc.virginia.edu]
> Sent: Tuesday, February 07, 2017 1:27 PM
> To: Baxton, Margaret E. (med7q) <med7q@eservices.virginia.edu< mailto:med7q@eservices.virginia.edu>>; Chiacchia, Kathryn A *HS <KAC6N@hscmail.mcc.virginia.edu< mailto:KAC6N@hscmail.mcc.virginia.edu>>; Celli, Alane Carol (Lanie) (acc8j) <acc8j@hscmail.mcc.virginia.edu< mailto:acc8j@hscmail.mcc.virginia.edu>>; Clarke, Jill Alexandra (jac2g) <jac2g@hscmail.mcc.virginia.edu< mailto:jac2g@hscmail.mcc.virginia.edu>>; 'som-systems@virginia.edu< mailto:som-systems@virginia.edu>' <som-systems@virginia.edu< mailto:som-systems@virginia.edu>>; Burtner, Wendy Aniseh (W. Aniseh) (wab3s) <wab3s@eservices.virginia.edu< mailto:wab3s@eservices.virginia.edu>>
> Subject: [som-systems] student LOA
>
> Hello
>
> Kieran Bhattacharya (SMD 20) has taken a leave of absence.
>
> Thanks,

**TO BE FILED UNDER SEAL**

> 
> 
> Katherine M. Yates, M.Ed.
> Registrar
> University of Virginia School of Medicine
> 200 Jeanette Lancaster Way
> Charlottesville, VA 22903
> Room 3136
> (434) 924-5200
> 
> 
>

TO BE FILED UNDER SEAL

# EXHIBIT DX13

JA700

**TO BE FILED UNDER SEAL**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF VIRGINIA

 3               (CHARLOTTESVILLE DIVISION)

 4

 5   KIERAN RAVI BHATTACHARYA,

 6         Plaintiff

 7   vs.                            CIVIL ACTION NO:

 8   JAMES B. MURRAY, JR., et al.,   3:19-cv-54-NKM-JCH

 9         Defendants

10   _____/

11

12         The Virtual Video-recorded Deposition of

13   ROXANNE BHATTACHARYA, M.D., was held on Saturday,

14   April 23, 2022, commencing at 8:36 a.m., at the

15   residence of the deponent, before Lynann Nicely,

16   Notary Public.

17

18

19

20

21   TRANSCRIBED BY:  Oneeka S. Hill
```

JA701

Page 2

```
 1   APPEARANCES:

 2

 3        ON BEHALF OF THE PLAINTIFF:

 4        MICHAEL S. LOCKERBY, ESQUIRE (Via Zoom)

 5             Foley & Lardner, LLP

 6             3000 K Street, Northwest

 7             Suite 600

 8             Washington, D.C.  20007-5143

 9             Telephone:  (202) 945-6079

10             E-mail:  Mlockerby@foley.com

11

12        ON BEHALF OF THE DEFENDANTS:

13        FARNAZ FARKISH THOMPSON, ESQUIRE (Via Zoom)

14        MELISSA RILEY, ESQUIRE (Via Zoom)

15             McGuire Woods, LLP

16              888 16th Street, Northwest

17              Suite 500

18              Washington, D.C.  20006

19              Telephone:  (202) 857-2488

20              E-mail:  Fthompson@mcguirewoods.com

21   (Appearances continued on the next page.)
```

JA702

**TO BE FILED UNDER SEAL**

Page 3

```
 1   APPEARANCES:  (CONTINUED)

 2

 3           ON BEHALF OF THE DEFENDANT:

 4           EVAN X. TUCKER, ESQUIRE (Via Zoom)

 5               McGuire Woods, LLP

 6               323 Second Street, Southeast

 7               Suite 700

 8               Charlottesville, Virginia  22902

 9               Telephone:  (804) 775-1067

10               E-mail:  Etucker@mcguirewoods.com

11

12           ON BEHALF OF THE DEFENDANT, SARA K. RASMUSSEN:

13           H. ROBERT YATES, III, ESQUIRE (Via Zoom)

14               O'Hagan Mayer

15               411 East Franklin Street

16               Suite 500

17               Richmond, Virginia  23219

18               Telephone:  (804) 403-7108

19               E-mail:  Ryates@ohaganmayer.com

20

21           (Appearances continued on the next page.)
```

JA703

TO BE FILED UNDER SEAL

Page 4

```
 1    APPEARANCES:  (CONTINUED)

 2

 3              ON BEHALF OF DR. ROXANNE BHATTACHARYA:

 4              PETER GOODMAN, ESQUIRE (Via Zoom)

 5                 Peter Goodman Law Offices

 6                 P.O. Box 1488

 7                 Mesilla Park, New Mexico  88047

 8                 Telephone:  (575) 521-0424

 9                 E-mail:  Peter@petergoodmanlaw.com

10

11    ALSO PRESENT:  MARY S. DUGGAN

12                   DINA MARTIN

13                   MICHAEL BARANKOVICH, VIDEOGRAPHER

14

15

16

17

18

19

20

21
```

JA704

**TO BE FILED UNDER SEAL**

```
                                              Page 5

 1                       INDEX

 2      Virtual Video-recorded Deposition of Roxanne

 3                  Bhattacharya, M.D.

 4                    April 23, 2022

 5

 6    Examination By:                          Page

 7    Ms. Thompson                               8

 8    Mr. Yates                                168

 9    Mr. Lockerby                             211

10

11    Exhibit No:                           Marked

12    Exhibit 1          Document 00000320    309

13    Exhibit 2      Univ. of Alabama Citation  37

14    Exhibit 3     Tab 2 - UVA00008013-8021    42

15    Exhibit 4     Tab 5 - UVA00002026-2029    50

16    Exhibit 5       Tab 6 - UVA00001650       61

17    Exhibit 6          Document 00002314-15   67

18    Exhibit 7         Tab 8 - DB00000032      72

19    Exhibit 8         Tab 9 - RB00000002      83

20    Exhibit 9        Tab 10 - DB00000005      87

21           (Continued on the next page.)
```

JA705

**TO BE FILED UNDER SEAL**

