In The
# United States Court of Appeals
For The Fourth Circuit

## KIERAN RAVI BHATTACHARYA,

*Plaintiff – Appellant*,

**v.**

**JAMES B. MURRAY, JR., in his official capacity as Rector of the Board of Visitors of the University of Virginia; WHITTINGTON W. CLEMENT, in his official capacity as Vice Rector of the Board of Visitors of the University of Virginia; ROBERT M. BLUE; MARK T. BOWLES; L. D. BRITT, M.D., M.P.H.; FRANK M. CONNER, III; ELIZABETH M. CRANWELL; THOMAS A. DEPASQUALE; BARBARA J. FRIED; JOHN A. GRIFFIN; LOUIS S. HADDAD; ROBERT D. HARDIE; MAURICE A. JONES; BABUR B. LATEEF, M.D.; ANGELA HUCLES MANGANO; C. EVANS POSTON, JR.; JAMES V. REYES, in his official capacity as Member of the Board of Visitors of the University of Virginia; PETER C. BRUNJES, in his official capacity as Member of the Board of Visitors of the University of Virginia; MELISSA FIELDING, in her official capacity as Deputy Chief of Police of the University of Virginia; JOHN J. DENSMORE, M.D., Ph.D., in his official capacity as Associate Dean for Admissions and Student Affairs of the University of Virginia School of Medicine; JIM B. TUCKER, M.D., in his official capacity as Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine; CHRISTINE PETERSON, M.D., Assistant Dean for Medical Education of the University of Virginia School of Medicine; EVELYN R. FLEMING; CARLOS M. BROWN; LEWIS FRANKLIN (L. F.) PAYNE, JR.,**

*Defendants – Appellees.*

___

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT CHARLOTTESVILLE**

___

## REPLY BRIEF OF APPELLANT

___

Michael J. Lockerby
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 600
Washington, DC 20007
(202) 945-6079

*Counsel for Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

I.  STATEMENT OF THE CASE .................................................... 1

II.  ARGUMENT ................................................................................. 8

    A.  Bhattacharya Was Deprived of His Seventh Amendment Right to Have the Jury Decide Factual Disputes About UVA's Motivation ........................................................................... 8

        1.  The District Court committed reversible error by dismissing Bhattacharya's First Amendment claim .................. 8

        2.  UVA subjected Bhattacharya to increasingly severe discipline in retaliation for his protected speech ...................... 11

            a.  Based on Bhattacharya's October 25, 2018 remarks, UVA surreptitiously charged him with unprofessional conduct and brought the charges before ASAC .............................................................. 11

            b.  On November 14, 2018, UVA forced Bhattacharya to undergo psychiatric evaluation based on the content of his speech at the microaggression panel discussion ...................................................................... 14

            c.  After the November 14, 2018 vote to reprimand him, an ASAC member diagnosed Bhattacharya's speech at the AMWA event as symptomatic of mental illness .............................................................. 16

            d.  ASAC's November 15, 2018 letter "suggesting" that Bhattacharya undergo "counseling" specifically referenced his statements about microaggressions .......................................................... 17

e.   On November 19 and 20, 2018, UVA branded Bhattacharya a "threat," forcing another psychiatric evaluation for questioning microaggression theory .......17

f.   On November 27, 2018, UVA unlawfully required that Bhattacharya receive a third "medical clearance" before he could resume his medical school education ............................................................21

g.   Shortly before and at the November 28, 2018 hearing, ASAC told Bhattacharya that his enrollment was in jeopardy because of his speech at the AMWA event............................................................23

h.   The stated basis for Bhattacharya's November 29, 2018 suspension was "aggressive and inappropriate interactions," including "during a speaker's lecture."...........................................................................24

i.   Bhattacharya's speech was the stated basis for the January 3, 2019 No Trespass Order whereby UVA prevented him from appealing the suspension ...............25

B.   The District Court Erred By Denying Plaintiff Leave to Amend and Refusing to Consider the Evidence Supporting Amendment.............................................................................27

C.   The District Court Erred By Dismissing Bhattacharya's Claim That UVA Violated His Due Process Rights.................28

III.   CONCLUSION...............................................................................29

CERTIFICATE OF COMPLIANCE......................................................31

CERTIFICATE OF SERVICE ..............................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................11

*Bd. of Curators of Univ. of Missouri v. Horowitz*,
    435 U.S. 78 (1978).....................................................................28

*Buschi v. Kirven*,
    775 F.2d 1240 (4th Cir. 1985) ..................................................27

*Clark v. Coleman*,
    335 F. Supp. 3d 818 (W.D. Va. 2018)...............................9, 11, 27

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) .................................................9, 11

*Greenville Publ'g Co. v. Daily Reflector, Inc.*,
    496 F.2d 391 (4th Cir. 1974) ....................................................27

*Halpern v. Wake Forest Univ. Health Scis.*,
    669 F.3d 454 (4th Cir. 2012) ....................................................28

*Henson v. Honor Comm. of Univ. of Va.*,
    719 F.2d 69 (4th Cir. 1983) ......................................................28

*Hinkle v. City of Clarksburg*,
    81 F.3d 416 (4th Cir. 1996) ......................................................27

*Incumaa v. Stirling*,
    791 F.3d 517 (4th Cir. 2015) ....................................................29

*Podberesky v. Kirwan*,
    38 F.3d 147 (4th Cir. 1994) ......................................................11

*Virginia v. Black*,
    538 U.S. 343 (2003)........................................................................7

*Webb v. Paine*,
    515 F. Supp. 3d 466 (S.D.W. Va. 2021) ....................................11

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)......................................................................29

## **CONSTITUTIONAL PROVISION**

U.S. Const. amend. I .......................................................................*passim*

## **RULE**

Fed. R. Civ. P. 15(b) ...................................................................28

Appellant Kieran Ravi Bhattacharya ("Bhattacharya"), by counsel, respectfully states as follows in reply to Appellees' Rule 30(c) Response ("UVA's Response").