```
                                                      Page 6

1    INDEX:  (Continued)

2

3    Exhibit No.:                                   Marked

4    Exhibit 10      Tab 11 - MPS000007795-7806        97

5    Exhibit 11          Tab 13a - RB00000044         109

6    Exhibit 12          Tab 14 - CPD00002347         135

7    Exhibit 13           Tab 15 - ████00003386       138

8    Exhibit 14          Tab 13 - KB006267-6279       144

9    Exhibit 15           Tab 16 - KB003857           161

10   Exhibit 16           Tab 21 - DB00000044         165

11   Exhibit 17           Tab 22 - RB0000053-54       165

12   Exhibit PX-1    10-26-18 Microaggression Q&A     230

13   Exhibit PX-2      Professionalism Concern Card   239

14   Exhibit PX-3            Tucker Youtube           251

15   Exhibit PX-4        Document Exhibit 53          245

16   Exhibit PX-5           PSH00003661               271

17   Exhibit PX-6         UVA CAPS00003481            277

18   Exhibit PX-7          Moseley Document           288

19   Exhibit PX-8              UVA2317                292

20   Exhibit PX-9           UVA0000047-48             301

21
```

JA706

Page 108

1    them on my phone; cluttering up my phone.

2        Q     When did you think that Kieran was going

3    to sue the UVA officials?

4            MR. GOODMAN:  Objection to the form.

5        A     Not sure.  Can you repeat the question?

6        Q     When did you think that Kieran was going

7    to sue the UVA officials?

8            MR. GOODMAN:  Same objection.

9        A     I -- I don't remember exactly when --

10   like I said before, I don't remember exactly.  Did

11   come to find out about it.  Probably discussed it

12   with him a few times and I did see it on the

13   Internet, but I don't remember exactly when I did.

14       Q     So what happened in November of 2018,

15   after you learned about his first hospitalization?

16       A     Well, that's a very broad question.

17   What specifically do you want me to answer?

18       Q     What did you do after you learned about

19   his hospitalization in November of 2018?

20       A     The one at UVA?

21       Q     The one that you just testified about.

JA707

Page 109

1        A     Oh, okay.  I made plans to go to

2   Charlottesville.

3        Q     Do you recall when you arrived in

4   Charlottesville?

5        A     Well, I got -- I got stuck in a

6   snowstorm in Philadelphia for one day.  So I arrived

7   one day later than I thought.  I believe it was a

8   Friday.

9              I don't know.  I think it might have

10  been like November 16th or thereabouts.  It was a

11  Friday.

12       Q     Did you talk with Dr. Moseley before you

13  came to Charlottesville in November of 2018?

14       A     No, never talked to him before that.

15       Q     Okay.  I'm going to go to -- Mary, can

16  you please go to Tab -- it's RB000044, Tab 13A.

17             (Bhattacharya Exhibit 11 was marked for

18  purposes of identification.)

19             So this is being marked as DX11.  It's

20  just one page.  It's a record that we received from

21  your attorney.  Do you mind reading it?

JA708

TO BE FILED UNDER SEAL

Page 110

1          MR. LOCKERBY:  Sorry.  Is this uploaded

2    yet?  I'm not seeing it.

3          A     No I'm not seeing it --

4          Q     It is uploaded.  If you click on "Marked

5    Exhibits" and it refreshes, it's DX --

6          A     Yeah, it just popped up for me.  I see

7    it.

8          Q     Are you done reading it?

9          A     Yep.

10         Q     So, are these e-mails -- DX11, are these

11   e-mails between you and your spouse?

12         A     Yeah, I believe so.

13         Q     Okay.  So, do you recall when you went

14   to Charlottesville?  Was it on or about November 15,

15   2018?

16         A     Let me see.  Okay, I'm looking at the

17   itinerary.  I can't remember exact dates, but

18   11-15-18 I assume that was the itinerary.  That

19   makes sense.

20               Okay, I believe I arrived on Friday, the

21   16th.  Like I said, I do remember getting -- I had

JA709

Page 111

1   to stay in an airport hotel in Philadelphia because

2   there was a blizzard and the little -- little hopper

3   to Charlottesville wasn't going, so -- but I believe

4   it was on the 16th.

5           It was the day that Kieran got -- got

6   released from his involuntary commitment.  I do know

7   that.

8       Q    Why did you go to Charlottesville?

9       A    Cause that's what you do as a parent

10  when your child is hospitalized, in most cases.

11  You're concerned about them.

12      Q    So, you were concerned about Kieran?

13      A    Of course.

14      Q    What was his -- when did you get to see

15  him after his release?

16      A    We arrived I think Friday.  I believe it

17  was Friday 16th evening, as far as I can recollect,

18  and I saw him, I don't believe, until Sunday, the

19  18th.

20          Yeah, that's -- that's the best I can

21  recall how it was in time.

JA710

TO BE FILED UNDER SEAL

Page 112

| | | |
|---|---|---|
| 1 | Q | Who did you stay with? |

1    Q    Who did you stay with?

2    A    I stayed in a hotel.

3    Q    Do you recall where you stayed?

4    A    You mean the hotel number -- hotel name?

5    Q    The hotel name.

6    A    It was a chain hotel.  It might have

7    been -- have been Super 8 or something like that.  I

8    -- but I don't recall if it was Super 8, but

9    something like that.  One of these cheap chain

10   hotels.

11       Q    So in this e-mail that's marked DX11,

12   there's an e-mail from your husband to you dated

13   November 14, 2018 that states, "█████ indicated that

14   you can stay in Kieran's room during your stay in

15   Charlottesville."

16           Why didn't you stay with Kieran?

17       A    That was --

18           MR. GOODMAN:  Objection to form.

19           THE WITNESS:  Go ahead.

20           MS. NICELY:  I didn't hear the answer.

21   I didn't hear it.  Could you repeat the answer, if

JA711

TO BE FILED UNDER SEAL

Page 113

1    there was a answer?

2              THE WITNESS:  No, there wasn't an

3    answer.  I didn't --

4              MS. NICELY:  Oh.

5              MR. GOODMAN:  Counsel, don't you mean

6    why didn't she stay with ███ at Kieran's place or

7    something?  Kieran wasn't there.

8              MS. THOMPSON:  Well, we haven't

9    established that, have we?  And so I would prefer --

10   yeah, I mean if she would like to testify to that,

11   I'm more than -- that's fine.

12       A    Oh, okay.  Can you repeat your question

13   more specific please?

14       Q    Sure.  The e-mail from your husband to

15   you dated November 14, 2018, as stated on DX11 says

16   that, "███ indicated that you can stay in Kieran's

17   room during your stay in Charlottesville."

18              Why didn't you stay in Kieran's room?

19       A    Because Kieran came back the same day as

20   me and he was staying in his room.

21       Q    Did you talk with Kieran on November

JA712

TO BE FILED UNDER SEAL

Page 114

1    16th?

2          A      Okay, that was -- yeah, that was what

3    the testimony I just gave that he -- he communicated

4    to me that -- that he was getting -- the judge let

5    him out from his involuntary commitment.  So I did

6    communicate with him that day, as I previously

7    testified.

8          Q      Okay.  And what did you say to him?

9          A      I don't remember.

10         Q      Who is ████████?

11         A      ████████ was, as far as I know,

12   Kieran's ████████.

13         Q      Were you in contact with ████████

14   during this time period of November 14th through the

15   16th?

16         A      Yes, I believe we were communicating by

17   text.

18         Q      Do you have your text messages with

19   ████████?

20         A      No.  Like I said, I don't keep old

21   texts, but I do believe -- I think my recollection,

JA713

Page 115

1   to the best I can recollect, we were mainly

2   communicating by text.  We were just kind of getting

3   details about -- like, the key, and the dog, and you

4   know, all this kind of stuff.

5        Q     Do you recall what -- do you know what

6   was going on with Kieran aside from his

7   hospitalization during the same time period of mid

8   November 2018?

9              MR. LOCKERBY:  Object to the form.

10             MR. GOODMAN:  Form.

11       A     Can you repeat that?  That's very

12   generalized; calls for a narrative answer I think.

13       Q     Do you know what other -- what other

14   events were going on with Kieran during the time

15   period of mid November 2018?

16       A     You mean every event in his life?

17       Q     Nope.  In this mid November 2018 time

18   period, do you know what was going on with him at

19   the School of Medicine?

20       A     No, I just know that he was

21   involuntarily committed.

JA714

Page 136

1   you aware that someone else made a call about Kieran

2   and his behavior?

3       A    I -- I can't recall that directly.  I

4   thought it was just me that called, but when I read

5   the petition for involuntary treatment I see that

6   neighbors called.  So I was a little confused with

7   that.

8            So that was probably at that -- cause

9   that makes sense.  Cause when I was reading that I

10  didn't understand.  I thought I was the only one who

11  called, but then it said -- I think I wrote that

12  that neighbor had called too.

13           So when I -- so at the time I obviously

14  knew it because I wrote it in the involuntary

15  admission for treatment.  I don't know how I knew

16  that; they called or whether ███ told me or I

17  don't remember.

18      Q    Okay.  So what happened after the call

19  to police?

20      A    I went back to the hotel.

21      Q    Did you wait until the police came?

JA715

Page 137

1      A      Oh, yeah.  Yeah, then I saw they talked

2  to him and he seemed fine and they -- he was, you

3  know, coherent and rational and calm down and he

4  talked to them and they left.

5              MS. THOMPSON:  Okay.  Mary, could we put

6  up Tab 15 as DX13.

7              Oh.  And just before we do that, for the

8  record we were discussing the police report which is

9  DX12.

10     Q      Do you agree with that, Dr.

11 Bhattacharya, we were just discussing --

12     A      Yeah, the one we just did was the

13 police -- the police report -- I mean the police

14 thing, yeah.

15     Q      DX12?

16     A      Yeah, the one --

17     Q      Just for the record, thank you.

18     A      Yeah, the one where they have a police

19 report on there.  Okay, sure.

20             MS. DUGAN:  Farnaz, which tab would you

21 like?

JA716

                                                      Page 138

 1              MS. THOMPSON:  That's Tab 15 and that'll

 2   be marked -- the next exhibit will be marked DX13.

 3              MS. DUGAN:  Thank you.

 4              (Bhattacharya Exhibit 13 was marked for

 5   purposes of identification.)

 6        Q    Okay.  Dr. Bhattacharya, are you able to

 7   pull up DX13?

 8        A    Let me see.  Oh boy.  Probably.

 9              Does this go on or is it just the one

10   page?

11        Q    This is all we received.  This is what

12   we -- what we've received in discovery and we --

13   looks like a text message from you to ████████.

14        A    Okay.  Yes.  Actually, I do remember him

15   throwing the shoes out the door.

16        Q    Okay.  So just for the record -- I'm

17   sorry we have to do this because it's being

18   transcribed --

19        A    Sure, I understand.

20        Q    So this is DX13.  Do you recognize this

21   as a text message that you sent to ████████ on

Page 139

1    November 18th of 2018?

2        A     Not specifically, but it sounds like

3    something -- it sounds like it -- it probably --

4    (inaudible).

5        Q     Okay.  And you -- do you recall that

6    Kieran through your shoes out of the front door --

7        A     I forgotten that detail, but now that

8    you say it, I do remember that.  I think he was

9    trying to do everything he could to get me to leave

10   and I wasn't going.

11       Q     Did that frighten you when he through

12   your shoes out the door?

13       A     No, it's not like physical harm to you.

14   He's like get out, you know.

15             I mean, in retrospect, like, if I hadn't

16   gone to his house, none of this would have happened.

17   I should have just respected what he wanted, what --

18   that he needed some space.

19             And we had a loving relationship.  And,

20   if I had given him a few more days, I think -- and

21   let him -- let him process things cause he been

Page 140

1  through a traumatic experience, I think that he

2  would have come in and told me, like, it's true

3  everything that happened from his standpoint.  I

4  just messed the whole thing up.

5       Q     What happened next on November 18, 2018?

6             You left his house.  What happened after

7  that?

8       A     I went to the hotel and threatened a

9  restraining order.  He texted me.  I assume that was

10 a restraining order to me cause I was the person who

11 was angry at -- (inaudible.)

12            I just said -- you know -- I felt bad

13 because I -- he hadn't, to my knowledge, been

14 arguing with ████ or anything like that.  They just

15 been co-existing.

16            It's always awkward ██████████████,

17 ████████████, but they were, I think, managing

18 despite that being a difficult situation to civilly

19 co-exist.  And I put █████ in the middle of it, by

20 having ████ open the door for me and force myself in,

21 saying, "Well, it's █████ house too.  ██████

JA719

Page 193

1         A    -- and I stated it in that.  So I was

2    just telling him what I put in the petition, and

3    that's what I felt at the time, yes, but not now.

4         Q    Okay.  But, at the time, on November

5    19th of 2018, you feared for your son's safety?

6         A    Yes, that's what was in the -- the

7    petition.  That's why I did the petition for

8    involuntary cause I believed so at that time.

9         Q    Okay.  On -- when you say that you --

10   when you were looking for him and you went to the

11   medical school library, did you go over and try and

12   give him a hug?

13        A    No.  He told me he didn't want -- he

14   didn't want to talk to me for a while.  He needed

15   space.  So I think it would be inappropriate for me

16   to walk up to him and hug him.  It has to be

17   reciprocated.

18        Q    How long were you in the library?

19        A    I can't remember, but it was -- I

20   don't -- I don't recall how long it was.

21        Q    You were close enough to see that he was

JA720

Page 197

1      A     So I kind of looked things up online,
2   but I don't remember who told me or where it was.
3   But I knew where the bus stop was.
4      Q     All right.  While you were at his
5   apartment, he made threatening gestures with his
6   hands --
7           MR. LOCKERBY:  Object to the form.
8      Q     Now let's get your exact language.
9      A     In my exact language, I didn't mention
10  the word "threatening" to --
11     Q     No.
12     A     To quote my statement, "My son, Kieran
13  Bhattacharya, got inches from my face, screaming and
14  pounding fists toward me, so that I felt I was in
15  eminent harm."
16           I did not say that word.
17     Q     You said you felt threatened by his
18  actions?
19     A     Yes.
20     Q     Okay.  And he was within inches of your
21  face when he was screaming at you?

JA721

Page 227

1  which turned out to be wrong which really surprised

2  me and -- and stuff from his ███████████, largely.

3          I never got a chance to hear his side.

4  I didn't know until I attended the commitment

5  hearing at Poplar Springs.  I heard when he did that

6  commitment hearing, he was so logical and so well

7  prepared and so professional.  I couldn't believe

8  that, you know, he, you know, like -- you know --

9  it -- I kind of went back to the hotel and cried

10  cause I thought what have I done.  It seems like

11  he's okay.  He seems like he's okay and then I --

12  like, I did this.  Why I put him in this place?

13          I felt so bad cause then I started to

14  have an inkling that I was wrong, wrong about the

15  whole thing.  All the assumptions I made were wrong.

16  They were played with good intent.  I thought I was

17  helping him.  I thought that's what needed to be

18  done to get him back in school.  Cause I knew he

19  wanted to be a doctor more than anything.

20          Not me, not my dream, his dream.  I

21  would be fine if he wanted to do another profession.

JA722

Page 228

1    That's okay.

2              I don't think any of my other children

3    would be physicians and I don't really care if they

4    are.  I want them to do what they want to do.

5              But it was his dream and I didn't want

6    him to lose it, and I thought doing this would help

7    him, but it didn't help him.

8         Q    What led you to believe it would help

9    him?

10        A    Well, I -- I thought that if UVA said --

11   I thought they cared about their students.  I

12   thought that it -- it -- it -- they said he needed

13   help, that he needed help.

14        Q    Did anyone at UVA tell you -- tell you

15   personally that he needed help in November 2018?

16        A     No, it was all my stupid assumptions

17   based on like the reputation what I thought UVA was

18   and what they stood for, but I realized they

19   don't -- they don't stand for the things they wrote

20   write on their website.

21              And I'm proud of my son for standing up

TO BE FILED UNDER SEAL

Page 310

1            C E R T I F I C A T E

2

3    I, ONEEKA S. HILL, certify that the foregoing

4    transcript is a true and accurate recording of the

5    proceedings.

6

7

8    _____

9    ONEEKA S. HILL

10   Approved transcriber

11

12

13   Dated:  May 6, 2022

14

15

16

17

18

19

20

21

JA724

**TO BE FILED UNDER SEAL**

# EXHIBIT DX13-A

**TO BE FILED UNDER SEAL**

| | |
|---|---|
| **From:** | ██████████████████████████████████████ |
| **Sent:** | Wednesday, February 08, 2017 at 04:20:57 AM HST |
| **To:** | "krb6yg@virginia.edu" <krb6yg@virginia.edu>, "Kieran Bhattacharya" <kieran0696@gmail.com> |
| **Cc:** | ████████████████████████████████████ |
| **Bcc:** | |
| **Reply-To:** | |
| **Priority:** | Low |
| **Subject:** | Withdrawal Date for tuition refund purposes at UVA |

Although it was no doubt an very tough decision, I think you are extremely wise to defer a year and make your health a priority. In doing so, you can then come back healthier and academically strong with an excellent chance of making a great boards score. No tarnish to your academic record. It is not one's fault to have to take a medical loa, much better than an academic one from a residency perspective. It is more common than you think. It shows maturity that you had the realization that as a future physician, you knew that in order to take the best possible care of your patients, you first have to make your own health top priority.

I noticed on the UVA website, that the effective date of withdrawal is not necessarily date you signed form, but it is said that it will be "DETERMINED BY THE DEAN." Considering the extenuating medical circumstances where you were hospitalized little more than a week into classes, the dean met you and offered deferral while you were in the hospital, could not even withdrawal while in hospital, and considering nature of your medical condition where it is hard to immediately determine right after discharge if you will be able to finish term or not, if you have not discussed with the dean if it would be possible to make the effective withdrawal date the last day of classes before your hospitalization, I would immediately. To be fair, in retrospect, that is when your term really ended.

If you did not discuss this possibility with the dean, it would be financially prudent to discuss it ASAP, because it will save you thousands of dollars in tuition/ loans. I think it is a reasonable request to make under the special circumstances of your situation. You have nothing to lose by asking and your dean may vary well work with you on this request. But I would try to discuss it today if you have not already, before things get too far with the bursers office re refund amount. If you can't talk to him personally today, try to email him at least so request will be dated today for reference.

CONFIDENTIAL
RB-00000032

JA726

**TO BE FILED UNDER SEAL**

Love     P.S. look in mail Friday for Valentine's Day Surprise!

CONFIDENTIAL

RB-00000033

JA727

**TO BE FILED UNDER SEAL**

# EXHIBIT DX13-B

JA728

**TO BE FILED UNDER SEAL**

## New Message                    Cancel

To: ██████████████

Sun, Nov 18, 5:27 PM