## I.    STATEMENT OF THE CASE

UVA's Response asks this Court to ignore evidence showing that Bhattacharya was banished from medical school for challenging microaggression theory. Beginning shortly after the October 25, 2018 event, students and faculty alike condemned Bhattacharya's speech as "unprofessional." Some complaints were made via the online "Listening Post" whereby students can make anonymous reports of "unprofessional" violations of the medical school's speech code. (JA461-462). At least one such "anonymous" complaint was solicited by Sean Reed. (JA1495). Reed is a UVA Med School "college dean" who participated in the "hearing" a month later at which the Academic Standards and Achievement Committee ("ASAC") voted to suspend Bhattacharya—a suspension that UVA soon made permanent by issuing the No Trespass Order ("NTO") subjecting Bhattacharya to arrest if he set foot on UVA Grounds before January 3, 2023.

One student organizer of this extracurricular event complained that Bhattacharya "called the legitimacy of one panelist's research into question." (JA1019). Another complained that Bhattacharya "questioned the validity of the information that [the speaker] had presented, all over the microphone for the entire

audience to hear." (JA1021). Shortly after the event, Individual Defendant Christine Peterson (another "college dean") told faculty members and students who complained that she objected to Bhattacharya's "words" and "semantics" and planned to meet with him the following week to explore his "thoughts about the topic of microaggressions." (JA1432, JA1440); (JA756). Peterson soon expanded the "thoughts" that she wanted to police beyond microaggressions. During their October 31, 2018 meeting, Peterson barely mentioned the AMWA event. Instead, she interrogated Bhattacharya about his views on various political and social issues— including his public statements about the 2016 election (JA1060-1061) that the second highest ranking UVA Med School administrator, Dean Canterbury, found "unprofessional." (JA1066); (JA1060-1061); (JA2809). After the meeting, Peterson expressly rejected the mental health narrative that soon became UVA's battle cry, telling her colleague she had "no concerns" about Bhattacharya mental health. (JA2816). At that point, the professionalism charges that she, Canterbury, and others planned to bring before ASAC were limited to Bhattacharya's questions and comments at the AMWA event. (JA1155).

The month before, Canterbury defined "unprofessional behavior" for which medical students would be "called to task" to include supporting the nomination of Supreme Court Justice Kavanaugh. (JA1069). Canterbury had previously branded Bhattacharya as "unprofessional" for expressing views with which Canterbury

disagreed at a 2016 post-election "town hall." (JA1084-1085); (JA1066). As of October 25, 2018, Canterbury controlled appointments to ASAC and had nominated all but one of its members. (JA474-479); (JA483-487). Canterbury was not present for the October 25, 2018 AMWA event and never did listen to what Bhattacharya actually said that day. But upon learning of the complaints, Canterbury told Bhattacharya's "college dean," Individual Defendant John Densmore, that "I think this is the equivalent of a concern card." (JA2787). Canterbury was referring to a Professionalism Concern Card ("PCC") used to document misconduct that can provide the basis for disciplinary action by ASAC. Even before Canterbury decreed complaints about Bhattacharya's speech to be "the equivalent of a concern card," Nora Kern—the newest member of ASAC and a panelist at the AMWA event—had already lodged one against Bhattacharya on October 25, 2018 after consulting with Peterson about how and whether to do so. (JA756-757).

UVA Med School's policies required Bhattacharya's "college dean" (Densmore) to discuss the PCC with Bhattacharya and document the discussion. (JA641). That never happened. To the contrary, the PCC's very existence was concealed from Bhattacharya until November 28, 2018, when—after receiving notice that ASAC would be meeting in a few hours to consider his continued enrollment—Bhattacharya asked why. In response, Sean Reed (who had solicited one of the Listening Post complaints) told Bhattacharya about the PCC for the very

first time. Even then, Bhattacharya's request that ASAC allow him to see the PCC and any other charges against him was denied during the November 28, 2018 "hearing"[1] that UVA now insists comports with due process. In fact, Bhattacharya was not allowed to see the PCC until the month *after* his suspension, when UVA Med School turned over his "student file" that supposedly contained all the evidence on which ASAC's discipline was based.[2] Although the PCC was part of the file, the only other document considered by ASAC on November 28, 2018 was not. The missing document—Peterson's November 23, 2018 "to whom it may concern" letter written at the behest of Bhattacharya's ex-girlfriend—was not mentioned in the minutes and was not produced in discovery until relatively late in the litigation even though Peterson read it out loud at the closed door ASAC meeting on November 28, 2018. It contained only one statement about Bhattacharya of which Peterson had personal knowledge: "On October 25, I witnessed his inappropriate and aggressive questioning of a guest speaker on a panel for an extracurricular program." (JA1427-1428). In other words, it echoed the characterization of Bhattacharya's questions and comments set forth in the October 25, 2018 PCC that Peterson had helped Kern submit in the first place.

---

[1] ¶¶63, 95, 128 (JA400, JA413-414, JA425).

[2] *See* SAC ¶¶59, 88, 159 (JA399, JA410-411, JA440).