██████ he is agitated and mad i am **here** so its **best** you are at hotel. He threw my shoes outside front door. But i cant lv **him** like this. If **he** does not calm down –hopefully he will and escalates i will have to call police to take **him** to er.

Yeah he just texted me and threatened a restraining order

I'll grab my stuff and

Text Message

TO BE FILED UNDER SEAL

# EXHIBIT DX15

**From:** Reed, Sean *HS
**Sent:** Sun Sep 02 07:05:07 2018
**To:** Keeley, Meg G. (mmg4z)
**Cc:** Peterson, Christine M (cmp8x);Densmore, John J (jjd2q)
**Subject:** Re: Student
**Importance:** Normal

Re: Student
Thanks Chris - seems like the best plan

Sent from my iPhone

On Sep 2, 2018, at 5:46 AM, Keeley, Meg M. *HS <MMG4Z@hscmail.mcc.virginia.edu< mailto:MMG4Z@hscmail.mcc.virginia.edu>> wrote:


So generally we have let people delay a summative for up to a couple days—not sure if that is what he is looking at vs. longer. Retakes and shelf delays/retakes will have to go on the designated days—next during fall break.
 Should we think about whether we want to say how many days a summative can be delayed and after that it goes to a retake date?  Just not to hold up grading, etc.?
 Meg


Begin forwarded message:

From: Meg Keeley <mkeeley2@gmail.com< mailto:mkeeley2@gmail.com>>
Date: September 2, 2018 at 5:39:05 AM EDT
 To: Meg Keeley <mmg4z@virginia.edu< mailto:mmg4z@virginia.edu>>
Subject: Fwd: Student


Sent from my iPhone

Begin forwarded message:

From: "Peterson, Christine M (cmp8x)" <CMP8X@virginia.edu< mailto:CMP8X@virginia.edu>>
Date: September 1, 2018 at 11:38:05 PM EDT
 To: "Densmore, John J (jjd2q)" <jjd2q@virginia.edu< mailto:jjd2q@virginia.edu>>
 Cc: "Reed, Sean W. (sr5fb)" <sr5fb@hscmail.mcc.virginia.edu< mailto:sr5fb@hscmail.mcc.virginia.edu>>, Meg Keeley <mkeeley2@gmail.com< mailto:mkeeley2@gmail.com>>
 Subject: Student

Kieran B called me at about 9:30 tonight to request permission to delay his CV summative. He has been symptomatic for a few days and unable to study. His physician has adjusted his meds. I told him that the policy permits a delay for medical reasons. He will need to submit documentation that his physician believes that K's medical condition warrants a delay. The physician is out of town for two weeks, and I told K that submitting the documentation when the MD returns would be fine. (I reminded him about CAPS resources in the interim.)
 I also told him he would have to retake the exam on one of the permitted dates, the first one occurring during the September break (assuming he is doing okay medically).
 He was calm and reasonable on the phone. I'll check in with him tomorrow.
 Just wanted all to be aware.
 Chris

Confidential

JA731

**TO BE FILED UNDER SEAL**

# EXHIBIT DX16

JA732

**TO BE FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| KIERAN RAVI BHATTACHARYA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 3:19-CV-54-NKM-JCH |
| | ) |
| | ) |
| JAMES B. MURRAY, JR., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**DECLARATION OF CHRISTINE PETERSON, M.D.**</u>

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.        My name is Christine Peterson. Since September 1987, I have been licensed to practice medicine in the Commonwealth of Virginia by the Virginia Board of Medicine. I am also board-certified in Obstetrics and Gynecology. I am at least eighteen years old, and if called to testify at trial, I would testify to the following facts based on my personal knowledge.

2.        I practiced medicine for 41 years. I was a member of the faculty at the University of Virginia School of Medicine for 34 years. During that time, I served as an Assistant Dean for Medical Education for 7 years and as an Assistant Dean for Medical Education and Student Affairs for 11 years.

3.        The first time I observed Mr. Kieran Bhattacharya in person was on October 25, 2018, at the American Medical Women's Association (AMWA) noontime panel on microaggressions. I did not know at that time that the person whom I observed on October 25, 2018, was Mr. Bhattacharya. Before that event, I primarily knew of Mr. Bhattacharya as ████ ████boyfriend.

1

JA733

**TO BE FILED UNDER SEAL**

4.      In my role as an Assistant Dean for Medical Education, I provided support to students.  I specifically provide support to students who are in my College, and the School of Medicine is comprised of four Colleges.  ▮▮▮▮▮  was a medical school student who was in my College.

5.      I also provided support to other students who were not in my College when requested by students or when I served as the Dean-on-Call.  One such example is when Kieran Bhattacharya called the Dean-on-Call number on September 1, 2018, while I happened to be serving as the Dean on Call.  He requested permission to delay his cardiovascular summative (final examination) as he had been experiencing symptoms (racing thoughts and inability to focus or to sleep) for a few days and was unable to study.  The following day, we exchanged a few text messages – I had reached out to inquire how Mr. Bhattacharya was doing and directed Mr. Bhattacharya to let his College Dean, Dr. Densmore, know when he was feeling better so that he could arrange his delayed exam.  A true and accurate copy of our text message exchange is attached to this Declaration as **Exhibit A**.  This instance was the only time I had personally interacted with Mr. Bhattacharya prior to the AMWA event.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of June 2022 in Charlottesville Virginia.

*Christine Peterson MD*
—————————————————
Christine Peterson, M.D.

2

JA734

TO BE FILED UNDER SEAL

# EXHIBIT DX16-A

**TO BE FILED UNDER SEAL**

Declaration of Christine Peterson, M.D.
Exhibits

# EXHIBIT A

# Chat with +1 434-962-0349

9/2/2018 9:16:54 AM - 9/2/2018 9:56:24 AM

---

## Export Details:

| | |
|---|---|
| Device Name | Kieran's iPhone |
| Device ID | 3e1c84a591f9162a6fdbe472995d4119139f8e9b |
| Backup Date | Wednesday, May 12, 2021 12:30 AM |
| Backup Directory | C:\Users\Kieran\AppData\Roaming\Apple Computer\3e1c84a591f9162a6fdbe472995d4119139f8e9b |
| iOS | 12.1.4 |
| Current Time Zone | (UTC-10:00) Hawaii |
| Created with | iExplorer v4.4.2.0 |

## Participants:

+1 434-962-0349

---

Sunday, September 2, 2018

+1 434-962-0349

Kieran, how are you doing today? Have you been able to sleep? Dr. P.   9:16 AM

*Me*

i fell asleep around 2 and woke up at 7. so a little better than before. also, I emailed the CV system leaders last night as instructed. thanks for asking!   9:27 AM

+1 434-962-0349

That's good to hear. Also it turns out that for a delayed exam (as opposed to a re-take after a failure), there is more flexibility. You can take it once you feel that you are ready. Please let Dr. Densmore know as you feel better and catch up with studying. Once your plans for taking it become clear, you can make arrangements with teh System Leaders.   9:45 AM

*Me*

Understood. I'll let Dr. Densmore know. Thanks for the explanation!   9:56 AM

KB-005744

JA737

# EXHIBIT DX17

**TO BE FILED UNDER SEAL**

From: Peterson, Christine M (cmp8x)
Sent: Sun Sep 02 15:49:58 2018
To: Soukoulis, Victor (vs7q);jdent@virginia.edu
Subject: Student
Importance: Normal

John and Victor,
Kieran Battacharya has permission to delay his Cardiovascular Summmative for medical reasons. He
will consult with his Dean, Dr. Densmore, and will let you know when he is feeling better and is
ready to take it.
Thanks,
Chris Peterson

Christine M. Peterson MD
Director, Gynecology Clinic
 Department of Student Health
Associate Professor of Obstetrics and Gynecology
Assistant Dean for Student Affairs
 School of Medicine
University of Virginia

UVA00002398

JA739

# Exhibit DX18

**(This exhibit is an audio file and will be submitted according to court procedure)**

TO BE FILED UNDER SEAL

# EXHIBIT DX19

**From:** Kern, Nora G. *HS
**Sent:** Mon Oct 22 09:49:03 2018
**To:** Rasmussen, Sara K *HS
**Cc:** ▮▮▮▮▮ *HS; Adams, Beverly C; Kern, Nora G (ngl2z); Rasmussen, Sara K (skr3f); ▮▮▮▮▮▮▮▮ (raj4rf);
**Subject:** Re: Microaggerssions panel - updated!
**Importance:** Normal

Re: Microaggerssions panel - updated!
I would agree with Sara. We can easily share our experiences but really the most important thing is for students to feel they can ask questions and be heard.

Thanks Nora


> On Oct 22, 2018, at 9:45 AM, Rasmussen, Sara K *HS <SKR3F@hscmail.mcc.virginia.edu> wrote:
>
> Hi ▮▮▮▮,
>
> I am wondering about how much Dr. Kern and I (and the third physician) should really plan to talk after Dr. Adams's presentation?  One hour is not a long time to devote to such a complex and often emotionally difficult topic, and I do not want to shorten the time for questions too much.  Of course, first and second year medical students may or may not have experienced much yet in the way of microaggressions in the clinical environment, but I wouldn't want to launch into what my experiences have been if there isn't going to be time to talk about them or field many questions.
>
> So I am thinking it would be good if rather than the clinicians speaking after Dr. Adams's speaks, the floor get opened up for questions.  Perhaps as the moderator, you can start off by asking the panel about their thoughts on the presentation, or to name an example of a behavior they have experienced that could be considered a micro-aggression?
>
> I say this because I am uncertain about having a white physician have the floor too long about her experiences with microaggressions when there is an issue of white people over-dominating these kinds of conversations.  I want to empower people to speak up, not tell them what to feel or say, and I want to listen and validate.  That being said, I also want to participate in the panel in a way that will be most meaningful for the students, so I will let you be my guide.
>
> Let me know your thoughts.
>
> Thanks,
>
> Sara
>
> Sara K. Rasmussen, MD, PhD.
> Assistant Professor of Surgery
> Division of Pediatric Surgery
> University of Virginia
> PIC #2006
>
> Administrative Assistant Cassandra Scruggs
> 434-924-9302
>
>
> _____

Confidential

UVA00002422

JA742

> From: █████████████ *HS █████████████
> Sent: Monday, October 22, 2018 09:16
> To: Adams, Beverly C; Kern, Nora G (ngl2z); Rasmussen, Sara K (skr3f)
> Cc: █████████████
> Subject: Re: Microaggerssions panel - updated!
>
> Hi Dean Adams,?
>
> 1.  ?The panel will be 12-1 pm on Thursday in the Claude Moore Medical School Auditorium (3rd floor). If you have any trouble finding it, my phone number is 813-625-3300. We have a patient coming to speak to our class in that room until 12 pm, so I will be out of contact from 11:10-12 pm.
> 2.  That works for me! We envisioned you giving us an introduction about microaggressions, Drs. Rasmussen and Kern sharing some insight about how they've dealt with them as they come up with patients and colleagues, and then leaving at least 20 minutes for questions. We sent out a survey asking people what they wanted to hear about, and the overwhelming response was "how do I respond to a microaggression in the moment?"
> 3.  Yes, there is a computer and a large projector screen.
> 4.  We've had about 90 people sign up, so I do anticipate at least 60-70 in attendance. This is an optional talk, but we have bribed them with some ice cream. They are all medical students, mostly first and second years. They will hopefully be pretty curious and engaged!
>
> Please let me know if you have any other questions. Thank you again, and looking forward to seeing you all on Thursday!
>
> █████
>
>
> --
> █████████████
> University of Virginia School of Medicine
> MD Candidate | Class of 2021
> █████████
>
> From: Adams, Beverly C (bca5y) <bca5y@virginia.edu>
> Sent: Monday, October 22, 2018 8:33 AM
> To: █████████████ (raj4rf); Kern, Nora G (ngl2z); Rasmussen, Sara K (skr3f); Adams, Beverly C
> Subject: Re: Microaggerssions panel - updated!
>
> Good morning █████, Sara, and Nora,
> I'm putting together my talk and wanted to touch base with you.
> Questions:
>
> 1.  Please tell me the location and timeframe.
> 2.  I will present for about 12-15 minutes.  Is that okay with everyone?
> 3.  I hope that I will have access to technology.  I'd like to present via PowerPoint.  Please let me know.
> 4.  What do you anticipate as the make-up of the audience?  How many?  Diversity?  Will folks be curious or are they required to attend?  (smile)
>
> Just let me know.
> (smile)
> Beverly
>
> Beverly Colwell Adams, PhD
> University of Virginia
> Association Dean
> Assistant Dean, College of Arts and Sciences
> Associate Professor, Psychology Department

Confidential

UVA00002423

> Monroe Hall - 269c
> 434-924-8873
> Charlottesville, VA  22903
>
>
> From: ████████████████
> Date: Tuesday, October 9, 2018 at 9:32 PM
> To: "Kern, Nora G (ngl2z)" <ngl2z@virginia.edu>, "Rasmussen, Sara K (skr3f)" <skr3f@virginia.edu>, Beverly
Colwell Adams <bca5y@virginia.edu>
> Subject: Microaggerssions panel - updated!
>
> Hi everyone,
>
> I was able to find a wonderful third panelist to join us for the talk on microaggressions! To introduce you all - Dr.
Beverly Adams is an undergraduate dean and Professor of Psychology who gave a talk on microaggressions earlier
this summer. Dr. Sara Rasmussen is a pediatric surgeon and Dr. Nora Kern is in the department of urology. We may
also have a third physician joining us - TBD.
>
> It sounds like Dr. Adams will start us off with a 15ish minute intro (with some videos?) about microaggressions,
and then Drs. Rasmussen and Kern can share their perspectives through the lens of healthcare providers. This first
30 minutes can really take whatever form you'd like, though, and the second 30 minutes will be Q&A.
>
> Currently the lecture is set up to be recorded for anyone who can't attend, but we can change this if you think it
would create a safer space to not have it recorded. Let me know what you think.
>
> Sorry for the lengthy email - please let me know if that sounds good to you all, and if you have any questions.
Thank you again so much for agreeing to be panelists!
>
> ████████
>
> --
> ██████████████
> University of Virginia School of Medicine
> MD Candidate | Class of 2021
> ████████████
>
>

Confidential          UVA00002424

JA744

TO BE FILED UNDER SEAL

# EXHIBIT DX20

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| **KIERAN RAVI BHATTACHARYA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 3:19-CV-54-NKM-JCH** |
| ) | |
| ) | |
| **JAMES B. MURRAY, JR., et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————— ) | |

## DECLARATION OF NORA G. KERN, M.D.

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.       My name is Dr. Nora G. Kern.  Since April 2013, I have been licensed to practice medicine in the Commonwealth of Virginia by the Virginia Board of Medicine.  I am also board-certified in urology.  I am a practicing physician within the University of Virginia Health System, where I specialize in pediatric urology.  I am at least eighteen years of age, and if called upon to testify at trial, I would testify to the following facts based upon my own personal knowledge.

2.       In addition to practicing medicine, I am a member of the faculty at the University of Virginia School of Medicine.  During my tenure at the School of Medicine, I have taught the 2nd year medical students in a classroom setting, and the 3rd and 4th year students in a clinical setting.

3.       In 2018, my professional responsibilities as a member of the School of Medicine's faculty included serving on the Academic Standards and Achievement Committee.  That committee is colloquially known at the School of Medicine as "ASAC."  I was a member of ASAC from June 2018 until August 2019.

1

JA746

4.      ASAC's purpose is to ensure each student in the School of Medicine masters the education program objectives. These objectives include assuring that each student demonstrates the required level of academic accomplishment and the required level of professionalism.

5.      The University of Virginia School of Medicine requires that students meet certain minimum technical standards that reflect the broad combination of cognitive, emotional, physical, and interpersonal skills a physician must possess to provide highly effective patient care. These technical standards are predicated on the school's learning objectives that are considered essential for completion of the M.D. degree, and students must meet these standards throughout medical school to progress and graduate. These include several standards related to professional or attitudinal behaviors.

6.      At the time a student accepts an offer to matriculate, they attest that they meet the School of Medicine's Technical Standards. Each student must attest on an annual basis that they continue to meet the standards.

7.      The role of ASAC is to promote students who meet the required Standards, and to address students who do not meet the Standards. This sometimes requires ASAC to interpret and apply the School of Medicine's general professionalism objectives and relevant Technical Standards to specific situations in which concerns are raised about a student's performance or behaviors.

8.      If ASAC determines that a student's conduct was inconsistent with the Technical Standards, the Committee can then determine whether any remedial action is necessary. In my experience, however, ASAC typically responded to minor breaches simply by sending students a letter reminding them of the appropriate standards rather than imposing any remedial action.

9.  On October 25, 2018, I participated as a panelist for the AMWA's lunchtime discussion on Microaggressions. The event was scheduled to begin at 12 p.m. and conclude at 1 p.m. I admit that I did not know what microaggressions were nor have I ever heard of this term prior to the invitation to the panel. I agreed to participate to support the AMWA group which is a voluntary student group in support of women in medicine.

10.  Following the event, I submitted a concern card regarding Kieran Bhattacharya's behavior at the AMWA Microaggressions discussion. A true and accurate copy of that concern card is attached to this Declaration as **Exhibit A**. As a part of the ASAC committee, I felt it was my duty to ensure someone, such as his college dean, spoke with Mr. Bhattacharya about changing his tone of voice when speaking to others during disagreements in future encounters, especially for patient care purposes.

11.  I did not submit the concern card because of the content of Mr. Bhattacharya's speech at the AMWA event. On the contrary, I agreed with the content of his speech and believe my personal views on microaggressions align with Mr. Bhattacharya and not with Dr. Beverly Adams, the primary speaker of the panel. My personal experience with overt racism against myself as an Asian American has led me to feel this way. I also am in agreement with Mr. Bhattacharya that Dr. Beverly Adams did, in fact, say things that were contradictory. Students are allowed, even encouraged, to challenge faculty; however, they must do so respectfully. Mr. Bhattacharya did not present his challenges in a respectful manner consistent with the way a medical student should act.

12.  Mr. Bhattacharya's tone of voice, his pressured speech, and his body language were rude and antagonistic towards Dr. Adams. To elaborate, at the event the audience members were sitting down at rows of table desks – Mr. Bhattacharya was not sitting back in his chair or even

upright, he was leaned forward over his desk in an aggressive manner. Mr. Bhattacharya dominated the conversation during the Q&A portion of the program despite there being only a finite amount of time for questions. Mr. Bhattacharya continued to question Dr. Adams without willingly yielding the floor to any other audience members for questions or asking any of the other speakers questions. Once Dr. Sara Rasmussen called on another student for a question, Mr. Bhattacharya appeared angry and upset as he abruptly grabbed his bag and left the room immediately instead of waiting until the conclusion of the discussion.

13.     I left the event concerned and worried about how Mr. Bhattacharya would handle disagreements with colleagues and other staff in a clinical setting. I had no concerns with the content of his questions and comments, as I agreed with them.

14.     On November 14, 2018, I attended a regularly scheduled ASAC meeting. As part of that meeting, the ASAC members discussed the issue raised by the concern card I had submitted: Kieran Bhattacharya's behavior at a lunchtime talk held in the School of Medicine on October 25, 2018. I did not raise the subject of Mr. Bhattacharya's specific views as he articulated them at the event, and none of the other ASAC members discussed the content of his speech.

15.     Mr. Bhattacharya attached a copy of correspondence sent to him on November 15, 2018 by Dr. Jim Tucker to his Second Amended Complaint as Exhibit 36, which is attached to this Declaration as **Exhibit B.** I did not write or participate in any way in drafting the letter that the Chair of ASAC, Dr. Tucker, sent to Mr. Bhattacharya on November 15, 2018. I did not review or see a draft of the November 15, 2018 letter before Dr. Tucker sent it to Mr. Bhattacharya. In my experience, this letter from ASAC would not have been included in his Medical Student Performance Evaluation.

4