From the outset, the PCC's characterization of what Bhattacharya had to say at the AMWA event—asking a "series of questions that were quite antagonistic toward the panel" and showing "little respect toward faculty members" (JA459)—was the UVA Med School party line. ASAC's November 15, 2018 letter "suggesting" that Bhattacharya "consider" getting "counseling" specifically referenced "notice of a concern about your behavior at a recent AMWA panel," parroting the PCC's characterization of it as "unnecessarily antagonistic and disrespectful." (JA465). The PCC was also quoted or paraphrased in the Emergency Custody Order ("ECO") and Temporary Detention Order ("TDO") proceedings by which UVA forced Bhattacharya to undergo two psychiatric evaluations within a week. This same verbiage from the PCC ended up in the "medical records" of these psychiatric evaluations that—much to UVA's chagrin—found no basis for Bhattacharya's involuntary hospitalization and did not condition his release upon taking the prescription medications that UVA's legal team now insists he should have been taking.

On November 28, 2018, when ASAC afforded Bhattacharya a few minutes to defend the unspecified charges against him, the only specific speech or conduct cited as the basis for ending his medical career was "your behavior at a panel meeting" and "the behavior you're exhibiting right now," *i.e.*, "You're extremely defensive

and you're recording all this." (JA2836) (19:26-44).[3] ASAC's November 29, 2018 correspondence notifying Bhattacharya of his suspension stated that Bhattacharya's "aggressive and inappropriate interactions . . . during a speaker's lecture" violated UVA Med School's Technical Standards. (JA492). Again, this verbiage came straight out of the PCC. No member of ASAC (including its Chairman) who voted to kick Bhattacharya out of UVA Med School listened to the five-minute audio recording. (JA430); (SJA80). Unlike ASAC, the District Court did, characterizing it as follows:

> Bhattacharya challenged one professor's definitions of "microaggression" and "marginalized group" as "contradictory" and "extremely nonspecific" Dkt.33-2. He also asked several questions about the "evidence" underlying that professor's claims, critiquing it—and the professor's research over "years"—as "anecdotal." *Id.*

(JA296). The District Court specifically held that Bhattacharya's protected free speech could not be the basis for discipline: "These comments and questions might be forward or pointed, but—as alleged—they did not materially disrupt the discussion or substantially invade the professor's, or anyone else's rights." (JA296). Notwithstanding this holding, UVA's Response repeatedly seeks to justify

---

[3] After listening to the audio recording (JA2836), the District Court found "Bhattacharya's expressions at the ASAC suspension hearing were protected speech" because they "were not made at inappropriate times or places, nor were his comments disruptive or offensive." (JA297).

Bhattacharya's suspension based on UVA's pejorative characterization of his protected free speech on October 25, 2018.

The events of October 25, 2018 and November 28, 2018 are not the only aspects of the District Court record that UVA seeks to rewrite after the fact to suit its narrative. The stated basis for the January 3, 2019 NTO was that "concerns were raised about comments [i]n a chat room that were perceived as threats." (JA502). More than two years later, UVA still had not identified any "true threats," prompting the District Court to rule that "once UVA discloses the statements underlying the issuance of the NTO, UVA may [argue] then that the statements are 'true threats' that receive no First Amendment protection. . . . . At this stage, however, the Court concludes that Bhattacharya has sufficiently alleged that this statements were protected speech."[4] The evidence cited in Plaintiff's MSJ Opposition was more than sufficient to support a jury verdict that the NTO would not have been issued but for Bhattacharya's protected speech. (JA2774-2783).

With respect to each act of First Amendment retaliation at issue, UVA's Response does not merely ignore the evidence that contradicts its narrative. Rather, UVA characterizes as "undisputed" alleged "facts" that have no evidentiary support and that are directly contrary to the evidence. In some cases, UVA's Response

___

[4] (JA298-299) (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

contrives "facts" that UVA never asserted in support of its summary judgment motion and that the District Court never found—such as the claim that Bhattacharya failed a "final exam" that was not final and that he ordinarily would have been permitted to retake. (JA2754, 2759). From start to finish, UVA's Response relies on "facts" that purport to support UVA's "diagnosis" that Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion were symptomatic of untreated mental illness. As set forth herein, many of these alleged "facts" are not only disputed but also not material. There is no evidence that many of these "facts" were even known to, much less considered by, the UVA officials who engaged in the conduct at issue—starting with issuance of the October 25, 2018 PCC and culminating in the January 3, 2019 NTO that UVA since refused to dissolve.

Unfortunately, UVA's Response is similarly less than faithful to the record upon which the District Court based its denial of leave to amend and its dismissal of Bhattacharya's due process claim, as set forth herein.

## II.   ARGUMENT

### A.   Bhattacharya Was Deprived of His Seventh Amendment Right to Have the Jury Decide Factual Disputes About UVA's Motivation.

#### 1.   The District Court committed reversible error by dismissing Bhattacharya's First Amendment claim.

The District Court erred as a matter of law by holding that the October 25, 2018 PCC, ASAC's November 14, 2018 vote to reprimand Bhattacharya, and the November 15, 2018 reprimand were *not* "adverse action[s]" likely to "deter 'a

person of ordinary firmness' from the exercise of First Amendment rights." *Clark v. Coleman*, 335 F. Supp. 3d 818, 825 (W.D. Va. 2018) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Previously, in denying UVA's Rule 12(b)(6) motion, the District Court found allegations that Defendants "issued a Professionalism Concern Card against him, suspended him from UVA Medical School, required him to undergo counseling and obtain 'medical clearance' as a prerequisite for remaining enrolled, and prevented him from appealing his suspension or applying for readmission by issuing and refusing to remove the NTO" *were* sufficient to establish adverse actions "[b]ecause a student would be reluctant to express his views if he knew that his school would reprimand, suspend, or ban him from campus for doing so." (JA299).