16.     As a faculty member and as a member of the medical profession, my assessment is that Mr. Bhattacharya's behavior is unprofessional and inconsistent with the School of Medicine's relevant technical standards.  My assessment of Mr. Bhattacharya's behavior at the October 25, 2018 lunchtime discussion was not based on the substance or content of his speech at that event.

17.     I also attended part of an emergency ASAC meeting on November 28, 2018, at which the committee convened to discuss Mr. Bhattacharya's inappropriate and aggressive conduct that occurred in November 2018.  Mr. Bhattacharya was invited to the meeting and attended the meeting.  Shortly after Mr. Bhattacharya left the meeting, I myself left the meeting before ASAC began its discussion and before a vote was taken.  Therefore, I did not participate in the ASAC's discussion, nor did I vote concerning what action the ASAC should take regarding Mr. Bhattacharya.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this _10_ day of _____June_____ , _2022__ , in __Charlottesville_____ , __VA_____ .
     (day)              (month)           (year)             (city)                              (state)

_____
Nora G. Kern, M.D.

5

JA750

# EXHIBIT DX20-A

Declaration of Nora G. Kern, M.D. Exhibits

# EXHIBIT A

**Yates, Katherine M *HS**

| | |
|---|---|
| **From:** | som-studentaffairs-request@virginia.edu on behalf of ngl2z@virginia.edu |
| **Sent:** | Thursday, October 25, 2018 9:04 PM |
| **To:** | som-studentaffairs@virginia.edu |
| **Subject:** | [som-studentaffairs] Concern Card |

# Concern Card

Faculty Information:

**From: ngl2z@virginia.edu**
**Name: Nora Kern**
**Department: Urology**
**Phone Number:**
**E-mail: ngl2z@virginia.edu**

Student Information:

**Student Name: Kieran Bhattacharya**
**Class Year: 2**
**Date: 10/25/18**

Concerns Based On:

Areas:

**Respect for Others**
**Respect for Differences**

Comments:

**For a AMWA session, we held a panel on micro aggression. Myself and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards.**

Contact Issues:

**I have discussed my concerns with the student: no**

**I feel uncomfortable discussing my concerns with the student: no**

1

Confidential

UVA00000383

JA753

**Please call me about these concerns: yes**

Confidential

UVA00000384

JA754

# EXHIBIT DX21

From: Kern, Nora G. *HS
Sent: Thu Oct 25 19:42:53 2018
To: Peterson, Christine M (cmp8x)
Subject: Re: Today's Panel
Importance: Normal

Re: Today's Panel
Thanks Chris!

> On Oct 25, 2018, at 7:30 PM, Peterson, Christine M (cmp8x) <CMP8X@virginia.edu> wrote:
>
> Nora,
> You can find concern cards on the Faculty Source at this link:
> https://www.med-ed.virginia.edu/listen/earlyconcern.cfm
> They go to Student Affairs and the staff routes them to the student's college dean.
> I'm hoping to meet with him (Kieran Bhattacharya) in a few days to learn more about what we observed. He says he was pleased with the panel and their response to his "semantic challenges"....
> Chris
>
> -----Original Message-----
> From: Kern, Nora G. *HS <NGL2Z@hscmail.mcc.virginia.edu>
> Sent: Thursday, October 25, 2018 3:11 PM
> To: Peterson, Christine M (cmp8x) <CMP8X@virginia.edu>
> Subject: Re: Today's Panel
>
> I think these are all reasonable things. I more was curious where this anger/frustration was coming from; he was talking so fast, I wasn't even sure what he was saying exactly or asking. But if he handles himself in that kind of manner on the wards, that is not acceptable behavior.
>
> Again I'm new at ASAC and I've heard the "concern card" thrown around but I have no idea how to submit one or to whom.
>
> Thanks again! Nora
>
> _____
> From: Peterson, Christine M (cmp8x) <CMP8X@virginia.edu>
> Sent: Thursday, October 25, 2018 2:54 PM
> To: Kern, Nora G (ngl2z)
> Subject: RE: Today's Panel
>
> Nora,
> I know who he is, but I don't know him personally. One of the students in my college just emailed me with a similar concern.
> I was literally just about to reach out to the questioner (and bcc his college dean) to invite him to have a conversation.
> My points would be that 1) he is not responsible for how other people feel, but he is responsible for his actions, including those that inexplicably (to him) may make someone uncomfortable - and, therefore, 2) he would be wise to develop skills in acknowledging someone's discomfort, assuring them that he meant no harm, and stating that he is sorry (which might be a stretch for him...) for his inadvertent misstep. What do you think about that approach? And please feel free to submit a Concern Card if you think he needs one.
> Thanks for contacting me.
> Chris
>
> -----Original Message-----
> From: Kern, Nora G. *HS [ mailto:NGL2Z@hscmail.mcc.virginia.edu]

Confidential                                                                        UVA00002461

JA756

> Sent: Thursday, October 25, 2018 2:32 PM
> To: Peterson, Christine M (cmp8x) <CMP8X@virginia.edu>
> Subject: Today's Panel
>
> Hey Chris,
>
>
> How are you? I'm (newly) on the ASAC committee with you and did the panel today on microaggression. Do you know the student who asked the first questions and was extremely unprofessional in the panel? I'm pretty sure you were there when he was raising his questions. That took me by surprise and feel like that kind of behavior should be brought up at ASAC. I would definitely have concerns on having someone like that in rotations...
>
>
> Thanks much!
>
>
> Nora
>

Confidential

TO BE FILED UNDER SEAL

# EXHIBIT DX22

From: Tucker, Jim *HS
Sent: Thu Nov 01 11:19:00 2018
To: Yates, Katherine M *HS
Subject: RE: Asac agenda item
Importance: Normal

OK, thanks.

Jim

**From:** Yates, Katherine M *HS
**Sent:** Thursday, November 01, 2018 11:09 AM
**To:** Tucker, Jim *HS
**Subject:** Asac agenda item

Hello Jim,

John asked me to add this to the ASAC due to extreme professionalism lapse (he is the student's dean). I wanted to send it to you in case you wanted to talk to him/ Dr Kern.

Thanks,
Katherine

**From:** som-studentaffairs-request@virginia.edu [mailto:som-studentaffairs-request@virginia.edu] **On Behalf Of** ngl2z@virginia.edu
**Sent:** Thursday, October 25, 2018 9:04 PM
**To:** som-studentaffairs@virginia.edu
**Subject:** [som-studentaffairs] Concern Card

# Concern Card

Faculty Information:
**From: ngl2z@virginia.edu**
**Name: Nora Kern**
**Department: Urology**
**Phone Number:**
**E-mail: ngl2z@virginia.edu**
Student Information:
**Student Name: Kieran Bhattacharya**
**Class Year: 2**
**Date: 10/25/18**
Concerns Based On:

Areas:
**Respect for Others**
**Respect for Differences**
Comments:

For a AMWA session, we held a panel on micro aggression. Myself and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards.

Contact Issues:

I have discussed my concerns with the student: no

I feel uncomfortable discussing my concerns with the student: no

Please call me about these concerns: yes

UVA00002509

JA760

**TO BE FILED UNDER SEAL**

# EXHIBIT DX23

JA761

**TO BE FILED UNDER SEAL**

 

SCHOOL OF MEDICINE

## MINUTES
### Academic Standards & Achievement Committee
### MR 5 3005
### Wednesday, November 14, 2018

The meeting was called to order at 4:03 p.m.  Present were Drs. Jim Tucker (chair), Brian Behm, Donna Chen, Stephen Culp, Pam Herrington, Nicholas Intagliata, Nora Kern, Wilson Miller, Barnett Nathan, Catherine Shaffrey, as well as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (students) Non- voting members: Megan Bray, Lesley Thomas, Selena Noramly, and Katherine Yates. Guests:  David Lewis, Lynne Fleming, Chris Peterson, Sean Reed. Absent: Drs. Roger Abounader, Robert Bloodgood, Sharon Diamond-Myrsten, Katheryn Frazier, and Angelique Redus-McCoy.

**Minutes**
Committee voted unanimously to accept minutes from October 17, 2018.

# Redacted - Privacy

**Professionalism Issues**

The committee voted unanimously to send Kieran Bhattacharya (Densmore) a letter reminding him of the importance in medicine to show respect to all: colleagues, other staff, and patients and their families.

# Redacted - Privacy

The meeting was adjourned at 5:18 pm.
Minutes respectfully submitted by:
Katherine Yates 11/27/18

CONFIDENTIAL                                                                                    UVA00008638

JA762

# EXHIBIT DX24

**Yates, Katherine M *HS**

| | |
|---|---|
| **From:** | Tucker, Jim *HS |
| **Sent:** | Thursday, November 15, 2018 10:36 AM |
| **To:** | Bhattacharya, Kieran R *HS |
| **Cc:** | Densmore, John J *HS (MD-Internal Medicine); Yates, Katherine M *HS |
| **Subject:** | ASAC Letter |
| **Attachments:** | ASAC Letter.pdf |

Dear Mr. Bhattacharya,

Please see the attached letter from the Academic Standards and Achievement Committee.

With best regards,

Jim B. Tucker, M.D.
Chair, Academic Standards and Achievement Committee

1

KB-001528

**JA764**



SCHOOL OF MEDICINE
*Academic Standards and Achievement Committee*

November 15, 2018

Kieran Bhattacharya
SMD 2021

Dear Mr. Bhattacharya:

The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.

It is always important in medicine to show mutual respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.

Sincerely,

Jim B. Tucker, M.D.
Chair, Academic Standards and Achievement Committee

CC: John Densmore, M.D., College Dean
Katherine Yates, Registrar

CONFIDENTIAL

TO BE FILED UNDER SEAL

# EXHIBIT DX25

**From:** Burtner, Wendy Aniseh (wab3s)
**Sent:** Mon Nov 12 18:53:33 2018
**To:** Densmore, John J (jjd2q);Peterson, Christine M (cmp8x);Keeley, Meg G (mmg4z);Reed, Sean W. (sr5fb)
**Cc:** Bray, Megan J (mjb7c);Gorham, James D *HS;Druzgal, Colleen H (chd7b);mgd9a@virginia.edu;Noramly, Selina (sn8d);Yates, Katherine Mason (kam5vd);Chiacchia, Kathryn A *HS
**Subject:** HEME Grades FINAL update 11-12
**Importance:** Normal
**Attachments:** Heme FINAL update 11-12.docx; Untitled attachment 00189.htm

Dear Deans Densmore, Peterson, Reed and Keeley

Attached is the final update for the HEME system. There are a handful of students who scored below 70% on their Summative exam, and 2 students who have yet to take the exam. If there are any difficulties with them, I will keep you posted.
I also included the Final Numeric Scores for the system.

Happy to answer any questions.

Sincerely  - Aniseh Burtner


Dear Deans Densmore, Peterson, Reed and Keeley

Attached is the final update for the HEME system. There are a handful of students who scored below 70% on their Summative exam, and 2 students who have yet to take the exam. If there are any difficulties with them, I will keep you posted.
I also included the Final Numeric Scores for the system.

Happy to answer any questions.

Sincerely  - Aniseh Burtner

UVA00000750

JA767

Bottom Summative Scores

| Student | | Username | DeansLastName | | Summative |
|---|---|---|---|---|---|
|  | | | Peterson | | 60.67 |
| | | | Peterson | | 64.04 |
| | | | Densmore | | 66.29 |
| Bhattacharya, Kieran | | krb6yg | Densmore | | 67.42 |
| | | | Keeley | | 69.66 |
| | | | Reed | | 70.79 |
| | | | Keeley | | 70.79 |
| | | | Densmore | | 71.91 |
| | | | Densmore | | 73.03 |
| | | | Peterson | | 73.03 |
| | | | Densmore | | 73.03 |
| | | | Peterson | | 73.03 |
| | | | Peterson | | 75.28 |
| | | | Densmore | | 75.28 |
| | | | Keeley | | 75.28 |

**Bottom Final Numeric Scores**

| Student | Username | DeansLastName | Final Numeric Score |
|---|---|---|---|
| | | Peterson | 69.26 |
| | | Densmore | 72.28 |
| | | Densmore | 73.67 |
| | | Peterson | 74.69 |
| Bhattacharya, Kieran | krb6yg | Densmore | 74.82 |
| | | Peterson | 75.60 |
| | | Reed | 76.44 |
| | | Peterson | 77.67 |
| | | Densmore | 78.50 |
| | | Keeley | 78.98 |
| | | Keeley | 79.01 |
| | | Keeley | 79.27 |
| | | Densmore | 79.56 |
| | | Reed | 80.59 |

# EXHIBIT DX26



## Fw:

**Bhattacharya, Kieran R *HS** <KRB6YG@hscmail.mcc.virginia.edu>     Wed, Nov 28, 2018 at 9:48 PM
To: "kieran0696@gmail.com" <kieran0696@gmail.com>

---

From: Bhattacharya, Kieran R *HS
Sent: Wednesday, November 14, 2018 8:54 AM
To: Densmore, John J *HS (MD-Internal Medicine)
Subject: Re:

Yup. I'll see you at 9:30.

---

From: Densmore, John J *HS (MD-Internal Medicine)
Sent: Wednesday, November 14, 2018 7:56 AM
To: Bhattacharya, Kieran R *HS
Subject: Re:

If you're around, would 9:30 work?

> On Nov 13, 2018, at 6:34 PM, Bhattacharya, Kieran R *HS <KRB6YG@hscmail.mcc.virginia.edu> wrote:
>
> Hello Dr. Densmore,
>
> Sure. At your earliest convenience.
>
> Sincerely,
> Kieran Bhattacharya
>
> _____
> From: Densmore, John J *HS (MD-Internal Medicine)
> Sent: Tuesday, November 13, 2018 3:57 PM
> To: Bhattacharya, Kieran R *HS
> Subject:
>
> Hi Kieran,
> Just checking in to see how you're doing.  Sounds like the Heme summative didn't go well.
> Can we meet to discuss?
>
> JJD

KB-006006

**TO BE FILED UNDER SEAL**

# EXHIBIT DX27

JA771

TO BE FILED UNDER SEAL

Thursday, November 15, 2018

Dictated by Kieran Bhattacharya

BHATTACHARYA, KIERAN RAVI
CSN: 200012200475
DOB: ████████ (22 yrs) Male
MRN: 2674865
Arr Date: 11/19/18

Hello Special Justice Clark,

My name is Kieran Bhattacharya, and I am 22 year and 5 month old. I am a second year medical student here at UVA. You might remember me as a person who you had previously involuntarily committed on or around January 10, 2017. On this occasion, I had met with a lawyer who had come to me in my hospital room and had explained to me that he had preferred for me to not come to my hearing at the time. I heeded his advice and did not attend the hearing. Since then, and since leaving the psych ward, I felt that this is one of the biggest mistakes of my life. I cannot stress the importance of representing myself in the judicial hearing to defend myself, provide accurate details, and to generally support myself and my namesake.

It is my understanding that the burden of proof in this hearing is on the individuals claiming that I am unable to do one or more of the following: that I am a harm to myself, that I am a harm to others, or that I cannot take care of myself or provide myself with basic needs. It is my understanding that this is the basis of involuntary commitment, TDOs, and ECOs in the state of Virginia.

I want to talk about the ECO and clarify the basis, or lack thereof, for which it was produced. I signed a document provided to me by CAPS, consenting to treatment by CAPS. But this signature was compelled and under duress by my dean, John J. Densmore, whose word can drastically affect the trajectory of my medical career through his dean's letter. For this reason, I never consented in actuality to receive treatment from CAPS. Furthermore, when I was in the office with Catherine Richard, LPC, was the counselor who then saw me at Densmore's request. I was in her office for another 3 hours. During this time, I felt obligated to stay because I did not want to leave because this would negatively affect John Densmore's impression of me for not following up on his advice. At many times throughout this interview with Ms. Richard, she reiterated that she was concerned about me and many times when she said this, I asked her to clarify what and why she was concerned. She asked me a question that I have been asked by every other person who has had significant involvement in my admission here to this hospital and to my TDO. The question was simply stated as, "Why do you feel that other people are concerned about you?" I feel that this question was repetitive, redundant, and loaded because I am an independent thinker and cannot speak for what other people think about me and therefore asking me this question is an impossible task. Ms. Richard had another man, who I don't know, but who is a counselor and a professor of African Studies, come in and ask me similar questions. This man's final statement to me before I left, is "We have an issue." His issue, and I quote, is "We can't be sure that you are not like how you were in January of 2017 at this time." I responded that his basis for determining whether or not if I was like that, shouldn't force the burden of proof onto me. It was similar to asking me about my concern for other people's concerns, in that there is an assumption embedded into the question that I can't answer without appearing guilty. Shortly after I left the room, I was put in handcuffs and taken to the UVA ER. I was very distressed at this time because I did not think that anything I said warranted an ECO. To clarify, during these 3 hours, I never talked directly or indirectly about hurting myself, someone else, or being unable to provide for my basic needs. I am strongly convinced that confirmation bias was permeated through my process after this ECO was put into place. And that due to

CONFIDENTIAL

KB-005999

JA772

**TO BE FILED UNDER SEAL**

my checkered mental health past, particularly with this institution, that there was nothing I could really do or say during further several other interviews over the next few hours, while in handcuffs during the first part of it. This is precisely why I have allocated my mental health treatment to Dr. Charles Mosley, who has no affiliation with UVA. I should clarify here that when Densmore first asked me to go to CAPS, he gave me a second option. And that option was to communicate with Charles Mosley instead of going the UVA route. This was an extremely conflicting and difficult decision for me for the following reasons: As mentioned before, my dean writes my dean's letter and controls the trajectory of my medical career; I am doing my best to appease my dean but at the same time I want to compartmentalize my mental health with my schooling. I do not want the details of my mental health treatment to be widely available to my colleagues as they have been every time I've entered the psych ward. For example, I am scheduled to take a rotation here at UVA Psych Hospital within the next 6 months. There is a strong possibility that every day I spend here on the psych ward will likely negatively affect the evaluations of me by faculty members who work here and will be evaluating me. I would like to extend my concerns about discussing my mental health with people in power over me, including Dean Densmore, being the precipitating actor in this case. Dr. Densmore had visited me in my hospital room in January 2017. I did not know how he got access to the fact that I was in the hospital and the hospital bed. But I did tell him that I felt uncomfortable with talking to him in the hospital setting because I Felt that anything I said to him would negatively affect me in the future. This included his asking me to go to CAPS 22 months later on 11/14/18.

With respect to my TDO and Region 10, specifically the evaluation by Heather Newcomb, who I understand is a student in the Master's of Social Work program here. I personally do not think she has the credentials or knowledge to understand or diagnose mania or depression. Of course, this is not what she is supposed to do: her job is supposed to determine if I am going to cause harm to myself or others, or that I lack capacity to make decisions for myself and provide myself with basic human needs. It should be noted that when she interviewed me, I had just recently been handcuffed and taken to the hospital, where I waited for a couple of hours and had been grilled by multiple counselors over the span of 3 hours. Furthermore, I had been unwittingly injected with Haldol before the interview, which made me drowsy. Beyond that, I was extremely frustrated at my situation and confused as to why I received the drug Haldol. For all of these reasons, I was not able to present to Ms. Newcomb my best defense of myself. Furthermore, I suspect that Ms. Newcomb's decision was influenced by confirmation bias from her colleagues.

I was provided by all of the attending physicians more than 30 pages of TDO, ECO, and involuntary commitment papers, which have helped me provide the basis for writing this letter and understanding laws surrounding my circumstances at this point. I am in complete favor of these laws, and I appreciate that these laws allow me to defend myself in this setting. Beyond that, I am open for any questions, comments, and concerns you may have.

Sincerely,

Kieran Bhattacharya

**JA773**

**TO BE FILED UNDER SEAL**

# EXHIBIT DX29

JA774

HIGHLY CONFIDENTIAL

**TO BE FILED UNDER SEAL**

NCV Nov. 14, 2018 2:32PM   Charlottesville Mag-strate                    &J&&NO. 1001   F.  04

**PETITION FOR INVOLUNTARY ADMISSION FOR TREATMENT**
Commonwealth of Virginia
VA. CODE §§ 16.1-340; 16.1-340.1; 19.2-169.6; 19.2-182.9; 37.2-808 through 37.2-819

Temporary Detention Order No. ................................
Case No. ....................................................
Hearing Date and Time ......................................

[ ] General District Court
[ ] Juvenile and Domestic Relations District Court

CITY OR COUNTY: Charlottesville

In re. **kieran Bhattacharya**
NAME OF RESPONDENT

DATE OF BIRTH _____   GENDER: M

RESIDENCE ADDRESS: 820 B Cabbell Ave.
CITY: Charlottesville   STATE: VA   ZIP CODE: 22903

MAILING ADDRESS IF DIFFERENT
CITY ____  STATE ____  ZIP CODE ____

NAME AND ADDRESS OF CURRENT LOCATION OF RESPONDENT: 400 Brandon Ave. Charlottesville VA 22908

NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

NAME OF PETITIONER: Catherine Richard, LPC

PETITIONER'S RELATIONSHIP TO RESPONDENT

NAME OF AGENCY OR FACILITY OF PETITIONER (IF APPLICABLE): UVA Student Health - CAPS