Those responsible clearly anticipated that the PCC and subsequent discipline would make Bhattacharya and others "reluctant to express" such views about microaggressions. One student leader of the AMWA who complained about Bhattacharya's October 25, 2018 remarks wanted him barred from practicing medicine altogether. (JA1473-1486). As a practical matter, that is what UVA did. The January 3, 2019 NTO did not expire until after the deadline for Bhattacharya to complete his education at UVA Med School.[5] Dissatisfied that Bhattacharya had

---

[5] (JA268) (graduation requirements "must be completed within six years from the date the student matriculated in the School of Medicine").

merely been suspended, this same student—as part of an organized campaign involving students from UVA and elsewhere[6]—claimed in a December 30, 2018 email that Bhattacharya made threats against UVA on an "alt-right website," reminded Peterson and Canterbury that "you both expressed concerns when our AMWA group spoke with you about the microaggressions panel," and observed that "it appears no one else is outspoken in support of Kieran's views or conduct." (JA1474). That same day, Canterbury cited Bhattacharya's alleged on-line threats as justification for the NTO (JA1226)—even though UVA's "Director of Threat Assessment" found that Bhattacharya made no such threats. (JA2736). The only explanation for the NTO that UVA ever provided Bhattacharya was that "concerns were raised about comments on a chat room that were perceived as threats." (JA502).

With respect to the NTO and certain other retaliatory conduct of which Bhattacharya complains, the District Court correctly held—at both the Rule 12(b)(6) stage and on summary judgment—that these were "adverse actions." UVA has not assigned error to these rulings. Instead, UVA's Response disregards and in many instances distorts the evidence from which a jury should have been permitted to find "a causal relationship between [Bhattacharya's] protected activity and the

---

[6] (SJA99-100); (SJA95).

defendants' conduct." *Clark*, 335 F. Supp. 3d at 825 (quoting *Constantine*, 411 F.3d at 499). This is "a fact-intensive inquiry, as the court must analyze 'the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts.'" *Webb v. Paine*, 515 F. Supp. 3d 466, 479-80 (S.D.W. Va. 2021).

By not permitting the jury to consider evidence that Bhattacharya was disciplined for engaging in protected free speech, the District Court violated Rule 56, which permits summary judgment only when the case is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). It was not the proper role of the District Court to "weigh the evidence and determine the truth of the matter" (*id*. at 249), "resolve . . . factual dispute[s]," and "resolve conflicts in the evidence." *Podberesky v. Kirwan*, 38 F.3d 147, 156-57 (4th Cir. 1994).

### 2. <u>UVA subjected Bhattacharya to increasingly severe discipline in retaliation for his protected speech.</u>

#### a. **Based on Bhattacharya's October 25, 2018 remarks, UVA surreptitiously charged him with unprofessional conduct and brought the charges before ASAC.**

The District Court's finding that a concern card is not, in and of itself, an adverse action may be true in the abstract. But here, the October 25, 2018 PCC provided the basis for all the discipline that followed. Those responsible for bringing

Bhattacharya before ASAC on "professionalism" charges understood full well how the PCC could be used to punish Bhattacharya, as it in fact was.

Upon receiving complaints about Bhattacharya's remarks at the AMWA event, Canterbury promised to "follow up," insisted that Bhattacharya be hauled before ASAC for "unprofessional" behavior, and characterized at least one complaint as "the equivalent of a concern card." (JA1084); (JA1066); (JA2787). By then, Bhattacharya was already the subject of an actual concern card that AMWA panelist Kern submitted on October 25, 2018 after consulting with Peterson about how and whether to do so. (JA756). On November 14, 2018, Kern, Peterson, and others brought Bhattacharya's "professionalism issues" before ASAC, which voted unanimously to send him the reprimand dispatched the following day.

By November 2018, however, those clamoring for more severe punishment recognized that UVA Med School had insufficient grounds to suspend Bhattacharya for violating "Technical Standards," academic reasons, or other grounds. (JA2820-2831). Turning ASAC's recommendation that Bhattacharya "consider" getting counseling into a forced psychiatric evaluation on November 14, 2018 was among the efforts that had the purpose and effect of ending an otherwise promising medical career. Although "front and center" in UVA's Response, Bhattacharya's prior hospitalization in January 2017 was never cited as a basis for disciplining him before

this litigation.[7]  Peterson herself initially rejected Densmore's efforts to link Bhattacharya's October 25, 2018 questions and comments with his prior January 2017 hospitalization—especially after Peterson met with Mr. Bhattacharya on October 31, 2018.  (JA1155); (JA2816).  The non-party witness who later helped supply the proverbial "grist" for UVA's mental health narrative "mill" was aware of the October 31, 2018 meeting between Peterson and Bhattacharya about the AMWA event and discussed it with Peterson in person the very next day, November 1, 2018.  (JA1452).  This witness—who later called AMWA panelist Rasmussen "my hero since you shut Kieran down at the microaggression panel" (Dkt.287-3)—did not seek to attribute Bhattacharya's October 25, 2018 remarks to mental illness until November 13, 2018.  (JA2816); (JA1045) (155:19-23).