FACSIMILE NUMBER (434) 243-6693

ADDRESS OF PETITIONER: 400 Brandon Ave

TELEPHONE NUMBER (434) 243-5150

CITY: Charlottesville   STATE: VA   ZIP CODE: 22903

ALTERNATE TELEPHONE NUMBER ( )

I, the undersigned petitioner, being a responsible person, hereby file this petition pursuant to Virginia Code

[X] §§ 37.2-805 through 37.2-819 (Adult Cares Only) and state that the respondent is unwilling to volunteer or incapable of volunteering for hospitalization or treatment, has a mental illness and is in need of hospitalization or treatment, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future:

    [ ] cause serious physical harm to [ ] self [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or

    [X] suffer serious harm due to respondent's lack of capacity to protect self from harm or to provide for respondent's own basic human needs

    [ ] I further state, based upon personal knowledge, that ............................................... meets
NAME OF PROPOSED ALTERNATIVE TRANSPORTATION PROVIDER
the criteria of an alternative transportation provider set forth in § 37.2-808 or § 37.2-810, and request the magistrate to consider authorizing transportation of the respondent by this identified person, facility or agency as an alternative to transportation by a law enforcement agency.

    [ ] The preadmission screening report has been prepared by the community services board and the report is attached.

    [ ] An initial mandatory outpatient treatment plan has been prepared by the community services board and is attached.

[ ] This petition is filed pursuant to Virginia Code § 37.2-817(C) prior to the expiration of the involuntary admission order entered on ..................................., to continue such order, of which the respondent is the subject, for a period not to exceed 180 days.
DATE

[ ] This motion for mandatory outpatient treatment is filed pursuant to Virginia Code § 37.2-805 or § 37.2-817(C) as the respondent has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or was involuntarily admitted pursuant to § 37.2-817(C), and on at least two previous occasions within 36 months preceding the date of the hearing, has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or has been involuntarily admitted pursuant to § 37.2-817.

[ ] § 19.2-169.6 and as the person having custody over the respondent, who is an inmate, state that the inmate has a mental illness; there exists a substantial likelihood that, as a result of mental illness, the inmate will, in the near future,
    [ ] cause serious physical harm to [ ] self [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and any other relevant information, or
    [ ] suffers serious harm due to his lack of capacity to protect himself from harm as evidenced by recent behavior and any other relevant information;
and the inmate requires treatment in a hospital rather than a local correctional facility.

Nov 14 2018 18:24 Region Ten CAC 434297503

Confidential

RegTen00007982

JA775

**TO BE FILED UNDER SEAL**

NOV Nev. 14, 2018 12:32PM    Charlottesville Magistrate                    0342N3. 7501    r. 55

re: Kieran B.

Temporary Detention Order No. _____

Case No. _____

[ ] § 19.2-182.9 and state that the respondent, who is an acquittee on conditional release
    [ ] has violated the conditions of the respondent's release, or
    [ ] is no longer a proper subject for conditional release,
and the respondent requires inpatient hospitalization.

[ ] § 16.1-340 or § 16.1-340.1 (Juvenile Cases Only) and state that because of mental illness, the respondent, who is a juvenile;
    [ ] presents a serious danger to [ ] self [ ] others to the extent that severe or irremediable injury is likely to result, as evidenced by recent acts or threats, or
    [ ] is experiencing a serious deterioration of the ability to care for self in a developmentally age-appropriate manner, as evidenced by delusionary thinking or by a significant impairment of functioning in hydration, nutrition, self-protection, or self-control.
and the juvenile is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment

[ ] The juvenile is currently detained in a detention home or shelter care facility by order of the
_____ Juvenile and Domestic Relations District Court. To the extent known,
                  NAME OF COURT
the following charges against the juvenile are the basis of the detention in the detention home or shelter care facility

_____
                CHARGE

_____
                CHARGE

[ ] See attached sheet for additional charges.

To the extent known, the names and addresses of the juvenile's parents are as follows:

_____
                NAME OF MOTHER AND ADDRESS

_____
                NAME OF FATHER AND ADDRESS

I request that the respondent be examined and accorded such assistance as provided by law. In support of this petition, I further state
as follows: Patient has history of Bipolar I Disorder or Psychosis (k was provision Presenting with pressured speech, irritability, grandiosity, possible paranoia and delusions. These result in an inability to engage in daily tasks + interactions.

11/14/18
DATE

Catherine Richart PC.
PETITIONER

The petitioner appeared this date before the undersigned and, upon being duly sworn, made oath that the facts stated in this petition are true based on the petitioner's knowledge.

_____
DATE

[ ] JUDGE  [ ] MAGISTRATE  [ ] SPECIAL JUSTICE  [ ] CLERK

FOR NOTARY PUBLIC'S USE ONLY:
State of _____ [ ] City [ ] County of _____
Acknowledged, subscribed and sworn to before me this _____ day of _____, 20 _____
by _____

_____          NOTARY PUBLIC
DATE          Notary Registration No. _____ (My commission expires _____)

Nov 14 2018 1825 Region Ten CAC 4342977503

Confidential

RegTen00007983

JA776

**TO BE FILED UNDER SEAL**

# EXHIBIT DX30

JA777

HIGHLY CONFIDENTIAL

Nov. 14, 2016 12:30PM    Charlottesville Magistrate        no. 7042    P. 2

**TO BE FILED UNDER SEAL**

**EMERGENCY CUSTODY ORDER**                               Case No.
Commonwealth of Virginia   VA. CODE §§ 37.2-808, 19.2-182.9; § 37.2-817.2     **ECO 540GM1800007635**

Charlottesville ......................................................... [ ] Circuit Court   [X] General District Court

Kieran Bhattacharya ...............................    820 B Cabell Ave., Charlottesville, VA 22903
                                                        NAME AND ADDRESS OF RESPONDENT

**TO ANY AUTHORIZED OFFICER OF:**
CHARLOTTESVILLE                                         COMPLETE DATA BELOW IF KNOWN

| RACE | SEX | BORN | | | HT. | WGT | EYES | HAIR |
|------|-----|------|------|------|-----|-----|------|------|
| | | MO. | DAY | YR | FT | IN. | | |

This emergency custody order is hereby issued                M
[X] upon motion of the undersigned  [ ] upon a sworn petition .
[X] and facts presented by                                  SSN

Catherine Richard, LPC          (434) 243 - 5150
NAME                            TELEPHONE NUMBER                DLR                    STATE

based upon probable cause to believe that the respondent:

[X] pursuant to § 37.2-808, is incapable of volunteering or unwilling to volunteer
for treatment, has a mental illness and is in need of hospitalization or treatment, and there exists a substantial likelihood that, as a result of
mental illness, the respondent will, in the near future, cause serious physical harm to self or others as evidenced by recent behavior causing,
attempting, or threatening harm and other relevant information OR suffer serious harm to respondent's lack of capacity to protect self
from harm or to provide for respondent's own basic human needs;

[ ] pursuant to § 19.2-182.9, is an acquittee on conditional release, and has violated the conditions of release or is no longer a proper subject
for conditional release, and requires inpatient hospitalization.

[ ] The respondent failed to appear for a hearing on ........................ to review a [ ] mandatory outpatient treatment plan [ ] discharge plan
pursuant to § 37.2-817.2.                           DATE

**THEREFORE**, you are commanded to execute this order, take the respondent into custody and

[X] transport the respondent to the location listed below for evaluation by a person designated by the community services board or behavioral
health authority who is skilled in the diagnosis and treatment of mental illness and who has completed a certification program approved by
the Department of Behavioral Health and Developmental Services in order to assess the need for hospitalization or treatment

[ ] transfer custody of the respondent to the alternative transportation provider, ..............................................................
DC-4000, ORDER FOR ALTERNATIVE TRANSPORTATION PROVIDER, is attached.

Custody of the respondent may be transferred pursuant to § 37.2-808(E). The respondent shall remain in custody until a temporary detention order is
issued, until the respondent is released, or until this emergency custody order expires. If the undersigned judicial officer issues this order pursuant to
§ 19.2-182.9, the period of custody may not exceed eight hours from the time that you execute this order. If the undersigned judicial officer issues
this order pursuant to § 37.2-808, then (1) the order is void if not executed within eight hours of the time of issuance and (2) the order is valid for a
period not to exceed eight hours from the time of execution. If the order becomes void for lack of timely execution, pursuant to § 37.2-808(M), a
law-enforcement officer must return the order to the office of the clerk of the issuing court, or, if such office is not open, to any magistrate serving
that court.

UVA Student Health - CAPS ............    400 Brandon Ave., Charlottesville, VA 22903 ....................................
                                          CURRENT LOCATION OF RESPONDENT

UVA Hospital E.D. ...................    1215 Lee Street, Charlottesville, VA 22903 ................................................
                                         NAME AND ADDRESS OF LOCATION FOR EVALUATION OR EXAMINATION

[ ] Transport the respondent to the medical facility (specified below) to obtain the following:

[ ] emergency medical evaluation or treatment, before transporting the respondent to the above specified location for evaluation.
[ ] a medical evaluation, before transporting the respondent to a hospital at which the respondent may be admitted for detention if a
physician at that hospital requires a medical evaluation of the respondent prior to the admission.

................................................................
NAME AND ADDRESS OF MEDICAL EVALUATION FACILITY

**TO THE PERSON CONDUCTING THE MENTAL HEALTH EVALUATION:**
Virginia Code § 37.2-808 and § 19.2-182.9 require that you evaluate the respondent pursuant to this order. Upon completion of your evaluation,
promptly report the results of your evaluation to the appropriate judicial officer.

**TO THE PERSON PROVIDING EMERGENCY MEDICAL EVALUATION OR TREATMENT:**
Virginia Code § 37.2-808 requires that you conduct the medical evaluation or treatment immediately in accordance with state and federal law.

**TO ANY HEALTH CARE PROVIDER** as defined in Virginia Code § 32.1-127.1:03, or other provider who has provided or is currently providing
services to or is currently evaluating the respondent: Virginia Code § 37.2-804.2 requires you to disclose certain information upon request. (See Page
Two, AUTHORIZATION FOR DISCLOSURE AND USE OF HEALTH INFORMATION.)

11/14/2018 12:11 PM                               _signature_
DATE AND TIME OF ISSUANCE                    [X] MAGISTRATE [ ] JUDGE [ ] SPECIAL JUSTICE

FORM DC-452 (MASTER, PAGE ONE OF TWO) 07/16          Louis Mascola

Confidential                                               RegTen00007981

JA778

TO BE FILED UNDER SEAL

# EXHIBIT DX31

## University of Virginia Police Department
### FIELD CASE REPORT

CASE# 2018-00027401

| NARRATIVE |
| --- |

2018-27401
D. Dotts, UP25
Assist Citizen, ECO
11/14/2018

On 11/14/2018 at approximately 1210 hours, I responded to UVA student Health for a Magistrate issued ECO for a Mr. Kieran Bhattacharya, a UVA student. Mr. Bhattacharya was taken into custody for the ECO at 1248 hours. Mr. Bhattacharya was handcuffed behind his back with the handcuffs double locked and checked for spacing. Mr. Bhattacharya was placed in the rear passenger side of a marked cage unit for transport to the UVA ER. Mr. Bhattacharya was registered and security took custody at 1300 hours. Nothing further.

| REPORTING OFFICER | DATE | REVIEWED BY | DATE |
| --- | --- | --- | --- |
| UP25 Dotts | 11/14/2018 | Acord, Casey | 11/14/2018 |
| | | OF | |

UPD Case 2018-00027401 Page 2 OF 2

CONFIDENTIAL

UVA00008068

JA780

TO BE FILED UNDER SEAL

# EXHIBIT DX32



# Incident Report

| | |
|---|---|
| **Print Date/Time:** 07/16/2021 13:08 | CHARLOTTESVILLE POLICE DEPARTMENT |
| **Login ID:** city\mooney | **ORI Number:** VA1020000 |

**Incident:** 2018-00034423

| | | | |
|---|---|---|---|
| **Incident Date/Time:** | 11/18/2018 5:53:55 PM | **Incident Type:** | Domestic |
| **Location:** | 820 CABELL AVE B | **Venue:** | Charlottesville |
| | Charlottesville VA 22903 | | |
| **Phone Number:** | | **Source:** | 911 |
| **Report Required:** | No | **Priority:** | 2 |
| **Prior Hazards:** | No | **Status:** | In Progress |
| **LE Case Number:** | | **Nature of Call:** | SOUNDS LIKE DOMESTIC FIGHT |

## Unit/Personnel

| Unit | Personnel |
|---|---|
| CP45 | 2140-Harvey |
| CP58 | 2654-Freishtat |
| CP63 | 129-Childers |

## Person(s)

| No. | Role | Name | Phone | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| 1 | Caller | REFUSED | (804)895-5769 | | | |
| 2 | Caller | BHATTACHARYA, ROXANNE | (808)344-4721 | | | |

## Vehicle(s)

| Role | Type | Year | Make | Model | Color | License | State |
|---|---|---|---|---|---|---|---|

## Disposition(s)

| Disposition | Count |
|---|---|
| 903 | 1 |
| 3 | 1 |

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|

Page: 1 of 2

CPD00002347

JA782

## CAD Narrative

11/18/2018 : 18:02:22 42DW Narrative: Narrative added from associated Call #: 86 - NO WEAPONS IN THE HOUSE
11/18/2018 : 18:01:49 42DW Narrative: Narrative added from associated Call #: 86 - NOT SLEEPING AND NOT EATING-NOW PACING AROUND THE APARTMENT
11/18/2018 : 18:01:15 42DW Narrative: Narrative added from associated Call #: 86 - 22 YO KERIN BHATTACHARYA BIPOLAR AND OFF HIS MEDS-ACTING MANIC
11/18/2018 : 17:56:13 123DZ Narrative: COMPL COULD ONLY HEAR IT, COULD NOT SEE ANYTHING
11/18/2018 : 17:54:48 123DZ Narrative: NO MENTION WEAPONS
11/18/2018 : 17:54:43 123DZ Narrative: MALE AND FEMALE FIGHTING. MALE IS SCREAMING AT THE FEMALE TO GET OUT OF HIS HOUSE

Confidential

CPD00002348

JA783

TO BE FILED UNDER SEAL

# EXHIBIT DX33

**PETITION FOR INVOLUNTARY
ADMISSION FOR TREATMENT**

Commonwealth of Virginia
VA. CODE §§ 16.1-340; 16.1-340.1; 19.2-169.6; 19.2-182.9; 37.2-808 through 37.2-819

Temporary Detention Order No. ...................................................

Case No. ...................................................

Hearing Date and Time ...................................................

[ ] General District Court
[ ] Juvenile and Domestic Relations District Court

...................................................
CITY OR COUNTY

In re   KIERAN R. BHATTACHARYA                    [redacted]              MALE
        NAME OF RESPONDENT                    DATE OF BIRTH              GENDER

8208 CABELL AVE
RESIDENCE ADDRESS                                MAILING ADDRESS IF DIFFERENT

CHARLOTTESVILLE      VA      22903
CITY              STATE      ZIP CODE        CITY        STATE        ZIP CODE

8208 CABELL AVE      CHARLOTTESVILLE VA 22903
NAME AND ADDRESS OF CURRENT LOCATION OF RESPONDENT

...................................................
NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

...................................................
NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

ROXANNE E BHATTACHARYA                          MOTHER
NAME OF PETITIONER                              PETITIONER'S RELATIONSHIP TO RESPONDENT

                                                (.............)
NAME OF AGENCY OR FACILITY OF PETITIONER (IF APPLICABLE)      FACSIMILE NUMBER

70 HALE PILI WAY                                ( 808 ) 344- 4721
ADDRESS OF PETITIONER                           TELEPHONE NUMBER

HAIKU            HI        96708                ( 808 ) 280- 8951
CITY              STATE      ZIP CODE          ALTERNATE TELEPHONE NUMBER

I, the undersigned petitioner, being a responsible person, hereby file this petition pursuant to Virginia Code

[X] §§ 37.2-805 through 37.2-819 (Adult Cases Only) and state that the respondent is unwilling to volunteer or incapable of volunteering for hospitalization or treatment, has a mental illness and is in need of hospitalization or treatment, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future:

      [X] cause serious physical harm to [ ] self [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or

      [X] suffer serious harm due to respondent's lack of capacity to protect self from harm or to provide for respondent's own basic human needs

[ ] I further state, based upon personal knowledge, that ............................................................................ meets
                                        NAME OF PROPOSED ALTERNATIVE TRANSPORTATION PROVIDER
the criteria of an alternative transportation provider set forth in § 37.2-808 or § 37.2-810, and request the magistrate to consider authorizing transportation of the respondent by this identified person, facility or agency as an alternative to transportation by a law enforcement agency.

[ ] The preadmission screening report has been prepared by the community services board and the report is attached.

[ ] An initial mandatory outpatient treatment plan has been prepared by the community services board and is attached.

[ ] This petition is filed pursuant to Virginia Code § 37.2-817(C) prior to the expiration of the involuntary admission order entered

on ............................................., to continue such order, of which the respondent is the subject, for a period not to exceed 180 days.
      DATE

[ ] This motion for mandatory outpatient treatment is filed pursuant to Virginia Code § 37.2-805 or § 37.2-817(C) as the respondent has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or was involuntarily admitted pursuant to § 37.2-817(C), and on at least two previous occasions within 36 months preceding the date of the hearing, has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or has been involuntarily admitted pursuant to § 37.2-817.

[ ] § 19.2-169.6 and as the person having custody over the respondent, who is an inmate, state that the inmate has a mental illness; there exists a substantial likelihood that, as a result of a mental illness, the inmate will, in the near future,

      [ ] cause serious physical harm to [ ] self [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and any other relevant information, or

      [ ] suffers serious harm due to his lack of capacity to protect himself from harm as evidenced by recent behavior and any other relevant information;

and the inmate requires treatment in a hospital rather than a local correctional facility.

FORM DC-4001 (MASTER, PAGE ONE OF TWO) 07/15

HIGHLY CONFIDENTIAL - AEO

KB-006274

JA785

Temporary Detention Order No. ..................................................

Case No. ...............................................

[ ] § 19.2-182.9 and state that the respondent, who is an acquittee on conditional release
    [ ] has violated the conditions of the respondent's release, or
    [ ] is no longer a proper subject for conditional release,
and the respondent requires inpatient hospitalization.

[ ] § 16.1-340 or § 16.1-340.1 (Juvenile Cases Only) and state that because of mental illness, the respondent, who is a juvenile:
    [ ] presents a serious danger to [ ] self [ ] others to the extent that severe or irremediable injury is likely to result, as evidenced by recent acts or threats, or
    [ ] is experiencing a serious deterioration of the ability to care for self in a developmentally age-appropriate manner, as evidenced by delusionary thinking or by a significant impairment of functioning in hydration, nutrition, self-protection, or self-control,
and the juvenile is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment.

[ ] The juvenile is currently detained in a detention home or shelter care facility by order of the
.................................................................................... Juvenile and Domestic Relations District Court. To the extent known,
             NAME OF COURT
the following charges against the juvenile are the basis of the detention in the detention home or shelter care facility:
............................................................................................
             CHARGE
............................................................................................
             CHARGE
           [ ] See attached sheet for additional charges.
To the extent known, the names and addresses of the juvenile's parents are as follows:
............................................................................................
             NAME OF MOTHER AND ADDRESS
............................................................................................
             NAME OF FATHER AND ADDRESS

I request that the respondent be examined and accorded such assistance as provided by law. In support of this petition, I further state as follows: My son age 22 Mr. Kieran R. Bhattacharya is a medical student of the University of Virginia. He was officially diagnosed with Bipolar disorder 1/2017 and admitted to involuntarily to UVA psych ward due to severe manic symptoms. He was recently on 11/14/18

    11/19/18 _____
    DATE

                      Roxann E Bhattacharya
                      PETITIONER

The petitioner appeared this date before the undersigned and, upon being duly sworn, made oath that the facts stated in this petition are true based on the petitioner's knowledge.

    11/19/2018 _____
    DATE

                [ ] JUDGE [X] MAGISTRATE [ ] SPECIAL JUSTICE [ ] CLERK

FOR NOTARY PUBLIC'S USE ONLY:

State of .................................................... [ ] City [ ] County of ....................................................

Acknowledged, subscribed and sworn to before me this .................... day of ...................................................., 20 ....................

by ....................................................

............................................................................................
    DATE

             NOTARY PUBLIC
             Notary Registration No. .................................... (My commission expires ....................)

FORM DC-4001 (MASTER, PAGE TWO OF TWO) 07/13

HIGHLY CONFIDENTIAL - AEO

KB-006275

JA786

page 2

Kieran R Bhattacharya (Respondent)

told by officials at medical school to go to student behavioral
health and he did and they evaluated him and found
him needing psych hospitalization in their opinion due
to severity of symptoms. He was admitted TDO on 11/14/18
and received to my knowledge (speaking to nurses) several
antipsychotic medications injectable. My understanding is that
did improve his thought process + so as he is quite intellegent
and knowlageble VA State legal matters he was able to convince
judge at hospital to let him out. I am his mother
Roxanne Bhattacharya MD (a pediatrician from Hawaii) I flew
over here to Charlottesville VA when I found out the situation
from his roomate currently. Unfortunately he was released
from Hospital just before I could get to the hospital.
As per his roomate, who is also a medical student
he has been exhibiting hypomanic (lower level mania)
symptoms for about a months. Concerning several weeks
ago neighbors in their community contacted roomate
that Kieran stared out them with panicked expression.
He verbally harrassed neighbors for example asking one
neighbor who was picking up mail "If that was really
her mail." He also scared another neighbor who was waiting
LYFT ride said he approached her and seemed unstable asking
her whether she was really getting a LYFT ride, if she
if FBI which really scared her. At a lecturer at medical
school he seemed unstable and threatening to a guest
speaker and at least several medical students complained
to dean and he was spoken to.
Since I have arrived he is not self-aware that he
has any problem. He texted me when he was released
11/16/18 a judge who met him 10 min understands him more
than his father and me. I hoped to meet him, gently convince
him may be a few days gradually if necessary to take his
needs and F/u with his psychiatrist who he has not

**TO BE FILED UNDER SEAL**

seen in months. In hospital, nurse said lithium
level showed he has not taken meds recently and
I believe he did tell staff he has been off
lithium for months. He told his sister Sarita Bhatcher
(24 yo accountant in NYC) he doubted bipolar diagnosis
because only 1 hospitalization.

For maybe a year he was taking his medication
and doing ok and therapy sessions with Dr Mosley
in Charlottesville.

After his hospitalization 1/2017 he had to take a year
off medical school to stabalize his condition.

At present in past 24 hours he has been increasingly
getting worse. He appears very angry and agitated,
As per his roomate staying up all night going out
walk dog at 2 am, leaving lighted unattended candles
in room of townhouse. He has on multiple occasions left food
unattended, on stove, the last few times in past
few days this happened.

When he is manic he wears full suits basinec
with earphones (not typical of him) and does strange
behavior. He has bee this for 48 hours and I
was worried and his roomate and I found him at
UVA library having the clerk print of 1600 pages of
psychiatry? into a and talking for several hours to
clerk at desk with laptop in front of him about
incoherent and inappropriate topics he would not
usually talk about. I followed him to UVA medical
records from there. He was literally pacing back and forth
rubbing his red eyes. Back in his apartment he was
taking bags of clothes to backyard, refusing to feed his dog
Refusing food and screaming obscenities so much that
neighbors and I called police. He is refusing any treatment.
I want my son to get the help he needs so he is
safe as he has no family in virginia, both in HI and I need
to go back 11/20/18. I want him to be safe, free of psychiatric
legal issues and hopefully back in school which he wants too.

HIGHLY CONFIDENTIAL - AEO

KB-006271

JA788

KB-006272

HIGHLY CONFIDENTIAL - AEO

TO BE FILED UNDER SEAL

Page 3

Kieran Bhattacharya   DOB 6/26/1996

My son Kieran Bhattacharya got inches from my face skreeming and pounding fists toward me so that I felt I was in imminent harm.

He was also since hospitalization exihibting paranoid behavior saying that UVA medical school was "out to get him" and that he was going to to sue them for it and planning on getting an attorney. There is no basis for this they are just wanting him to get treatment so he can go back to class.

Kieran's roommate (former girlfriend) can't go back to her own house she is fearful for her safety and needs to stay elsewhere and have friends accompany her to get her stuff.

Kieran is also acting financially irresponsible just liquidated today approx $11,000K of joint stock her had with girlfriend. He did give her password, but this was a joint account and he did not ask her permission of discuss this financial move with her. He has never made such unusual transactions in past, to attempt to take out large sums of money for no apparent need tuition, rent, etc.

# EXPLANATION OF EMERGENCY CUSTODY PROCEDURES

Commonwealth of Virginia        VA. CODE §§ 37.2-808, 37.2-817.2

To the Respondent:

You are a person who has been taken into emergency custody pursuant to Va. Code § 37.2-808 or § 37.2-817.2.

You were taken into emergency custody because a judge, special justice, or magistrate issued an emergency custody order, a law-enforcement officer believed that you met the criteria for emergency custody, or because you voluntarily consented to be transported for assessment or evaluation, you then revoked your consent, and the officer believed that you met the criteria for emergency custody.

You were taken into emergency custody because the judge, special justice, magistrate or law-enforcement officer decided that there was probable cause to believe that:

1. You have a mental illness and there exists a substantial likelihood that, as a result of mental illness, you will in the near future
    a. cause serious physical harm to yourself or others as evidenced by your recent behavior causing, attempting or threatening harm and other relevant information, OR
    b. suffer serious harm due to your lack of capacity to protect yourself from harm or to provide for your basic needs, AND
2. You are in need of hospitalization or treatment, AND
3. You are unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

While you are in emergency custody, you will be transported by a law-enforcement officer or an alternative transportation provider to a convenient location to be evaluated to determine whether you meet the criteria for temporary detention, and to assess the need for you to be hospitalized or treated.

You may also be transported to a medical facility if it is determined that emergency medical evaluation or treatment is necessary, or if a doctor at the hospital where you may be detained requires a medical evaluation before you can be admitted.

You will remain in custody until a temporary detention order is issued, until you are released, or until the emergency custody order expires. The maximum amount of time that you could remain in emergency custody is 8 hours.

If you were taken into emergency custody as a result of an emergency custody order, the order must have been executed within 8 hours after the order was issued or the order is void. An emergency custody order is executed when a law-enforcement officer takes you into custody under the order. When the emergency custody order is executed or a law-enforcement officer takes you into custody without an order, the law-enforcement officer must then notify the community services board right away.

FORM DC-4050 REVISED 07/14

HIGHLY CONFIDENTIAL - AEO                                                                KB-006273

JA790

# Exhibit DX35

**(This exhibit is a video file and will be submitted according to court procedure)**

**TO BE FILED UNDER SEAL**

# EXHIBIT DX36

JA792

**TO BE FILED UNDER SEAL**

**From:** Henry, Michael Patrick (mph2qj)
**Sent:** Mon Nov 19 15:22:16 2018
**To:** Internal Notification List (police@virginia.edu);Graham, Gloria (gg6bd);Lampkin, Patricia M (pml)
**Subject:** Internal Notification- Assist Citizen ECO
**Importance:** Normal

Assist Citizen ECO
Report# 2018-28123
Today at 1236 hours officers were dispatched to the Claude Moore Medical Education building (200 Jean Lancaster Way) to assist with a subject possibly
Having mental health issues. The subject reportedly came into the Dean of Medicines office, and began reading him Miranda Rights and acting strangely.
He left the building, but was subsequently contacted by CPD officers.
Upon making contact with the subject, it was determined that an ECO had already been issued. It was obtained by the subjects mother through the magistrates office.
The subject was taken into custody for evaluation.


UVA Grad Student- Kieran Ravi Bhattacharaya
DOB-█████
SSN-█████████


Sgt. Michael Henry
Evening Shift Patrol Supervisor
University of Virginia Police Department
2304 Ivy Road
Charlottesville, VA 22903
434-924-7166

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy, or disclose to anyone the message or any attachments. If you have received the message in error, please advise the sender by reply e-mail and delete all copies of the message.

Confidential

# EXHIBIT DX37

1      IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF VIRGINIA

2

       _____

3                              :

       KIERAN RAVI             :

4      BHATTACHARYA,           :

                               :

5          Plaintiff,          :

                               :

6      v.                      : Civil Action No.
                               :  3:19-CV-00054-NKM-JCH

7      JAMES B. MURRAY, JR., :

       et al.,                 :

8                              :

           Defendants.         :

9      _____:

10              Wednesday, April 6, 2022

11

12          Videotape Zoom deposition of PATRICK

13     L. STAFFORD, M.D., taken with the witness

14     participating remotely from his residence at

15     100 Hurst Lane, Apartment 306, Charlottesville,

16     Virginia, beginning at 10:08 a.m., Eastern

17     Standard Time, before Ryan K. Black, a Registered

18     Professional Reporter, Certified Livenote

19     Reporter and Notary Public.

20

21

22

23

24

25

JA795

Page 37

1    Nursing note and vitals reviewed."

2        Q.    So what were your observations of these

3    behaviors in Kieran Bhattacharya on November

4    19th, 2018?

5        A.    Exactly as documented.  I recall him and

6    -- and recall my observations to be such that he

7    was, indeed, anxious, had a labile mood and

8    affect, was angry that he was in the emergency

9    department.  His speech was rapid and pressured.

10   He did appear to be agitated and was acting

11   aggressive and hyperactive.  We were concerned

12   about him potentially becoming combative due to

13   his anger and aggression.  We thought his thought

14   content to be paranoid at times.  We did not

15   find his thought content to have any delusional

16   components to that.  We did think his -- his

17   cognition and -- and memory were normal at the

18   time insofar that he was not, at the time, having

19   any sort of clear evidence of memory loss.  He

20   was acting impulsive with inappropriate judgment

21   and did not necessarily endorse homicidal and

22   suicidal ideation.

23       Q.    When you wrote that "Kieran Bhattacharya

24   was agitated and aggressive," what did you mean?

25       A.    On initial presentation to the

JA796

1   emergency room, he was pacing back and forth

2   and confronting staff members and using language

3   that could have been deemed as agitated and

4   aggressive.

5       Q.   What kind of language was Kieran

6   Bhattacharya using that you think was angry and

7   aggressive or agitated?

8       A.   To my recollection, as quoted in this

9   document, at some point there was a quote, get

10  the fuck out of my face, end quote, in regards to

11  asking questions to the patient at the time of

12  his presentation to the emergency room.  Further,

13  he continued to ask every staff member for his or

14  her name and proof of badge and their credentials

15  for being in the emergency room and -- and caring

16  for him at the time.  And he did not agree with

17  his presence in the emergency room, as far as

18  being there under an ECO.

19      Q.   Okay.  When you wrote that Kieran

20  Bhattacharya was hyperactive and combative, what

21  did you mean?

22      A.   Hyperactive meaning that he was -- I

23  guess, to rephrase that, there's -- there's a

24  scale of activity from someone being completely

25  in bed asleep, not responsive to -- to stimuli

TO BE FILED UNDER SEAL

# EXHIBIT DX38

**TO BE FILED UNDER SEAL**

**TEMPORARY DETENTION ORDER – MAGISTRATE**    Case No. _____
Commonwealth of Virginia    Va. Code §§ 37.2-809; 19.2-169.6, 19.2-182.9

Charlottesville      [X] General District Court    [ ] Circuit Court

Kieran Bhattacharya
NAME OF RESPONDENT

820 B Cabell Ave., Charlottesville, VA 22903
ADDRESS OF RESPONDENT

| | COMPLETE DATA BELOW IF KNOWN | | | | | | |
|---|---|---|---|---|---|---|---|
| RACE | SEX | BORN | | | HT. | WGT. | EYES | HAIR |
| | M | MO___ DAY___ YR___ | | | FT. 5' IN. 08" | 163 | BRO | BRO |

**TO ANY AUTHORIZED OFFICER OF:** Charlottesville
This temporary detention order is hereby issued [ ] upon motion of the undersigned magistrate

SSN ████████

[X] upon the sworn petition of M. Kalinsky    (434) 297 - 7448
     NAME        TELEPHONE NUMBER

DL# _____    STATE _____

an evaluation having been conducted by Jalieen Grogan    **TDO 540GM-1800007783**
     NAME

Region Ten CSB      (434) 972 - 1800 based upon a finding of probable cause pursuant to
AGENCY/FACILITY      TELEPHONE NUMBER

[X] § 37.2-809, it appearing from all evidence readily available, including any recommendation from a physician or clinical psychologist treating the person, and if available, information provided by the person who initiated emergency custody, that the person (i) has a mental illness, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future, (a) cause serious physical harm to him/herself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information or (b) suffer serious harm due to his/her lack of capacity to protect him/herself from harm or to provide for his/her basic human needs, (ii) is in need of hospitalization of treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

[ ] subdivision A2 of § 19.2-169.6, it appearing from all evidence readily available, including any recommendation from a physician or clinical psychologist treating the inmate, that the inmate (i) has a mental illness; (ii) there exists a substantial likelihood that, as a result of a mental illness, the inmate will, in the near future, cause serious physical harm to him/herself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information; and (iii) the inmate requires treatment in a hospital rather than a local correctional facility.

[ ] § 19.2-182.9, that the respondent is an acquittee on conditional release who has violated the conditions of release or is no longer a proper subject for conditional release, and requires emergency evaluation to assess the need for inpatient hospitalization.

**THEREFORE,** you are commanded to execute this order, take the respondent into custody and

[X] transport the respondent from the respondent's current location to the location listed below, or if this order is entered pursuant to § 37.2-809, to the alternative facility of temporary detention identified by the employee or designee of the community services board if you continue to have custody of the respondent when an alternative facility is identified.

[ ] transfer custody of the respondent to the alternative transportation provider, ........................................................
DC-4000, ORDER FOR ALTERNATIVE TRANSPORTATION PROVIDER, is attached.

UVA Hospital E.D.      1215 Lee Street, Charlottesville, VA 22903
     CURRENT LOCATION OF RESPONDENT

Poplar Springs Hospital      350 Poplar Dr., Petersburg, VA 23805
     NAME AND ADDRESS OF TEMPORARY DETENTION FACILITY

[ ] Prior to placement in the above temporary detention facility, transport the respondent

[ ] for emergency medical evaluation or treatment

[ ] for medical evaluation or treatment as may be required by a physician at the temporary detention facility

to: ........................................................
     NAME AND ADDRESS OF FACILITY

The duration of temporary detention may not exceed the period authorized in Virginia Code § 37.2-809, subdivision A 2 of § 19.2-169.6 or § 19.2-182.9. If this order commands that the respondent be detained pursuant to § 37.2-809, the director of the facility of temporary detention may release the respondent prior to a hearing as authorized in § 37.2-814 if it appears, based on an evaluation conducted by the psychiatrist or clinical psychologist treating the respondent, that the respondent no longer meets the criteria for temporary detention. If the respondent is detained by this order pursuant to subdivision A 2 of § 19.2-169.6 or §19.2-182.9, the director of the facility of temporary detention may not release the respondent without an order of a judge. If the judicial officer issues this order pursuant to § 37.2-809, or subdivision A 2 of §19.2-169.6, this order becomes void if not executed within [X] 24 hours [ ] _____ hours after issuance.

**TO ANY HEALTH CARE PROVIDER** as defined in Virginia Code § 32.1-127.1:03, or other provider who has provided or is currently providing services to or is currently evaluating the respondent: Virginia Code § 37.2-804.2 requires you to disclose certain information upon request. (See Page Two, AUTHORIZATION FOR DISCLOSURE AND USE OF HEALTH INFORMATIC ____

11/19/2018 08:47 PM      _George Pisano_
DATE AND TIME OF ISSUANCE          George S. Pisano    MAGISTRATE

Respondent discharged from institution on this day: .................... by ....................
         NAME AND TITLE

| EXECUTED by delivering a copy of this Order to the respondent on this day | 11/19/18 | 2233 |
|---|---|---|
| | DATE AND TIME OF EXECUTION | |
| | 11/20/18 | 0015 |
| M.T. Greene M.T. Riddle | DATE AND TIME RESPONDENT DELIVERED TO FACILITY | |
| NAME OF TEMPORARY DETENTION FACILITY (IF DIFFERENT FROM ABOVE) | 13 Charlottesville SO | 103 |
| OFFICER TAKING RESPONDENT INTO CUSTODY | BADGE NO., AGENCY, JURISDICTION | |
| for J.E. Brown III | | |
| SHERIFF | | |

FORM DC-894A (MASTER, PAGE ONE OF TWO) 07/16
CONFIDENTIAL

**INSTITUTION COPY #2**

UVA00009367

JA799

TO BE FILED UNDER SEAL

# EXHIBIT DX39

**TO BE FILED UNDER SEAL**

## Case #18-2277

## Report Information

**Report Source**
Reporter

**Report Source Description**

**Method of Contact**
Email

**Date/Time Received**
11/19/2018 8:53:00 PM

**Created By**
Laurie Casteen

**Police Report Number**

**Advocate #**

## Involved Parties

Kieran Bhattacharya (krb6yg) / Subject
Nicole Ruzek (nar7r) / Reporter
███████████ / Witness
John Densmore (jjd2q) / Witness

## Incident Date/Time Information

**Is Exact Date Known**
Yes

**Is Exact Time Known**
No

**Date/Time of Incident**
11/19/2018

**Date/Time of Incident Description**

## Incident Location Information

**Is Exact Location Known**
Yes

**Location**
University Hospital

**Address Line 1**
1215 Lee St

**Address Line 2**

**City**
Charlottesville

**State**

**Zip Code**

**Location Description**

## Case Information

**Involved Student Organization**

**Involved Student Organization Description**

**Case Type(s)**
General Interpersonal Conflict, Unusual/Concerning Behavior, Disclosed Mental Health Concern, Bizarre Thinking/Behavior, Clery