On November 13, 2018, events in Bhattacharya's relationship with the non-party witness provided her with motive and opportunity to change her story in

_____

[7] Presumably, UVA's public recitation of these "facts" has some purpose other than smearing Bhattacharya.  If "material" (*i.e.*, outcome-determinative) within the meaning of *Liberty Lobby*, these facts are very much in dispute.  For example, there is evidence in the record—including medical records filed under seal—that one or more of the "roommate(s)" referenced in UVA's Response attributed the 2017 hospitalization to a pill "slipped" to Bhattacharya by the source of Peterson's information about Bhattacharya's prior hospitalization.  This sealed evidence also shows that this same individual made some troubling revelations that put Peterson on notice that this individual was not a credible source and that her allegations about Bhattacharya should at the very least have been investigated rather than taken at face value.  (JA2749-2750).

retaliation. (JA2809-2814). At that point, the witness approached Peterson and provided a new mental health narrative that Peterson immediately passed on to Densmore. (JA2816); (JA1045) (155:19-23). The very next day, November 14, 2018, Densmore hastily arranged an impromptu meeting with Bhattacharya for the ostensible purpose of discussing a subpar exam grade during which Densmore insisted that Bhattacharya accompany him to a psychiatric evaluation. (JA2754, 2761); (JA770). That same day, within an hour of the ASAC meeting in which Peterson participated, the non-party witness texted two other medical students that "Kieran's in the psych ward again," "I feel guilty since I told Dean Peterson that he was having paranoia again and that I'm worried for him," "[a]nd the deans decided to intervene and get him to the ED." (JA2818). As a result, when ASAC voted on November 14, 2018 to reprimand Bhattacharya for his "behavior at a recent AMWA panel," the "counseling" that Bhattacharya was told to "consider getting" (JA465) was well underway.

### b. On November 14, 2018, UVA forced Bhattacharya to undergo psychiatric evaluation based on the content of his speech at the microaggression panel discussion.

The records of Bhattacharya's November 14, 2018 Forced Psychiatric Evaluation—kept by CAPS, UVA Medical Center, and Region Ten—all reference the October 25, 2018 AMWA event:

| Individual | Reference to AMWA Microaggression Panel Discussion |
|---|---|
| Catherine Richard | "Kieran attended a panel regarding microaggressions and many concerns were raised by the panelists and others in attendance that Kieran was confrontational." (JA2620) |
| Michael Mason | "Patient attempted to report why he was 'made' to come to student health. He noted that he was perceived as having been acting aggressive towards panelists during a presentation about microaggressions." (JA2647) |
| Drs. Syverud and Carlson | "Per girlfriend he has not gotten any sleep recently and per counselor patient was hyper focusing on a panel of people that were calling him confrontational." (JA1593) |
| Dr. Murray, Herrington, Ball, Bashir, and Dr. Saripalli | "Per CAPS, p[AS.5]atient was on 5E in January 2017 d/t potential psychosis and bipolar disorder. Was brought to CAPS by medical[AS.1] school[AS.3] dean who is concerned he is acting differently. There was a panel on microaggressions 2 weeks ago, and patient was confrontational during this panel which is different and out of character for him." (JA1622) |
| Ana Askew, Occupational Therapist | "Was brought to CAPS by medical school dean who is concerned he is acting differently. There was a panel on microaggressions 2 weeks ago, and patient was confrontational during this panel which is different and out of character for him." (JA1805) |
| Bethanne Smith, Region Ten employee | November 14, 2018 ECO cites the microaggression panel: "Concerning for... confrontational during a conference." (RegTen00007918) (Dkt.464-32) |
| Heather Newcomb | Preadmission Region 10 screening in support of TDO petition repeatedly referenced the microaggression panel: "CAPS Staff report that client... has been disruptive in class." Summary of presenting crisis: "Paper ECO was obtained by UVA CAPS for client presenting as combative and confrontational with other students." (RegTen00007940, 7944) (Dkt.464-32) |

Ignoring this and other evidence, UVA's Response bases its characterization of the November 14, 2018 psychiatric evaluation on alleged "facts" that are very much in dispute. Bhattacharya's evaluation by CAPS was forced, not voluntary.

(JA2758-2760). Those who evaluated him were not "clinicians" (*i.e.*, doctors). They were politically biased non-physician counselors who interrogated Bhattacharya about his political views and questions and comments at the AMWA event. (JA2759-2760).[8] CAPS reported that Bhattacharya made "sexist, demeaning remarks," signing the ECO based on the AMWA event and information provided by Densmore that Peterson obtained the day before from Bhattacharya's "ex." (JA2759-2760) (JA2760-2761). Bhattacharya did not tell CAPS that the FBI had followed him or that his ex-girlfriend was involved with the FBI. (JA2811). Moreover, UVA cites no evidence that ASAC considered the November 14, 2018 psychiatric evaluation when it voted to suspend Bhattacharya or that UVA shared Bhattacharya's medical records with students and faculty members who participated in the November 28, 2018 suspension "hearing."

> **c.    After the November 14, 2018 vote to reprimand him, an ASAC member diagnosed Bhattacharya's speech at the AMWA event as symptomatic of mental illness.**

The day after ASAC's voted to reprimand Bhattacharya for his remarks on October 25, 2018, a voting member of ASAC was responsible for the forced psychiatric evaluation that UVA had procured. She "diagnosed" Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion as

---

[8] One of these so-called "clinicians" later "diagnosed" Bhattacharya's August 8, 2019 request for documents before filing his *pro se* complaint as "Bipolar [disorder], [current] episode manic severe [with] [psychotic] features." (JA1622).

symptomatic of untreated bipolar disorder. (JA1622-1623). UVA Medical Center, however, found no basis for Bhattacharya's involuntary hospitalization. (JA1162-1164). When Bhattacharya was released the very next day, his release was not conditioned on taking the medications that UVA's Response claims he should have been taking. (JA1628-1629). Upon hearing this news, Canterbury lamented to Densmore: "It's a shame they released him." (JA1424). A few days later, UVA forced Bhattacharya to go to a hospital other than UVA Medical Center for a second opinion.

### d. ASAC's November 15, 2018 letter "suggesting" that Bhattacharya undergo "counseling" specifically referenced his statements about microaggressions.

Consistent with the PCC, ASAC's November 15, 2018 reprimand characterized Bhattacharya's "behavior at a recent AMWA panel" as "unnecessarily antagonistic and disrespectful." (JA465). The District Court found that "a student would be reluctant to express his views if he knew that his school would reprimand . . . him . . . for doing so." (JA299). UVA's Response does not explain why a jury could not have reached the same conclusion.