**Was a weapon involved**

**Type(s) of Weapon**

**Weapon Description**

**Description of Incident**

Medical student Keiman Bhattacharya (KB) was TDO'd following a meeting with his advisor Dr. John Densmore, as a result of manic and possibly psychotic behavior. he was transported to Poplar Springs in Petersburg as no UVA beds were available on UVA 5E. Student ███████████ is his ex-girlfriend and current roommate who currently fears for her safety. KB's mother flew in from Hawaii to assist this weekend following another previous hospitalization less than a week before.

### addition by etm2n on 4/2/2019 8:39 AM ###

**Were there Witnesses**

**Attributes**

TO BE FILED UNDER SEAL

# EXHIBIT DX40

ORDER FOR TREATMENT
**TO BE FILED UNDER SEAL**
Case No: 5400-M180000 7783

Commonwealth of Virginia    VA. CODE §§ 37.2-814, -815, -816, -817

PETERSBURG
CITY OR COUNTY                    [X] General District Court   [ ] Circuit Court

In re _____ Kieran Bhattacharya _____ unknown
         NAME OF RESPONDENT                              SOCIAL SECURITY NUMBER

_____ 820 B Cabell Ave, Charlottesville VA 22903
ADDRESS                           CITY              STATE      ZIP CODE

POPLAR SPRINGS HOSPITAL - 350 POPLAR DR., PETERSBURG VA 23805
PRESENT LOCATION OF RESPONDENT

Petitioner: _____ M. Kalinsky
                 NAME OF PETITIONER

ADDRESS _____ Region 10 CSB
                 CITY                    STATE      ZIP CODE

Present:

[✓] Respondent   [ ] Respondent did not attend because _____

[✓] Attorney for respondent  James H. Risdon, Jr.   [ ] Petitioner _____

[ ] Independent examiner ................................................ [ ] in person [ ] by audio/video or telephone

[ ] Attending or treating physician ............................... [ ] in person [ ] by audio/video or telephone

[ ] Attending or treating psychologist ......................... [ ] in person [ ] by audio/video or telephone

[ ] Community Services Board (CSB) representative .......... (Not availed (e)
                                                              NAME OF CSB REPRESENTATIVE

Region 10    434 972 1800                                     [ ] in person [ ] by audio/video or telephone
NAME OF CSB AND TELEPHONE NUMBER

[ ] Interpreter ............................................................. [ ] in person [ ] by audio/video or telephone

[✓] Other Dr. Roxanne Bhattacharya      Hawaii                    mother
           NAME                          ADDRESS                  RELATIONSHIP/TITLE

_____          _____          _____
           NAME                          ADDRESS                  RELATIONSHIP/TITLE

A petition for the involuntary admission for inpatient treatment or mandatory outpatient treatment of the respondent having been filed pursuant to Virginia Code §§ 37.2-805 through 37.2-819.

[ ] prior to the hearing authorized by §§ 37.2-814 through 37.2-819, the director of the facility in which the respondent was detained released the person pursuant to § 37.2-813 and, without a hearing, the petition is hereby dismissed.

[✓] the respondent appeared before this court for a hearing. At the commencement of the hearing, it was ascertained that the respondent was given the written explanation of the involuntary admission process. The respondent was informed of the respondent's right to apply for voluntary admission for inpatient treatment as provided for in § 37.2-805 and of the prohibition from purchasing, possessing or transporting a firearm pursuant to § 18.2-308.1:3 upon voluntary admission of the respondent's right to a full and impartial hearing in the event that the respondent is incapable of or unwilling to apply for voluntary admission; of the respondent's right to counsel, the basis of the detention, the standard upon which the respondent may be detained and treated on an involuntary basis, the respondent's right to appeal the decision to the circuit court and the respondent's right to a jury on appeal.

[attested clerk text]
in the performance of my official duties.

1-13-22
Date                Clerk / Deputy Clerk

**CONFIDENTIAL**

UVA00009364

JA804

**TO BE FILED UNDER SEAL**

Case No. ...540G4418000098783...

[ ] The court finds that the respondent has been under a temporary detention order and is willing and capable of seeking voluntary admission for inpatient treatment. The respondent has agreed to this hospitalization and treatment for 72 hours, unless released earlier. The respondent further has agreed to give the facility 48 hours' notice of the respondent's desire to leave the facility, and to remain at the facility during these 48 hours unless discharged. The respondent has been advised that by agreeing to this voluntary admission, the respondent cannot purchase, possess or transport firearms until a court issues an order restoring the respondent's right to purchase, possess or transport a firearm. The respondent has been informed that after release, the respondent may petition the general district court where the respondent resides to restore such rights, and that the court can restore these rights only if the court finds that the respondent will not likely act dangerously and that restoring these rights would not be against the public interest.

Based upon the respondent's agreement to the requirements of § 37.2-814(B), the petition is hereby dismissed. The clerk shall certify the respondent's voluntary admission to the Central Criminal Records Exchange pursuant to § 37.2-819.

The court has reviewed the petition, observed the respondent and considered the recommendations of any treating physician or psychologist licensed in Virginia, if available, any past actions of the person, any past mental health treatment of the person, any examiner's certification, any health records available, the preadmission screening report, and any other relevant evidence that was admitted, including whether the person recently has been found unrestorably incompetent to stand trial after a hearing held pursuant to § 19.2-169.1(E).

Having considered all relevant and material evidence,

[ ] The court finds that the respondent does not meet the criteria for involuntary admission or treatment. The court, therefore, orders that the case is dismissed and that the facility release the respondent from involuntary custody.

[ ] The court finds by clear and convincing evidence that the person meets the criteria for mandatory outpatient treatment specified in Virginia Code § 37.2-817(D) in that:

[ ] the person has a mental illness and there exists a substantial likelihood that, as a result of mental illness, such person will, in the near future,

[ ] cause serious physical harm to [ ] himself [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, or

[ ] suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs; and

[ ] less restrictive alternatives to involuntary inpatient treatment that would offer an opportunity for improvement of the person's condition have been investigated and are determined to be appropriate; and

[ ] the person has agreed to abide by his treatment plan and has the ability to do so;

[ ] the ordered treatment will be delivered on an outpatient basis by the community services board or designated provider to the person as the services are available in the community.

[ ] The person has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or was involuntarily admitted pursuant to § 37.2-817(C), and on at least two previous occasions within 36 months preceding the date of the hearing, has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or has been involuntarily admitted pursuant to § 37.2-817,

Accordingly, the court so certifies and orders that the respondent be involuntarily admitted to mandatory outpatient treatment for ................... days, a period not to exceed 90 days, and further orders that the respondent shall comply with the initial mandatory outpatient treatment plan, with the comprehensive mandatory outpatient treatment plan and with any modifications thereof that are filed with the court in this proceeding, which plans are incorporated by reference in this order.

The ................................................... community services board shall monitor the implementation of the mandatory outpatient treatment plan and report any material noncompliance to the court.

Date ................. Clerk / Deputy Clerk

CONFIDENTIAL

UVA00009365

JA805

Case No. ...... 5400M1800007783

[✓] The court finds by clear and convincing evidence that the person meets the criteria for involuntary admission and treatment specified in Virginia Code § 37.2-817(C) in that

[✓] the person has a mental illness and there exists a substantial likelihood that, as a result of mental illness, such person will, in the near future,

    [ ] cause serious physical harm to [ ] himself [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, or

    [✓] suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs; and

[✓] less restrictive alternatives to involuntary inpatient treatment that would offer an opportunity for improvement of the person's condition have been investigated and are determined to be inappropriate; and

Accordingly, the court so certifies and orders the involuntary admission of the respondent

to ___P.S.H.___ or ___CSB___, a facility designated by the community services board, for

                    (NAME OF FACILITY

a period not to exceed 30 days from the date of this order, or if the petition is for recommitment, for a period not to exceed 180 days from the date of this order.

[ ] AUTHORIZATION TO DISCHARGE (Va. Code § 37.2-817(C1))

The court further finds by clear and convincing evidence that:

    [ ] the person has a history of lack of compliance with treatment for mental illness that has at least twice within the past 36 months resulted in the person being subject to an order for involuntary admission pursuant to Virginia Code § 37.2-817(C);

    [ ] in view of the person's treatment history and current behavior, the person is in need of mandatory outpatient treatment following inpatient treatment in order to prevent a relapse or deterioration that would be likely to result in the person meeting the criteria for involuntary inpatient treatment;

    [ ] as a result of mental illness, the person is unlikely to voluntarily participate in outpatient treatment unless the court enters an order authorizing discharge to mandatory outpatient treatment following inpatient treatment; and

    [ ] the person is likely to benefit from mandatory outpatient treatment.

Based on recommendations of the community services board, the duration of mandatory outpatient treatment pursuant to

this order shall be .......................... days from the date of discharge.

Accordingly, the court authorizes the person's treating physician to discharge the person from involuntary admission under this order to mandatory outpatient treatment under a discharge plan developed, submitted for approval by the court, and monitored by the community services board in accordance with the provisions of Virginia Code § 37.2-817(C2). Upon discharge from inpatient treatment to mandatory outpatient treatment by the treating physician, the respondent shall comply with the discharge plan that is filed with the court in this proceeding, which plan is incorporated by reference in this order.

It is further ordered, pursuant to § 37.2-818(C), that copies of the relevant records of the subject of this order be released to the treatment facility in which the person has been placed under this order, if any; to the community services board of the jurisdiction where he resides, to the treatment providers identified in any mandatory outpatient treatment plan attached to or incorporated in this order and to any other treatment providers or entities involved in the development or implementation of the mandatory outpatient treatment plan.

[✓] The court further orders pursuant to § 37.2-829 that transportation of the person to the facility shall be provided by

    [ ] the Sheriff of ........................................
                      CITY OR COUNTY

    [ ] the alternative transportation provider as designated on the attached form DC-4000, ORDER FOR ALTERNATIVE TRANSPORTATION PROVIDER.

___11-21-2018___
DATE

[ ] JUDGE [ ] SPECIAL JUSTICE ___J.D. Britt___ ... DISTRICT COURT
[ ] the undersigned Clerk or Deputy Clerk of the above named court, authenticate pursuant to VA Code § 8.01-391 (C) on this date that the foregoing is a true copy.

**NOTICE TO THE RESPONDENT:**
Pursuant to Virginia Code § 18.2-308.1:3, if you are ordered to be involuntarily admitted to a facility for inpatient treatment or ordered to mandatory outpatient treatment as a result of a commitment hearing held pursuant to Virginia Code § 37.2-817, or if you were the subject of a temporary detention order issued pursuant to Virginia Code § 37.2-809 and you subsequently agreed to voluntary admission pursuant to Virginia Code § 37.2-805, it is unlawful for you to purchase, possess or transport a firearm.

___1-15-22___
Date

___(signature)___
Clerk / Deputy Clerk

UVA00009366

JA806

# EXHIBIT DX41

TO BE FILED UNDER SEAL

Poplar Springs Hospital
350 Poplar Drive
Petersburg, VA 23805

PATIENT: BHATTACHARYA, KIERAN         MRN: 576-000049290
ADMIT DATE: 11/19/2018                ACCT: 20641940026
DISCHARGE DATE: 11/26/2018            DOB: 06/20/1996

## DISCHARGE SUMMARY

**ADMITTING DIAGNOSES:**
**Psychiatric and Medical Diagnoses:**

1. Bipolar I disorder, most recent episode, manic.
2. Cannabis use disorder, moderate.

**Psychosocial and Contextual Factors:**

1. Family conflicts.
2. Financial stress.
3. Marijuana use.
4. Possible medication noncompliance.

**HISTORY AND ONSET OF PRESENT ILLNESS:** This is a 22-year-old male who apparently has had two admissions to UVA Hospital and apparently after the last discharge, he continues to decompensate. The patient is lacking in certain details of his history, but it is after some period of time they did admit he had previously been diagnosed Zyprexa and lithium, but he is no longer taking those at the current time. It is of interest to know that his urine drug screen in the ER was positive for marijuana. The patient has had problems at home with his mother and also the medical school he got into a verbal altercation with the dean and he was in adversarial situation requiring various staff members in the emergency room at University of Virginia Hospital. The symptoms that he presents with was elevated mood and erratic behavior, not sleeping, leaving candles burning and the stove on according to a housemate, all of this is in the record. These issues reflect some impairment caused by this apparent bipolar disorder.

**INDICATIONS FOR HOSPITALIZATION:** Evaluation of bizarre behavior.

**PAST PSYCHIATRIC HISTORY:** The patient has been to UVA Hospital. At one point, he was prescribed Zyprexa and lithium. There was a second admission in 11/2018 and the patient was discharged on 11/16/2018. The patient refused the physician permission to talk to his mother about any further clinical details of his past treatment efforts. The risk of doing this was explained to the patient and he understood.

**SUBSTANCE ABUSE HISTORY:** The patient denies using cigarettes, alcohol was used, one to two drinks a week and he has used marijuana even as recently as a week ago.

**MEDICAL HISTORY:** None.

JA808

### DISCHARGE SUMMARY

**ALLERGIES: SUNSCREEN**

**FAMILY PSYCHIATRIC HISTORY:** Unknown, perhaps the mother may have some mood disturbance, according to the patient. Maternal uncle reportedly has schizophrenia.

**SOCIAL HISTORY:** Lives with girlfriend and he is a second year medical student at UVA.

**LEGAL HISTORY:** None.

**ACCESS TO WEAPONS:** None.

**TRAUMA HISTORY:** The patient has been grabbed and poked by individual in the past. He found it very uncomfortable.

**PHYSICAL EXAM:** Conducted by the medical doctor revealed a normal exam with no changes medically.

**COURSE OF HOSPITALIZATION:** The patient was admitted to the Adult Unit where he was placed on close observation. He was seen daily by the psychiatrist and encouraged to participate in individual, group, and family therapy as well. Following medication adjustment and therapy that the patient received, he was able to stabilize and was recommended for discharge on 11/26/2018. At the time of discharge, the patient was functioning well on the unit, going to group therapy, activity therapy, art therapy, music therapy, in the cafeteria, and functioning well in all those settings. He denied any suicidal or homicidal ideation, intent or plan and was functioning appropriately in social settings. The patient repeatedly refused to permit me to call his mother.

**DISCHARGE MEDICATIONS:**

1. Lithium carbonate 300 mg at 9 a.m. and 5 p.m.
2. Latuda 60 mg at 6 p.m.

**FOLLOWUP PLANS:** Will be with the intake office in Charlottesville on 11/27/2018 at 8 a.m. At the time of that appointment, the patient will be referred to a psychiatrist.

**SUMMARY OF PATIENTS CONDITION AT DISCHARGE:** Improved physically, psychiatrically stable with improved social functioning.

**PROGNOSIS:** Guarded without treatment, but good with treatment.

**DISCHARGE DIAGNOSES:**
**Psychiatric and Medical Diagnoses:**

1. Bipolar I disorder, most recent episode, manic.

JA809

## DISCHARGE SUMMARY

2. Cannabis use disorder, moderate.

**Psychosocial and Contextual Factors:**

1. Family conflicts.
2. Financial stress.
3. Marijuana use.
4. Possible medication noncompliance.

Electronically signed by James W. Wooldridge, Jr.,
M.D. on 11/30/2018 1:39:38 PM

DD: 11/28/2018 07:23
DT: 11/29/2018 10:04
Job# 182870346
:

DISCHARGE SUMMARY

TO BE FILED UNDER SEAL

# EXHIBIT DX42

JA811

TO BE FILED UNDER SEAL

## STUDENT PARTICIPATION IN CURRICULAR EVENTS

## All Phases of Curriculum:

**Absences from required academic activities:**
Students may miss required academic activities for health-related reasons (see "Absences due to Illness" below), compelling personal or family issues (e.g., death in immediate family, participant in wedding), professional meetings (e.g., participant in meeting – poster, presenter, panel), or public service (e.g., jury duty). **In all instances, a student's college dean must be contacted for approval of an absence as soon as the potential need arises.**

**Absences due to Illness:**
If a student misses more than two consecutive days due to illness, they must notify their college dean and the Office of Student Affairs (som-studentaffairs@virginia.edu) as well as obtain medical evaluation from the Department of Student Health or other licensed healthcare provider. It is anticipated that this will be done in person, but students with a flu-like illness first should call Student Health to determine whether or not to report. Students with contagious diseases may be furloughed by Student Health and the UVA Health System to prevent infections from spreading to patients, healthcare workers and fellow students. Clearance from Student Health is required before the student can resume educational activities.

**Excessive Absences:**
If in the view of any SOM faculty leadership a student's absences have affected adversely their education or the education of others in an affiliated group, the faculty may submit a Concern Card regarding that student to the Office of Student Affairs. The student must meet with their college dean to address the issue(s). If the issue(s) cannot be resolved or recurs, the student will be referred to the Academic Standards and Achievement Committee (ASAC) for review and action.

## Pre-clerkship Phase of Curriculum:

**Attendance:**
The Next Generation Curriculum provides many diverse learning opportunities for our medical students and attendance at all activities is encouraged. However, students are responsible for their own learning and are not required to attend all activities. Attendance is mandatory for all activities in which team accountability is required, including but not limited to, Team-Based Learning activities, Anatomy Dissection Teams, and Foundations of Clinical Medicine groups. Attendance also is mandatory for all patient presentations, interviews or panel discussions out of professional respect for the patient(s) and/or invited panelists. Failure to attend a mandatory activity is considered a breach of professionalism and will result in a Concern Card being submitted to the student's college dean, unless the college dean has excused the absence in

Revised & Reaffirmed by CC 6/2019

advance. Whether or not an absence is approved by the college dean, students must inform the System Leader(s) or the appropriate instructor about their absence from mandatory activities.

**Delay of Summative and Formative Examinations:**
Summative examinations and Formative examinations worth greater than or equal to 8% of grade, may be delayed only for reasons of illness, or under unusual circumstances for compelling personal reasons. In all instances, approval to delay a summative examination must be obtained from the student's college dean in advance of the examination unless there is an emergency that precludes it. Students who seek to delay these examinations for medical reasons also must be seen by the Department of Student Health unless the student has flu-like symptoms, in which case they should call Student Health (924-5362) to see if a visit is warranted. When approval is given to delay a summative or formative examination, it is the student's responsibility to inform the appropriate System Leader or Course Director and to arrange a time for examination make-up. There is no make-up for other scored formative activities.