### e. On November 19 and 20, 2018, UVA branded Bhattacharya a "threat," forcing another psychiatric evaluation for questioning microaggression theory.

On November 20, 2018, Canterbury, Densmore, and Peterson agreed to bring Bhattacharya to the attention of UVA's Threat Assessment Team ("TAT").

(JA1424).   Peterson did so by forwarding a podcast of the AMWA panel discussion "sent by a concerned student" and UVA Med School's Technical Standards.[9]   CAPS Director Ruzek then called Poplar Springs Hospital in Petersburg, where UVA had Bhattacharya taken the night before, requesting that Bhattacharya not be released anytime soon.   She stated that UVA Med School planned to suspend Bhattacharya while he was hospitalized and should not be released because of "threats," not "physical threats" but because he "threatens litigation against his Dean."   (JA504).

The evidence catalogued in Plaintiff's MSJ Opposition shows that UVA forced a second psychiatric evaluation three days after UVA Medical Center found no basis for Bhattacharya's involuntary hospitalization.   (JA2761-2769).   The November 19, 2018 ECO Petition cites Bhattacharya's protected speech:   "At a lecture at medical school he seemed unstable and threatening to a guest speaker and at least several medical students complained to dean and he was spoken to." (JA787).   For this reason alone, the jury should have been permitted to decide whether Bhattacharya's speech was the reason for the hospitalization.

By November 19, 2018, however, UVA was able to embellish its story compared to the week before.   The *quid pro quo* for the new November 19, 2018

---

[9] (JA1087-1088).   Peterson also quoted November 19, 2018 text messages from Plaintiff's ex-girlfriend, who on November 14, 2018 was "adamant that there were no safety concerns." (JA1425, 1426).   Privately, Peterson told Canterbury, "I think the evidence for actual risk is flimsy." (JA1015-1017).

claim by UVA's witness that she feared for her safety was Peterson's agreement to write a letter to help obtain a PPO against Bhattacharya and obtain possession and custody of the couple's shared apartment and puppy. (JA1048); (JA1087-1088); (JA1427-1428). That same day, the witness helped UVA procure another forced psychiatric evaluation of Bhattacharya in a way that did not directly involve Peterson or Densmore. The original "plan" was for Peterson or Densmore, who were scheduled to meet with Bhattacharya on November 19, 2018, to claim that he was "presenting" in a way that warranted another forced psychiatric evaluation by CAPS. (JA2761-2769). Thirteen minutes before Bhattacharya's scheduled meeting with Densmore, Bhattacharya's ex-girlfriend reported to UVA that she had succeeded in getting Bhattacharya's mother, Roxanne, to sign the ECO Petition. Roxanne Bhattacharya testified that the ECO petition was "basically secondhand," that she relied on what Bhattacharya's ex-girlfriend told her and assumed "that UVA was acting in good faith" in seeking another hospitalization to "help him," but after signing the ECO petition "realized that … I had just been part of setting him up in a trap"[10]—a realization that was confirmed by contemporaneous text messages between Bhattacharya's ex-girlfriend and UVA dean Tabatha Enoch.[11] Immediately after his scheduled meeting with Bhattacharya, Densmore had UVA Med School

---

[10] (JA2763-2764) (PX28, PX28A).

[11] (UVA00002314-15, Roxanne Bhattacharya Dep. Ex. DX6).

Professor Marzani call Region Ten to procure a TDO. Consistent with the original plan, Marzani told Region Ten that Bhattacharya had "presented" in Densmore's office and was "actively psychotic." (PX 32). On November 27, 2018, Canterbury instructed Tucker to convene an "emergency" ASAC meeting to suspend Bhattacharya, claiming that Densmore "had to have [Mr. Bhattacharya] taken from his office by police a week ago." (JA828). That may have been "the plan," but it is not what really happened, as UVA has since admitted. (PX31).

When Densmore was deposed on May 9, 2022, he tried to get his story straight with what the November 19, 2018 TDO said, claiming that he felt threatened by an alleged statement by Bhattacharya that day that Densmore better "watch himself." That is not how Densmore remembered it when he documented the meeting contemporaneously for Bhattacharya's "student file." (Dkt.261). At the time, Densmore told others he did not feel "physically uncomfortable" in his meeting with Bhattacharya due to "any articulation or physical presentation of a threat." (JA1063). The only threats Densmore reported were "threats of litigation." (JA504). This discrepancy in Densmore's story is a question of witness credibility for the jury—not an issue the District Court should have resolved in favor of UVA.

UVA's November 19, 2018 machinations to have Bhattacharya moved to and kept at Poplar Springs are documented extensively in Plaintiff's MSJ Opposition. (JA2765-2766). While Bhattacharya was at Poplar Springs, Peterson used

information from the non-party witness to write a November 23, 2018 "to whom it may concern" letter on UVA Med School letterhead (even though the only statement about Bhattacharya of which Peterson had personal knowledge was "inappropriate and aggressive questioning of a guest speaker on a panel for an extracurricular program"). (JA1427-1428). Even with Peterson's help, the non-party witness was initially unsuccessful as the magistrate denied her petition on November 23, 2018. Thereafter, UVA arranged for a law school faculty member to represent the witness, who—after falsely claiming that other cases involving these parties had not been filed in Virginia courts—sought and obtained from a different judge the PPO that UVA now cites as justifying Bhattacharya's expulsion. (JA2766-2767).