## Clerkship and Post Clerkship Phases of Curriculum:

**Clinical Service - Work Hours:**
Medical students rotating on clinical services (clerkships and electives) will be subject to the same principles that govern the 80-hour work week for mid-level residents (a maximum of 80 hours of required clinical duties per week averaged over a four-week period, no more than 24 consecutive on-duty hours with at least eight hours off between shifts, and on average one day in seven free from all required clinical duties). Four additional hours for the handover of patients (no new patients) after 24 hours is allowed for feedback on clinical decisions and for continuity. Clerkship and electives directors are responsible for monitoring and ensuring that duty hours are adjusted as necessary. Student duty hours were established by the Curriculum Committee considering the effects of fatigue and sleep deprivation on learning and patient care and mirroring the duty hour limits for mid-level residents per the ACGME Common Program Requirements.

**Absences and Reporting of Absences:**
Students whose absence either is due to illness or has been excused by their college dean must notify the clerkship or elective director as well as the immediate faculty instructor by e-mail or in person. The clerkship or elective director will determine how and when the student can make up the time and activities that have been missed.

Orientations for all Clerkships are required and an absence shall preclude a student from being able to participate in that clerkship.

If a student is absent less than 20% of the time within a given clerkship, the clerkship director in discussion with the student will determine whether the student has had sufficient clinical experience to take the shelf exam at the end of the rotation. The student's college dean may

Revised & Reaffirmed by CC 6/2019

JA813

be consulted if they have information of extenuating circumstances that could influence this decision. If the student is absent more than 20% of the time within a given clerkship, the student shall take the shelf exam in the next academic cycle after making up any necessary clinical time and fulfilling the other requirements of that clerkship. In either case the student will receive an "Incomplete" until all work requirements are completed.

### Delay of Shelf Examinations:
NBME Subject Examinations ("shelf exams") may be delayed only for reasons of illness, or under unusual circumstances for compelling personal reasons. In all instances, approval to delay a shelf examination must be obtained from the student's college dean in advance of the scheduled examination. Students seeking to delay a shelf examination for medical reasons also must be seen by a the Department of Student Health unless the student has flu-like symptoms in which case they should call Student Health (924-5362) to see if a visit is warranted. When approval is given to delay a shelf examination, it is the student's responsibility to inform the appropriate Clerkship Director and Clerkship Coordinator. After making up any necessary clinical time and fulfilling the other requirements of that clerkship, it is also the student's responsibility to contact the Clerkship Coordinator to arrange a time for shelf examination make up in the next academic cycle at a time when clerkship students are taking a shelf exam. The student will receive an "Incomplete" until all clerkship requirements are completed.

### Other:
No time off is allowed during the required Geriatrics clerkship, an internship preparation course or an elective scheduled as an Advanced Clinical Elective (ACE). Anyone who is ill or has a personal or family emergency during these times must contact their college dean, course director and the attending faculty on service immediately.

For all other fourth year electives, students are allowed to take up to one day per week off (or four days during a four-week rotation) between October 1 and February 1 for residency interviews. Some electives do not allow time off to interview, and it is the student's responsibility to check the elective course description or make inquiry of the course director. Specific days missed must be pre-approved by the course director and the attending on the service. The course director will determine if days missed must be made up and, if so, how that will be scheduled.

Students may schedule time off for USMLE exams during electives that are not scheduled as an ACE or that do not prohibit absence during the rotation in the elective course description. The time off must be pre-approved by the course director and the attending on the service. The course director will determine if days missed must be made up and, if so, how that will be scheduled. Students are responsible for reviewing the Elective Handbook for full details regarding fourth-year attendance.

### Questions:
Students with questions related to the attendance or absences policies should contact the Office of Student Affairs or their college dean.

Revised & Reaffirmed by CC 6/2019

 UVA00009396

JA814

TO BE FILED UNDER SEAL

# EXHIBIT DX44

From: Densmore, John J *HS (MD-Internal Medicine)
Sent: Tue Nov 27 05:57:20 2018
To: Canterbury, R. J. *HS
Subject: Fwd: Re:
Importance: Normal


Sent from my iPhone

Begin forwarded message:

**From:** "Bhattacharya, Kieran R *HS" < KRB6YG@hscmail.mcc.virginia.edu>
**Date:** November 27, 2018 at 5:00:19 AM EST
**To:** "Densmore, John J *HS (MD-Internal Medicine)" < JJD2Q@hscmail.mcc.virginia.edu>
**Subject: Re:**

How can it be legal to mandate psychiatric evaluations to continue my education?

"Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience." - Kelly Sarabyn, FIRE (Foundation for Individual Rights in Education)

_____
From: Densmore, John J *HS (MD-Internal Medicine)
Sent: Monday, November 26, 2018 5:45 PM
To: Bhattacharya, Kieran R *HS
Subject:

Hi Kieran,
I hope you're doing well.  We were notified by the Dean of Students Office that you were heading back to Charlottesville.  You will need to be seen by CAPS before you can return to classes.
Let me know if you have questions.

Best regards,
JJD

Confidential

TO BE FILED UNDER SEAL

# EXHIBIT DX45

**TO BE FILED UNDER SEAL**

From: Canterbury, R. J. *HS
Sent: Tue Nov 27 11:48:18 2018
To: Bhattacharya, Kieran R *HS
Bcc: Groves, Allen W; Densmore, John J *HS (MD-Internal Medicine)
Subject: Required process to attend class
Importance: Normal

Dear Kieran,

I have heard from Dr. Densmore that you have been calling him about your desire to return to class today. You are not cleared to return to class until you have been evaluated by CAPS at the Student Health Service. Do not attend your CPD group today. Make an appointment with CAPS to initiate the medical clearance process.

Best regards,
R. J. Canterbury, M.D., M.S., DLFAPA
Senior Associate Dean for Education
Wilford W. Spradlin Professor
UVA School of Medicine
Box 800005
Charlottesville, VA 22908-0005
Phone: (434) 243-2522
Fax: (434) 924-5986
http://www.medicine.virginia.edu
*Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Any use, reuse, copying or distribution of the content of this email is strictly prohibited.*

TO BE FILED UNDER SEAL

# EXHIBIT DX46

**TO BE FILED UNDER SEAL**

**From:** Densmore, John J *HS (MD-Internal Medicine)
**Sent:** Tue Nov 20 08:54:43 2018
**To:** Canterbury, R. J. *HS
**Importance:** Normal

Hi Randy,
 I wanted to update you on my student KB. After I took him to CAPS last week, he ended up the the ED for 24 hours, but was released Friday. He worsened over the weekend to the point that his mother and ex-girlfriend called the police Sunday night.
 I met with him at his request on Monday and he was dramatically worse. Posey helped me by calling region ten and then the police. They found him and took him to the ED on an ECO. I just had a call with Nicole Ruzek, who is taking him to the threat assessment team today.
 I will let you know when I hear more.

Best,
 John

Confidential

TO BE FILED UNDER SEAL

# EXHIBIT DX47

JA821

**From:** Densmore, John J *HS (MD-Internal Medicine)
**Sent:** Tue Nov 27 14:22:15 2018
**To:** Canterbury, R. J. *HS; Groves, Allen W; Fleming, Lynne *HS
**Cc:** rjc9s@virginia.edu
**Subject:** RE: call from Kieran
**Importance:** Normal

RE: call from Kieran
Thank you, Randy. Very similar to the message he left me.

Best,
John

---

From: Canterbury, R. J. *HS
Sent: Tuesday, November 27, 2018 2:03 PM
To: Groves, Allen W; Fleming, Lynne *HS; Densmore, John J *HS (MD-Internal Medicine)
Cc: rjc9s@virginia.edu
Subject: call from Kieran

I just got off the phone from a call from Kieran Bhattacharya. I listened primarily for about 7 minutes while he spoke rapidly and in a pressured way. He argued against being seen at CAPS, does not understand why he was not "compelled" to go there after his hospitalization last year—causing him to think this is a new requirement for him. He expressed suspicion about CAPS and their competence—indicating that they lied on his ECO form. He did tell me about the many other personal issues with which he is coping—losing his apartment, his dog and living in a hotel. I tried to be empathic about that and he softened for a few moments but quickly returned to his need to be back in school. I reiterated throughout the conversation 5-6 times that he needs to be seen at CAPS before he can be considered for a return to classes. Several times he indicated that as a public institution we are violating his rights to free speech and expressed anger about this. He also threatened to hire lawyers to "fight the battle for me." He denied being a threat to himself or others—spontaneously without any prompting from me.

I told him that I could not continue to talk and that he needs to go to CAPS. He ended the conversation politely but with the thret of hiring lawyers.

Randy

R. J. Canterbury, M.D., M.S., DLFAPA
Senior Associate Dean for Education
Wilford W. Spradlin Professor
UVA School of Medicine
Box 800005
Charlottesville, VA 22908-0005
Phone: (434) 243-2522
Fax: (434) 924-5986
http://www.medicine.virginia.edu
Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Any use, reuse, copying or distribution of the content of this email is strictly prohibited.

# EXHIBIT DX48

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| **KIERAN RAVI BHATTACHARYA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:19-CV-54-NKM-JCH** |
| | ) | |
| | ) | |
| **JAMES B. MURRAY, JR., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### DECLARATION OF RANDOLPH J. CANTERBURY, M.D.

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.      My name is Randolph J. Canterbury, M.D.  Since 1979, I have been licensed to practice medicine in the Commonwealth of Virginia by the Virginia Board of Medicine.  Since 1985, I have been board-certified in psychiatry by the American Board of Psychiatry and Neurology. I am at least eighteen years of age, and if called upon to testify at trial, I would testify to the following facts based upon my own personal knowledge.

2.      I have practiced medicine for 42 years. My specialty is psychiatry. I have taught medical students in both classroom and clinical settings for 42 years.

3.      As an academic, I have published almost 50 articles in peer-reviewed journals on topics including psychiatry and medical education, and I have consulted on psychiatry, medical education, and medical school accreditation.

4.      I serve as a field secretary for the Liaison Committee on Medical Education ("LCME"), which accredits medical schools in the United States. Through this body, I am

intimately familiar with the operation of a medical school and with the twelve standards and ninety-three elements medical schools must meet to receive accreditation.

5.     I have testified by deposition and at trial as an expert in psychiatry.

6.     For 37 years, I served on the faculty at the School of Medicine at the University of Virginia. I taught courses in psychiatry, and I oversaw students and residents in psychiatry settings.

7.     In addition to my faculty membership, I served as the Senior Associate Dean for Education until my retirement on June 30, 2021.

8.     As Senior Associate Dean for Education, I had the administrative responsibility for approximately 1,000 students in four educational programs, which were the M.D, M.D./Ph.D., Ph.D., and MPH/MSCR programs. My primary objectives were to ensure each program obtained and retained accreditation, ensure the School of Medicine had in place conforming policies and procedures, provide support to the Associate Deans, and manage the budget among others.

9.     I became aware of Mr. Bhattacharya's Bipolar Disorder diagnosis from the presentation of his case by several residents to me to use as a teaching case with several medical students. At the time of this presentation, I did not know initially this patient was a medical student.

10.    At no time did I clinically evaluate, diagnose, or treat Mr. Bhattacharya. I never had a doctor-patient relationship with Mr. Bhattacharya.

11.    My conclusion that his behaviors in Fall 2018 were consistent with the diagnosis he received in 2017 is based on my training and extensive experience in psychiatry after considering the reports I received from various sources about Mr. Bhattacharya's behavior and my own observations of and interactions with Mr. Bhattacharya.

12.    Among the behaviors reported to me and that I observed is Mr. Bhattacharya's pressured speech at times.

13.    Pressured speech is an uncontrollable impulse to share thoughts and ideas and to make comments which may or may not be logical to the listener. An individual exhibiting this behavior feels an overwhelming pressure to talk and is challenged to be quiet and listen. It is a common finding in people who have bipolar disorder and who are hypomanic or manic. It commonly is associated with rapid speech.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _9th_ day of __June_____ , _2022__, in __Earlysville_____, __Virginia_____.
 (day)                 (month)               (year)               (city)                          (state)

*Randolph Vanderbury* MD

TO BE FILED UNDER SEAL

# EXHIBIT DX49

**From:** Canterbury, R. J. *HS
**Sent:** Tue Nov 27 11:55:22 2018
**To:** Tucker, Jim *HS
**Cc:** Thomas, Lesley L *HS
**Subject:** Emergency ASAC meeting
**Importance:** Normal

Dear Jim,

Can you call an emergency meeting of the ASAC to discuss a student, Kieran Bhattacharya, who has been hospitalized for psychotic mania twice in the past two weeks and was released yesterday. He is still manic and has been intimidating John Densmore—to the point that John had to have him taken from his office by police a week ago. John has all the details. I have used my emergency authority to tell him that he cannot return to the learning environment until he has been cleared by CAPS but that authority has time limits, of course. He is insisting on returning to class today—which is what I have forbidden. He's still quite manic and likely psychotic.

Let me know how we might help.

Randy

R. J. Canterbury, M.D., M.S., DLFAPA
Senior Associate Dean for Education
Wilford W. Spradlin Professor
UVA School of Medicine
Box 800005
Charlottesville, VA 22908-0005
Phone: (434) 243-2522
Fax: (434) 924-5986
http://www.medicine.virginia.edu
***Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Any use, reuse, copying or distribution of the content of this email is strictly prohibited.***

# EXHIBIT DX50

**From:** Tucker, Jim *HS
**Sent:** Tue Nov 27 13:53:19 2018
**To:** Canterbury, R. J. *HS
**Cc:** Thomas, Lesley L *HS
**Subject:** RE: Emergency ASAC meeting
**Importance:** Normal

Hi Randy,

I can certainly call an emergency meeting.  I would think we'll need an account of his egregious behavior in order to act.  Perhaps we can use that information to force a medical leave of absence, which I gather is essentially what you've done.

Lesley, are you available to talk this through?  I've got a phone appointment at 2:00, but my schedule for this afternoon is flexible otherwise.

Thanks,

Jim

**From:** Canterbury, R. J. *HS
**Sent:** Tuesday, November 27, 2018 11:55 AM
**To:** Tucker, Jim *HS
**Cc:** Thomas, Lesley L *HS
**Subject:** Emergency ASAC meeting

Dear Jim,

Can you call an emergency meeting of the ASAC to discuss a student, Kieran Bhattacharya, who has been hospitalized for psychotic mania twice in the past two weeks and was released yesterday.  He is still manic and has been intimidating John Densmore—to the point that John had to have him taken from his office by police a week ago.  John has all the details.  I have used my emergency authority to tell him that he cannot return to the learning environment until he has been cleared by CAPS but that authority has time limits, of course.  He is insisting on returning to class today—which is what I have forbidden.  He's still quite manic and likely psychotic.

Let me know how we might help.

Randy

R. J. Canterbury, M.D., M.S., DLFAPA
Senior Associate Dean for Education
Wilford W. Spradlin Professor
UVA School of Medicine
Box 800005
Charlottesville, VA 22908-0005
Phone: (434) 243-2522
Fax: (434) 924-5986

UVA00002635

JA830

**TO BE FILED UNDER SEAL**

http://www.medicine.virginia.edu
***Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Any use, reuse, copying or distribution of the content of this email is strictly prohibited.***

Confidential

UVA00002636

TO BE FILED UNDER SEAL

# EXHIBIT DX51

**TO BE FILED UNDER SEAL**

**From:** Yates, Katherine M *HS
**Sent:** Wed Nov 28 13:00:48 2018
**To:** Bhattacharya, Kieran R *HS
**Cc:** Tucker, Jim *HS; Densmore, John J *HS (MD-Internal Medicine)
**Subject:** ASAC meeting invite
**Importance:** High

ASAC meeting invite
Hello Kieran,
The Academic Standards and Achievement Committee will be meeting today to discuss your current enrollment status. You are invited to attend to share your insights with the committee. The meeting will take place at 5:00 in the Claude Moore Medical Education Building, in room G 165. Please arrive at 5:00. The meeting has some business to attend to before they have questions for you, so we will have someone waiting to let you know when they are ready for you.
Please reply and let us know if you will be in attendance.
Thank you,
Katherine M. Yates, M.Ed.
Registrar
School of Medicine
University of Virginia
PO Box 800739
Charlottesville, VA 22908
434-924-5200

Confidential

# Exhibit DX52

**(This exhibit is a video file and will be submitted according to court procedure)**

**TO BE FILED UNDER SEAL**

# EXHIBIT DX54

**TO BE FILED UNDER SEAL**

 

UNIVERSITY
*of* VIRGINIA

SCHOOL OF MEDICINE

**MINUTES**
**Academic Standards & Achievement Committee**
**MEB G 165**
**Wednesday, November 28, 2018**

The meeting was called to order at 4:58 p.m.  Present were Drs. Jim Tucker (chair), Roger Abounader, Brian Behm, Robert Bloodgood, Donna Chen, Sharon Diamond-Myrsten, Nicholas Intagliata, Nora Kern, Wilson Miller, Barnett Nathan, Catherine Shaffrey, as well as ███ ███ (student)
Non- voting members: John Densmore, Megan Bray, Lesley Thomas, and Katherine Yates.
Guests: Kieran Bhattacharya, Lynne Fleming and Chris Peterson.
Absent: Drs. Stephen Culp, Pam Herrington, and Angelique Redus-McCoy as well as ███ ███ (student).
On leave from committee: Dr. Katheryn Frazier.

<u>Professionalism Issues</u>

The committee convened to discuss concerning behaviors exhibited by Kieran Bhattacharya (Densmore) over the past weeks after members of the Technical Standards Committee determined that the concerns were best addressed by the ASAC.  The ASAC convened an emergency meeting on Wednesday November 28.  Kieran Bhattacharya was invited to attend the meeting to discuss his enrollment status and did attend the meeting..

The student was given the opportunity to address concerns about his behavior.  He asked questions of members of the Committee and responded to questions asked by the Committee.

The Committee reviewed the list of technical standards that are acknowledged annually by the students especially the Emotional, Attitudinal and Behavioral Skills.

Because the student's behavior demonstrated his inability to meet several of those standards.  Dr. Nathan made a motion to suspend Kieran Bhattacharya (Densmore) from the School of Medicine, effective immediately, with the option to petition to return in August of 2019. Dr. Behm seconded the motion.  The committee voted unanimously to accept the motion. Nora Kern did not vote on the matter, as personal business required her to leave before the vote was executed.

A letter will be sent to Kieran Bhattacharya's email, informing him of the decision and explaining the appeals process.

The meeting was adjourned at 6:18 pm.
Minutes respectfully submitted by:
Katherine Yates 11/29/18

PO BOX 800739 • CHARLOTTESVILLE, VA  22908-0739 • PHONE (434) 924-5579 • FAX (434) 982-4073
http://www.med-ed.virginia.edu/

CONFIDENTIAL

UVA00012329

JA836