        **f.**      **On November 27, 2018, UVA unlawfully required that Bhattacharya receive a third "medical clearance" before he could resume his medical school education.**

On its face, UVA's "Time and Attendance Policy" provides no justification for not permitting Bhattacharya to return to class on November 27, 2018. The policy contemplates medical evaluation by a "licensed healthcare provider." (JA812). Bhattacharya had just been evaluated by two licensed healthcare providers: UVA Medical Center and Poplar Springs. Neither one found any basis for Bhattacharya's involuntary hospitalization. (JA808). The day after Bhattacharya's release, Canterbury—who had not seen or spoken to Bhattacharya in more than two years—

declared that "he's still quite manic and likely psychotic" (JA830) and insisted that Bhattacharya receive "medical clearance" from CAPS even though:

- Bhattacharya's release was not contingent upon any ongoing medication or treatment. (JA1162-1163); (JA808-810).

- Bhattacharya said that doing so would violate his First Amendment rights. (JA467); (JA469-470); (JA472); (JA1471).

- UVA's Office of General Counsel said that Bhattacharya could not be required to go to CAPS. (JA1267-1268).

- UVA TAT Director Markowski said that requiring the CAPS evaluation was improper. (JA1104-1106).

- The Director of CAPS was not "aware of any policy that requires a student to be cleared by CAPS to go back to class." (JA1114, 1142) (31:3-5, 243:9-12).

Canterbury nevertheless scheduled an "emergency" ASAC meeting the following day and insisted upon the CAPS evaluation by invoking "emergency powers" that he admittedly did not have. (JA1249-1250) (322:24-323:2). In short, the evidence would support a jury finding that this policy was **not** applied on an "even-handed" basis as UVA argued and the District Court found.

**g. Shortly before and at the November 28, 2018 hearing, ASAC told Bhattacharya that his enrollment was in jeopardy because of his speech at the AMWA event.**

The November 28, 2018 ASAC suspension "hearing" represents both an act of First Amendment retaliation and a due process violation (which is also evidence of pretext under the authorities cited in Bhattacharya's Opening Brief). The existence of the October 25, 2018 PCC was never disclosed to Bhattacharya previously, much less discussed with him and documented as required by UVA Med School Policy. (JA383-384); (JA465) (JA641). Nor was Bhattacharya told that the November 15, 2018 reprimand from ASAC would be a topic of discussion at the hearing notwithstanding his request for such information. The audio recording (SJA115) confirms that the alleged "unprofessional" conduct identified by ASAC on November 28, 2018 was limited to: (1) the AMWA Microaggression Panel Discussion and (2) the accusation that he was being "defensive" while trying to defend the unspecified charges against him—both of which the District Court found to be "protected speech." (Dkt.129) (JA308-311).

UVA's First Amendment and due process violations during the portion of the November 28, 2018 ASAC meeting for which Bhattacharya was present were compounded after he left. The minutes do not disclose that ASAC based its decision on Peterson's November 23, 2018 letter that she read out loud that day. (JA1033-

1034) (67:20-68:3).[12]    The deprivation of due process reflected in UVA's concealment of this basis for his suspension is compounded by UVA's reliance on hearsay statements from a witness that Peterson knew was not credible and prone to inappropriate acts of retaliation.  (JA2749-2752, JA2778, JA2793); (JA2833-2835).  Credible or not, the claims of this witness were not the subject of any attempt to verify them.  Nor did Bhattacharya have any opportunity to address these claims at the November 28, 2018 ASAC hearing that resulted in the career equivalent of a death sentence.

>    **h.    The stated basis for Bhattacharya's November 29, 2018 suspension was "aggressive and inappropriate interactions," including "during a speaker's lecture."**

On its face, the November 29, 2018 notice of suspension was based on Bhattacharya's protected speech, which it characterized as "aggressive and inappropriate interactions . . . during a speaker's lecture."  Related due process violations include the fact that Peterson told the non-party witness about the November 28, 2018 ASAC meeting before Bhattacharya was notified that it had been scheduled.  Although UVA policy required that the meeting be kept confidential, Peterson told the non-party witnesses about the vote to suspend Bhattacharya before he received notice of the outcome.  The non-party witness was

---

[12] Nor was it included in Bhattacharya's student file for use on appeal.  Indeed, UVA denied its existence and did not produce it during much of the discovery period.

not told to keep this information confidential and disclosed the suspension to Bhattacharya's classmates at UVA Med School as early as November 30, 2018. (JA992); (HSU 000033). On November 30, 2018, Peterson and others at UVA learned of additional reasons to question the reliability of this witness[13] in addition to "red flags" of which Peterson was aware dating back to January 2017.[14] Rather than reconsider the suspension or at least afford Bhattacharya an opportunity to appeal, UVA made the suspension permanent by issuing the NTO.

**i.**      **Bhattacharya's speech was the stated basis for the January 3, 2019 No Trespass Order whereby UVA prevented him from appealing the suspension.**

On January 2, 2019, University counsel Lynne Fleming reported to Canterbury that the NTO was unlikely to be overturned. (UVA00003311). At no time since then has UVA ever identified exactly what "unprofessional and threatening behavior"[15] warranted UVA's issuance of the NTO and refusal to dissolve it before the deadline for Bhattacharya to complete his studies. The only explanation provided to Bhattacharya was that "concerns were raised about comments [i]n a chat room that were perceived as threats." (JA502-503). As it turns out, Bhattacharya himself made no threats, instead merely posting background about

---

[13] (JA2801-2805).

[14] (JA2749-2752, JA2778, JA2793); (JA2833-2835).

[15] *See* UVA's Response at 1.

his suspension for the purpose of obtaining legal representation. (JA2776). Bhattacharya had no responsibility for the hateful comments made by third parties in reaction to what UVA had done[16]—just as those who exercise their First Amendment right to criticize the Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Organization* are not responsible for those who react to such criticism by advocating violence against Supreme Court Justices.

By the time UVA's witnesses were deposed, UVA realized that it could not do what the District Court said it must do to defeat Bhattacharya's First Amendment claim: "identify 'true threats' that receive no First Amendment protection." (JA299). So UVA came up with a series of contradictory and constantly changing explanations after the fact—all of which were demonstrably lacking in credibility. (JA2774-2783). The District Court erred by not allowing the jury to decide which explanation it found more credible—what UVA said at the time or the changing narrative adopted for litigation.

---

[16] (JA2727); (JA889); DX62-D at UVA00003231; DX62-E at UVA00003298; UVA00009278; UVA00003289; UVA00003300; UVA00003292; UVA00006277; UVA00003183; UVA00003199; UVA00003232; UVA00003246; (JA1478); UVA00003263; UVA00006273; UVA00003271; (Dkt.379-1) at 38334671, 38428293, 34265553, 34256637, 34256663; UVA00008079.

**B.    The District Court Erred By Denying Plaintiff Leave to Amend and Refusing to Consider the Evidence Supporting Amendment.**

The intra-enterprise conspiracy doctrine does not apply if the alleged conspirators include a third party (Bhattacharya's "ex") or party defendant (Peterson) with an "independent personal stake." *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974); *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985). UVA's contention that Bhattacharya never previously argued that a conspiracy is actionable if the conspirators have the same ***objective*** regardless of whether they have different ***motives***[17] is simply wrong. His prior briefing cited a "common commitment to the goal of punishing" Bhattacharya, "common purpose in seeing to it that [he] was suspended if not expelled from UVA Med School," and "specific examples of communications between" the third party and Peterson "involving their common objective." (Dkt.155 at 5-6, 9).

UVA also scolds Bhattacharya for not making more specific allegations about Peterson's November 23, 2018 letter, critical evidence that UVA withheld from Bhattacharya's student file and during much of discovery. The District Court abused its discretion by refusing to consider this and other evidence supporting Bhattacharya's conspiracy allegations, especially after refusing to permit any discovery before the deadline for moving to amend. Bhattacharya should have been

---

[17] *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996).

allowed to rely upon such evidence in support of his proposed amended pleading and to conform it to the evidence—just as he would have been permitted to do under Rule 15(b) had there been a jury trial beginning October 24, 2022 as scheduled.

### C. The District Court Erred By Dismissing Bhattacharya's Claim That UVA Violated His Due Process Rights.

Faced with the "more stringent procedural protection" due process requirements of "disciplinary" proceedings,[18] UVA insists that it suspended Bhattacharya for "academic" reasons even though UVA itself found insufficient grounds for an academic suspension. (JA2820-2831). This Court's holding in *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 463 (4th Cir. 2012) that a medical student's expulsion on professionalism grounds was academic and therefore not subject to attack under the Americans with Disabilities Act does not permit state institutions to violate the First Amendment with impunity by the simple expedient of citing "professionalism." Bhattacharya was not barred from UVA Med School based on "academic deficiencies" like the student in *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 92 (1978). Nor does Bhattacharya seek to impose "greater obligations on the University than it placed on itself in conducting its disciplinary proceedings." *Henson*, 719 F.2d at 74. To the contrary, starting with the PCC and continuing through the NTO, UVA violated its own policies. UVA cites no

---

[18] *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983).

evidence that Bhattacharya received prior notice of the "charges" to be considered at the November 28, 2018 "emergency" ASAC meeting. At the meeting itself, ASAC cited only the AMWA event and that Bhattacharya was being "defensive."

If there were other reasons for the suspension, UVA never articulated them and indeed concealed them (as with Peterson's November 23, 2018 letter)—impeding Bhattacharya's efforts to appeal his suspension before UVA made it permanent by issuing the NTO. Neither the suspension nor the NTO states grounds sufficient to provide "a basis for objection before the next decisionmaker or in a subsequent . . . review." *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005); *see also Incumaa v. Stirling*, 791 F.3d 517, 535 (4th Cir. 2015).

## III.   CONCLUSION

The District Court erred by accepting UVA's narrative as to why it banished Bhattacharya from medical school rather than letting the jury consider the evidence showing that it resulted from his protected speech about microaggressions. The District Court also misapplied the law governing Bhattacharya's proposed conspiracy claim and his due process claim. The decisions appealed from should therefore be reversed.

Date:  March 29, 2023

Respectfully submitted,

By:   */s/ Michael J. Lockerby*
Michael J. Lockerby (VSB No. 24003)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W. Suite 600
Washington, D.C. 20007-5109
(202) 945-6079 (Telephone)
(202) 672-5399 (Facsimile)
mlockerby@foley.com

*Counsel for Appellant*,
*Kieran Ravi Bhattacharya*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Fed. R. App. P. 32(f), this brief contains 6,500 words. This certificate was prepared in reliance on the word-count function of Microsoft Word 2010.

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), this brief was formatted in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14-point type font.

/s/ Michael J. Lockerby
Michael J. Lockerby

## CERTIFICATE OF SERVICE

I hereby certify that, on this 29th day of March, 2023, the foregoing REPLY

BRIEF IN SUPPORT OF APPEAL was served on the following counsel of record

for Defendants-Appellees, James Murray, Jr., et al., through the CM/ECF system:

> Andrew Nathan Ferguson, Solicitor General
> Erika L. Maley, Principal Deputy Solicitor General
> Kevin M. Gallagher, Deputy Solicitor General
> Rick W. Eberstadt, John Marshall Fellow
> OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
> 202 North 9th Street
> Richmond, Virginia 23219

/s/ Michael J. Lockerby

Michael J. Lockerby
